ORIGINAL

FILED
DEC 17 2003
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| M. MAROPAKIS CARPENTRY, INC., | |
| Plaintiff, | |
| v. | No. 03-2825C |
| THE UNITED STATES OF AMERICA | Judge ________ |
| Defendant. | |

## COMPLAINT

### The Parties

1. Plaintiff is M. Maropakis Carpentry, Inc. ("Maropakis"), a New York Corporation which maintains an office at 78 Rapelye, Brooklyn, New York, 11231.

2. Defendant is the United States of America, acting through the Contracting Office, Naval Inventory Control Point ("NAVICP"), 5450 Carlisle Pike, Mechanicsburg, Pennsylvania 17055-0788 (hereinafter "Navy" or "Government").

3. Maropakis and the Navy are parties to Contract No. N-62472-97-C-4166 (the "Contract") for the demolition and rehabilitation of Building No. 110 at the NAVICP.

### Jurisdiction

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1491 because this lawsuit involves a breach of contract claim by Plaintiff Maropakis based upon an express contract with the Navy.

5. This lawsuit is timely filed pursuant to 41 U.S.C. § 609(a) following a Final Decision of the Contracting Officer of the United States Department of Navy.

## Background Facts

6. On or about April 6, 1999 Maropakis and the Navy entered into a $1,288,940 contact for a construction project known as Contract N 62472-97-C-4116 for the replacement of a roof, windows, light fixtures and associated work on Building Number 110 at the NAVICP ("the project").

7. The project work included, generally, the demolition and removal of asbestos containing materials and associated work, disposal, replacement and installation of windows, roof, flashing, light fixtures, exterior insulation finishing system and associated work.

8. The contract provided that the overall project work shall be completed within 210 calendar days.

9. Following award of the contact, 3 change orders were issued on this project that changed the date for completion date and contract amount, as follows:

a. Change Order 1 dated June 30, 2000 increased the contract price by $6,154.00 and extended the time for completion of the project by fourteen (14) days - from January 16, 2000 to January 30, 2000.

b. Change Order 2 dated February 18, 1999, among other things, increased the number of days in the contract beginning April 1, 1999 listed in section 00720 paragraph 1.3 and section 01110 paragraph 1.5 shall be changed from 210 to 270 calendar days.

c. Change Order 3 dated March 15, 2001 increased the contract price by $2,057.00 and extended the time for completion of the project to February 4, 2000.

10. Although the three modifications were issued and 79 days were added to the

project schedule, this in no way compensated Maropakis for the delays, impacts and disruptions encountered by Maropakis during the course of the project.

11. It is undisputed that the adjusted contract price following issuance of the 3 change orders was $1,297,151.00.

12. According to the Navy, the adjusted date for completion of the project was February 4, 2000.

13. Maropakis disputes the Navy's adjusted date for completion of the project.

**Delays, Impacts, and Disruptions**

14. As explained herein, throughout the project, by no fault of its own, Maropakis experienced substantial delays, impacts, disruptions, and interferences to its work as a result of, among other things, defective and unnecessarily atypical contract specifications, known to the Navy and its Consultant but not disclosed to Maropakis, and improper administration of the contract by Navy personnel.

*Impacts Due To Non-Traditional Window Specifications*

15. Specification Section 08520, which governed the Aluminum Windows called for on this project, contained specific requirements for dimensions, condensation resistance factor, air infiltration and water resistance, and thermal performance.

16. Specification Section 08520 failed to identify specific manufacturers who could supply windows meeting the criteria contained in the contract documents.

17. Specification Section 08250 contained non-traditional standards for aluminum windows not readily available in the marketplace, which made it far more difficult for Maropakis to meet the contract requirements.

18. Upon information and belief, the Navy and its Consultant knew or should have known that the specifications called for windows that were not traditional and not readily available in the marketplace.

19. In the contract documents, the Navy represented to Maropakis and all prospective bidders that all work on the project could be completed within 210 days.

20. The fact that the specifications called for atypical windows was not disclosed to Maropakis or any prospective bidders.

21. The Navy's representations to Maropakis were material to the terms of Maropakis' bid for the project.

22. Maropakis relied upon the representations of the Navy in bidding the project.

23. Maropakis faced great difficulty in obtaining windows manufactured to meet the Contract Specifications in a timely manner.

