**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| M. MAROPAKIS CARPENTRY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03-2825C |
| v. | ) | |
| | ) | (Judge Baskir) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT**

## I. INTRODUCTION

M. Maropakis Carpentry, Inc. ("Maropakis") requests this court issue an order granting *M. Maropakis Carpentry, Inc.'s Motion for Leave to File a First Amended Complaint* ("Maropakis's Motion). Granting Maropakis's Motion will help the court resolve this case. The proposed First Amended Complaint provides a roadmap of Maropakis's claim. A draft of Maropakis First Amended Complaint is attached hereto as exhibit A and incorporated by reference. Although Maropakis requested that the United States Department of the Navy ("the Navy") agree to the filing of this First Amended Complaint, it refused to do so. A copy of the Navy's refusal is attached as exhibit B and incorporated by reference.

As will be explained in greater detail below, the First Amended Complaint substantially clarifies Maropakis's claims arising from the defective nature of the specifications and the Navy's improper administration of the contract. It also withdraws from consideration Maropakis's claim of that unusually severe weather constituted a concurrent delay on the project.

The Navy will not be prejudiced by these amendments. The specific allegations set forth in the First Amended Complaint were addressed in substantial detail during discovery. Maropakis argues that Justice requires it be permitted to file the First Amended Complaint.

Maropakis filed its Original Complaint in this matter on December 16, 2003. A copy of Maropakis's Original Complaint is attached hereto as exhibit C. This is Maropakis's First Motion to Amend its Complaint.

## II. DISCUSSION

### A. Background Information.

Maropakis and the Navy are parties to Contract Number N-662472-97-C-4166 (the "Contract") for certain demolition and replacement work at Building Number 110 at the NAVICP ("the Project"). The project was a warehouse used by the Navy. The Contract work included, *inter alia*, the following: (a) Removal and replacement of certain monitor windows from the roof of the project; (b) Removal and replacement of the roofing materials; (c) Removal, disposal and replacement of asbestos containing transite panels; and (d) Other incidental and related work.

Maropakis's original complaint alleged, *inter alia*, that it suffered damages as a result of defective and atypical contract specifications and improper administration of the contract by the Navy. (Compl. ¶ 14.)

### B. Maropakis's Defective Window Specifications Claim

#### 1. *Allegations in Maropakis's Original Complaint*

Maropakis's Original Complaint alleged that it incurred additional costs and delay because the Navy's specifications for the replacement windows were defective. These allegations are explained below:

First, Maropakis alleged that Specification Section 08520 Aluminum Windows contained specific requirements for the windows, including, *inter alia*, air infiltration testing tolerances and pressures and water resistance test pressure. However, the specifications failed to identify any fabricators who could meet those specific criteria. Maropakis also alleged that the criteria imposed in the specifications was non-traditional and not readily available in the marketplace. (Compl. ¶ 15 through 17.)

Second, Maropakis alleged that the Navy knew or should have known that the specifications called for atypical windows but failed to disclose this to Maropakis (Compl. ¶ 18.)

Third, Maropakis alleged that it was unreasonably delayed due to the specification of non-traditional and/or non available windows (Compl. ¶ 35.)

Finally, Maropakis alleged that there were errors in the design of the replacement windows (Compl. ¶ 38).

2. *Allegations in Maropakis's First Amended Complaint*

a. The Navy Specified Windows Which Do Not Exist.

Maropakis's proposed First Amended Complaint clarifies that the Navy specified windows which do not exist.

First, it notes that Specification Section 08520 specifically requires the replacement windows to comply with the requirements of, and be certified as complying with, the ANSI/AAMA 101 (1993) Aluminum and Poly (Vinyl Chloride) (PVC) Prime Windows and Glass Doors ("the AAMA 101-93"). (First Amend. Compl. ¶ 12 and 13.)

Second, it noted that under Specification Section 08520 Maropakis was required to provide windows certified under the AAMA 101-93 as "P-HC 40 (Optional Performance Class)." (First Amend. Compl. ¶ 14.)

Third, it explains that each of the terms set forth in that identification (i.e. the "P," "HC," "40," and "Optional Performance Class") have specific meanings under the AAMA 101. The term "P" means projected. The term "HC" means heavy commercial. The term "40" describes the windows positive design pressure. The term "optional performance class" means that the window has been tested to conform to higher uniform structural load and water resistance test criteria than standard windows. In the simple terms, the specification required Maropakis to provide a heavy commercial projected window with a design pressure of 40 and conforming to higher uniform structural load and water resistance tests. (First Amend. Compl. ¶15.)

Fourth, it notes that while P HC-40 windows are common place and recognized under the AAMA 101-93, a P HC-40 (optional performance class) window is specifically not permitted or recognized by the AAMA 101-93. Accordingly, it does not exist. (First Amend. Compl. ¶ 18.)

Finally, it noted that the Navy and its contract documents did not disclose to Maropakis that the specified window does not exist under the AAMA. (First Amend. Compl. ¶18.) Maropakis subsequently found in discovery documents reflecting that the Navy knew its specifications contained impermissibly high water infiltration test pressures and it purposefully refused to disclose this to Maropakis because the disclosure would support Maropakis's delay claim and lead to the remission of liquidated damages. A copy of this internal document is attached as Exhibit D and incorporated by reference.

