# EXHIBIT F

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

. . . . . . . . . . . . . . . . .
M. MAROPAKIS CARPENTRY, INC., . No. 03-2825C
Plaintiff .
. (Judge Baskir)
vs. .
.
THE UNITED STATES, .
Defendant .
. . . . . . . . . . . . . . . . .

Deposition of: **LONNIE RAY MOYER**

Taken by : Plaintiff

Date : February 16, 2006, 10:12 a.m.

Place : One South Market Square
Harrisburg, Pennsylvania

Before : Bethann M. Mulay, Notary Public
Registered Professional Reporter

APPEARANCES:

RHOADS & SINON LLP
By: DAVID W. FRANCIS, ESQ.

For - Plaintiff

U.S. DEPARTMENT OF JUSTICE
By: JAMES D. COLT, ESQ.

For - Defendant

ALSO PRESENT: Alan R. Caramella, Esq.

# I N D E X

## WITNESS


| | Examination |
|---|---|
| LONNIE RAY MOYER | |
| By Mr. Francis | 3 |
| By Mr. Colt | 76 |


## EXHIBITS


| Moyer Deposition Exhibit | Page |
|---|---|
| A. Notice of Deposition of Designee(s) for Defendant, The United States | 6 |
| B. M. Maropakis Carpentry, Inc.'s Request for the Production of Documents at the Deposition of the Navy's Designee | 62 |
| C. Memorandum from E.C. Aldridge, Jr. | 63 |
| D. Military Handbook | 65 |
| E. Unified Facilities Guide Specifications Section 08520S | 75 |

STIPULATION

It is hereby stipulated by and between counsel for the respective parties that sealing, certification and filing are hereby waived; and all objections except as to the form of the question are reserved to the time of trial.

LONNIE RAY MOYER, called as a witness, having been duly sworn, testified as follows:

EXAMINATION

BY MR. FRANCIS:

Q. Mr. Moyer, my name is David Francis. I'm the attorney that represents M. Maropakis Carpentry, Inc. in this matter. We are deposing you as the designee for the Department of the Navy.

MR. FRANCIS: Also present in the room is James Colt who is the attorney for the United States as well as?

MR. CARAMELLA: Alan Caramella.

MR. FRANCIS: Would you mind spelling the last name.

MR. CARAMELLA: Sure, C-a-r-a-m-e-l-l-a. First name is A-l-a-n.

MR. FRANCIS: Before we go any further, we should talk about objections and whether the

witness is going to read and sign the deposition. In past we have stipulated that all objections except as to the form of the question are preserved until the time of trial. Is that acceptable?

MR. COLT: We'll keep our usual objections.

MR. FRANCIS: Well, can we put them on the record?

MR. COLT: I'm sorry?

MR. FRANCIS: Would you mind stating what your understanding of objections is for purposes of the record.

MR. COLT: The same situation that we've had in prior depositions.

MR. FRANCIS: The same stipulations?

MR. COLT: Yes.

MR. FRANCIS: Is Mr. Moyer going to read and sign the deposition?

MR. COLT: Yes, he will read it.

MR. FRANCIS: And sign it?

MR. COLT: After he has read it and made any corrections.

BY MR. FRANCIS:

Q. Mr. Moyer, I've deposed you before, so you're familiar I think to some extent with this

matter. However, I'm going to go over the instructions with you once again. The purpose of the deposition is for me to ask you questions, for you to answer them, and for the court reporter to get down what we say, okay?
A. Yes.
Q. So, therefore, it's very important that you articulate your answers. Nods of the heads, uh-huhs, so forth are very difficult for the court reporter to get down, okay?
A. Yes.
Q. Secondly, it's important that only one of us talk at the same time because it's impossible for the court reporter to get down two people talking at once, okay?
A. Okay.
Q. Third, it's important that you understand the questions that I'm asking you so that we have a clear and concise record. In that regard if there are any questions which you don't understand, I'd be happy to rephrase so that you do understand what I'm asking, okay?
A. Yes.
Q. Is it your understanding that you're appearing today as the designee for the Department of the

Navy?

A. Yes.

MR. FRANCIS: I'm going to have that marked as Exhibit A.

(Moyer Deposition Exhibit A marked for identification)

BY MR. FRANCIS:

Q. Mr. Moyer, I've handed you what's been marked as Exhibit A which is a copy of the notice of deposition for the designee of the Department of the Navy. Have you seen this document before?

A. Yes.

Q. And is it your understanding that you've been identified to testify with respect to all the issues that are set forth in here?

A. Yes.

Q. Let's go to Page 2 of the document where it identifies the areas where the designee is expected to testify, and let's start with Paragraph Number 1. And I'll read the beginning of this paragraph. It says, quote, the existence of any statutes, and then it later goes on to address, it states, to address standard specifications for construction projects. Do you see that?

A. No.
Q. Actually why don't you read Paragraph 1.
A. The existence of any statutes, acts, regulations, directives, standards, handbooks, or other publications that address standard specifications for construction projects.
Q. You're right. I misspoke and said windows. I apologize. It goes on to say, this includes but is not limited to standard specifications for windows, correct?
A. Yes.
Q. Let's go through that. Are you aware of any statutes that were in existence during the design phase of this project that dealt with standardized specifications for construction projects?
A. There is a handbook, Military Handbook, that discusses the requirements for preparation of plans and specifications.
Q. I understand that. I have a copy of that here today. My question, though, is whether at the time that this project was designed was there a statute that governed specifications for construction projects, do you know?
A. A statute?

Q. Do you not understand what a statute is?
A. A law.
Q. A law. Do you know whether there's a law that governed standard specifications for construction projects?
A. I'm not aware of any.
MR. FRANCIS: I'd like the record to indicate that Mr. Colt whispered the answer to the witness.
BY MR. FRANCIS:
Q. Do you know who is aware?
MR. COLT: We would also object that this is knowledge, regulations and statutes, that would be equally available to the plaintiff.
MR. FRANCIS: Are you directing him not to answer?
MR. COLT: We do not have any knowledge that would not be equally available to Maropakis in this matter with regard to regulations or statutes.
MR. FRANCIS: Are you directing him not to answer?
MR. COLT: What was the question?
MR. FRANCIS: Who from the Department of the Navy could testify as to the statute that

was in place at the time that this project was designed?

MR. COLT: The answer is we do not have anybody who would have knowledge regarding that that would not be available to Maropakis already.

MR. FRANCIS: First of all, you're not the witness, Mr. Colt. Mr. Moyer is. He's under oath. He's answering the questions. Are you directing him not to answer?

MR. COLT: That's the answer.

MR. FRANCIS: Just for purposes of the record, he suggested that to the witness. I'm going to object to your attempt to control what Mr. Moyer testifies to. I'm going to ask the question in this form.

BY MR. FRANCIS:

Q. Is there or is there not somebody within the Department of the Navy who would be aware as to whether there was a statute in place during the design phase of this project that governs standard specifications for construction projects?

MR. COLT: Mr. Moyer is prepared to testify about the applicability of these design

specification guidelines. That is what he has been prepared to testify for -- with regard to.

MR. FRANCIS: So the record is clear, is it your position, Mr. Colt, that you have not produced someone to testify regarding the existence of a statute that governs standard specifications for windows?

MR. COLT: We have not-- We are not going to produce anybody to testify with regard to statutes or regulations that Maropakis has equivalent access to.

MR. FRANCIS: Do you have authority for the proposition that you don't have to produce somebody to testify to that?

MR. COLT: If there is-- We talked about the limits of this deposition. If you believe that we need to provide-- We do not have anybody who can testify on that with regard to knowledge that Maropakis already has or should have. It is not our burden to educate you on the law or to educate your client on applicable regulations.

