**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| M. MAROPAKIS CARPENTRY, INC., Plaintiff<br><br>v.<br><br>THE UNITED STATES Defendant | No. 03-2825C<br><br>(Judge Baskir) |

**M. MAROPAKIS CARPENTRY, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

RHOADS & SINON LLP

By: /s/David W. Francis
David W. Francis
Kelly H. Decker
One South Market Square
P. O. Box 1146
Harrisburg, PA 17108-1146
(717) 233-5731

*Attorneys for M. Maropakis Carpentry, Inc.*

December 14, 2006

## TABLE OF CONTENTS

I. STATEMENT OF THE CASE .......... 1

II. QUESTIONS INVOLVED .......... 1, 2

III. DISCUSSION .......... 2

A. Background Information .......... 2

B. Contract Requirements .......... 2

C. AAMA Requirements .......... 5

D. Defects in the Navy's Window Specifications .......... 8

E. Discovery of Lead Paint .......... 13

IV. ARGUMENT .......... 14

A. Standard for Summary Judgment .......... 14,15

B. Contractual Interpretation and Summary Judgment .......... 16

C. Maropakis is Entitled to Summary Judgment on the Defective Specification Claim Because the Navy's Specifications Were Inconsistent and Identified Conflicting Design Criteria for the Windows .......... 17

D. Breach of Warranty of the Specifications .......... 19

E. Maropakis is Entitled to a Longer Extension of Time Because it Encountered Lead Paint in the Windows .......... 20

V. Conclusion .......... 21

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ............14,15

*Big Chief Drilling Co. v. United States*, 26 Cl. Ct. 1276 (1992)............10

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) ............19,20

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 657 (Ct. Cl. 2003) ............15

*DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1322 (Fed. Cir. 2001)............16

*Ehlers-Noll, GMBH v. U.S.*, 34 Fed. Cl. 494, 498-99 (Ct. Cl. 1995) ............15

*Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed. Cir. 1985)............16

*J.L. Simmons Co. v. United States*, 188 Ct. Cl. 684, 689 (1969)............19,20

*Ordinance Research, Inc. v. United States*, 221 Ct. Cl. 641, 609 F.2d 462 (1979)............19

*R.P. Wallace, Inc. v. The United States*, 63 Fed. Cl. 402 (2004)............17

*Sweats Fashions, Co. v. Pannill Knitting, Inc.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987) ............15

*SW Government Travel, Inc. v. United States*, 61 Fed. Cl. 559, 571 (2004) ............16

*Telenor Satellite Srvs., Inc.*, 71 Fed. Cl. 114 (Ct. Cl. 2006)............14,16

*TLT Construction Corp. v. United States*, 60 Fed. Cl. 187, 193-94 (2004)............16

*United States v. Spearin*, 248 U.S. 132 (1918)............19

### FEDERAL RULES OF CIVIL PROCEDURE

Rules of the Federal Court of Claims 56(b)............1

# Exhibits

Exhibit A: Specification Section 01110 Summary of Work, Paragraph 1.2.1

Exhibit B: Specification section 08520 Aluminum Windows

Exhibit C: Referenced pages of the AAMA 101

Exhibit D: Relevant portions of Abdul Rangwalla's Deposition Transcript

Exhibit E: Relevant portions of Gary W. Brown's Deposition Transcript

Exhibit F: Relevant portions of Lonnie R. Moyer's Deposition Transcript

Exhibit G: Email correspondence from Lonnie R. Moyer dated November 2, 1999

Exhibit H: Relevant portions of Robert F. Rosenberry's Deposition Transcript

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **M. MAROPAKIS CARPENTRY, INC.,**<br>**Plaintiff**<br><br>**v.**<br><br>**THE UNITED STATES**<br>**Defendant** | **No. 03-2825C**<br><br>**(Judge Baskir)** |

**M. MAROPAKIS CARPENTRY, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I. STATEMENT OF THE CASE

Pursuant to Rule 56(b) of the Rules of the United States Court of Federal Claims ("RCFC"), Plaintiff M. Maropakis Carpentry, Inc. ("Maropakis"), respectfully requests that the Court enter partial summary judgment in its favor and against the Untied States ("the Navy") because there are no genuine issues of material fact and Maropakis is entitled to judgment as a matter of law. Maropakis requests entry of this motion with respect to (a) its claim that the error in the Navy's specifications for the replacement monitor windows and its refusal to correct that error resulted in delay for which Maropakis is entitled to a time extension; and (b) that the Navy did not give a sufficient time extension to accommodate the impact encountered when Maropakis encountered lead paint on the project. Maropakis requests that the duration of these delays be established at trial following entry of an Order granting the relief set forth herein.

