IN THE UNITED STATES COURT OF FEDERAL CLAIMS

M. MAROPAKIS CARPENTRY, INC., :
PLAINTIFF :
:
VS : NO. 03-2825C
:
THE UNITED STATES, : (JUDGE BASKIR)
DEFENDANT :

DEPOSITION OF: ABDULQADER RANGWALLA

TAKEN BY: DEFENDANT

BEFORE: TERESA K. BEAR, REPORTER
NOTARY PUBLIC

DATE: APRIL 15, 2005, 9:10 A.M.

PLACE: RHOADS & SINON
ONE SOUTH MARKET SQUARE
HARRISBURG, PENNSYLVANIA

APPEARANCES:

RHOADS & SINON
BY: DAVID W. FRANCIS, ESQUIRE

FOR - PLAINTIFF

U.S. DEPARTMENT OF JUSTICE
BY: JAMES D. COLT, ESQUIRE

FOR - DEFENDANT

EXHIBIT D

(Letter dated 3/9/00 produced and marked as Defendant's Exhibit No. 3.)

MR. FRANCIS: What's your question, Counsel?

BY MR. COLT:

Q What date did you tell the window manufacturer not to bring the windows on site?

MR. FRANCIS: Hold on a second. Window manufacturer or window subcontractor?

BY MR. COLT:

Q The window subcontractor, YonCon. When did you tell YonCon not to bring the windows on site?

A On May 9th -- on March 9, I'm sorry. March 9, 2000. It's per the document you have given to me to verify.

MR. COLT: Off the record.

(Discussion held off the record.)

BY MR. COLT:

Q Why did you tell them not to bring the windows on site?

A Because we suspected -- we found that lead -- I mean window contains lead paint.

Q When you say the window, the old windows, the windows that were --

A The existing windows.

MR. FRANCIS: Can I ask that the parties -- that, Mr. Colt, you not step on his answer by talking while he's answering.

MR. COLT: I apologize. If I need a clarification, I'll wait until you're done. I'm sorry, please continue.

MR. FRANCIS: I think he answered it.

BY MR. COLT:

Q Just so I understand, encountering the lead caused you to tell them not to bring the windows on site?

A That's true.

Q When did you inform the Navy that there might be a problem with lead?

A Again, I don't recollect, but do you have a document to indicate or to show me so I can look at the document and tell you?

Q Mr. Rangwalla, I'm going to refer you to what shall be marked as Defendant's Exhibit 4. Specifically it was provided to Maropakis. It's a letter from Maropakis on Maropakis letterhead dated March 30th, 2001, signed by you, Abdul Rangwalla, and specifically it was provided to Maropakis at Bates Numbers 4492 through 4495.

(Letter dated 3/30/01 produced and marked as Defendant's Exhibit No. 4.)

BY MR. COLT:

Q About the presence of lead.

MR. FRANCIS: About the specific comments that are in Paragraph 11?

BY MR. COLT:

Q Did you tell the Navy prior to that?

MR. FRANCIS: Object to the form of the question and direct him not to answer. You have to be more specific about what you're asking him. If you're asking him did you tell the Navy on or about April 26 that the window had been previously tested, which means they knew about it beforehand, and was considered hazardous waste under RCRA standards, then the answer is obviously yes. Is that what you're asking him?

BY MR. COLT:

Q Had you informed -- had Maropakis informed the Navy earlier than that about the possibility that there was lead on the site, lead on the windowpanes?

A Yes.

Q Do you remember when?

A I don't recollect, but if you have a document, could you show it to me? On March 7th, Paragraph 8 on this page number 4492.

Q Could you read that, please.

A M. Maropakis was prepared to mobilize and

commence the removal of asbestos containing transit panels all around the monitors on March 7, 2000. The window installation was scheduled to immediately follow. Since lead paint was suspected on the windows, M. Maropakis requested lead sampling results from the Navy.

Q When was this request made, do you recall?

A Mr. Rosenberry.

Q And when was it made, do you recall?

A I don't recall the date.

Q Please continue reading.

A M. Maropakis requested lead sampling results from the Navy. Lead sampling results were not readily available and the Navy was checking whether samples were taken from the window paint. During the interim, M. Maropakis instructed our abatement contractor to take necessary samples.

Q So when did Maropakis inform the Navy, as far as you recall or as far as you're aware?