24. Maropakis repeatedly notified the Navy that Maropakis was unable to locate a window manufacturer that conforms with the specifications, and requested the Navy identify approved manufacturers that could supply conforming windows.

25. On August 23, 1999, the Navy identified four (4) window manufacturers who purportedly could satisfy the atypical specifications.

26. Maropakis contacted each of the window manufacturers initially identified by the Navy, and concluded that none of the four window manufacturers named by the Navy met the requirements of the contract specifications.

27. Maropakis informed the Navy that none of the manufacturers met the specifications, and requested permission to start the roofing work prior to the window installation

in order to allow the project to proceed without further delay.

28. The Navy arbitrarily denied Maropakis' request.

29. On September 20, 1999, Maropakis again requested that the Navy provide a list of window manufacturers that met the contract specifications and again asked to commence roof replacement work in order to avoid further delays.

30. Finally, on October 22, 1999 the Navy sent a letter to Maropakis advising it that it had contacted several window manufacturers and the following three (3) companies could potentially meet the specifications: (a) Forte, Inc.; (b) J. Sussman, Inc. and (c) Graham Architectural Products, Corp.

31. Maropakis made arrangements with J. Sussman to review the existing site conditions.

32. After discussing with Sussman fabrication and delivery time of the non-traditional windows on October 29, 1999, Maropakis submitted a revised project schedule to the Navy indicating the completion date of August 15, 2000 for approval.

33. The Navy advised Maropakis that it deemed it appropriate under the circumstances to approve Maropakis' revised schedule establishing August 15, 2000 as the project completion date.

34. Notwithstanding the above, the Navy has now refused to honor Maropakis' revised schedule.

35. As a result of the non-traditional standards for the windows, Maropakis' performance of work was substantially and materially delayed. This delay was excusable as it was not within the reasonable control of Maropakis nor was it by any fault of Maropakis.

36. As a result of the Navy's refusal to permit Maropakis to work on the roof and due to the Navy's failure to timely provide Maropakis with direction on how to proceed, Maropakis experienced a 219 calendar day delay which affected performance of the work contemplated by the parties' Contract.

37. Alternatively, neither the Navy nor Maropakis were aware that the window specifications called for windows not readily available in the marketplace.

38. There were errors in the design and/or the project schedule.

39. As a result, Maropakis experienced a 219 calendar day delay which affected performance of the work contemplated by the parties' Contract.

*Impacts and Delay Due to the Unanticipated Presence of Lead Paint*

40. Maropakis' performance was also delayed and disrupted due to the unforseen and undisclosed presence of lead paint in the window panes.

41. Maropakis was prepared to mobilize and commence removal of asbestos containing transit panels all around the windows on March 7, 2000. The window installation was scheduled to immediately follow.

42. Maropakis encountered the presence of lead paint on the window panes which greatly impacted performance of Maropakis' work.

43. The presence and removal of lead paint was not contemplated by the parties' contract.

44. Upon information and belief, the Navy and its consultants knew or should have known that the window panes contained lead paint.

45. In the contract documents, the Navy represented to Maropakis and all prospective

bidders that all work on the project could be completed within 210 days.

46. The fact that lead paint would or might be found on window panes was not disclosed to Maropakis or any prospective bidders.

47. The Navy's representations and/or failure to disclose the presence of lead paint to Maropakis were material to the terms of Maropakis' bid for the project.

48. Maropakis relied upon the representations of the Navy in bidding the project.

49. During the project, Maropakis requested lead sampling results from the Navy.

50. The Navy did not have lead samples readily available and did not obtain lead paint samples expeditiously.

51. To avoid further delay, Maropakis instructed its subcontractor CES, Inc. ("CES") to take the necessary samples.

52. On April 25, 2000, CES's test results confirmed the presence of lead paint in all of the tested window frames.

53. Lead paint is considered hazardous by RCRA standards for lead and pursuant to RCRA must be disposed of as hazardous waste.

54. Maropakis immediately mailed a copy of the results of the paint analysis to the Navy and informed the Navy of the need for removal of the paint; Maropakis also requested direction from the Navy on how to proceed.

55. On May 1, 2000, the Navy informed Maropakis that the Navy would review the lead paint issue further and instructed Maropakis not to start any work until further direction.

56. Again, on June 7, 2000, Maropakis informed the Navy of the costs of removal and again requested direction on how to proceed.

57. The Navy then issued a modification to the contractor to remove the windows as hazardous waste.

58. On June 28, 2000, the Navy approved the modification, however, in the meantime, with the Navy's permission, Maropakis commenced work on June 22, 2000.