This issue is not new to the Navy. Whether the P HC-40 (optional performance class) window exists, and whether its designation was an error, was specifically addressed during depositions and other discovery in this matter. As an example only, Lonnie R. Moyer, P.E, a Civil Engineer from the Navy ("Moyer") testified that he did not know what the "P," "HC," "40," or "optional performance class" designations meant; did not know whether such a window

existed, and agreed that specifying a window which does not exist is an error. (Moyer Dep. at 50 line 15 to 53 line 22, attached as exhibit E.)

b. <u>The Navy's specification of water resistance test pressure at 20psf is not permitted under the AAMA 101-93</u>

The AAMA 101-93 provides that the water resistance test pressure of an HC window is 15% of the positive design pressure. Accordingly, for an HC-40 window, the water resistance test pressure is 6 psf (i.e. 40psf x 15% = 6psf). (First Amend. Compl. ¶20.) However, the Navy's specifications required a water resistance test pressure of 20psf. (First Amend. Compl. ¶21.) This is a contradiction in the contract documents and an error.

Further, the AAMA 101-93 also sets the maximum water resistance test pressure at 12 psf. A water test pressure designated at 20 psf violates the specific "maximum" set forth in the AAMA 101-93. (First Amend. Compl. ¶ 22.)

This issue was specifically addressed during the depositions. As an example, Moyer testified that he was not familiar with the AAMA standards regarding water resistance. Specifically, he did not know the AAMA 101-93 standard for water resistance test pressure for an HC-40 window; consequently, he did not know whether the contractually specified 20 psf exceeded the standard. (Moyer Dep. at 56 line 15 to 56 line 18 attached as exhibit F.) In addition, Gary W. Brown, P.E. ("Brown"), Civil Engineer for Gale Associates, testified that a design specification that required water resistance test pressures in excess of 12 psf does not comply with the AAMA 101-93 standard. However, he also testified that the contract documents in this case required AAMA compliant windows. (Brown Dep. at 24 line 8 to 27 line 9 attached as exhibit G.)

c. The Navy's specification of air infiltration test pressure of 0.1 $ft^3$/min/ft violates the AAMA 101-93

Maropakis's First Amended Complaint also describes how specification section 08520 was defective because it required an air infiltration pressure of 0.1 $ft^3$/min/ft. This is inconsistent with the designation of HC-40. Under the AAMA 101-93 the air infiltration pressure for an HC-40 window is specified at 0.37 $ft^3$/min/ft.

This issue was specifically addressed during the depositions. Moyer testified that he did not know the AAMA air infiltration standard for an HC-40 window. (Moyer Dep. at 58 line 19 to 59 line 16 attached as exhibit H.) Brown testified that the air infiltration test pressure required by the contract specifications were more stringent than that required by the AAMA 101-93. (Brown Dep. at 50 line 8 to 50 line 19 attached as exhibit I.)

**C. Maropakis's Claim That The Navy Unreasonably Prohibited it From Performing Roof Removal and Replacement Work.**

Maropakis's Original Complaint alleged that Maropakis's roofing work was adversely impacted by the Navy. (Compl. ¶¶ 62-68.) Maropakis's First Amended Complaint clarifies that the Navy improperly refused to allow Maropakis to perform roofing work on top of the monitors during the delay period caused by the windows.

This issue is not new to the Navy. During depositions, the Navy's attorney specifically questioned Mr. Rangwalla of Maropakis regarding this claim. (Rangwalla Dep. at 57 line 3 to 59 line 24 attached as Exhibit J). Accordingly, the Navy will not be prejudiced by this amendment.

**D. The Navy's Refusal to Allow Maropakis to Use of Asphalt as an Adhesive**

Maropakis's Amended Complaint does not make any clarifications regarding its claim arising out of the improper refusal of the Navy to allow Maropakis to use asphalt materials as an adhesive on the roof.

### E. Delay Caused by the Discovery of Lead Paint

Maropakis's First Amended Complaint does not make any clarifications with respect to the delays attributable to the discovery of lead paint on the project.

### F. Unusually Severe Weather Delay Claim

Maropakis's First Amended Complaint removes this claim for concurrent delay from consideration by this court.

## III. ARGUMENT.

### A. Maropakis's Request for Leave to File the First Amended Complaint

Maropakis requests this court grant its Motion pursuant to Rule 15(a) of the Rules of the United States Court of Federal Claims. Under RCFC 15(a), after the initial pleadings are complete, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." As explained above, the Navy does not consent to the amendment; therefore, Maropakis seeks leave to amend from this court. Granting Maropakis's Motion is well within the discretion of this court, it is in the interest of justice, and it will simplify the litigation without causing prejudice or delay.

### B. Standard for Granting this Motion

It is well established that the decision to grant or deny a motion to amend lies within the "sound discretion" of the court. *Phonometrics, Inc. v. Resinter North American Corp.*, 1997 U.S. App. LEXIS 26574, *6 (Fed. Cir. September 17, 1997). Well established case law provides that RCFC 15(a) is to be liberally construed in favor of granting leave to amend. As an example, this court has held that leave to amend will be granted "in the absence of any apparent good reason that it should be denied." *Design and Production Inc. v. United States*, 10 Ct. Cl. 80, 82 (Ct. Cl. 1986). Further, because there is a presumption in Rule 15(a) favoring the granting of leave, the

non-moving party typically has the burden of showing why leave to amend should not be granted. *Id.* Finally, a court must provide "justifying reason[s]" for denying a motion for leave to amend. *Phonometrics*, 1997 U.S. App. LEXIS 26574 at *6.

In deciding whether to grant a party leave to amend, this court has followed the Supreme Court's standard as defined in *Foman v. Davis*, 371 U.S. 178 (1962). *Foman* provides that a plaintiff should be afforded an opportunity to amend a complaint except where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, or futility. 371 U.S. at 182. *See Koston v. Secretary of the Dept. of Health and Human Svcs.*, 23 Cl. Ct. 597, 601 (Cl. Ct. 1991).