BY MR. FRANCIS:

Q. So you're refusing to answer the question. Is that right, Mr. Moyer?

MR. COLT: I have said that we do not have--

MR. FRANCIS: Listen--

MR. COLT: You asked about--

MR. FRANCIS: --I'll get the judge on the line if you want. This is ridiculous.

MR. COLT: You asked if we have somebody else in the Navy who can testify, and we do not have anybody in the Navy who can testify with regard -- give any information with regard to regulations that Maropakis would not already have access to.

MR. FRANCIS: First of all, we're talking about statutes, not regulations.

BY MR. FRANCIS:

Q. And my question is whether or not there is somebody from the Department of the Navy who is aware of whether there were statutes in place during the design phase. Do you know the answer to that?

MR. COLT: Statutes regarding what?

MR. FRANCIS: Standard specifications for construction projects.

BY MR. FRANCIS:

Q. Is there somebody within the Department of the

Navy who would know?
A. I'm not aware of someone.
Q. Are you familiar with the National Technology Transfer and Advancement Act of 1995?
A. No, I'm not.
Q. Refresh my recollection as to what your duty position was during the design phase of this project.
MR. COLT: I would object in the sense that any questions about Mr. Lonnie Moyer's personal status is beyond the scope of this deposition given that he's speaking as a 30(b)(6) deponent.
MR. FRANCIS: Are you directing him not to answer?
MR. COLT: Actually I do direct him not to answer that as beyond the scope of his status as a 30(b)(6) deponent.
MR. FRANCIS: Do you agree with me that it's within the scope of the deposition to determine whether or not the witness that you produced is competent to testify with respect to the items that have been identified, Mr. Colt?
MR. COLT: He is competent to testify in that we have tried to educate him and to the extent that he has personal knowledge that can

relate to these. And we have tried to prepare him for these questions, and that is the basis of his competency to testify.

MR. FRANCIS: Do you agree with me that it's permissible for Maropakis to question Mr. Moyer specifically about his knowledge of these items and whether he has -- whether his duty position required him to have information regarding statutes, acts, regulations during the design phase?

MR. COLT: He can testify and he has been prepared to testify about the applicability of these specification guidelines.

MR. FRANCIS: That's not the question. Can you read back the question, please.

(The court reporter read back the referred-to portion of the testimony.)

MR. COLT: Again, this is not about Mr. Moyer's personal capabilities.

MR. FRANCIS: Are you directing him not to answer the question?

MR. COLT: What was the question?

MR. FRANCIS: Do you agree-- I'll restate it. Do you agree that Maropakis is entitled to question Mr. Moyer as to whether he is the

appropriate person to testify regarding these items?

MR. COLT: He is our designee, and he has been prepared with regard to -- to testify with regard to the guide specifications -- the specification guidelines that you wanted to know about. That is what qualifies him.

MR. FRANCIS: That's not the question. Just so we're clear, the notice of deposition doesn't address guidelines. It addresses a number of different items. Is it your position that Mr. Moyer is here to testify regarding the existence of statutes, yes or no?

MR. COLT: He can give any knowledge that the special knowledge that the Navy might have had, but there was no special-- There were no special regulations or statutes that Maropakis would not have had equally available. And he has tried to testify about a handbook and other guidelines.

MR. FRANCIS: Do you agree with me that Maropakis has the right to challenge the designation of Mr. Moyer as the designee for the Navy?

MR. COLT: I'm sorry, Mr. Francis,

determinations of matters of law are for the court and for us to argue before the court. There is no person to testify about matters of law. This is fact discovery. You asked for an extension of fact discovery, and we've tried to provide somebody who can testify about these guidelines. Questions of law are for the court.

MR. FRANCIS: Well, I disagree that this is a question of law. We're not asking for an interpretation of the statute. We're asking whether or not there was a statute in existence. Ultimately we're going to ask about whether the Navy complied with that statute. That has nothing to do with an interpretation of law. Are you directing the witness not to respond to questions about his background?

MR. COLT: What are your questions about his background?

BY MR. FRANCIS:

Q. What was your duty position during the design phase?

A. I was a design manager.

Q. Did you have a responsibility for approval of designs that were submitted for construction projects at the Naval Inventory Control Point?

A. Somewhat, a cursory approval.
Q. Were you delegated with responsibility to review and approve specifications that were prepared by design professionals?
A. In a cursory sense, yes.
Q. Were you delegated with authority?
A. Delegated?
MR. COLT: Objection, asked and answered.
BY MR. FRANCIS:
Q. Do you know what the term delegated means?
A. Yes.
Q. What does it mean to you?
A. Well, I was assigned to handle this project, this design project.
Q. Is there somebody at the Naval Inventory Control Point who is responsible for approving designs that are prepared by design professionals for construction projects?
MR. COLT: Objection, asked an answered. Mr. Moyer said that he was involved in that.
MR. FRANCIS: That is not an answer.
BY MR. FRANCIS:
Q. Is there somebody who is responsible for approval?
A. The contracting officer ultimately signs off on

projects.

Q. And you are not the contracting officer, correct?

A. No.

Q. Do you know whether the contracting officer had any information regarding the existence of statutes in effect at the time of the design phase that governed standard specifications for construction projects?

A. No, I do not.

Q. Do you agree with me that such knowledge may be important in determining the adequacy of the specifications for the project?

MR. COLT: Objection as to form.

MR. FRANCIS: Are you directing him not to answer?

MR. COLT: I just made an objection as to form.

MR. FRANCIS: Are you directing him not to answer?

MR. COLT: I have not said that. Could you repeat the question.

BY MR. FRANCIS:

Q. Do you agree with me that it would be important information to know-- Let me rephrase it. Do

you agree with me that it would have been important for the contracting officer to know of the existence of statutes that governed mandatory provisions of construction projects when he approved the design -- a construction design for a project?

MR. COLT: I'm going to object. Mr. Moyer wasn't designated to testify as to the specifics of the capabilities of a contracting officer. And I believe we provided the contracting officer or other people in prior depositions.

MR. FRANCIS: Are you directing him not to answer?

MR. COLT: Yes, I am as beyond the scope of the deposition.

MR. FRANCIS: Excuse me for a moment. Let's take a brief break.

(Recess taken)

MR. FRANCIS: I'm going to read from the rules of the United States Court of Claims governing depositions upon oral examinations, Subparagraph C which states in part--

MR. COLT: I'm sorry, which rule number is that?

MR. FRANCIS: C.

MR. COLT: No, the rule number.

MR. FRANCIS: 30C which states in part, all objections made at the time of the examination to the qualifications of the officer taking the deposition, to the manner of taking it, to the evidence presented, to the conduct of any party, or to any other aspect of the proceedings shall be noted by the officer upon the record of the deposition, but the examination shall proceed with the testimony being taken subject to the objections, close quote. Is it your position that notwithstanding that rule you're authorized to tell the witness not to answer questions?

MR. COLT: First of all, Mr. Francis, I would remind you we have actually been far less vocal than you were in the deposition that we took several months ago of the Maropakis 30(b)(6) nominee. And I recall several instances in which you instructed your witness not to answer. I have been far more restrained, and I have only instructed the witness so far not to answer on matters that I feel are beyond the scope of the deposition and that he should not reasonably be -- the Navy should not reasonably be required to provide a deponent

with regard to specifically, for example, matters of law.

If you have a specific statute that you want to ask about-- But I do not feel that I have acted improperly in this matter, and I have not done anything that you did not do in a comparable deposition that we had.

MR. FRANCIS: Asking the question a second time, notwithstanding the language in the rule which specifically states, quote, the examination shall proceed, with the testimony being taken subject to objections, close quote, is it or is it not your position that you can direct the witness not to answer questions?

MR. COLT: Yes, if it seeks matters that are beyond the scope of the deposition or which the Navy should not reasonably be required to provide a deponent with regard to.

MR. FRANCIS: And what rule are you relying upon in making that assertion?