## II. QUESTIONS INVOLVED

1. Whether Maropakis is entitled to a time extension because the Navy provided specifications for a window that simply does not exist.

2. Whether Maropakis is entitled to a time extension because the Navy provided specifications that identified inconsistent criteria, making it impossible to satisfy all of the requirements of the contract.

3. Whether Maropakis is entitled to a longer extension of time than awarded by the Navy because lead paint was encountered on the project.

## III. DISCUSSION

### A. Background Information.

Maropakis and the Navy are parties to Contract Number N-662472-97-C-4166 (the "Contract") for certain demolition and replacement work at Building Number 110 at the NAVICP ("the Project"). The Contract work included, *inter alia*, the following: (a) removal and replacement of certain monitor windows from the roof of the project; (b) removal and replacement of the roofing materials; (c) removal, disposal and replacement of asbestos containing transite panels; and (d) other incidental and related work. Specification Section 01110 Summary of Work, Paragraph 1.2.1 set forth the entire project description. A copy of this specification is attached hereto as exhibit A and incorporated by reference.

### B. Contract Requirements.

The contract documents included specification section 08520 Aluminum Windows. A copy of this specification is attached hereto as exhibit B and is incorporated by reference. Specification Section 08520 sets for the requirements for the replacement windows to be used on this project. Several portions of this specification are directly relevant to this motion for summary judgment as follows:

First, specification 08520 paragraph 1.1 entitled "References" specifically identified the American Architectural Manufactures Association's ("AAMA") publication ANSI/AAMA 101

(1994) Aluminum and Poly (Vinyl Chloride) (PVC) Prime Windows and Glass Doors ("AAMA 101" or "ANSI/AAMA 101") as part of the contract. A copy of the AAMA 101 is attached hereto as exhibit C and incorporated by reference.

Second, specification 08520 paragraph 1.2 required that windows supplied contain a certification warranting that the window complies with the AAMA 101. It provides,

> 1.2 CERTIFICATION
>
> Each Prime Window unit shall bear the AAMA Label warranting that he product complies with the ANSI/AAMA 101. Certified test reports attesting that the prime window units meet the requirements of the ANSI/AAMA 101, including test size, will be acceptable in lieu of product labeling.

(Emphasis supplied).

Third, specification section 08520 paragraph 1.3.4.1 required the contractor to provide test reports certifying that the windows have been tested and conform to the requirements specified in the ANSI/AAMA 101, as follows:

> 1.3.4.1 Report Requirements
>
> Submit test reports for each type of window attesting that identical windows have been tested and meet the requirements specified herein for conformance with ANSI/AAMA 101 including test size and minimum condensation resistance factor (CRF).

(emphasis supplied).

Fourth, specification section 08520 paragraph 1.3.5 SD 14, Samples, subparagraph a Windows required submission of windows with AAMA labeling, as follows:

> 1.3.5 SD-14, Samples
>
> a. Windows
>
> Submit one full-size window of each type proposed for use, complete with AAMA label. . . .

Fifth, specification section 08520, paragraph 2.1 Windows set forth numerous requirements Maropakis was contractually required to provides, as follows:

> 2.1 Windows
>
> Prime windows shall conform to ANSI/AAMA 101 and the requirements specified herein. Provide windows of types, grades, performance classes, combination and sizes indicated or specified.
>
> . . .
>
> 2.1.1 Standards
>
> Except as otherwise indicated, requirements for aluminum windows, terminology[1] and standards of performance, and fabrication workmanship are those specified and recommended in the ANSI/AAMA 101 and applicable general recommendations published by the AAMA and ANSI.
>
> 2.1.2. Performance and Testing.
>
> Except as otherwise indicated, comply with air infiltration tests, water resistance tests, and applicable load tests specified in ANSI/AAMA 101 for type and classification of window units required in each case.
>
> * * *
>
> 2.1.4 Specific Performance Requirements
>
> Windows shall conform to specified ANSI/AAMA standards and the following, whichever are more stringent.
>
> * * *
>
> > b. Air Infiltration Test (Operable Units): With the vent in a closed and locked position, the window shall be subjected to an air infiltration test in accordance with ASTM E 283. Air infiltration shall not exceed .10 cfm/ft when tested a [sic] pressure of 6.24 psf.

---

[1] As will be discussed in this motion, the Navy used the terminology set forth in the ANSI/AAMA for the windows to be supplied. However, the requirements set forth in the Navy's specifications contradicted that terminology and the mandatory requirements of the AAMA.