A It would be found on March 7 when we were ready to mobilize and prepared to commence the transit panels containing asbestos. At that time we realize and at that time we inform the Navy that there's a problem with the lead. On the same day we asked whether they have any previous results for this lead -- lead sampling results.

again? Mr. Rangwalla, do you need to see Defendant's Exhibit 4 again?

MR. FRANCIS: Take a look at it. See if it says the date that you confirmed that. That's an ambiguous -- that's an ambiguous question.

MR. COLT: I'm sorry, could -- I'm sorry, may the record reflect that Mr. Francis is standing over Mr. Rangwalla while -- and flipping the pages while Mr. Rangwalla is trying to read.

MR. FRANCIS: Well, that's fine. I'm pointing him out to, you know, a portion of the exhibit that you gave him to look at where it says, quote, paint samples were taken by our subcontractor CES on March 22, 2000.

So to the extent that I, you know, refreshed Mr. Rangwalla's understanding by pointing to a specific provision of the letter that you provided him as an exhibit, guilty.

BY MR. COLT:

Q Does that refresh your recollection about when you informed the Navy?

MR. FRANCIS: Of what?

BY MR. COLT:

Q That you had found lead paint.

MR. FRANCIS: Found. Jim, can you explain

Q That letter in front of you, which has been marked Defendant's Exhibit 4, says that you informed the Navy of the test results on April 26th, I believe. Could you read the date that it says?

MR. FRANCIS: Read the whole sentence, Abdul.

A Yeah, the Paragraph 11 on page 4493, it says, positive results were obtained on April 25th, 2000 indicating that the paint on the window frame is considered hazardous by RCRA standards for lead and must be disposed as a hazardous waste. The Navy was advised about this matter on April 26, 2000.

BY MR. COLT:

Q Had Maropakis informed the Navy of these results prior to April 26, 2000?

MR. FRANCIS: Of the testing results?

BY MR. COLT:

Q Of the testing results.

A Would you please repeat the question?

Q Prior to April 26th, 2000 had the Navy informed -- had Maropakis informed the Navy that it had confirmed that there was lead paint that was a hazardous material prior to that date?

MR. FRANCIS: Under RCRA?

A You can always -- I cannot confirm anything

the test results into the record, Mr. Colt, so it's plain what the results were, or do you want to put a copy of the letter from CES which explains the results into the record?

MR. COLT: If Mr. Rangwalla recalls, that's adequate enough.

MR. FRANCIS: The specific parts per --

MR. COLT: I don't believe we need that information at this stage right now.

MR. FRANCIS: Then what exactly are you asking for?

BY MR. COLT:

Q Did the lab results indicate the presence of lead paint that had to be dealt with as a hazardous material?

A We have a copy of the testing laboratory and from the contractor. If you want, I can read it. And if you want to keep that as document for the records, I can do that. I don't recall anything right now, but I can read the letter. We have a copy of that letter. I can read it and I can provide that as a document.

Q Did Maropakis conclude it was going to have to dispose of the old windowpanes as hazardous material?

A Knowing the results from the subcontractor where the lab confirmed that the window components and

frames consist of lead, then, yes, you had to remove that hazardous waste.

Q So Maropakis concluded it would have to remove the -- dispose of the windowpanes as hazardous waste?

A If it is hazardous material, of course you have to remove hazardous waste.

MR. FRANCIS: Under RCRA.

BY MR. COLT:

Q When did it conclude -- inform the Navy of this conclusion?

MR. FRANCIS: Hold up.

A Again, that's a very ambiguous question. If you have any documents, please show it to me so I can recollect the date.

MR. FRANCIS: Hold on.

MR. COLT: Counsel, if you feel that I'm in any way misleading the witness or creating an ambiguity that isn't there, you'll have a chance to ask your questions after I am done.

MR. FRANCIS: I also have the opportunity to pose objections as to the form of the question during the deposition, as we stipulated, and I am right now considering based upon my review of the mountains of documents that we have whether or not your question is

BY MR. COLT:

Q Did the Navy eventually tell Maropakis to dispose of the old windowpanes as hazardous waste?

A Do you have any document regarding this to show it to me?

Q How did Maropakis dispose of the windows, the old windows?

A There was an order from the Navy. The Navy must have written to us.

Q How did Maropakis dispose of the windows? You're Maropakis' 30(b)(6) deponent. How did Maropakis dispose of the old windowpanes? Did it dispose of them as hazardous waste?