59. As a result of the undisclosed and unanticipated discovery of lead paint, Maropakis' performance of work was substantially and materially delayed.

60. This delay was excusable as it was not within the reasonable control of Maropakis nor was it by any fault of Maropakis.

61. As a result of the Navy's refusal to permit Maropakis to work on the roof and due to the Navy's failure to timely provide Maropakis with direction on how to proceed, Maropakis experienced a 122 calendar day delay which affected performance of the work contemplated by the parties' Contract.

*Impact and Delay Relating to Roof Materials*

62. Maropakis' performance was also delayed and disrupted during the installation of the roofing materials.

63. On August 6, 1999, Maropakis submitted the manufacturers assembly indicating the attachment method of fiberboard to roof system using Type III asphalt.

64. The Navy/Consultant accepted and approved this method.

65. Based upon this approval, Maropakis ordered and delivered Type III asphalt to the project site.

66. The Navy accepted delivery of the asphalt, gave the location for storage to the delivery but never objected to the usage of asphalt.

67. Despite the tacit acceptance of asphalt and notwithstanding the prior approval by the Navy and its Consultant Gale Associates, the Navy did not inform Maropakis that asphalt could not be used.

68. However, after the asphalt was delivered, the Navy insisted on the use of adhesive in place of asphalt.

69. As a result, Maropakis experienced 20 consecutive calendar days of delay.

*Delay Due to Unusually Severe Weather Conditions*

70. During the performance of its work, Maropakis experienced unusually severe weather conditions during the months of April - July 1999 and January - February 2000.

71. Maropakis has calculated that it lost a total of approximately 64 calendar days as a result of the unusually severe weather conditions experienced.

72. As a result of these impacts, Maropakis' work was further impacted, and delayed.

**Procedural History**

73. On August 20, 2001, Maropakis submitted a Claim to the Navy pursuant to 41 U.S.C. § 605(a) and F.A.R. 52.233-1.

74. In its Claim, Maropakis requested a 447 calendar day extension of time for the project relating to the above mentioned and other delays and explained the reasons for its request.

75. By letter dated August 28, 2001, the Navy wrongfully refused to issue the requested time extension but requested additional information from Maropakis in support of its claim for extension of time.

76. On June 28, 2002, the Navy notified Maropakis that it was assessing liquidated damages in the amount of $650 per day for 467 days totaling $303,550.00.

77. Maropakis refuted the liquidated damages by letter dated July 22, 2002.

78. At a meeting on October 31, 2002, Maropakis presented additional information to the Navy demonstrating delay as a result of the atypical window specifications and other documentation supporting its claim for an extension of time.

79. On December 30, 2002, the Navy issued a Final Decision pursuant to 41 U.S.C. 605(a) denying Maropakis' request for an extension of time and assessing $303,550.00 in liquidated damages. A copy of the Navy's Final Decision is attached hereto as Exhibit A.

80. In its Final Decision, the Navy determined that Maropakis is liable to the Navy for $59,514.00, the difference between the remaining undisputed contract balance of $244,035.00 and the assessed liquidated damages $303,550.00.

81. Maropakis received the decision on December 21, 2002, therefore this claim is filed in a timely manner pursuant to 41 U.S.C. § 609.

82. Maropakis claims that each of the Navy - caused problems delineated above delayed and disrupted its performance rendering it impossible for Maropakis to complete the project within the project schedule.

83. Maropakis claims that the assessment of liquidated damages was improper.

84. In addition, the failures and refusals described above amount to the Navy's wrongful refusal and failures to afford Maropakis the requested extensions pursuant to the Contract.

85. Further, the Navy's refusal and failure to award Maropakis an extension of time constitutes a material breach of the contract.

86. Moreover, the material defects in the specifications which caused Maropakis to

incur substantial delays constitute a breach of the Navy's implied warranty that the detailed specifications for the window monitors were suitable for the intended purpose.

87. As a direct and proximate cause of the Navy's failure and refusal to grant Maropakis the requested time extensions, as a result of the Navy's breach of implied warranty, and as a result of improper administration of the contract by Navy personnel, Maropakis has and will continue to incur damages in the form of expenses and costs, including liquidated damages assessed by the Navy.