### C. <u>None of the Exceptions to the Granting of Leave Are Satisfied in this Case</u>

#### 1. *<u>No undue delay or bad faith</u>*

This Motion will not cause undue delay to the parties and is not being brought in bad faith. To the contrary, Maropakis's Motion constitutes a good faith effort to expedite and simplify the litigation. Maropakis seeks to eliminate one of its claims and more precisely aver its remaining claims. Because Maropakis is not seeking to add new parties or new claims to the action, allowing Maropakis to file its First Amended Complaint, should not require the Navy to engage in additional discovery. Finally, the trial date has not been set for this action as of the date of this Motion, and even if it were, granting leave to Maropakis to file its First Amended Complaint would not unduly delay the litigation because Maropakis is prepared to file its First Amended Complaint immediately. *See Design and Production Inc.*, 10 Cl. Ct. at 82 (finding no undue delay when the trial date had not been set).

#### 2. *<u>Maropakis has not been dilatory in bringing this motion.</u>*

Although this Motion comes approximately a year and a half after Maropakis filed its original Complaint, "the mere fact that an amendment is offered late in the case is not enough to

bar it; amendments may be offered at trial, or even after reversal and remand." *Senza-Gel Corp. v. Seiffhart*, 803 F.2d 661, 667 (Fed. Cir. 1986). In addition, the discovery of new evidence constitutes a "plausible reason" for granting leave to amend. *Id.* at 772. Information obtained during discovery revealed that the windows required by the Navy's specifications were more than "not traditional and not readily available," as alleged in the first complaint, rather, the specifications required windows that did not exist in the marketplace.

3. *No repeated failure to cure*

Because this is Maropakis's first request to amend its Complaint, Maropakis has not repeatedly failed to cure deficiencies in its Complaint. This case is clearly distinguishable from *Hays v. United States*, 16 Cl. Ct. 770, 772 (Cl. Ct. 1989), where this Court denied relief to a party seeking leave to amend for the third time.

4. *No prejudice to the parties*

The Navy will not be prejudiced if the Court grants Maropakis's Motion. As stated above, Maropakis is not adding parties or claims to its complaint. The Navy will not need to engage in new discovery. Maropakis is not changing the legal theory behind its action. *See Koston*, 23 Cl. Ct. at 602. To the contrary, Maropakis's original Complaint put the Navy on notice that Maropakis believed it had a cause of action for defective specifications. The First Amended Complaint merely states that claim with more precision and facts.

5. *Maropakis's Motion is not futile.*

Courts will find granting leave to amend futile if the moving party seeks to bring a claim that will be barred by *res judicata*, collateral estoppel, lack of jurisdiction, *Saladino v. United States*, 62 Fed. Cl. 784, 795 (Fed. Cl. 2004), or a statute of limitations. *Lockheed Martin Corp. v. United States*, 39 Fed. Cl. 197, 199 (Fed. Cl. 1997). Clearly *res judicata*, collateral estoppel

and jurisdiction are not at issue here. Nor is there a statute of limitations issue here, because Maropakis is not adding any new claims or parties., collateral estoppel and jurisdiction are not at issue here. Nor is there a statute of limitations issue here, because Maropakis seeks only to clarify its original claims, not add any new claims or parties. *Design and Production Inc.*, 10 Cl. Ct. at 81 (an amendment that seeks to clarify a previously claim "relates back to the date of the original pleading").

## IV. CONCLUSION

Consistent with the presumption in Rule 15(a) that leave to amend should be "freely given when justice so requires," Maropakis's Motion for Leave to File the First Amended Complaint will expedite and simplify this action without prejudice or delay to the Navy. The interests of justice will be served by granting Maropakis's Motion because Maropakis seeks only to clarify and streamline its claim. None of the exceptions to Rule 15(a) are present in this case. As such, Maropakis respectfully asks this Court to grant its Motion.

Respectfully submitted,

RHOADS & SINON LLP

By: ____________________

David W. Francis
Kelly H. Decker
One South Market Square
P.O. Box 1146
Harrisburg, PA 17108-1146
(717)-233-5731
Attorneys for Plaintiff

July 6, 2005

# EXHIBIT A

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| M. MAROPAKIS CARPENTRY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03-2825C |
| v. | ) | |
| | ) | (Judge Baskir) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## FIRST AMENDED COMPLAINT

### Introduction

1. Plaintiff is M. Maropakis Carpentry, Inc. ("Maropakis"), a New York Corporation which maintains its office at 555 63rd Street, Brooklyn, New York 11220.

2. Defendant is the United States of America acting through the Department of the Navy, contracting office at the Naval Inventory Control Point ("NAVICP"), 5450 Carlisle Pike, Mechanicsburg, Pennsylvania 17055 ("the Navy").

3. Maropakis and the Navy are parties to Contract Number N-662472-97-C-4166 ("the Contract") for certain demolition and replacement work at Building Number 110 at the NAVICP ("BLDG 110"). BLDG 110 was a warehouse used by the Navy.

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1941 because this claim involves a breach of contract claim brought by Maropakis against the Navy.

5. This lawsuit is timely filed pursuant to 41 U.S.C. § 609(a) following a final decision of the contracting officer.

### Discussion

6. The contract documents were prepared by, *inter alia*, Gale and Associates, Inc. ("Gale"), an architectural and engineering firm with offices located in Baltimore, Maryland.

7. On or about April 6, 1999, Maropakis and the Navy entered into the Contract. Because of its bulk and size a full copy of the contract is not attached. However, the Navy does have a full copy.

8. The contract work included, *inter alia*, the following activities:

a. Removal and replacement of certain monitor windows (located on monitors situated on top of the roof);

b. Removal and replacement of the roofing materials;

c. Removal and replacement of asbestos containing transite panels; and

d. other related work as set forth in the contract.