MR. COLT: Rule 30(b)(6), Rule 30(b) as comparable--

MR. FRANCIS: I'm going to hand you--

MR. COLT: --requirements.

MR. FRANCIS: I'm going to hand you the

rules of the United States Court of Federal Claims. I would ask you to read into the record the provision of those rules that specifically addresses your authority to direct the witness not to answer questions.

MR. COLT: If it is something beyond the scope of the deposition or about which the Navy should not have been required to provide somebody -- a witness who will not answer what he cannot or what is -- what he cannot answer or what is a legal matter for the Court to decide.

MR. FRANCIS: Just so we're clear, you are not reading from the rules. I will ask you again to read from the rules and provide the specific statement in the rules which authorizes you to tell a witness not to answer.

MR. COLT: I refer to my previous answers.

MR. FRANCIS: I take it that there's nothing in the rules that authorizes you to direct a witness not to answer.

MR. COLT: I believe the whole structure of Rule 30(b)(6) allows an instruction like that if it's beyond the scope of the deposition or if it's something about which no deponent should be required to testify.

MR. FRANCIS: Can you read the specific language from Rule 30(b)(6) which says that?

MR. COLT: We stand by our previous stance. Do you have further questions for this witness?

MR. FRANCIS: Yes, I do. We're going to be here all day. Do you have specific provisions from Rule 30(b)(6) which authorizes you to direct a witness not to answer questions?

MR. COLT: If it is beyond the scope of the deposition, then, yes, we believe that 30(b)(6) is restricted to the scope of the deposition, what is known or reasonably could be known, and it does not require us to give legal determinations. That's for the Court to make.

MR. FRANCIS: I take it, therefore, that there is no specific language from Rule 30(b)(6) that you are relying upon in making that assertion. Is that correct?

MR. COLT: 30(b)(6)-- It is within 30(b)(6) and all the rules regarding depositions that you can only be required to testify regarding -- with regard to the scope of the deposition and with regard to what a deponent can testify about. You're not supposed to usurp prerogatives of the court such as legal

determinations.

MR. FRANCIS: Well, first of all, do you agree that you haven't filed a protective order with respect to the items that were identified in the notice of deposition?

MR. COLT: It was our understanding that you needed a deponent to testify about the applicability about the guide specs. That is what we have done here as near as we can. We can't know every specific question you're going to ask beforehand.

MR. FRANCIS: Do you agree with me that you haven't filed a protective order with respect to the items that are set forth in Exhibit A?

MR. COLT: No, we have not.

MR. FRANCIS: Do you agree with me that the existence of a statute which addresses standard specifications for construction projects, the existence of a statute is a relevant fact I can ask a witness about?

MR. COLT: We haven't said that there aren't any statutes. We've said that there are statutes that Maropakis would have had equal access to. We can't provide somebody who knows about every statute, and we can't predict

beforehand every question that you may ask. Do you have a question about a specific statute?

MR. FRANCIS: I want to know if the Navy is aware that one exists.

MR. COLT: If you have questions about a specific statute, I believe our deponent can answer them.

MR. FRANCIS: I asked him specifically about the National Technology and Transfer Act of 1995, and he's indicated he's not familiar with that statute.

BY MR. FRANCIS:

Q. Is that correct, Mr. Moyer?

A. Yes.

MR. COLT: Do you have some specific question about that statute?

MR. FRANCIS: Not for somebody who isn't familiar with it, no.

MR. COLT: Was this matter-- If this statute was important, why did you not mention this statute specifically? We can't provide a witness who has encyclopedic knowledge of all statutes and regulations out there. If this statute was important, why did you not identify it? Mr. Moyer can testify about the guide

specifications. Is it correct that you did not identify this statute specifically and indicate that you wanted to ask questions about it?

MR. FRANCIS: Sure, yeah. The notice of deposition speaks for itself. The notice of deposition wants to know -- wants a deponent to testify regarding the existence of statutes that govern standard specifications for windows. Maropakis' position is that the Department of the Navy and the personnel who are responsible for approving the design and monitoring the construction should be aware of the existence of any such statute.

If it's your position that I had to specifically identify the exact statute that may or may not apply, that's an objection that you can make. But in my position and Maropakis' position you cannot direct a witness not to answer a question. You have to make the objection, and the testimony has to proceed. And I believe that the United States is in violation of that rule.

MR. COLT: Well, we believe for the reasons stated before that if something is beyond the scope of the deposition -- of a 30(b)(6)

deposition or for some other reason that that instruction can be given. And I also would note that you gave that similar instruction several times in the deposition that we took of Maropakis's 30(b)(6) deponent.

MR. FRANCIS: Well, just so the record's clear, we're going to reserve the right to file a motion to compel the designation of another witness. And Maropakis's position is that Mr. Moyer is an improper designee with respect to the existence of a statute.

MR. COLT: If you have a specific question with regard to that statute that you--

MR. FRANCIS: No. The record speaks for itself. That's not-- I don't believe under the rules that I have an affirmative duty to identify the specific statute where I'm interested in the existence of any such statute. We can fight about it with the court. I mean, we're going to obviously have a debate about that with the court.

MR. COLT: Do you have any other questions for Mr. Moyer?

MR. FRANCIS: As I've indicated, yeah, we're going to be here all day. I'll let you

know when I'm done.

BY MR. FRANCIS:

Q. Are you aware, Mr. Moyer, of the existence of any regulations that address standard specifications for construction projects at the time -- during the design phase of this project?

MR. COLT: Our answer with regard to regulations would be the same as for statutes, just to simplify matters.

MR. FRANCIS: I'd like to make sure the record is plain. Actually let me go back to statutes.

BY MR. FRANCIS:

Q. Are you aware of any statutes that exist today that govern standard specifications for construction projects?

MR. COLT: I believe asked and answered.

MR. FRANCIS: Are you directing him not to answer?

MR. COLT: I said asked and answered.

MR. FRANCIS: Are you directing him not to answer? It's a simple question. I'd like to indicate that Mr. Colt is shaking his head to Mr. Moyer indicating an answer in a no format.

BY MR. FRANCIS:

Q. What's your answer, Mr. Moyer, no?
A. No.
Q. Is there anybody within the Department of the Navy that would be aware of the existence of any such statutes?
A. I don't know.
MR. CARAMELLA: Can I just interject here. It almost seems like you're asking for us to produce the general counsel of the Navy or some-- You're asking for a lawyer type, someone who can give you all the statutes and all the regulations that may have some applicability.
MR. COLT: Even the general counsel of the Navy would not have an encyclopedic knowledge beforehand of every statute out there.
MR. CARAMELLA: Which is why if you had some specific ones that you wanted to talk about--
MR. COLT: Mr. Moyer is prepared to talk about the applicability of guide specifications and how they work.
MR. FRANCIS: Well, I disagree with your assertion that there's nobody within the Department of the Navy who would be familiar with the statutes, and we'll get into that

perhaps later in the deposition.

BY MR. FRANCIS:

Q. Let me ask you just so it's plain on the record, Mr. Moyer, are you familiar with any regulations which govern standard specifications for construction projects during the design phase?

A. There is a Military Handbook that speaks to the process for preparing plans and specifications.

Q. Do you have an understanding as to whether a regulation is different from a handbook?

MR. COLT: Objection. Again, that's a legal question.

MR. FRANCIS: No, it's not.

BY MR. FRANCIS:

Q. Do you have an understanding as to whether a regulation is different than a handbook?

A. No.

Q. Do you believe that the handbook is a regulation, the handbook you just referred to?

A. Is the handbook a regulation?

MR. COLT: Objection. Mr. Moyer is not an attorney. He can't give that determination. He has said that a military handbook is an applicable guideline with regard to this.