> 2.1.5 Water Resistance Test
>
> The glazed unit shall be mounted in its vertical position continuously supported around the perimeter. The window unit shall be subjected to a water resistance test in accordance with ASTM E 331 and ASTM E 547. When a static pressure of 20.00 pounds per square foot[2] has been stabilized, five gallons of water per square foot of window area shall be applied to the exterior face of the unit for a period of 15 minutes. No water shall pass the interior face of the window frame and there shall be no leakage as defined in the test method.

(emphasis supplied).

Specification section 08520, paragraph 2.1.8 Projected Windows also specifically identified the windows to be provided, as follows:

> 2.1.8 Projected Windows
>
> Type P-HC 40 (Optional Performance Class). Provide projected windows with concealed four bar friction hinges only.

As explained herein, the designation "P-HC 40 (Optional Performance Class)" has specific and inconsistent meanings under the AAMA 101 and is an identification of specific and conflicting performance criteria for the windows. This performance criteria is inconsistent with other performance criteria in the specifications.

**C. AAMA Requirements.**

The AAMA 101 is a National Standard that establishes minimum requirements for windows. The preface of the AAMA provides in part as follows:

> PREFACE
>
> This American National Standard establishes minimum requirements for aluminum and poly (vinyl chloride) (pvc) prime windows. It consists of three sections and an Appendix.
>
> * * *

[2] As explained herein, the ANSI/AAMA 101 provides that this testing should not exceed 12 psf.

> SECTION 2 contains specific requirements for product performance. Three are three mandatory primary performance requirements. The are: 1) Structural adequacy to withstand wind loads, 2) Resistance to water leakage, and 3) Resistance to air infiltration. Levels of performance are set forth for each window and door type covered by the standard.
>
> SECTION 3 contains optional higher performance classes which make it possible for the specifier to require higher uniform lad structural test pressures and higher water resistance test pressures than those contained in Section 2. Use of products in the higher performance classes is desirable where severe weather condition or wind loadings are encountered.
>
> The APPENDIX, although not part of this ANSI/AAMA standard, contains much information on materials, construction, installation, wind loads, water resistance, air infiltration, condensation and heat transmission that will be helpful to the specifier in the selection and specification of windows and doors.

(emphasis supplied).

The preface also explains what is specified in the term "HC." The preface provides,

> This standard defines requirements for four grades of windows and glass doors. The grades are Residential (R), Commercial (C), Heavy Commercial (HC) and Architectural (AW).

(emphasis supplied). Thus the "HC" in the designation P HC-40 means "Heavy Commercial." In other words, the Navy specified that Maropakis was required to supply Heavy Commercial windows for this project.

Section 2 Specific Requirements, Section 2.1 Primary Performance Requirements sets forth the primary performance requirements applicable to particular types of windows. This section specifically provides that the Performance Class is the Design Pressure. Accordingly, the "40" in P-HC 40 is the design pressure for the window. Section 2.1 also provides that the Water Test Pressure is 0.15 times the design pressure. Accordingly, the water test pressure for a P-HC

40 window is 6 lbf/ft$^2$. This is further set forth in the table that appears in Section 2.1, which provides in pertinent part as follows:

| Window/Door Designation | Design Pressure lbf/ft$^2$ (Pa) | | Structural Test Pressure [2] lbf/ft$^2$ (Pa) | | Water Resistance Test Pressure [3] lbf/ft$^2$ (Pa) | | Air Infiltration | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Test Pressure lbf/ft$^2$ (Pa) | | Maximum Rate [4] ft$^3$/min (m$^3$/h) | |
| P-HC40 | **40** | (1915) | 60 | (2873) | **6.00**[3] | (287.3) | 6.24 | (299) | **0.37**[4] | (2.06) |

(emphasis supplied).

Section 3 of the ANSI/AAMA 101 describes the requirements for windows designated as "Optional Performance Classes." Significantly, this designation is inconsistent with the designation of a window as a P-HC 40 window. The table which appears on the first page of Section 3 sets forth that them minimum designation for an HC window is a positive design pressure of 45 lb/ft$^2$. This table provides that the highest positive design pressure designation for any HC window is 80. This results in a water resistance test pressure of only 12 psf, not 20 psf as mandated by the Navy.

The appendix mandates that the maximum water resistance test pressure permitted is 12 psf. Page 35 of the AAMA 101 provides,

> [W]ater resistance is generally determined at a pressure less than the Design Pressure. The required Water Resistance Test is commonly conducted at a pressure equal to 15% of the Design Pressure for R, C and HC products (20% for AW products) but never less than 2.86 psf (132 Pa) nor more than 12 psf (575 Pa).