MR. FRANCIS: Again, just for purposes of the record, there is an amendment to the contract that's executed by Mr. Nihoff which specifically directs Maropakis on how to remove the lead contaminated material and it's -- you know, it's a document that I'm looking at right now and -- I'll certainly make a copy of it for you if you want to see it. It was produced to you in the course of discovery and you should have it since it's your document.

BY MR. COLT:

Q Mr. Rangwalla, you recall this amendment increased the pay by the Navy to Maropakis by over $6,000,

is that true?

A That is true.

Q And the Navy gave Maropakis 14 more days on the contract which Maropakis said it regarded as inadequate, is that true?

A That's true.

Q I'm going to refer you to pages 393 -- Bates Numbers 393 through 406 of the government's document production and that will be marked as Defendant's Exhibit 5.

(Packet of documents produced and marked as Defendant's Exhibit No. 5.)

MR. COLT: Please note that Mr. Francis took the documents and is looking at them.

MR. FRANCIS: Please let the record reflect that unlike the depositions where I gave Mr. Colt copies of the exhibits to look at, he does not have copies for me and so that therefore as part of my job I'm looking at the documents to make sure that there's nothing objectionable before the witness looks at them. And once again, I'd request that copies of these documents be provided to me following the deposition so I can keep accurate records.

MR. COLT: That shall be done. Off the record.

(Discussion held off the record.)

Q In fact, there's a page in there where you signed and you made a notation. Could you read that notation, please.

A Accepting the amount $6,154 but not the extended time from January 16 to January 30, 2000.

Q How much did you claim originally should have been given in additional time because of the lead issue?

A Again, I don't recollect, but you must have a document -- my document indicating how many days we requested. Would you please show it to me, that document.

Q May I see that, please, Defendant's Exhibit 5.

A (Handing.)

Q On page Bates Number 393 of Defendant's Exhibit 5, a memo to the contract file states that Maropakis demanded a 360 day time extension rather than a 14 day, is that correct?

A I have to see the document to make sure.

Q Well, here, and please also look at the next page Bates numbered 394. I believe you made a notation at the bottom. Was that you, Mr. Rangwalla, or was that somebody else from Maropakis?

A No, this is from Abdul Rangwalla.

he's requesting because of lead at Bates stamp 406. So, I mean, again, I'd object to the form of the question because it's going to be misleading on the record. If you want to ask him about the calculations on page 406, you certainly can do that.

MR. COLT: Fair enough.

BY MR. COLT:

Q Mr. Rangwalla, how did Maropakis calculate the delay it claims it should have gotten?

MR. FRANCIS: For the lead paint?

BY MR. COLT:

Q For the lead paint on this modification P00001. If Maropakis had had its way, how many days of -- additional days would it have gotten?

A (Pause.)

Q Sir, how many days? You made several notations and I believe those should refresh your recollection. How many days for this modification did Maropakis claim?

A There's a letter written by -- and signed by Abdul Rangwalla dated July 10, 2000 to Mr. James Nihoff and that letter clearly explains step by step and made the conclusion at that time that the total number of days for the lead removal item is altogether 122 calendar days.

Q For the lead issue?

A Right, correct.
Q So any other -- the mention of the year extension involved other issues as well?
A That's true.
Q So for the lead you were at that time only claiming 122 days?
A 122.
Q That's correct?
A Yes.
Q So Maropakis eventually disposed of the old windowpanes as hazardous waste, is that correct?
A It's not correct in the sense that Maropakis did not dispose. We just removed, you know, the framing of the windows and an associate part of the windows is a -- contained lead.
Q And then those were disposed of as hazardous waste?
A The hazardous waste disposal was done by the government.
Q Now, Maropakis at one point wanted to proceed with the roof work before the windows had been done, wasn't that correct?
A Correct.
Q And could you describe the layout of this building? In other words, on a traditionally shaped

building the windows are on the wall and the roof is above the wall, isn't that correct, in most buildings that people think of?

MR. FRANCIS: I'm sorry, could you say that again? I'm sorry.

BY MR. COLT:

Q Was this a -- let me rephrase that. I'm sorry, that's a bit awkward. In this building isn't it true that the windows where the work was going to be done were above the part of the roof where -- that was also going to be worked upon -- worked on, isn't that correct?

MR. FRANCIS: You're talking about all of the roof?

BY MR. COLT:

Q Parts of the roof that were going to be worked on under the contract, the windows were above that, correct? In other words, somebody doing work on the windows would get there by being on top of the roof, isn't that correct?

A There are two roofs, one is a main roof and one is a monitors.