**Requests for Relief**

WHEREFORE, Plaintiff, M. Maropakis Carpentry, Inc. demands judgment of and from the United States as follows:

(a) Compensatory damages in the amount of $244,036.00 for the contract balance due and presently owing to Maropakis, and other delay damages incurred by Maropakis throughout the project;

(b) Recission of Liquidated Damages as improper because the delays were beyond the reasonable control of Maropakis and without its fault or negligence;

(c) To the extent this Court finds in favor of Maropakis, Maropakis is entitled to interest pursuant to 41 U.S.C. § 611 from on or about August 21, 2001, the date the Contracting Officer received Maropakis' claim under 41 U.S.C. § 605(a) at a rate established by the Secretary of the Treasury pursuant to Public Law 92-41.

(d) All attorneys' fees and costs incurred by Maropakis in the preparation of this claim and in the prosecution of this action; and

(e) All other relief as this Court deems just and proper.

POWELL, TRACHTMAN, LOGAN, CARRLE
& LOMBARDO, P.C.

By: Kelly H. Decker
Paul A. Logan
David W. Francis
Kelly H. Decker
114 North Second St.
Harrisburg, PA 17101
(717) 238-9300
(717) 238-9325

Date: December 16, 2003

DEPARTMENT OF THE NAVY
ENGINEERING FIELD ACTIVITY, NORTHEAST
NAVAL FACILITIES ENGINEERING COMMAND
10 INDUSTRIAL HIGHWAY
MAIL STOP, #82
LESTER, PA 19113-2090

IN REPLY REFER TO
4330
Code 02B\AR
20 December 2002

**EXPRESS MAIL**
Maropakis Carpentry, Inc.
Attn: Abdul Rangwalla
400 3rd Avenue
Brooklyn, New York 11215

Final Decision #03-002F

Gentlemen:

Subject: CONTRACT N62472-97-C-4116, REPLACE ROOF, BUILDING 110, NAVAL INVENTORY CONTROL POINT, MECHANICSBURG, PA

Reference is made to our Demand letter to you dated June 28, 2002. After reviewing your letter dated July 22, 2002 and information presented at the 31 October 2002 meeting at Engineering Field Activity, Northeast, the Contracting Officer has determined that there has been no new information presented to change our position. Therefore, we reiterate our demand that you are liable to the Navy for the difference between the remaining contract balance of $244,035.00 and $303,550.00, the total amount of liquidated damages due and owing the Government.

The original contract completion date is January 16, 2000 and not July 16, 2000. Our calculations are based on the contract completion date of 4 February 2000 as set forth under modification P00003.

We make demand on you for $59,514.00. Your check should be made out to the U.S. Treasury Department. Pursuant to the interest clause in your contract, interest is due at the rate established by law from the date of the demand letter which is June 28, 2002.

You may submit a proposal for deferment of collection if immediate payment is not practicable or if you plan to dispute the amount due. Any requests for deferment shall be submitted to the Contracting Officer. Please remit payment to:

Commanding Officer, Engineering Field Activity, Northeast
Naval Facilities Engineering Command
10 Industrial Highway, MS #82
Lester, PA 19113-2090

EXHIBIT
A

This is the Final Decision of the Contracting Officer. This Decision may be appealed to the Armed Services Board of Contract Appeals, which is the authorized representative of the Secretary of the Navy for hearing and determining contract disputes.

If you decide to appeal this decision, written notice thereof must be mailed or otherwise furnished to the Armed Services Board of Contract Appeals, Skyline Six, 5109 Leesburg Pike, 7th Floor, Falls Church, CA 22041, within ninety days from the date you receive this decision. A copy of that notice shall also be furnished to the Contracting Officer from whose decision the appeal is taken, at the address set forth at the head of this letter, Attention: Director, Contracts Department. The notice should indicate that an appeal is intended, should reference this decision, identify the contract by number, and state the amount in dispute. The rules of procedure of the Armed Services Board of Contract Appeals are in the DFAR, Appendix A, Part Two. Optional Accelerated Procedures are available in appeals involving $50,000.00 or less. Small Claims (Expedited) Procedures are available in appeals involving $10,000 or less. In lieu of appealing to the Armed Services Board of Contract Appeals, you may bring action directly in the U.S. Court of Federal Claims within 12 months of the date you received this decision (except as provided in Section 4 of the Act (Maritime Contracts) ).

Sincerely,

Robert G. Smith

ROBERT G. SMITH
Contracting Officer
By direction of the
Commanding Officer