9. The contract further provided that the contract work had to be completed within 270 calendar days.

10. This claim involves Maropakis' request for a compensable time extension and extra costs as a result of errors and omissions in the contract documents as well as actions taken by the Navy and its consultants during the period of contract performance.

**Maropakis Window Claim**

*The Specifications Required a Window Which Does Not Exist*

11. The contract documents included specification section 08520 aluminum windows ("Section 08520") which provided the technical requirements for the replacement monitor windows.

12. Specification 08520 specifically incorporated certain industry standards as part of the Contract. These included, but were not limited to, the following:

a. The ANSI/AAMA 101 (1993) Aluminum And Poly (Bi-Chloride) PVC Prime Windows And Class Doors ("AAMA 101"); and

b. The AAMA 1503.1 (1988) Thermal Transmitants And Condensations Resistance Of Windows, Doors And Glazed Wall Sections ("AAMA 1503.1").

13. Section 08520 specifically required the windows to be manufactured and certified in accordance with the requirements of the AAMA 101.

14. Paragraph 2.1.8 of Section 08520 required Maropakis to supply "Type P HC-40 (optional performance class)" monitor windows for the project.

15. Under the labeling scheme set forth in the AAMA, the designations "P HC-40 (Optional Performance Class")" have specific meanings, as follows:

a. The term "P" means that the windows were "projected."

b. The term "HC" means "Heavy Commercial." Thus Maropakis was required to provide projected windows that were heavy commercial.

c. The term "40" is the positive design pressure for the windows.

d. The terms "optional performance class" means that the window has been tested to conform with higher uniform load structural and water resistance criteria than the normal performance levels. The AAMA specifically identifies the higher performance criteria which is required in order to obtain the "optional performance class" rating.

16. P HC-40 windows are common.

17. The AAMA 101 does not provide for P HC-40 "(optional performance class)" windows.

18. The Navy and the contract documents did not disclose to Maropakis that "P HC-40 (optional performance class)" windows do not exist under the AAMA 101. The Navy's failure to disclose this information is a material breach of contract which resulted in additional costs and delay to Maropakis.

*The Specifications Violated the AAMA With Respect to Water Resistance Test Pressure*

19. Under the AAMA 101 labeling scheme, windows designated as P HC-40 are to meet certain requirements with respect to water resistance test pressure.

20. Under the AAMA 101 provisions, water resistance test pressure is designated as 15% of the design pressure. Accordingly, an HC-40 window would have a water resistance test pressure of 6 psf (i.e. 40 psf x 15% = 6 psf).

21. Notwithstanding the designation of HC-40, Specification 08520 required Maropakis to supply windows with a water resistance test pressure of 20 psf.

22. The AAMA 101 specifically provides that the maximum water resistance test pressure for windows is 12 psf. Accordingly, Specification 08520 exceeded the AAMA's maximum water resistance test pressure for any window by 8 psf.

23. The Navy's requirement that Maropakis supply windows which conflicted with the AAMA's provisions, while simultaneously requiring Maropakis to provide certifications that the windows met AAMA, is a material breach of the contract which interfered in Maropakis's orderly progression of the work and caused it to incur additional costs and delay.

24. As a result of the Navy's defective specifications, Maropakis was required to provide custom manufactured windows for the project which exceeded the maximum water resistance test pressure for any windows as set forth in the AAMA 101. This further delayed and impacted Maropakis's work on the project and caused it to incur additional costs.

25. Upon information and belief, the Navy was aware of this deficiency in the specifications, but simply chose not to disclose it to Maropakis because it would support Maropakis claim that the window specification delayed its work.

*The Specifications Violated the AAMA With Respect to Air Infiltration Pressure.*

26. Specification 08520 also identified the criteria for air infiltration.

27. For a P HC-40 window, the permissible air infiltration is designated by the AAMA 101 as 0.37 psf when tested at 6.24 psf.

28. Notwithstanding this requirement, the Navy's contract documents required an air infiltration not exceed 0.1 psf when tested at 6.24 psf. This requirement is inconsistent with the designation of P HC-40 window.

29. The Navy's designation of windows as P HC-40 and simultaneously requiring windows meeting a greater air infiltration pressure was a material breach of the contract which severely impacted and delayed Maropakis's work and caused further costs on the project.

30. Maropakis is entitled to a compensable extension of time due to the Navy's failure to disclose the deficiency in its specifications.

31. The Navy has refused to pay Maropakis for the impact caused by this delay and breach of contract.

**Delay Due To Discovery of Lead Paint**

32. Maropakis's performance of work was also materially and improperly impacted and delayed due to the discovery of lead paint on the existing windows.

33. The contract documents did not inform Maropakis that lead paint requiring removal and disposal in accordance with RCRA standards would be encountered on the project.

34. After the lead paint was discovered on the project, the Navy failed to address it in a timely basis, which caused Maropakis to be delayed from March 7, 2000, up to and including June 21, 2000.

35. Maropakis is entitled to a compensable time extension due to the delays caused by the Navy in timely addressing the removal and disposal of the lead paint found on the windows.

36. The Navy has refused to compensate Maropakis for the impact caused by this delay and its breach of contract.

**Requirement to use Asphalt Adhesive Materials**

37. Asphalt is frequently used in the roofing industry as an adhesive for new roofing work.

38. The contract documents called for Maropakis to provide non-asphaltic adhesive materials for the new roof.

39. Maropakis's submittal for the roofing work identified the use of asphalt materials.

40. Gale reviewed Maropakis's roofing submittal and approved the use of asphalt as an adhesive.

41. Based upon this approval, Maropakis ordered and had delivered asphalt materials for the project.

42. Navy personnel saw the asphalt materials and did not timely object to its use.

43. When Maropakis was ready to being placing the new roofing on the project, the Navy rejected the use of asphalt and required Maropakis to supply non-asphaltic materials.