BY MR. FRANCIS:

Q. Do you know what regulations are?
A. No.
MR. COLT: Objection. Well, strike that.
BY MR. FRANCIS:
Q. Do you know what regulations are, Mr. Moyer?
A. Some kind of written rules to follow.
Q. Do you know whether Naval personnel are required to perform their duties in accordance with Naval regulations, do you know?
A. Well, I would think so, yes.
MR. COLT: Does the handbook that you referenced--
MR. FRANCIS: Objection. You're not allowed--
MR. COLT: --contain the rules that have to be followed?
MR. FRANCIS: Objection. Hold on. Hold on. Objection. Mr. Colt, I'm asking the questions of the witness. You will have an opportunity at the close of the deposition to ask questions of Mr. Moyer, but I can't allow you to be asking questions of the witness right now. It's improper.
BY MR. FRANCIS:
Q. Mr. Moyer, is there anybody within the

Department of the Navy that would have information regarding regulations that govern standard specifications for construction projects, do you know?
A. No.
Q. Are you aware of the existence of any directives which addressed standard specifications for construction projects during the design phase of this project?
A. No.
Q. Do you know if there's anybody within the Department of the Navy that would be -- have knowledge about that?
A. I don't know who they would be.
Q. Does that mean you do or don't know about whether there is somebody that would know?
MR. COLT: Objection, asked and answered.
BY MR. FRANCIS:
Q. Do you understand the question, Mr. Moyer?
A. Say that again.
Q. I was unclear by your answer whether you believe there is somebody who would know or whether you don't know whether there's somebody who would know about the existence of directives during the design phase.

A. I don't know.
Q. Are you aware of the existence of any directives which currently exist?
MR. COLT: One moment. I need to-- We need to take a break for just say two minutes.
(Recess taken)
MR. COLT: Did you have something to say?
A. No.
MR. COLT: Well, with regard to directives?
MR. CARAMELLA: Let him ask a question.
MR. FRANCIS: Actually before we do that, I'm just going to launch a general objection to coaching the witness about how to answer questions.
MR. COLT: Okay. A 30(b)(6) deposition by its very nature is somewhat artificial, and there may be questions about the state of knowledge that the agency has, and that makes discussions of the most appropriate answer correct and appropriate.
MR. FRANCIS: I'm going to hand you back the rules. Would you please tell me what provision of the rules say that's true.
MR. COLT: If you have any objections to how we are handling this deposition, you can

bring your objections to the court.

MR. FRANCIS: Does that mean you don't have a rule?

MR. COLT: I stand by my answer.

MR. FRANCIS: Does that mean you don't have a rule, Mr. Colt?

MR. COLT: I stand by my answer. I believe we're acting appropriately within the rules of the court.

MR. FRANCIS: I'm going to read something into the record, if I may. I'm going to read from Rule 37(a)(2)(b). It reads, if a deponent fails to answer a question propounded or submitted under RCFC 30 or 31, or a corporation or other entity fails to make a designation under RCFC 30(b)(6) or 31(a), or a party fails to answer interrogatory submitted under RCFC 33, or if a party, in response to a request for inspection submitted under RCFC 34, fails to respond that the inspection will be permitted as questioned or fails to permit inspection as requested, the discovering party may move for an order compelling an answer or a designation or an order compelling inspection in accordance with the request.

The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make the discovery in an effort to secure the information or material without court action.

When taking a deposition on oral examination, the proponent of the question may complete or adjourn the examination before applying for an order. That's the end of the rule.

I'd like to make it plain that this is my good-faith attempt at resolving the dispute regarding your direction to the witness not to answer questions, your discussing answers with the deponent and how to answer questions, your indications that there are questions which are beyond the scope of discovery because they deal with the existence of statutes, and any other objections that you've made.

It is my intent to bring a motion with the court which will compel you to produce a witness who can testify to these items and that they answer them. I intend to proceed with the deposition today so that I can make a full

record of all of the areas where Mr. Moyer either does not have knowledge or is directed not to answer the questions. Back to the questions.

BY MR. FRANCIS:

Q. Mr. Moyer, do you have any knowledge of the existence of directives today which govern standard specifications for construction projects?

A. There is a Military Handbook 1006 that deals with the preparation of plans and specifications.

Q. In addition to Handbook 1006, are there any other directives that you're aware of that deal with standard specifications for construction projects?

A. Not that I'm aware of.

Q. Did this Handbook 1006 exist at the time of the design phase of this project, do you know?

A. Yes. Yes, it did.

Q. Are you aware of any standards for construction projects that existed during the design phase other than what might be set forth in 1006?

A. Just the Military Handbook 1006.

Q. Are you aware of any other publications that

would have existed during the design phase that would have had standard specifications for construction projects?

A. No.

Q. Let's go on to Paragraph 2. I've already asked you about the existence of statutes that govern standard specifications. Are you aware of the existence of any statutes which govern mandatory requirements for compliance with standard specifications for construction?

A. I believe the--

MR. COLT: I'm sorry, to clarify, are these mandatory requirements that you're asking about?

BY MR. FRANCIS:

Q. Why don't you read Paragraph 2 to yourself real quick, Mr. Moyer.

A. The Military Handbook 1006 talks about a requirement to use SPECSINTACT for our projects.

Q. I understand that. My question has to do with statutes, though. Are you aware of any statutes that address mandatory requirements for compliance with standard specifications for construction projects? I assume your answer is no based upon--

MR. COLT: Our standard objection with

regard to the matters of law, statutes, acts, regulations applies.

MR. FRANCIS: Again, you're directing the witness not to answer?

MR. COLT: Yes.

MR. FRANCIS: And your standard objection is based upon the fact that you believe that's a conclusion of law.

MR. COLT: And also the fact that statutes, acts, and regulations would have been equally available to Maropakis.

BY MR. FRANCIS:

Q. You mentioned SPECSINTACT. What is that?

A. SPECSINTACT is a computer program and system to provide guide specs for the creation of a specification package for construction.

Q. And do you know if SPECSINTACT is still utilized by the Department of the Navy?

A. Yes, it is.

Q. Just to clarify, do you know whether it's still used by the Department of the Navy for current designs, i.e. projects that are currently under design?

A. Yes, it is.

Q. Do you know what the Unified Facilities Guide

Specifications are?
A. Yes.
Q. What are they?
A. The Navy previously had a series of guide specs. I should say the DOD had guide specs. There was a Navy version, an Army version. Various divisions like Northern Division, Atlantic Division had their own series of guide specs. The Unified Facilities Guide Specs was an attempt to consolidate all those different guide specs.
Q. Is it your understanding that the Unified Facilities Guide Specifications are the same as or different than SPECSINTACT?
A. They're included in SPECSINTACT. I don't understand the question.
Q. Well, let me rephrase it. It's your understanding that the Unified Facilities Guide Specifications are included within SPECSINTACT?
A. Yes, they are.
Q. And your understanding of SPECSINTACT is that it's provided in CD format?
MR. COLT: Objection.
BY MR. FRANCIS:
Q. Is that correct?

MR. COLT: Objection to form.

BY MR. FRANCIS:

Q. How are SPECSINTACT provided?

A. Originally they were distributed on CDs. Now it's online.

Q. Let's go to Paragraph 3. Why don't you read that to yourself. Have you had an opportunity to read it?

A. Yes.

Q. Mr. Moyer, are you familiar with the existence of any statutes which address modifications to standard specifications for construction projects?

MR. COLT: Our standard objection with regard to the statutes, acts, and regulations applies.

MR. FRANCIS: So you're directing him not to answer?

MR. COLT: Yes.

BY MR. FRANCIS:

Q. Mr. Moyer--

MR. COLT: I want to specify that with regard to the standing objection, we have said previously that if Mr. Francis asked about a specific act or regulation we might be able to

give some question, but just a general description we can't here.

BY MR. FRANCIS:

Q. The present question is whether any such statutes exist which address modifications to standard specifications. Are you aware of whether any such statutes exist?

MR. COLT: Our standing objection applies.