(emphasis supplied).

Further, a table appearing in the errata attached to the end of the AAMA 101 notes that the maximum design test pressure is 12 psf, as follows:

---

[3] 6.00 psf is the water resistance test pressure designated for a P-HC40 window. The Navy specified a water resistance test pressure of 20 psf. This is a conflict and prohibited by the AAMA.

[4] 0.37 psf is the air infiltration test pressure for a P-HC40 window. However, the Navy specified an air infiltration test pressure of 0.1 psf. This is a conflict in the specifications.

| | | |
|---|---|---|
| Design Pressure | = | Performance Class |
| Structural Test Pressure | = | 1.5 x Design Pressure |
| Water Resistant Test Pressure | | |
| R, C & HC | = | 1.5 x Positive Design Pressure* |
| AW | = | 20x Positive Design Pressure |
| | | ***(Maximum 12 psf)** |

(emphasis supplied)

Notwithstanding this mandatory requirement, the Navy specified a Water Resistance Test Pressure of 20 psf. Further, the Navy found out about this error but refused to disclose or correct it.

**D. <u>Defects in the Navy's Window Specifications.</u>**

1. <u>Deposition of Abdul Rangwalla.</u>

Abdul Rangwalla ("Mr. Rangwalla") was the project engineer at the project site for Maropakis. (Rangwalla Dep. at p4, ln. 6 – 15) (A copy of the reference pages of Mr. Rangwalla's deposition is attached hereto as exhibit D and incorporated by reference).

After being awarded the contract, Maropakis began looking for a window manufacturer that could meet the requirements of the specifications. (Rangwalla dep. at p. 15, ln. 15 – 24). Rangwalla testified that the major problems encountered was that Maropakis could not find a window manufacturer that could meet the requirements for water infiltration or air infiltration. (Rangwalla dep. at p. 16, ln. 3 – 14). Maropakis notified the Navy in writing several times that it was unable to find a window manufacturer that satisfied the requirements of the specifications. (Rangwalla Dep. at p. 16 ln. 19 – p. 17 ln. 14). Ultimately Maropakis supplied custom built

windows that satisfied the most stringent of the conflicting requirements of the specifications. This delayed substantially delayed the project.

2. Deposition of Gary W. Brown.

Gale & Associates ("Gale" or "the professional") was the designer on the project. Gary W. Brown, P.E. ("Mr. Brown") was the Gale employee who was the designer of record. He reviewed all of the design work and signed the plans. (Brown dep. at p. 10, ln. 22 – p. 11, ln. 5) (A copy of Mr. Brown's deposition is attached hereto as exhibit E and incorporated by reference).

Gale prepared the specifications for this project based upon standard Navy specifications entitled, "Specs Intact." Prior to this project Mr. Brown had worked with Specs Intact on other Navy design projects. (Brown dep. at p. 18, ln. 3 – 12). Typically, the Navy provides Specs Intact to designers, and the designers then make modifications to the Specs Intact for specific contracts. (Brown dep. at p. 20, ln. 2 – 18).

Specs intact contains design criteria for windows, including water resistance test pressure. (Brown dep. at p. 20, ln. 21 – p. 21, ln. 8). Gale made changes to the specifications to incorporate higher water resistance test pressures and air infiltration test pressures than contained in Specs Intact.

Mr. Brown's deposition transcript reflects that he was very unfamiliar with the design requirements for windows when Gale prepared the contract documents. As an example, Mr. Brown admitted that he did not know whether the water resistance test pressure and air infiltration pressure criteria set forth in Gale's window specification was authorized under the AAMA documents. He did not know whether the AAMA specifies anything other than minimum design criteria. (Brown dep. at p. 22, ln. 13 – p. 23, ln. 6). However, when presented

with a copy of the AAMA to consider, he then agreed that 12 psf is the highest water resistance test pressure authorized under the AAMA. (Brown dep. at p. 26, ln. 6 – 18).

Mr. Brown was unfamiliar with the designations included in the window specification that Gale modified. As an example, Mr. Brown testified that he could not recall what the "HC" in "P-HC 40" stood for. (Brown dep. at p. 28, ln. 5 – 6). He also (mistakenly) testified that there is no correlation between design pressure and water resistance test pressure under the AAMA. (Brown dep. at p. 28, ln. 17 – 22).

Mr. Brown agreed that the contract documents reference to a "P-HC 40 (optional performance class)" window was an error and that the minimum HC optional performance class window is and HC 45. (Brown dep. at p. 31, ln. 9 – 19).