Q The roof of the monitors -- the monitors, just to clarify, being a small part of the building with a wall and it's own mini roof and windows on the side that's above the main roof, is that correct?

Q Take your time to read it, if you need, Paragraph 1.5. Let me know when you're done.

A I finished reading Paragraph 1.5 indicated in the specification Section 01110, page 3.

Q What is the title of that section?

A Construction sequence.

Q And doesn't it require that the window work be completed before the roof work?

A It does.

Q And you understood this requirement, didn't you?

A Yes.

Q In fact, I'm going to refer you to Defendant's Exhibit 6.

(Letter dated 8/20/01 produced and marked as Defendant's Exhibit No. 6.)

BY MR. COLT:

Q This is a letter from Maropakis which you wrote, at least it has your name, and it's dated August 20th, 2001. Have you seen this before? It's in the Plaintiff's document production. It's Bates Number M0001 through M0004. Do you recall writing this letter or do you recognize it?

MR. FRANCIS: Objection, asked and answered. You can answer it again.

BY MR. COLT:

Q It has your signature, doesn't it?

A Yes. And I wrote this letter, yes.

Q And, in fact, in Paragraph 2, could you read that, please?

A The contract requires that the window work must be performed prior to the roofing work.

Q Thank you very much. So this was a contract requirement and Maropakis acknowledged that this was a contract requirement of the specs, is that true?

A Yes.

Q Did Maropakis feel that the Navy had an obligation to allow it to proceed with roof work when the windows were incomplete?

A This is a request, not that Navy should allow it or not.

Q But you made the request?

A We made the request to avoid further delays.

Q And the Navy --

A Rejected it.

Q -- insisted that you hold to the contract sequence?

A True, that's true.

Q Mr. Rangwalla -- and we're just about done.

amendment?

A Again, would you please clarify this question in the sense that the Navy or professional people, the people who were working for the Navy?

Q By anybody. Did Maropakis feel it was given permission by anybody to use asphalt? Did Maropakis feel that it had permission to use asphalt?

A Yes.

Q Why did it feel it had permission to use asphalt after this amendment?

A We submitted the roofing system indicating that we are going to use asphalt on the system and we submitted this document to the consultant.

Q The consultant being whom?

A Gale Associates.

Q It was submitted directly to Gale Associates?

A It was submitted through Mr. Rosenberry.

Q So you gave it to Mr. Rosenberry --

A (Witness nods head affirmatively.)

Q Just to clarify, Maropakis submitted something to Mr. Rosenberry?

A As I recollect, all of our submissions used to go through Mr. Rosenberry.

Q Did Mr. Rosenberry tell you that you could

BY MR. COLT:

Q You testified that this came through Mr. Rosenberry.

MR. FRANCIS: Correct.

BY MR. COLT:

Q Did you, Mr. Rangwalla?

A We submitted -- the procedure was to submit all the submittals to Mr. Rosenberry and then Mr. Rosenberry would submit that to the consultant.

Q And did Mr. Rosenberry -- so this all came through Mr. Rosenberry?

A No, it -- what I'm saying is the procedure is to submit any submissions through Mr. Rosenberry. So we submitted this to Mr. Rosenberry and his job at that time was to submit all the submittals, including this, to the consultant for his approval or disapproval.

Q And did Mr. Rosenberry ever tell you that asphalt could be used on the roof?

MR. FRANCIS: Again, object to the form of the question. When you say tell, it's not plain what you're asking. I mean, there's a procedure in the contract for review and approval of submittals. Maropakis submitted asphalt to Rosenberry and Rosenberry sent it to Gale. Gale approved it and wrote on there the asphalt is required. That was sent to Rosenberry and Rosenberry

returned it to Maropakis.
A Right.
MR. FRANCIS: Are you asking for something in addition to that?
BY MR. COLT:
Q So was the submittal, was that what you felt gave you permission to use asphalt on the contract?
A Yes.
Q On the roof?
A Yes.
Q Was there anything else?
A No.
Q So just the submittal, you believed that that gave you permission to use asphalt on the project?
A That's true.
Q I'm going to show you what has previously been marked as Plaintiff's Exhibit 7. It is a diary of events from Mr. Rosenberry on the project. I'm going to refer you specifically to the page of Plaintiff's Exhibit 7 marked with Bates Number 4512. Could you please read Paragraph 38. Here's the rest of the document. Take your time and read it and let me know when you've red it.
A I read this paragraph dated 6/29/2000.
Q Could you read it into the record, please.
A It's written by Mr. Rosenberry. Phoned