44. The Navy's untimely rejection of the asphalt materials was a material breach of the contract, and caused Maropakis to experience delays, impact and extra costs.

**Refusal to allow Maropakis to begin roof removal and replacement work.**

45. The contract documents provided that Maropakis was required to complete removal and replacement of the monitor windows before removal and replacement of the roof. This was because the Navy did not want Maropakis' workmen walking onto the newly installed roof.

46. Maropakis requested authorization to remove and replace the roofing materials which were on top of the monitors before the windows were ready to be installed. This area would not have been walked upon by Maropakis's workmen.

47. The Navy unreasonably and arbitrarily refused to allow Maropakis to perform this work. This was a material breach of the contract which impacted and delayed Maropakis's work and resulted in additional costs.

**Delays due to Improper review of submittals.**

48. Maropakis was also delayed by the Navy's and/or its professionals' improper administration and review of submittals.

49. This improper administration and review of submittals delayed and impacted Maropakis's work and caused it to incur additional costs.

**Remission of Liquidated Damages.**

50. On June 28, 2002, the Navy notified Maropakis that it was assessing liquidated damages in the amount of $650 per day for 467 days totaling $303,550.00.

51. Upon information and belief, the Navy did not incur additional costs justifying the imposition of liquidated damages.

52. Maropakis claims that the assessment of liquidated damages was improper and seeks its remission in full.

**COUNT I**

53. Maropakis incorporates all of the above paragraphs as if fully set forth here at length.

54. The Navy's actions and omissions as set forth above constitute material breaches of contract.

55. The Navy's actions in assessing liquidated damages were also a material breach of contract.

56. Maropakis is entitled to additional costs and a compensable extension of time.

WHEREFORE, Plaintiff, M. Maropakis Carpentry, Inc. demands judgment from the United States as follows:

(a) Compensatory damages in the amount of $244,036.00 for the contract balance due and presently owing to Maropakis, and other damages incurred by Maropakis throughout the project;

(b) Rescission of Liquidated Damages as improper because the delays were beyond the reasonable control of Maropakis and without its fault or negligence;

(c) To the extent this Court finds in favor of Maropakis, Maropakis is entitled to interest pursuant to 41 U.S.C. § 611 from on or about August 21, 2001, the date the Contracting Officer received Maropakis's claim under 41 U.S.C. § 605(a) at a rate established by the Secretary of the Treasury pursuant to Public Law 92-41;

(d) All attorneys' fees and costs incurred by Maropakis in the preparation of this claim and in the prosecution of this action; and

(e) All other relief as this Court deems just and proper.

Respectfully submitted,

RHOADS & SINON LLP

By: ______________________________

David W. Francis
Kelly H. Decker
One South Market Square
P. O. Box 1146
Harrisburg, PA 17108-1146
(717) 233-5731

Attorneys for Plaintiff

# EXHIBIT B



"James.Colt@usdoj.gov" <James.Colt@usdoj.gov>

06/16/2005 03:58 PM

To "DFrancis@Rhoads-Sinon.com" <DFrancis@Rhoads-Sinon.com> (Receipt Notification Requested) (IPM Return Requested)

cc

bcc

Subject RE: M. Maropakis vs. Department of the Navy; Court of Claims Docket No. 03-2825C

David- The Government will not consent to amendment of the initial pleadings at this stage of the proceedings. Best- Jim.

-----Original Message-----
From: DFrancis@Rhoads-Sinon.com [mailto:DFrancis@Rhoads-Sinon.com]
Sent: Wednesday, June 15, 2005 3:07 PM
To: Colt, James (CIV)
Subject: M. Maropakis vs. Department of the Navy; Court of Claims Docket No. 03-2825C

Jim,

Enclosed is a copy of the amended complaint which Maropakis will be filing in this matter. This amended complaint removes any claim with respect to the weather delays, and clarifies the claims regarding the specifications for the windows.

Rule 15(a) provides that amendments may be filed by the written consent of the parties, or by leave of court upon motion. Please review this amended complaint and let me know whether the United States will provide written consent to its filing. Thank you.

The message is ready to be sent with the following file or link attachments:
RSDOCS-#562704-v1-Maropakis_amended_complaint.pdf

Note: To protect against computer viruses, e-mail programs may prevent sending or receiving certain types of file attachments. Check your e-mail security settings to determine how attachments are handled.

David W. Francis
Rhoads and Sinon LLP
One South Market Square
12th Floor (P.O. Box 1146)
Harrisburg, PA 17108-1146
Telephone: (717) 237-6738
Fax: (717) 231-6600
e-mail: dfrancis@rhoads-sinon.com
website: www.rhoads-sinon.com

(See attached file: RSDOCS-#562704-v1-Maropakis_amended_complaint.pdf)
*****************
Notice: This email transmission, including any attachments, may contain confidential information protected by the attorney-client or other legal

privilege. Unauthorized use, distribution or copying is prohibited. If you received this email in error, please notify the sender by replying to this email or by calling Rhoads & Sinon LLP at 717.233.5731 and deleting the erroneous transmission from your system without copying it. Thank You.

# EXHIBIT C

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| M. MAROPAKIS CARPENTRY, INC., | : | FILED DEC 17 2003 |
| Plaintiff, | : | |
| v. | : | No 03-2825C |
| THE UNITED STATES OF AMERICA | : | Judge ____________ |
| | : | |
| Defendant. | : | |

**COMPLAINT**

**The Parties**

1. Plaintiff is M. Maropakis Carpentry, Inc. ("Maropakis"), a New York Corporation which maintains an office at 78 Rapelye, Brooklyn, New York, 11231.