MR. FRANCIS: Are you directing him not to answer?

MR. COLT: Yes.

MR. FRANCIS: But you would allow him to answer if I identified a specific statute. Is that right?

MR. COLT: If you had a specific question about a specific statute, he might be able to answer it.

MR. FRANCIS: And you wouldn't direct him not to answer it?

MR. COLT: It would depend on if it was something that could reasonably be known.

MR. FRANCIS: Just so we're plain for purposes of the record, it's your position, position of the United States, that I can ask questions about specific statutes that I

identify but that I can't ask questions about whether such statutes exist and that you're directing him not to answer that. Is that right?

MR. COLT: There might be some question that might not require a conclusion of law or might be within the scope of the deposition, and that might be answerable.

MR. FRANCIS: Do you think that the existence of a statute is a conclusion of law?

MR. COLT: The applicability of a statute is, and more to the point, it is also equally available to Maropakis.

MR. FRANCIS: So you're directing him not to answer?

MR. COLT: Yes.

BY MR. FRANCIS:

Q. Mr. Moyer, do you use regulations in your job with the Department of the Navy?

A. I'm sure there are.

MR. COLT: I'm sorry, what do you mean by use?

MR. FRANCIS: Let me ask a different question. Let me ask a broader question.

BY MR. FRANCIS:

Q. Are there documents that -- Naval publications or Department of Defense publications that you use in performing your duties with the Department of the Navy?

A. There are things called FAR clauses, DFAR clauses. They're included in many of the specifications or reference to in specifications especially the boilerplate front sections.

Q. And are you familiar with those FAR sections?

A. Somewhat. They're referenced a lot.

Q. Just for purposes of the record, what is a FAR?

A. Federal Acquisition Regulation.

Q. What's a DFAR? Is it Defense Federal Acquisition Regulation?

MR. COLT: Objection as to form.

BY MR. FRANCIS:

Q. Is it, do you know?

A. I'm not sure what the D stands for.

Q. How do you utilize the FARs and the DFARs in your job?

MR. COLT: Objection. Well, strike that.

BY MR. FRANCIS:

Q. Do you use the FARs and the DFARs in your job, Mr. Moyer?

MR. COLT: What do you mean use?

BY MR. FRANCIS:
Q. Do you have an understanding of the term use?
A. Typically the guide specs are prepared and already have the references contained in them for various clauses.
Q. Is there anything-- Other than the fact that they're referenced in guide specifications, is there anything that you do with the FARs and the DFARs in the course of your employment?
A. Very little.
Q. In addition to the FARs and the DFARs, do you know whether the Department of the Navy has regulations that govern modifications to standard regulations -- or standard specifications?
A. I can only make reference to that Military Handbook.
Q. Let's go on to Paragraph 4. Why don't you read Paragraph 4 to yourself. Have you had an opportunity to review it?
A. Yes.
Q. Do you know what a command is?
MR. COLT: Well, objection. It's a term used by Mr. Francis in his notice of deposition.
BY MR. FRANCIS:

Q. Mr. Moyer, are you familiar with what a command is for the Department of the Navy?
A. Yes, I think so.
Q. What is a command?
A. That would be an office that's in charge of a certain region or area.
Q. For example, the Naval Facilities Engineering Command is a command, correct?
A. Yes.
MR. COLT: Objection as to form.
BY MR. FRANCIS:
Q. Is it? Is it a command?
A. Yes.
Q. Do you know whether the Naval Facilities Engineering Command is responsible for standardization of construction specifications?
A. It is responsible for preparing the guide specs that we use.
Q. By guide specifications, are you referring to the SPECSINTACT, or are you referring to publication 1006?
A. The SPECSINTACT program in its entirety, yes.
Q. Do you know whether there are any of the other entities, office, departments, division, branch, units, or other entities responsible for

standardization of construction specifications?
A. Just the Naval Facilities Engineering Command.
Q. And do you know whether or not the Naval Facilities Engineering Command was responsible for standardization of construction specifications during the design phase of this project?
A. Well, they were responsible for preparing the guide specs that were used to prepare these specifications.
Q. Are you familiar with the provisions that are set forth in SPECSINTACT?
A. What do you mean by provisions?
Q. Well, what is SPECSINTACT?
A. SPECSINTACT, the acronym SPECSINTACT, stands for Specifications-Kept-Intact, and it's a computer program. I believe it was developed by NASA. And it utilizes guide specs. Now, the guide specs could be the Army's guide specs or the Navy's. There are different choices.
Q. And those are now unified, correct?
MR. COLT: Objection as to form.
A. They have been unified, yes.
BY MR. FRANCIS:
Q. My understanding, and correct me if I'm

mistaken, is that SPECSINTACT are utilized by design professionals in preparing designs for the Department of the Navy?
A. Yes.
MR. COLT: Objection.
BY MR. FRANCIS:
Q. Is that correct?
MR. COLT: Objection. This is a-- Mr. Moyer can't testify as to what other consultants use outside of the Navy. He's here as a Navy designee.
MR. FRANCIS: I think I just asked him the Department of the Navy.
BY MR. FRANCIS:
Q. Limiting yourself to the Department of the Navy, is it your understanding that design professionals utilized SPECSINTACT to prepare specifications for construction projects by the Navy?
A. Yes.
Q. Does the Department of the Navy also use SPECSINTACT to prepare specifications for the Navy?
A. Yes.
Q. And do you do that?

A. Yes.
Q. So you're familiar with what's set forth or contained in SPECIFICATIONS INTACT?
A. Yes.
Q. Can SPECIFICATIONS INTACT be modified?
A. Oh, yes.
Q. How is it modified?
A. They're intended to be edited.
Q. So you might change the provisions that are set forth in the specifications?
MR. COLT: Objection as to form.
BY MR. FRANCIS:
Q. Is that correct?
A. Yes.
Q. Let's go to Paragraph 5. Let me know when you finish reading that.
A. Okay.
Q. Are you aware of any command, office, department, division, branch, unit, or other entity that is responsible for approving modifications of construction specifications?
A. The Navy Facilities Engineering Command is responsible for approving the changes to the guide specs, and they're updated from time to time.

Q. We spoke a moment or two ago about edits that are made to the SPECSINTACT for a specific project, correct?
A. Yes.
Q. Those edits, is there a command, office, department, division that's responsible for approving those edits?
A. Those edits are reviewed by our office in that we look over the specs for general items to fit our needs. It's not a detailed review. That's the responsibility of the design consultant that signs and seals the plans or specs.
Q. So in terms of the chain of command, if you will, it doesn't go-- Edits to SPECSINTACT for a specific construction project at the Naval Inventory Control Point don't go to a different command for approval?
MR. COLT: Objection as to form.
BY MR. FRANCIS:
Q. Do you understand my question?
A. Yes. We did use Northern Division Fire Protection to review fire protection items.
Q. But, for example, specifications where there are modifications to SPECSINTACT for windows, that wouldn't have been approved by a higher command,

correct?
A. No.
Q. What's the ROIC office?
A. ROIC stands for resident officer in charge of construction.
Q. And for this project, who was that, do you recall?
A. Commander Kelly, I think.
Q. Do you know whether he was delegated with responsible to review edits to the SPECSINTACT?
A. To review edits?
Q. Yes.
A. The ROIC officers would typically look over the specs to look for certain things. How detailed that review is, I don't -- not very detailed.
Q. Do you know whether he was delegated with that authority, to approve edits?
A. Well, he signs off on the specs before they go out to bid. I believe his name was Kelly Snook.
MR. COLT: Kelly being the first name?
A. Yes.
BY MR. FRANCIS:
Q. Let's go to Paragraph 6. Let me know when you've had a chance to read that.
A. Okay.