Mr. Brown could not identify any reason why Gale modified the water resistance test pressure and air infiltration pressure requirements. He testified that does not know whether the 20 psf requirement came from. (Brown dep. at p. 44, ln. 20 – p. 45 ln. 5). He also testified that he had no recollection of any discussion with Navy personnel about this issue. (Brown dep. at p. 31, ln. 14 – p. 33, ln. 16).

Mr. Brown was not aware of any claims made by Maropakis that it could not find windows that satisfied the requirements of the specifications. (Brown dep. at p. 33, ln. 17 – 21). Mr. Brown did not contact any manufacturers to find out if they could meet the requirements of the specifications, and did not know whether anyone else from Gale did. (Brown dep. at p. 33, ln. 22 – p. 34, ln. 2).

3. <u>Deposition Testimony of Lonnie R. Moyer</u>

Lonnie R. Moyer is a civil engineer employed by the Navy (Moyer dep. at p. 6, ln. 17 -- 21). (A copy of the referenced pages from Mr. Moyer's deposition is attached hereto as exhibit

F and incorporated by reference). He worked with Gale in the preparation of the plans and specifications. (Moyer dep. at p. 9, ln. 5 – 16).

Mr. Moyer has made several admissions which are relevant to this motion for summary judgment. First, he admitted in email correspondence dated November 2, 1999 that the water resistance test pressure for this contract "should have been 10 psf or perhaps lower." The email stated in part,

> Terry,
>
> As you know, I gave a list of three window manufacturers who can met the spec. for water resistance to the ROICC office. These manufacturers were: Graham Architectural Products, J. Sussman, Inc., and Forte, Inc. Another manufacturer, Peterson Window Corp. has said that they can meet the spec., but I have not received their information yet. <u>The requirement in the spec is for a water resistance test of 20 psf with no leaks. This requirement should have been 10 psf or perhaps lower.</u> <u>Bob Rosenberry has advised me that we should not revise this requirement at this time. The consequences may be as follows: (1) The contractor used this item as an excuse of his time delay. A change now would justify his delays and may cost us for delays. (2) LD's would be canceled. (3) Other bidders may file a complaint since they would have bid on the original spec.</u>

(emphasis supplied). A copy of this email is attached as exhibit G and incorporated by reference.

During this deposition, Mr. Moyer confirmed that the water resistance test pressure in the contract was to high, testifying, "The water resistance test pressure provision of the window specification was a little tighter than it needed to be for the building and the tenants intended use." (Moyer dep. at p. 45, ln. 9 – p. 46 ln. 15). He stated that he did not know why the water resistance test pressure was tighter than it needed to be. (Moyer dep. at p. 48, ln. 10 – 12). He also testified he does not know where he obtained that information about the water resistance test pressure, but assumes it came from Gale. (Moyer dep. at p. 63, ln. 3 – 19).

Mr. Moyer also confirmed his ignorance regarding the requirements of the AAMA 101. He testified that he was not familiar with the provisions of the AAMA 101 (Moyer dep. at p. 49, ln. 11 – 14), that he did not know what the "P," "HC" or "40" in P-HC 40 stands for, (Moyer dep. at p. 50., ln. 15 – p. 51, ln. 513), that he did not know what the term "Optional Performance Class" means (Moyer dep. at p. 51, ln. 6), that he did not know whether there is a P-HC 40 (optional performance class) window under the provisions of the AAMA (Moyer dep. at p. 51, ln. 7 – 9), that he did not know if P-HC 40 windows are designated under the AAMA as being tested for water resistance at 20 psf (Moyer dep. at p. 56, ln. 15 – 24), that he did not know whether the AAMA permits the testing of windows of water resistance test pressure at 20 psf (Moyer dep. at p. at p. 56, ln. 25 – p. 57, ln. 3), that he did not know if there was a relationship in the AAMA between the positive design pressure (i.e. the "40" in "P-HC 40") and the water resistance test pressure (Moyer dep. at p. 57, ln. 16 – 19), and that he did not know what the water resistance test pressure for a P-HC 40 window is or whether the AAMA specifies such a test pressure. (Moyer dep. at p. p. 57, ln. 20 – 25).

He agreed, however, that the contract documents contained a representation to the contractor that a P-HC 40 optional performance class window actually exists. (Moyer dep. at p. 51, ln. 15 – p. 52, ln. 11). Moyer further agreed, as a registered professional engineer, that it is a mistake for a specification to identify a window that does not exist. (Moyer dep. at p. 52, ln. 12 – p. 52, ln. 22).