2. Defendant is the United States of America, acting through the Contracting Office, Naval Inventory Control Point ("NAVICP"), 5450 Carlisle Pike, Mechanicsburg, Pennsylvania 17055-0788 (hereinafter "Navy" or "Government").

3. Maropakis and the Navy are parties to Contract No. N-62472-97-C-4166 (the "Contract") for the demolition and rehabilitation of Building No. 110 at the NAVICP.

**Jurisdiction**

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1491 because this lawsuit involves a breach of contract claim by Plaintiff Maropakis based upon an express contract with the Navy.

5. This lawsuit is timely filed pursuant to 41 U.S.C. § 609(a) following a Final Decision of the Contracting Officer of the United States Department of Navy.

**Background Facts**

6. On or about April 6, 1999 Maropakis and the Navy entered into a $1,288,940 contact for a construction project known as Contract N 62472-97-C-4116 for the replacement of a roof, windows, light fixtures and associated work on Building Number 110 at the NAVICP ("the project").

7. The project work included, generally, the demolition and removal of asbestos containing materials and associated work, disposal, replacement and installation of windows, roof, flashing, light fixtures, exterior insulation finishing system and associated work.

8. The contract provided that the overall project work shall be completed within 210 calendar days.

9. Following award of the contact, 3 change orders were issued on this project that changed the date for completion date and contract amount, as follows:

a. Change Order 1 dated June 30, 2000 increased the contract price by $6,154.00 and extended the time for completion of the project by fourteen (14) days - from January 16, 2000 to January 30, 2000.

b. Change Order 2 dated February 18, 1999, among other things, increased the number of days in the contract beginning April 1, 1999 listed in section 00720 paragraph 1.3 and section 01110 paragraph 1.5 shall be changed from 210 to 270 calendar days.

c. Change Order 3 dated March 15, 2001 increased the contract price by $2,057.00 and extended the time for completion of the project to February 4, 2000.

10. Although the three modifications were issued and 79 days were added to the

project schedule, this in no way compensated Maropakis for the delays, impacts and disruptions encountered by Maropakis during the course of the project.

11. It is undisputed that the adjusted contract price following issuance of the 3 change orders was $1,297,151.00.

12. According to the Navy, the adjusted date for completion of the project was February 4, 2000.

13. Maropakis disputes the Navy's adjusted date for completion of the project.

**Delays, Impacts, and Disruptions**

14. As explained herein, throughout the project, by no fault of its own, Maropakis experienced substantial delays, impacts, disruptions, and interferences to its work as a result of, among other things, defective and unnecessarily atypical contract specifications, known to the Navy and its Consultant but not disclosed to Maropakis, and improper administration of the contract by Navy personnel.

*Impacts Due To Non-Traditional Window Specifications*

15. Specification Section 08520, which governed the Aluminum Windows called for on this project, contained specific requirements for dimensions, condensation resistance factor, air infiltration and water resistance, and thermal performance.

16. Specification Section 08520 failed to identify specific manufacturers who could supply windows meeting the criteria contained in the contract documents.

17. Specification Section 08250 contained non-traditional standards for aluminum windows not readily available in the marketplace, which made it far more difficult for Maropakis to meet the contract requirements.

18. Upon information and belief, the Navy and its Consultant knew or should have known that the specifications called for windows that were not traditional and not readily available in the marketplace.

19. In the contract documents, the Navy represented to Maropakis and all prospective bidders that all work on the project could be completed within 210 days.

20. The fact that the specifications called for atypical windows was not disclosed to Maropakis or any prospective bidders.

21. The Navy's representations to Maropakis were material to the terms of Maropakis' bid for the project.

22. Maropakis relied upon the representations of the Navy in bidding the project.

23. Maropakis faced great difficulty in obtaining windows manufactured to meet the Contract Specifications in a timely manner.

24. Maropakis repeatedly notified the Navy that Maropakis was unable to locate a window manufacturer that conforms with the specifications, and requested the Navy identify approved manufacturers that could supply conforming windows.

25. On August 23, 1999, the Navy identified four (4) window manufacturers who purportedly could satisfy the atypical specifications.

26. Maropakis contacted each of the window manufacturers initially identified by the Navy, and concluded that none of the four window manufacturers named by the Navy met the requirements of the contract specifications.

27. Maropakis informed the Navy that none of the manufacturers met the specifications, and requested permission to start the roofing work prior to the window installation

in order to allow the project to proceed without further delay.

28. The Navy arbitrarily denied Maropakis' request.

29 On September 20, 1999, Maropakis again requested that the Navy provide a list of window manufacturers that met the contract specifications and again asked to commence roof replacement work in order to avoid further delays.

30. Finally, on October 22, 1999 the Navy sent a letter to Maropakis advising it that it had contacted several window manufacturers and the following three (3) companies could potentially meet the specifications: (a) Forte, Inc.; (b) J. Sussman, Inc. and (c) Graham Architectural Products, Corp.

31. Maropakis made arrangements with J. Sussman to review the existing site conditions.

32. After discussing with Sussman fabrication and delivery time of the non-traditional windows on October 29, 1999, Maropakis submitted a revised project schedule to the Navy indicating the completion date of August 15, 2000 for approval.

33. The Navy advised Maropakis that it deemed it appropriate under the circumstances to approve Maropakis' revised schedule establishing August 15, 2000 as the project completion date.

34. Notwithstanding the above, the Navy has now refused to honor Maropakis' revised schedule.

35. As a result of the non-traditional standards for the windows, Maropakis' performance of work was substantially and materially delayed. This delay was excusable as it was not within the reasonable control of Maropakis nor was it by any fault of Maropakis.