Q. When SPECSINTACT are modified for a construction project, is there authority that's requested before the modifications are made?
A. No. The design professional is required to prepare those specifications.
Q. And he then submits them for approval to the Department of the Navy?
A. Yes.
Q. And does the design professional have an obligation to justify to the Navy why it's requesting modification to SPECSINTACT?
MR. COLT: Objection. I think it might be a mischaracterization to say that they're requesting a right to modify. Do they request a right to modify--
MR. FRANCIS: Objection. Objection.
MR. COLT: --or do they request approval for the project?
MR. FRANCIS: Objection. You can't-- Don't answer that. Listen, this is my deposition. I object to you asking him questions in the middle of my examination. You're leading the witness. If you want to state an objection as to the clarity of my question or if the witness doesn't understand

it, he can request clarification, and I'll attempt to elaborate. But you are not supposed to be questioning a witness during my examination. If you disagree with it, again, I'm going to hand you the rules, cite me the specific rule that authorizes you to interrupt my interrogation of the witness.

MR. COLT: Is that a distinction that you need to answer?

BY MR. FRANCIS:

Q. Do you understand my question?

A. Would you say it again.

Q. Let me make it simpler for you. Design professionals make edits to SPECSINTACT for a project, correct?

MR. COLT: Objection as to form.

A. Yes.

BY MR. FRANCIS:

Q. Do they bring it to the attention of the Department of the Navy, do you know?

MR. COLT: One question, do they make edits to SPECSINTACT or to the project -- when they're designing the project, do they--

MR. FRANCIS: Objection. Stop--

MR. COLT: --deviate from SPECSINTACT?

MR. FRANCIS: --asking the witness questions.

BY MR. FRANCIS:

Q. Mr. Moyer, do you understand the question I'm asking you? Would you like me to rephrase it?

MR. COLT: Do you need to take a break?

A. Rephrase it, please.

BY MR. FRANCIS:

Q. Let's talk about this project, the improvements to the Naval Inventory Control Point Building 110. I assume that Gale Associates provided the specifications to the Department of the Navy, correct?

A. Yes.

Q. And those specifications were based upon SPECSINTACT, correct?

A. Yes.

Q. And those specifications contained edits, correct?

A. Yes.

Q. Other than providing the specifications to the Department of the Navy, did Gale Associates provide any information which drew more attention to the edits?

A. No.

Q. Do you know whether Gale provided the Department of the Navy with justifications for the modifications that were made to SPECSINTACT for this project?
A. No. But I don't think any were required.
Q. Just so we're plain about what we're saying, you do not believe that Gale supplied engineering to justify edits that were made to SPECSINTACT for this project?
MR. COLT: Objection, asked and answered. I believe he said it wasn't required.
BY MR. FRANCIS:
Q. Do you know whether or not that was submitted?
MR. COLT: Objection, asked and answered.
BY MR. FRANCIS:
Q. Engineering?
A. Say that again, that they--
Q. Do you know whether Gale Associates provided the Department of the Navy with design calculations that justified edits to the SPECSINTACT for this project?
MR. COLT: Objection. I need to take a break.
MR. FRANCIS: No.
MR. COLT: We need to take a break.

MR. FRANCIS: No, no, no. I'm objecting again to your desire to coach the witness on how to answer a question. He's under oath. He's supposed to answer my question.

MR. COLT: We need to take a break for say two or three minutes, please.

MR. FRANCIS: You're not allowed to leave.

MR. COLT: I'm sorry, yes, we're taking a break.

MR. FRANCIS: Can I ask for your authority to take the witness outside of the room and coach him on how to answer a question?

MR. COLT: As a representative of the witness, we have the ability.

MR. FRANCIS: Can you cite the rule that authorizes you to do that?

MR. COLT: We'll be back in two or three minutes.

(Recess taken)

MR. FRANCIS: I believe I made it clear when the witness and his lawyers got out of the room that I object again to coaching the witness.

BY MR. FRANCIS:

Q. Mr. Moyer, did you receive clarification on how

to answer my questions during the break?
A. We're on Number 6?
Q. Yes.
A. And that deals with requested authority to make modifications to design criteria?
Q. Right.
A. None were expected. We expect the design professional to make those edits. That's what we pay them for.
Q. So it's your understanding that the Navy's engineers, for example Gale, does not have to request authority to make modifications to SPECSINTACT for a project?
MR. COLT: Objection, asked and answered.
A. There is one occasion when approval is required. We specify Best locks for any locks or a lock that's compatible with Best locks. So that's required because it has to match the lock system on the base.
BY MR. FRANCIS:
Q. Let's go on to Number 7. Actually let's stay on Number 6. Did your attorney instruct you how to answer that last question?
A. Not in that way.
Q. How did he specifically direct you how to answer

the question?

A. That's--

MR. COLT: I will say I think-- Did we discuss it in lines of what we had discussed prior to this deposition?

MR. FRANCIS: Objection. I'm asking the questions here. If you want to object on attorney-client privilege, you can do that. But you can't ask him questions during my deposition. You can ask him at the close. It's improper.

BY MR. FRANCIS:

Q. Mr. Moyer, do you want to answer the question or not?

A. Say that again.

Q. What specifically did Mr. Colt tell you with respect to answering that question?

A. To be honest, I'm a little rattled, and I don't remember exactly.

Q. Am I rattling you?

A. Everybody is.

MR. COLT: We apologize.

BY MR. FRANCIS:

Q. Is Mr. Colt giving you express instructions on how to answer the questions here today?

A. No.
Q. Did he give you general instructions?
A. Yes.
Q. What were those?
A. Just to-- The things that I already know about as far as the operation of SPECSINTACT and how our consultant deals with them, editing SPECSINTACT, what they're required to do.
Q. Let's move on to Number 7. Maybe I'll be able to clarify some of the questions I have. Why don't you read Number 7.
A. Okay.
Q. Did Gale Associates have to justify the edits that they made to SPECSINTACT for the windows in the shop?
A. No, they don't have to justify them. We expect them to make -- to do the editing for the SPECSINTACT to provide what they feel is what we need for our projects.
Q. So just so we're plain, when Gale supplied the plans, drawings, and specifications to the Navy for approval, it would not have simultaneously submitted documents containing engineering which explained why it made the edits, do you know?
A. No. We typically get calculations on structural

things, nothing else.
Q. So Gale did not supply calculations which justified changes in the window specifications for this project?
A. No.
MR. COLT: Objection, asked and answered.
BY MR. FRANCIS:
Q. Let me ask you this in reverse going to Paragraph Number 8, did the Navy identify to Gale any justifications for nonstandard windows on this project?
A. No.
Q. Let's go to Paragraph 9. Could you read Paragraph 9 to yourself. Do you see that?
A. Yes, I see that. No, they didn't notify us that--
MR. COLT: I'm sorry, do you have a question?
BY MR. FRANCIS:
Q. Do you see that?
A. Yes, I see that.
Q. Do you know whether Gale made the edits to SPECSINTACT without notifying the Department of the Navy as to why it was doing so?
A. No, they didn't notify us.

Q. They didn't explain, in other words, why it is that they changed the SPECSINTACT to what it was when it was left for bid?
A. No.
Q. Let's go to Number 10. Why don't you read that one to yourself.
A. Okay.
Q. Other than the approval that was issued by Kelly-- How do you say--
A. Snook.
Q. S-n-o-o-k?
A. Yes.
Q. Other than his approval of the plans, drawings, specifications, did the Navy otherwise agree to the edits that were made to SPECSINTACT for the windows? Let me rephrase that.
MR. COLT: I think this is asked and answered.
BY MR. FRANCIS:
Q. Do you understand my question?
A. We agreed with them in that they're still the responsibility of the design professional.
Q. I guess I just want to know what you mean by that. Let me ask you this, the Navy expected Gale Associates to use their best engineering

judgment in making the edits to SPECSINTACT for this project. Is that correct?

MR. COLT: Objection as to form.