4. <u>Deposition of Robert F. Rosenberry</u>

Mr. Rosenberry worked at the ROICC office an the Navy facility. (Rosenberry dep. at p. 6, ln. 19 – p. 7, ln. 4) (A copy of the reference portion of Mr. Rosenberry's deposition is attached hereto as exhibit H and incorporated by reference). He was involved in construction

management. He ensured the contractors complied with the construction documents. (Rosenberry dep. at p. 5, ln. 5 – 12).

Mr. Rosenberry oversaw the work performed by Maropakis quality control personnel. (Rosenberry dep. at p. 10, ln. 3 – 8). He also physically observed the work to ensure that it complied with the contract requirements. (Rosenberry dep. at p. 10, ln. 22 – p. 11 ln. 1). He was at the project site on a daily basis, spending approximately 15 to 20 minutes there. (Rosenberry dep. at p. 11, ln. 2 – 6).

Mr. Rosenberry did not recall the conversation reflected in the email quoted above in which it was reported that he advised Mr. Moyer not to revise the water resistance test pressure requirement in the contract. (Rosenberry dep. at p. 30, ln. 1 – p. 31, ln. 3). He testified that he did not recall whether he ever reviewed the AAMA 101, (Rosenberry dep. at p. 23, ln. 25 – p. 24, ln. 10), that he did not know what the requirements for the AAMA 101 were under this contract, (Rosenberry dep. at p. 26, ln. 23 – p. 27, ln. 3), that he does not know what classification of window is tested for water resistance test pressure at 20 psf, (Rosenberry dep. at p. 27, ln. 15 – 5), that he did not know whether there are any documents that set forth the criteria for designating a window as P-HC 40, (Rosenberry dep. at p. 28, ln. 12 – 21), that he did not know what the term "optional performance class" means (Rosenberry dep. at p. 28, ln. 22 – 23), and that he did not know whether there is a P-HC 40 window with the designation "optional performance class" under the provisions of the AAMA. (Rosenberry dep. at p. 28, ln. 25 – p. 29, ln. 2).

**E. <u>Discovery of Lead Paint</u>**

On March 7, 2005 Mr. Rangwalla informed the Navy of his believe that lead paint had been encountered on the existing monitor windows. (Rangwalla dep. at p. 28, ln. 26 to p. 29 ln.

25). For this reason, on March 9, 2006 Rangwalla requested that the window installation subcontractor not deliver the specialty windows to the project site. (Rangwalla dep. at p. 24, ln. - - p. 25, ln. 11).

Maropakis remediation subcontractor obtained samples of the suspected lead paint on or about March 22, 2006. (Rangwalla dep. at p. 33, ln. 10 – 14). Lab results reflecting the presence of lead were provided to Maropakis on April 25, 2000. This confirmed that the lead had to be disposed of under RCRA standards. The Navy was notified of this on April 26, 2000. (Rangwalla dep. at p. 39, ln. 1 – 12). The Navy subsequently told Maropakis to dispose of the lead painted windows. (Rangwalla dep. at p. 48, ln. 2 – 9).

The Navy issued an amendment to the contract to provided Maropakis with approximately $6,000 and fourteen (14) additional days to complete the lead abatement work. (Rangwalla dep. at p. 48, ln. 24 to p. 49, ln. 2). Maropakis claimed that the 14 days was not sufficient (Rangwalla dep. at p. 49, ln. 3 – 6), and noted in the contract amendment that it did not accept the 14 day contract amendment. (Rangwalla dep. at p. 51, ln. 1 –5).

Maropakis forwarded a letter to the Navy on July 10, 2000 explaining that it is entitled to 122 day time extension. (Rangwalla dep. at p. 53. ln. 16 – 25). It is requesting an Order from the Court holding that Maropakis is entitled to a time extension of more that fourteen days and in a duration to be established at a hearing.

## IV. ARGUMENT.

### A. STANDARD FOR SUMMARY JUDGMENT

Summary disposition is appropriate where there are no genuine disputes as to any material fact. RCFC 56; Telenor Satellite Srvs., Inc., 71 Fed. Cl. 114, 118-19 (Ct. Cl. 2006) citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d. 202

(1986). Summary judgment may no longer be regarded as a disfavored procedural shortcut. Sweats Fashions, Co. v. Pannill Knitting, Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987). Rather, summary judgment is "a salutary method of disposition 'designed to secure the just, speedy and in and inexpensive determination of every action.'" Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986)). As emphasized by the court of appeals in Sweats Fashions: "[T]he burden is not on the movant to produce evidence showing the absence of a genuine issue of material fact." 833 F.2d at 1563 (emphasis in original). Rather, "'the burden on the moving party may be discharged by "showing" – that is, pointing out to the [Court of Federal Claims] – that there is an absence of evidence to support the non-moving party's case.'" Id. (emphasis in original) (quoting Celotex Corp. v. Catrett, 477 U.S. at 325). A "material fact" is one "that might affect the outcome of the suit under the governing law," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby Inc., 477 U.S. at 248.