36. As a result of the Navy's refusal to permit Maropakis to work on the roof and due to the Navy's failure to timely provide Maropakis with direction on how to proceed, Maropakis experienced a 219 calendar day delay which affected performance of the work contemplated by the parties' Contract.

37. Alternatively, neither the Navy nor Maropakis were aware that the window specifications called for windows not readily available in the marketplace.

38. There were errors in the design and/or the project schedule.

39. As a result, Maropakis experienced a 219 calendar day delay which affected performance of the work contemplated by the parties' Contract.

*Impacts and Delay Due to the Unanticipated Presence of Lead Paint*

40. Maropakis' performance was also delayed and disrupted due to the unforseen and undisclosed presence of lead paint in the window panes.

41. Maropakis was prepared to mobilize and commence removal of asbestos containing transit panels all around the windows on March 7, 2000. The window installation was scheduled to immediately follow.

42. Maropakis encountered the presence of lead paint on the window panes which greatly impacted performance of Maropakis' work.

43. The presence and removal of lead paint was not contemplated by the parties' contract.

44. Upon information and belief, the Navy and its consultants knew or should have known that the window panes contained lead paint.

45. In the contract documents, the Navy represented to Maropakis and all prospective

bidders that all work on the project could be completed within 210 days.

46. The fact that lead paint would or might be found on window panes was not disclosed to Maropakis or any prospective bidders.

47. The Navy's representations and/or failure to disclose the presence of lead paint to Maropakis were material to the terms of Maropakis' bid for the project.

48. Maropakis relied upon the representations of the Navy in bidding the project.

49. During the project, Maropakis requested lead sampling results from the Navy.

50. The Navy did not have lead samples readily available and did not obtain lead paint samples expeditiously.

51. To avoid further delay, Maropakis instructed its subcontractor CES, Inc. ("CES") to take the necessary samples.

52. On April 25, 2000, CES's test results confirmed the presence of lead paint in all of the tested window frames.

53. Lead paint is considered hazardous by RCRA standards for lead and pursuant to RCRA must be disposed of as hazardous waste.

54. Maropakis immediately mailed a copy of the results of the paint analysis to the Navy and informed the Navy of the need for removal of the paint; Maropakis also requested direction from the Navy on how to proceed.

55. On May 1, 2000, the Navy informed Maropakis that the Navy would review the lead paint issue further and instructed Maropakis not to start any work until further direction.

56. Again, on June 7, 2000, Maropakis informed the Navy of the costs of removal and again requested direction on how to proceed.

57. The Navy then issued a modification to the contractor to remove the windows as hazardous waste.

58. On June 28, 2000, the Navy approved the modification, however, in the meantime, with the Navy's permission, Maropakis commenced work on June 22, 2000.

59. As a result of the undisclosed and unanticipated discovery of lead paint, Maropakis' performance of work was substantially and materially delayed.

60. This delay was excusable as it was not within the reasonable control of Maropakis nor was it by any fault of Maropakis.

61. As a result of the Navy's refusal to permit Maropakis to work on the roof and due to the Navy's failure to timely provide Maropakis with direction on how to proceed, Maropakis experienced a 122 calendar day delay which affected performance of the work contemplated by the parties' Contract.

*Impact and Delay Relating to Roof Materials*

62. Maropakis' performance was also delayed and disrupted during the installation of the roofing materials.

63. On August 6, 1999, Maropakis submitted the manufacturers assembly indicating the attachment method of fiberboard to roof system using Type III asphalt.

64. The Navy/Consultant accepted and approved this method.

65. Based upon this approval, Maropakis ordered and delivered Type III asphalt to the project site.

66. The Navy accepted delivery of the asphalt, gave the location for storage to the delivery but never objected to the usage of asphalt

67. Despite the tacit acceptance of asphalt and notwithstanding the prior approval by the Navy and its Consultant Gale Associates, the Navy did not inform Maropakis that asphalt could not be used.

68. However, after the asphalt was delivered, the Navy insisted on the use of adhesive in place of asphalt.

69. As a result, Maropakis experienced 20 consecutive calendar days of delay.

*Delay Due to Unusually Severe Weather Conditions*

70. During the performance of its work, Maropakis experienced unusually severe weather conditions during the months of April - July 1999 and January - February 2000.

71. Maropakis has calculated that it lost a total of approximately 64 calendar days as a result of the unusually severe weather conditions experienced.

72. As a result of these impacts, Maropakis' work was further impacted, and delayed.

**Procedural History**

73. On August 20, 2001, Maropakis submitted a Claim to the Navy pursuant to 41 U.S.C. § 605(a) and F.A.R. 52.233-1.

74. In its Claim, Maropakis requested a 447 calendar day extension of time for the project relating to the above mentioned and other delays and explained the reasons for its request.

75. By letter dated August 28, 2001, the Navy wrongfully refused to issue the requested time extension but requested additional information from Maropakis in support of its claim for extension of time.

76. On June 28, 2002, the Navy notified Maropakis that it was assessing liquidated damages in the amount of $650 per day for 467 days totaling $303,550.00.

77. Maropakis refuted the liquidated damages by letter dated July 22, 2002.

78. At a meeting on October 31, 2002, Maropakis presented additional information to the Navy demonstrating delay as a result of the atypical window specifications and other documentation supporting its claim for an extension of time.

79. On December 30, 2002, the Navy issued a Final Decision pursuant to 41 U.S.C. 605(a) denying Maropakis' request for an extension of time and assessing $303,550.00 in liquidated damages. A copy of the Navy's Final Decision is attached hereto as Exhibit A.