A. Yes.

BY MR. FRANCIS:

Q. And, therefore, the Navy did not do an independent analysis of the modifications that were made to SPECSINTACT for this project. Is that correct?

MR. COLT: Objection to form and asked and answered.

A. No.

BY MR. FRANCIS:

Q. Number 11, could you read that one to yourself.

A. Okay.

Q. And let me talk about it in terms of SPECSINTACT because it's your testimony that the Unified Facilities Guide Specifications are SPECSINTACT. Do you know whether the use of SPECSINTACT was encouraged or required for design professionals?

A. Yes, it is.

Q. Encouraged and required or what's the yes?

MR. COLT: Objection as to form.

A. It's required.

BY MR. FRANCIS:

Q. The handbook that you referred to, do you use that in your course of employment with the Department of the Navy, Handbook 1006?
A. Yes.
Q. Do you have it in your office?
A. Yes, we have a copy.
Q. How difficult would it have been for you to have brought it with you today?
A. I could have gotten it, I guess.
Q. What would have been involved in bringing it to your deposition?
A. I'd have to dig it out and copy it, I guess.
Q. Where in your office is it located? Is it on a shelf?
A. Yes.

MR. COLT: As a practical matter, I would also note, though, that any documents handed over would have had to have gone through internal Department of Justice review.

BY MR. FRANCIS:
Q. Are there any other documents that you use in the course of your employment at the Naval Inventory Control Point?
A. Other documents?
Q. That you use in reviewing specifications, do you

know?
A. No.
Q. I'm going to show you what's been marked as Exhibit B.
(Moyer Deposition Exhibit B marked for identification)
BY MR. FRANCIS:
Q. Mr. Moyer, I'm going to ask you to take a look at that, and let me know when you're finished looking at it.
A. Okay.
Q. Have you ever seen this document before?
A. I think so.
Q. You think so?
A. Yeah.
Q. When did you see it?
A. It was e-mailed to me a couple days ago.
Q. Did you attempt to identify documents that would be responsive to this request?
A. Well, the 1006 is the only one I know of.
Q. Are you familiar with Military Standard 3007?
A. No.
Q. Are you familiar with the Department of Defense Standard Practice for Unified Facilities Criteria and Unified Facilities Guide

Specifications?
A. Is that the 1006?
Q. That's Military Standard 3007.
A. Okay.
Q. Do you know Department of Defense Standard Practice for Unified Facilities Criteria and Unified Facilities Guide Specifications?
A. I know how to use SPECSINTACT if that's what you mean.
Q. Let me show you this document.
(Moyer Deposition Exhibit C marked for identification)
BY MR. FRANCIS:
Q. I've handed you what's been marked as Exhibit C which is a memorandum from the Under Secretary of Defense to various entities with the subject, it says, Department of Defense Unified Facilities Criteria, and it references Military Standard 3007. Do you see that?
A. Yes.
Q. Do you know whether that would have applied to the construction project at issue in this case?
A. Unified Facilities Design Construction Criteria, no, I don't think so.
Q. Because of the date?

A. Yes.
Q. Do you know whether Military Standard 3007 existed prior to May of 2002?
A. No, I'm not sure.
Q. Do you know what Department of Defense 4270.1-M Policy Guidelines for Installation, Planning, Design, Construction, and Upkeep is?
A. I may have seen it, but I don't remember it specifically.
Q. Do you know whether at any -- set forth any criteria which would have been applicable to the design of this facility?
A. No.
Q. No, you don't know?
A. No.
Q. Actually it needs to be clear on the record. No means, no, I don't know?
MR. COLT: Objection as to form.
BY MR. FRANCIS:
Q. Is that right?
A. Yes.
Q. Do you know what master text is?
A. I think that's the commercial guide specs or commercial specs for projects, master spec.
Q. Do you know whether it has any application to

the Department of the Navy design contracts?
A. It may have been used at one time to create the navy guide specs.
(Moyer Deposition Exhibit D marked for identification)
BY MR. FRANCIS:
Q. I've given you what's been marked as Exhibit D for identification. What is this?
A. It's Military Handbook 1006.
Q. Was this effective in 1995?
A. Yes.
Q. Is this the publication that you were referring to earlier, the handbook?
A. Yes.
Q. I'm going to refer you to the forward which is on Page Roman Numeral III. In the first paragraph can you read that paragraph to yourself that begins, this handbook is a series -- is one of a series.
A. Okay.
Q. The last sentence of that states, quote, do not deviate from MIL-HDBK-1006/1A for NAVFAC project drawings and specifications preparation without prior approval of NAVFACENGCOM Code 15C?
MR. COLT: Has Mr. Moyer been able to read

the entire -- all three paragraphs on the page?
BY MR. FRANCIS:
Q. Go ahead, read it.
A. Okay.
Q. Did you have a chance to read all of it?
A. Yes.
Q. Do you know whether or not-- Well, first of all, what is NAVFACENGCOM? That's Naval Facilities Engineering Command, correct?
A. Yes.
MR. COLT: Objection as to form.
A. Yes, it is.
BY MR. FRANCIS:
Q. Do you know whether that sentence, the one that I read into the record, relates to SPECSINTACT and modifications to SPECSINTACT?
A. It says don't deviate from Military Handbook 1006.
Q. Does 1006 govern requirements for specifications for construction projects by the Department of the Navy?
A. Yes.
Q. Does it require the utilization of SPECSINTACT?
A. Yes.
Q. Does that sentence indicate that you're supposed

-- that design professionals are required to obtain prior approval from Naval Facilities Engineering Command prior to modifications or deviations from SPECSINTACT?
A. No, that's not the way I understand it.
Q. How do you understand it?
A. The design professionals are expected to edit and revise the guide specs. They're created to be a guide.
Q. What is your understanding in that sentence of the words prior approval?
A. This has to do with deviating from this Military Handbook.
MR. FRANCIS: I'd like the record to indicate that once again Mr. Colt is coaching the witness on provisions of the document.
MR. COLT: I am referring him to parts of the document to ask him about them.
MR. FRANCIS: I'd like the record to reflect that once again Mr. Colt is whispering to the client and pointing to parts of the document, and it appears as if he's coaching the document on provisions in which to respond to questions I'm asking.
MR. COLT: For the record, I am referring

Mr. Moyer to parts of the text in front of us including the bold paragraph at the bottom of this same page that says-- Well, it's part of the record now. I won't quote it. But it says that this is not to be referenced for procurement purposes.

BY MR. FRANCIS:

Q. Mr. Moyer, with respect to the provision that Mr. Colt just referred you to in the bold language at the bottom, do you have an understanding as to the difference between a design and specifications for procurement?

A. A difference between the design--

Q. Let's do this, why don't you read the paragraph that Mr. Colt's been referring you to.

A. The bottom paragraph?

Q. Yes.

A. Okay.

Q. Do you believe that that paragraph means that Gale did not have to comply with the requirements of Military Handbook 1006 in the design of this facility?