If the movant succeeds in carrying its burden, then the burden shifts to the non-movant to demonstrate by appropriate evidence, the existence of a genuine issue of material fact. See Ehlers-Noll, GMBH v. U.S., 34 Fed. Cl. 494, 498-99 (Ct. Cl. 1995). Unsupported assertions or conclusory allegations are insufficient to withstand summary judgment. See Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 657 (Ct. Cl. 2003).

It is anticipated that Defendant will file a cross-motion for summary judgment. When there are cross-motions for summary judgment, the court must evaluate each motion individually, making inferences in favor of the non-moving party with respect to each motion.

Telenor, 71 Fed. Cl. at 119; see also DeMarini Sports, Inc. v. Worth, Inc., 239 F.3d 1314, 1322 (Fed. Cir. 2001).

In this case, there is no dispute over any fact that could affect the resolution of this motion. Accordingly, it is appropriate to dispose of the issues addressed in this motion by granting summary judgment in favor of Maropakis.

## B. Contractual Interpretation and Summary Judgment

Interpretation of the terms of a government contract is a question of law to be decided by the Court. See SW Government Travel, Inc. v. United States, 61 Fed. Cl. 559, 571 (2004)(citing Fortec Constructors v. United States, 760 F.2d 1288, 1291 (Fed. Cir. 1985)). The United States Court of Appeals for the Federal Circuit repeatedly has held that contract interpretation is a question of law generally amenable to summary judgment. See TLT Construction Corp. v. United States, 60 Fed. Cl. 187, 193-94 (2004). The Court is required to interpret the contract by its plain language. Id. at 194. An interpretation that gives a reasonable meaning to all parts of a contract will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result. See SW Government Travel, Inc., 61 Fed. Cl. at 571.

Maropakis' arguments on this motion for summary judgment are succinctly stated as follows. The government-drafted design specifications for the windows required Maropakis to procure a window that simply did not exist. It learned of this defect but purposefully decided not to tell Maropakis. As a result, Maropakis had to obtain a specialty custom-made window that took more time and money to procure. Maropakis is entitled to a time extension because of this error in the specifications and the Navy's unreasonable refusal to notify Maropakis of the error

and to correct it. Maropakis is also entitled to a time extension for the full impact associated with its discovery of lead paint on the existing windows.

### C. Maropakis Is Entitled To Summary Judgment On The Defective Specification Claim Because The Navy's Specifications Were Inconsistent And Identified Conflicting Design Criteria For The Windows.

This court has already examined a case involving conflicts in a specification for replacement windows. In R.P. Wallace, Inc. v. The United States, 63 Fed. Cl. 402 (2004), the Plaintiff contractor, contracted with the Navy for renovation work to a naval facility. Among other things, the contractor was responsible for replacing all existing exterior windows.

The contract specifications called for replacement of windows that conformed to the building's historic appearance and, therefore differed from standard specifications for windows. Specifically, the contract drawings provided various details regarding these windows, including specifications concerning the following: (1) panning and muntins; (2) the aluminum panning of the window jambs was required to be convex; and (3) historically accurate "true" muntins that could support a "design pressure" of 65 psf, indicating an ability of the glass to withstand wind loads of almost 160 miles per hour.

The contractor provided the window submittal, which was rejected by the Navy for various reasons, including that plaintiff proposed using "false" muntins instead of "true" muntins called for by the contract. In response to the Navy's rejection of the submittal, the window manufacturer responded indicating that it was impossible to build an aesthetically acceptable window using "true" muntins that complied with the contract's wind resistance requirements, emphasizing "we can offer the Navy either the historic type muntins as we have already submitted, or we can offer a true muntin however, we can no longer offer a combination of both, nor can anyone else." Id. at 406. The window manufacturer went on to state:

> What it boils down to . . . is that the Navy can have either the structural integrity offered by a bulky true muntin, or they may have the atheistic [sic] value of a false muntin, but not both! The Navy will not find another manufacturer capable of performing this feat, or able to present a test report to substantiate it.

Accordingly, the contractor requested a variance from the Navy's specifications. The Navy ultimately approved the use of "false" muntins and conceded that the Navy's specifications for the windows were defective in that they included two incompatible requirements, to wit: (1) the windows had to meet current wind load requirements to remain intact through a hurricane, and, at the same time, (2) were required to be duplicates of the original windows they were replacing, i.e., to have full muntins between each pane of glass in a multi-pane window. Id. The penetration of the window by true muntins would have weakened the glass to such an extent that it could not meet the wind load requirements. Id.