80. In its Final Decision, the Navy determined that Maropakis is liable to the Navy for $59,514.00, the difference between the remaining undisputed contract balance of $244,035.00 and the assessed liquidated damages $303,550.00.

81. Maropakis received the decision on December 21, 2002, therefore this claim is filed in a timely manner pursuant to 41 U.S.C. § 609.

82. Maropakis claims that each of the Navy - caused problems delineated above delayed and disrupted its performance rendering it impossible for Maropakis to complete the project within the project schedule.

83. Maropakis claims that the assessment of liquidated damages was improper.

84. In addition, the failures and refusals described above amount to the Navy's wrongful refusal and failures to afford Maropakis the requested extensions pursuant to the Contract.

85. Further, the Navy's refusal and failure to award Maropakis an extension of time constitutes a material breach of the contract.

86. Moreover, the material defects in the specifications which caused Maropakis to

incur substantial delays constitute a breach of the Navy's implied warranty that the detailed specifications for the window monitors were suitable for the intended purpose.

87. As a direct and proximate cause of the Navy's failure and refusal to grant Maropakis the requested time extensions, as a result of the Navy's breach of implied warranty, and as a result of improper administration of the contract by Navy personnel, Maropakis has and will continue to incur damages in the form of expenses and costs, including liquidated damages assessed by the Navy.

**Requests for Relief**

WHEREFORE, Plaintiff, M. Maropakis Carpentry, Inc. demands judgment of and from the United States as follows:

(a) Compensatory damages in the amount of $244,036.00 for the contract balance due and presently owing to Maropakis, and other delay damages incurred by Maropakis throughout the project;

(b) Recission of Liquidated Damages as improper because the delays were beyond the reasonable control of Maropakis and without its fault or negligence;

(c) To the extent this Court finds in favor of Maropakis, Maropakis is entitled to interest pursuant to 41 U.S.C. § 611 from on or about August 21, 2001, the date the Contracting Officer received Maropakis' claim under 41 U.S.C. § 605(a) at a rate established by the Secretary of the Treasury pursuant to Public Law 92-41.

(d) All attorneys' fees and costs incurred by Maropakis in the preparation of this claim and in the prosecution of this action; and

(e) All other relief as this Court deems just and proper.

POWELL, TRACHTMAN, LOGAN, CARRLE
& LOMBARDO, P.C.

By: Kelly H. Decker
Paul A. Logan
David W. Francis
Kelly H. Decker
114 North Second St.
Harrisburg, PA 17101
(717) 238-9300
(717) 238-9325

Date: December 16, 2003

**DEPARTMENT OF THE NAVY**
ENGINEERING FIELD ACTIVITY, NORTHEAST
NAVAL FACILITIES ENGINEERING COMMAND
10 INDUSTRIAL HIGHWAY
MAIL STOP, #82
LESTER, PA 19113-2090

IN REPLY REFER TO
4330
Code 02B\AR
20 December 2002

**EXPRESS MAIL**
Maropakis Carpentry, Inc
Attn: Abdul Rangwalla
400 3rd Avenue
Brooklyn, New York 11215

Final Decision #03-002F

Gentlemen:

Subject: CONTRACT N62472-97-C-4116, REPLACE ROOF, BUILDING 110, NAVAL INVENTORY CONTROL POINT, MECHANICSBURG, PA

Reference is made to our Demand letter to you dated June 28, 2002. After reviewing your letter dated July 22, 2002 and information presented at the 31 October 2002 meeting at Engineering Field Activity, Northeast, the Contracting Officer has determined that there has been no new information presented to change our position. Therefore, we reiterate our demand that you are liable to the Navy for the difference between the remaining contract balance of $244,035 00 and $303,550.00, the total amount of liquidated damages due and owing the Government.

The original contract completion date is January 16, 2000 and not July 16, 2000. Our calculations are based on the contract completion date of 4 February 2000 as set forth under modification P00003.

We make demand on you for $59,514 00. Your check should be made out to the U.S. Treasury Department. Pursuant to the interest clause in your contract, interest is due at the rate established by law from the date of the demand letter which is June 28, 2002.

You may submit a proposal for deferment of collection if immediate payment is not practicable or if you plan to dispute the amount due. Any requests for deferment shall be submitted to the Contracting Officer. Please remit payment to:

Commanding Officer, Engineering Field Activity, Northeast
Naval Facilities Engineering Command
10 Industrial Highway, MS #82
Lester, PA 19113-2090

EXHIBIT
A

This is the Final Decision of the Contracting Officer. This Decision may be appealed to the Armed Services Board of Contract Appeals, which is the authorized representative of the Secretary of the Navy for hearing and determining contract disputes.

If you decide to appeal this decision, written notice thereof must be mailed or otherwise furnished to the Armed Services Board of Contract Appeals, Skyline Six, 5109 Leesburg Pike, 7th Floor, Falls Church, CA 22041, within ninety days from the date you receive this decision. A copy of that notice shall also be furnished to the Contracting Officer from whose decision the appeal is taken, at the address set forth at the head of this letter, Attention: Director, Contracts Department. The notice should indicate that an appeal is intended, should reference this decision, identify the contract by number, and state the amount in dispute. The rules of procedure of the Armed Services Board of Contract Appeals are in the DFAR, Appendix A, Part Two. Optional Accelerated Procedures are available in appeals involving $50,000.00 or less. Small Claims (Expedited) Procedures are available in appeals involving $10,000 or less. In lieu of appealing to the Armed Services Board of Contract Appeals, you may bring action directly in the U.S. Court of Federal Claims within 12 months of the date you received this decision (except as provided in Section 4 of the Act (Maritime Contracts)).

Sincerely,

Robert G. Smith

ROBERT G. SMITH
Contracting Officer
By direction of the
Commanding Officer