A. They're supposed to follow this handbook in the design of the plans and specifications. But this-- Okay.

Q. It's not part of the contract with Maropakis, correct?
A. No.
Q. I understand.
MR. COLT: Objection as to form.
BY MR. FRANCIS:
Q. Can we turn to Page 3 of the handbook. It's entitled Section 2: Policy. If you could read Section 2.1.1 which is the acronym for Naval Facilities Engineer Command.
A. Okay.
Q. Did you have an opportunity to read all the subparagraphs as well, A through E, not 2.1.2 but 2.1.1.
A. Okay.
Q. Let's talk about Subparagraph D, NAVFAC guide specifications (NFGSs); what is that?
A. What is?
Q. Is that SPECSINTACT?
A. Yes.
Q. Let's go up then to the 2.1.1 and the provision that says, when deviations from the following mandatory published criteria are considered, prior clearance shall be obtained from NAVFACENGCOM Code 15C criteria managers with

documented confirmation. Does that indicate that prior clearance must be obtained for deviations from the NAVFAC guide specifications?
A. Seems to.
Q. Who is a Naval Facilities Engineering Command Code 15C criteria manager, do you know?
A. No, I don't.
Q. It's not you, though?
A. It's not me.
Q. Do you know if it's somebody at the ROIC office?
A. No.
Q. Let's turn, if you wouldn't mind, to Page 30. And why don't you read Paragraph 5.2.1.
A. Okay.
MR. FRANCIS: Again, I'd like the record to reflect that Mr. Colt is specifically pointing to portions of the document in guidance on how to answer my questions.
BY MR. FRANCIS:
Q. Did you have an opportunity to read the entire section, Mr. Moyer?
A. Just a second.
Q. Sure.
A. Okay.
Q. I'm interested primarily in the bottom paragraph

which states, NFGSs, though mandatory for use in preparing project specifications, shall be tailored as necessary to suit the work actually required by the specific project, including tailoring for metric or inch-pound projects. Do you see that?

A. Yes.

Q. And is it your position that Gale modified SPECSINTACT as set forth in that paragraph?

A. They edited the specs, yes.

Q. Do you understand whether that paragraph had anything to do with Gale's determination to modify SPECSINTACT for the windows?

MR. COLT: Objection. I would object to him testifying about what Gale's motivations were. I'm going to instruct him not to answer that actually.

BY MR. FRANCIS:

Q. Do you know whether Gale Associates has a copy of the specification Section 1006?

A. No, I don't.

Q. Let's turn to Page 32 in Paragraph 5.4. Why don't you read that section and let me know when you're done.

A. Okay.

Q. Is it your understanding that Section 5.4 discusses SPECSINTACT?
A. Yes.
Q. I'm interested in the sentence, quote, changes to the requirement should be made only when backed by sound engineering justification. Do you see that?
A. Yes.
Q. Have you ever seen sound engineering justification which supports the modifications that were made to SPECSINTACT for the windows on this project?
A. No, I didn't see any written justification for the windows specified.
Q. And do you know whether any sound engineering justification exists for the modifications that were made to the windows on this project?
MR. COLT: Objection, asked and answered. He already testified no justifications were required.
MR. FRANCIS: That's not the question.
BY MR. FRANCIS:
Q. Do you know whether any exists?
A. No.
MR. FRANCIS: I'm going to take a

five-minute break.

(Recess taken)

BY MR. FRANCIS:

Q. Have you been authorized to attend any seminars or schools sponsored by the Department of Defense or Department of the Navy or the Department of the Army in your capacity?

A. Yes.

Q. Which ones have you gone to?

A. I can't recall the names of them now.

Q. How many?

A. How many?

MR. COLT: Objection, foundation, if you remember.

BY MR. FRANCIS:

Q. Approximately.

A. I don't know.

Q. Were these classes at the Naval Inventory Control Point or somewhere else?

MR. COLT: Objection.

A. There was a class in Norfolk.

BY MR. FRANCIS:

Q. Where else?

MR. COLT: Objection, foundation, if you remember.

A. I don't remember.

BY MR. FRANCIS:

Q. What was the subject of the course in Norfolk?

MR. COLT: Objection, foundation, if you remember.

A. There was a class on ROIC office operations.

BY MR. FRANCIS:

Q. Have you had any classes, whether in person or by correspondence course, with respect to the requirements of compliance with Military Handbook 1007?

A. A course, no.

Q. Or any courses that address that.

MR. COLT: Objection, asked and answered.

BY MR. FRANCIS:

Q. Do you recall?

A. I don't recall.

Q. Are you familiar with operations of Naval Facilities Engineering Command?

A. Operations, vaguely.

Q. Do you know whether it has different offices for purposes of administration?

A. I'm not familiar with them that much.

Q. Do you have copies of SPECSINTACT from 1997 at your office?

A. We have the old disks, yes.

(Moyer Deposition Exhibit E marked for identification)

BY MR. FRANCIS:

Q. Mr. Moyer, I've handed you what has been marked as Exhibit E for purposes of identification. These are the Unified Guide Specifications, Specification Section 08520S as in Sierra dated December of 2005, and I have just one question for you.

If you turn to Page 3, it contains language that appears to be in bold, and it appears to be a note for the design professional or the Navy to use in preparing or modifying these specifications. Do you see that?

A. Yes.

Q. Is it your understanding that that's what those notes are?

A. Yes.

Q. Do you know whether the SPECSINTACT that existed in 1997 had similar notes?

A. Yes.

MR. FRANCIS: That's all I have. Those are all the questions I have. Thank you.

MR. COLT: We'll take a 10-minute break.

(Recess taken)

MR. FRANCIS: Before you start, I want to object to the fact that you were coaching your witness during the break.

MR. COLT: We were merely responding to-- We were merely discussing the questions that we were going to ask.

EXAMINATION

BY MR. COLT:

Q. Mr. Moyer, you're still under oath. I just have a few questions in follow-up. Do you remember on Page 3 of Exhibit D, do you remember seeing Paragraph 2.1.1?

A. Yes.

Q. We talked earlier Mr. Francis asked you about deviations from this. What is your understanding of what that means? Can you clarify that?

A. Well, it's my understanding that we're supposed to use SPECSINTACT for generation of all of our specifications. And if we want to use something else, then you need approval ahead of time.

Q. What do you mean something else?

A. Some other form of specification system.

Q. Oh, okay. So is that the meaning of that

paragraph?

MR. FRANCIS: Objection.

A. Yes, yes, that's my understanding.

MR. FRANCIS: Objection to the extent that now you're asking him for legal conclusions. To the extent that you're objecting to my asking questions about the existence of a statute, you're now asking the meaning of a document, and it's inconsistent. So I object to the extent that-- Well, actually I'm not going to object. I'm just going to point it out for the record that you're now asking a question that you objected to me asking him.

BY MR. COLT:

Q. Is this a Navy document?

A. Yes.

MR. FRANCIS: And by this, he's referring to Exhibit E.

MR. COLT: I said Exhibit D actually.

BY MR. COLT:

Q. I just have one more question. Does the Military Handbook-- I want to clarify the relationship between the Military Handbook and the guide specs. Does the Military Handbook mandate then that the guide specs be used as

point of departure?
A. It mandates that we use the guide specs, yes.
Q. But then I believe you testified, do you recall, that it's expected that a consultant will use their expertise to hire -- to design the project, the actual project specs?
A. Oh, yes, that's correct.
Q. So does the Navy regard it as a violation of the Military Handbook to edit the guide specs when designing a project?
A. No, I don't think so. We expect the consultant to design and edit the project specs, but we require him to use SPECSINTACT.
MR. COLT: Thank you much. No further questions.
(The deposition concluded at 1:06 p.m.)

COMMONWEALTH OF PENNSYLVANIA :

COUNTY OF YORK :

I, Bethann M. Mulay, Reporter and Notary Public in and for the Commonwealth of Pennsylvania and County of York, do hereby certify that the foregoing deposition was taken before me at the time and place hereinbefore set forth, and that it is the testimony of:

LONNIE RAY MOYER

I further certify that said witness was by me duly sworn to testify the whole and complete truth in said cause; that the testimony then given was reported by me stenographically, and subsequently transcribed under my direction and supervision; and that the foregoing is a full, true and correct transcript of my original shorthand notes.

I further certify that I am not counsel for or related to any of the parties to the foregoing cause, or employed by them or their attorneys, and am not interested in the subject matter or outcome thereof.

Dated at York, Pennsylvania this 22nd day of February, 2006.

Commonwealth of Pennsylvania
NOTARIAL SEAL
BETHANN M. MULAY, Notary Public
West Manchester Twp., County of York
My Commission Expires August 15, 2009

Bethann M. Mulay
Registered Professional Reporter
Notary Public

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.