In this case, the Navy identified more than one set of criteria for the same windows, including the following conflicts:

- That the designation P-HC 40 is in consistent with the designation "optional performance class;
- That the specified water resistance test pressure of 20 psf is inconsistent with the designation P-HC 40.
- That the specified water resistance test pressure of 20 psf is not permitted under the AAMA documents, yet the Navy demanded that the windows contain an AAMA certification.
- That the specified air infiltration pressure was not consistent with the designation P-HC 40.

As in R.P. Wallace, in this case the Navy cannot have it all. If it had wanted a window that satisfies the extreme design criteria indicated (which, given the depositions responses, is not clear that it did) it should not have defined it as a P-HC 40 (optional performance class) window or required it to comply with the requirements of the AAMA.

**D. Breach of Warranty of the Specifications.**

The government warrants design specifications and if such specifications are deficient, the government bears the risk. See United States v. Spearin, 248 U.S. 132 (1918); see also Neal & Co. v. United States, 19 Cl. Ct. 463, 467-68 (1990), aff'd, 945 F.2d 835 (Fed. Cir. 1991). The theory of implied warranty for government design specifications was recognized early by the United States Supreme Court in United States v. Spearin. In Spearin, the Court upheld a judgment against the United States noting that: "if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." Id. at 136. Since the Spearin decision in 1918, courts have recognized the principle that design specifications contain an implied warranty that if they are followed an acceptable result will be produced. See Big Chief Drilling Co. v. United States, 26 Cl. Ct. 1276, 1294 (1992); see also Ordinance Research, Inc. v. United States, 221 Ct. Cl. 641, 609 F.2d 462 (1979). The Court of Claims has recognized the general principle that when the government issues design specifications of a detailed nature, it warrants the sufficiency of a detailed nature, it warrants the sufficiency and efficacy of the specifications to produce the desired results in a satisfactory manner; and, if such specifications prove defective, the government must compensate the contractor for the additional costs of performance.

Design specifications "set forth in detail the materials to be employed and the manner in which the work is to be performed, and the contractor is 'required to follow them as one would a road map'." Big Chief Drilling Co, 26 Cl. Ct. at 1294 (quoting J.L. Simmons Co. v. United States, 188 Ct. Cl. 684, 689 (1969)). In contrast, performance specifications set forth an "objective or end result to be achieved, and the contractor may select the means of

accomplishing the task." Big Chief, 26 Cl. Ct. at 1294 (quoting J.L. Simmons Co., 188 Ct. Cl. at 689). Generally, in order for a contractor to recover an equitable adjustment it must demonstrate that the specification is a design specification, not a performance specification, and that such design specification is defective or impossible to perform. Big Chief, 26 Cl. Ct. at 1294. In Big Chief, the court found it uncontested that the specifications were design specifications because they gave precise detail about the requirements and measurements. Id.

Likewise, this Court should find it uncontroverted that the specifications were design specifications due to the precise detail. In this case, the Specifications issued by the government for the windows were design specifications. They set forth in great detail exactly what the government wanted, including measurements, certain tests that the windows would have to comply with, and the codes that the windows would have to meet. The requirements were akin to a "road map." The roadmap was impossible to follow because the specifications were materially defective. Accordingly, Maropakis is entitled to summary judgment on this issue.

**E. Maropakis Is Entitled To A Longer Extension Of Time Because Of It Encountered Lead Paint In The Windows.**

The Navy has admitted that Maropakis is entitled to an extension of time due to the existence of lead paint on the project. In fact, the Navy issued an amendment to the contract that provided Maropakis an additional 14 days to complete the project work. However, the 14 day time extension issued by the Navy was insufficient and not acceptable by Maropakis. As explained in this motion, the evidence supports Maropakis' request for a longer extension of time to be determined following a hearing.

## V. <u>CONCLUSION</u>

For all of the above reference reasons, Maropakis requests the entry of summary judgment in its favor and against the Navy as set forth herein.

Respectfully submitted,

RHOADS & SINON LLP
By: /s/David W. Francis________
David W. Francis
Kelly H. Decker
One South Market Square
P.O. Box 1146
Harrisburg, PA 17108-1146
(717)-233-5731
Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of December, 2006, a true and correct copy of the foregoing Motion for Summary Judgment was filed electronically. I understand that notice of this filing will be sent to all parties of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/David W. Francis
David W. Francis