V I R G I N I A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------X

M. MAROPAKIS CARPENTRY, INC., :

Plaintiff, :

VERSUS, : 03-2825C

THE UNITED STATES OF AMERICA, :

Defendant. :

-------------------------------X

Fairfax, Virginia

Friday, May 6, 2005

Deposition of

**GARY W. BROWN, P.E.,**

a witness, called for examination by counsel for the plaintiff, pursuant to notice and agreement, in the offices of Gale and Associates, Inc., 11781 Lee Jackson Highway, Fairfax, Virginia 22033, beginning at approximately 1:05 o'clock p.m., before LeShawne M. Thompson, a Verbatim Court Reporter and a Notary Public in and for the Commonwealth of Virginia at large, when there were present on behalf of the respective parties:

LT05-068



EXHIBIT
E

A Yes.

Q Okay. And do you understand what I mean by construction administration, which would be the services that a professional might perform during the construction of a project?

A Yes.

Q And what is your understanding of what those would be?

A Review submittals, review shop drawings, inspect the work that is being installed.

Q Good. That is my understanding too.

And do you perform any of those services as an employee of Gale at this time?

A Yes, I do.

Q And which ones do you perform?

A All of the above.

Q How long have you been employed by Gale?

A I believe it has been about five years. I had a two or three year stint several years ago that I left for a couple of years and now I have been back here for about three years, two and a half to three years.

Q Are you familiar with the building 110 project that is in dispute in this case?

A Yes, I am.

Q And how is it you are familiar with that?

A I was the designer of record. I signed the drawings. I reviewed all the work that was performed to get to the design.

Q And at that time, the time that you were the designer of record for this project, did you work out of this Fairfax office or did you work out of the Baltimore office?

A The Baltimore office.

Q And let's just talk about at that time. At that time when you were the, quote, unquote, designer of record, did you provide any construction administrative services?

A In general you mean?

Q Yes.

A Yes.

Q Like what?

A Inspection, submittal review, same types of services.

MR. HUTCHISON: I think we have to clarify, because he asked in general. So are you talking about this project?

Q Don't know.
What does Mr. Ed Madden do?
A He runs the office in Baltimore. He is the overall -- he is the vice president of the firm.
Q Okay. He didn't review your design work, did he?
A No, sir.
Q Was there anyone from Gale who at that time that you were the designer of record for this project, is there anyone that reviewed your design work at that time?
A I do not recall. I mean I had the final say. I am a professional engineer and I have the final say on drawings. It may or may not have been reviewed by another P.E. out of the Baltimore office.
Q Okay.
Now, did you have subordinates who were assisting you with the design during this project?
A Yes.
Q Who were they?
A Tom Grasso was the primary person.
Q Actually, let me step back for a question. Are you a P.E., a registered professional --

Q Specs -- yes, you are right. That is what it is called. Yes. I stand corrected.

Prior to this project, have you ever worked with the specs intact before?

A Yes.

Q How many times?

A I would have to say several, but I cannot remember exact specific location.

Q Were all of those for the Department of the Navy or were they for other agencies as well or other owners as well?

A It would only be Navy type work.

Q Do you know whether other agencies use specs intact?

A I do not know that.

Q The scope of work for this project included among other things the removal and replacement of monitor windows; is that your understanding?

A Yes.

Q What was your involvement in the design and/or specifications for that work?

A Identify the appropriate window for reinstallations and design with that particular window

what point?

Q Well from - let me -- good question.

I assume you received the specs intact from somewhere?

A Yes, we do.

Q Where did you receive it from?

A I am not sure if the Navy just gives you a CD, but in some way or manner we got the unedited version of the spec.

Q Did you at some point -- strike that.

Did Gale at some point during the design phase of the project modify specification section 08520?

A Yes.

Q What did you modify about it?

A Probably quite a bit. I mean the original specification has a lot of choices that you can make and you delete the choices that you do not need and you include choices that you do need.

Q Did you add or subtract any design -- strike that.

Do you know whether this document contains design criteria for the windows?

A Yes, it does.

Q And what would you classify as design criteria, in general terms?

A Generally it would tell you the performance criteria of certain elements.

Q So for example, issues might be the water resistance test pressure, might a design -- performance criteria; correct?

A That is correct.

Q Let's go back to the front page of this specification. It refers to certain documents that are part of the specification under paragraph 1.1 references, and one of the ones that is listed there is the ANSI/AAMA 101; are you familiar with that document?

A Yes.

Q Have you ever read it?

A Yes.

Q The 1993 version?

A I read it frequently, so I am sure the 1993 would have been read.

Q And was it your understanding that the windows that were designated for this window complied with the requirement of the AAMA 101?

A They were at least as stringent as the

requirements of AAMA 101; yes.

Q I am not sure I understand that answer. At least as stringent. What do you mean by that?

A AAMA sets aside standards that they are looking to get as minimum standards.

Q And your specifications were -- you are saying were -- what were they in relation to the AAMA?

A There were some criteria that were equal to, some criteria that were greater than, and no criteria that was less than the AAMA standard.

Q Let's go to paragraph 1.2. Strike that. Let me go back to that question.

Do you know whether the criteria that were set forth in specification section 08520 were authorized under AAMA?

A I do not know that AAMA authorizes anything besides their minimum, so I do not have an answer to that?

Q Did you know at the time that this project was let for bid?

A I am sorry?

Q Did you know at the time that this project was let for bid by the contractors?

A Did I know that it was let for bid?

Q Did you know -- you are saying you do not know? Did you know at some point in time whether AAMA set limitations on design factors for windows?

A No, I do not know if there are any maximums.

Q Would you agree with me that that would be an important factor to consider when preparing specifications for construction of a project?

A Minimum standards are absolutely required and then anything greater than that is up to the designer's discretion.

Q Well, let's talk about the certification, paragraph 1.2. Each prime window unit shall bear the AAMA label warranting that the product complies with ANSI/AAMA 101. Do you see that?

A Yes, sir.

Q Do you know whether windows that exceed the minimum -- the maximum requirement set forth in AAMA can be certified in accordance with that provision?

MR. HUTCHISON: Objection.

BY MR. FRANCIS:

Q Do you know?

allows for pressure equal to 15 percent of the design pressure. So if you have got excessive design pressures there are times when it will go greater than 15 -- I am sorry, 12 psf.

BY MR. FRANCIS:

Q Let me just see if I understand what you are saying. Are you saying that if you have a window that is designated with a higher design pressure, let's call it 133 ounce per square foot, that that would result in a water resistance test pressure in excess of 12?

A Can you repeat the question? I was reading that again.

Q Is it your testimony that if a window is designated as let's say a PHC 200, that that allows for testing of the water resistance test pressure at more than 12 pounds per square foot?

A No, after rereading that I see that 12 is the max.

Q So, do you believe that you can have an AAMA certified window that exceeds that provision that is tested at greater than 12?

MR. HUTCHISON: Objection.

THE WITNESS: The test gives you a result,

the result being 12 or less to 2.86, and then it would be approved by AAMA. Anything outside of those standards, whether it is less than 2.86 or greater than 12, does not fall within AAMA.

BY MR. FRANCES:

Q Question: Do you know whether the windows that were specified in the contract documents had to be certified as complying with AAMA?

A Yes, it looks like they would have to.

Q Why don't we go to page four of the specifications. Under paragraph 2.1.8, projected windows, there is a designation of PHC40, parens, optional performance class, close parens. Do you see that?

A Yes, I do.

Q Is that a reference to an actual window?

A Yes. Performance class, yes.

Q Well, do you believe that there is in fact under the AAMA PHC40, parens, optional performance class, close parens, window?

A Yes, I believe you can find those types of windows.

Q Well, I gave you -- that is not the

question. The question is under the AAMA.

First of all, do you know what the P stands for in that designation?

A Projected.

Q What does the HC stand for?

A High -- I do not recall.

Q Do you know what the 40 stands for?

A Forty pounds per square foot.

Q And what is it? Effective design pressure?

A Not necessarily. You can put any number designation you want there as a minimum. If you have got 20 pounds you can still ask for HC40 or 60 or other class, but it is as a minimum, yes.

Q A minimum for design pressure?

A Yes.

Q What is the difference between design pressure and water resistance pressure?

A There is really -- there is not necessarily a correlation between the two.

Q Under the AAMA?

A That is correct.

Q How about we go to page 8 of the AAMA.

or AW. I do not know necessarily the difference between the two.

Q Do you agree with me though that the specifications didn't identify providing AW windows?

A That is correct.

Q Does this chart identify any optional performance class windows?

A No.

Q Turn to page 30 of the AAMA 101?

A Yes, I have done that.

Q Does that identify the optional performance class windows?

A Yes, it does.

Q Is there a PHC40 window?

A No.

Q Is there an HC window 40?

A An HC? I am sorry.

Q HC.

A No, 45 is the minimum HC.

Q Well, let's talk about 45. What is the water resistance test pressure that is identified for a HC45 window?

A 6.75.

Q Are there any other windows that are identified in the optional performance class that exceed 12 psf?
A No.
Q Were you aware -- well, strike that.
Did you discuss the water resistance test pressure specification for this project with anyone from the Department of the Navy during the design phase?
A Not to my recollection.
Q How about internally with employees of Gale?
A Not to my recollection.
Q Did you become aware -- strike that.
Did you discuss the water resistance test pressure with anyone from the Department of the Navy during the construction phase of this project?
A Very likely.
Q Do you know who you would have discussed it with?
A The only person I would have talked to at NAVICP was Lonnie Moyer.
Q And I take it you don't recall any specific conversations?

A No, sir.

Q Did you ever have a conversation wherein you discussed the requirements of the AAMA with respect to water resistance test pressure? Do you know?

A I do not recall.

Q Did you have any conversations with any window manufacturers or suppliers during the design or construction phase with regard to the requirements of the AAMA 101?

A I did not, no.

Q Do you know if anyone from your office did?

A Perhaps Mr. Grasso did.

Q Do you have any information about what he discussed?

A No, sir.

Q Were you aware of any claims made by Maropakis during the construction phase of the project that they could not find a window manufacturer who could meet the specifications?

A I was not aware of that.

Q Do you know whether Gale contacted any window manufacturers in order to determine whether they

could meet the specifications?
A I did not do that, so I do not know.
MR. FRANCIS: Can I have this marked as Gale 2.
(The document referred to below was marked Gale Deposition Exhibit Number 2 for identification.)
MR. COLT: This is Gale 2?
COURT REPORTER: Yes.
BY MR. FRANCIS:
Q Mr. Brown, I have handed you what has been marked as Gale Exhibit Number 2, which is a document that was Bate stamped G as in golf, 001109. Would you take a moment to look at this document?
A Okay.
Q You are on the cc list for this document; correct?
A Yes.
Q Did you receive this document during the construction phase of this project?
A Yes. I imagine -- I mean, I have got that. So I would say it was routed to myself, yes.
Q There is a notation on the right-hand side next to TRACO, I will spell that, that is T-R-A-C-O,

where it says except water infiltration 20 psf, TRACO 12 psf; whose handwriting is that, do you know?

A I do not know.

Q Do you know whether the Department of the Navy asked Gale to research whether manufacturers can meet the specifications set forth in the contract documents?

A Only based on the wording of this letter. I was not -- no one asked me specifically.

MR. FRANCIS: Can I get this marked, please.

(The document referred to below was marked Gale Deposition Exhibit Number 3 for identification.)

MR. COLT: This is Gale Exhibit 3?

COURT REPORTER: Yes.

BY MR. FRANCIS:

Q Mr. Brown, I am handing you what has been marked as Gale Exhibit Number 3 for identification, it is a document that was Bate stamped G as in golf, 001154; do you know whose handwriting this is?

A It looks like Tom Grasso's, but I am not positive.

Q Under TRACO at the bottom, there is a

provision that is in quotes, and I will read it, it says: none projected, provide 20 pounds. AAMA states 10 pounds. AAMA provides 12 pounds, close quotes.

Did you ever have a conversation with Mr. Grasso about that statement?

A No. When the project went into construction phases I did not deal with any of the issues at all. Mr. Grasso took care of all the construction issues.

Q Just so I am clear. So after -- during the construction phase he no longer reported to you?

A There is no clear lines of reporting to me on a project. Basically the project designer would have the direct reporting. After it got into a different phase he reported to somebody else. I am not sure who that would have been.

Q You do not know who Mr. Grasso reported to with respect to this project during the construction phase?

A No, sir. It could have been Mr. Madden or it could have been someone else.

Q But it was not you?

A That is correct.

A Frequently we take master specifications and utilize our minimums.

Q Did you have any conversations with anyone at the Department of the Navy about changing the minimum water resistance test pressure to 20?

A No.

Q Do you recall any conversations with anyone at the Department of the Navy with respect to whether that was consistent with with the designation of HC40?

A No.

Q Did Gale do any other projects on this facility, on the Naval facility involving the utilization -- strike that -- involving the removal and replacement of windows?

A I do not know.

Q How about the installation of new windows?

A I do not know.

Q Do you know whether that modification would have been made during the design phase?

A Which modification?

Q Changing the water resistance test pressure to 20 psf?

they either review it or don't review it to their satisfaction.

Q Which means that you don't identify the changes that you have made?

A No, sir. Those are our changes and --

Q And so there is never discussion about the changes that are made unless the Navy catches them during the design phase?

MR. HUTCHISON: Objection.

BY MR. FRANCIS:

Q Is that what you are saying?

MR. HUTCHISON: Objection.

BY MR. FRANCIS:

Q Can you explain that to me?

A Gale does the design and we have recommendations and specifications that are sometimes greater than the minimums required by the Navy or other agencies, and no, we do not necessarily tell them specifically what those changes are.

Q Are you aware of any professional publications such as the AAMA or the ASDMs which provide -- strike that.

Did Gale rely upon any professional

publications such as the AAMA or the ASDMs when it identified the minimum water resistance test pressure of 20 pounds per square foot? Do you know?

A I do not know where the 20 came from originally.

Q How was it that you know it is the minimum specification required by Gale?

A Because our master specs that we rely on to get the data for specifications.

Q That is what they say, the 20?

A We check 20 versus what the minimum standard requirement is in the industry.

Q That is not my question. My question is how do you know that that is what the Gale minimum standard is?

A When I open up a specification, a master spec, and it says a criteria is a certain number, that is what we are starting from.

Q Who actually went through the specs intact and Gale's master spec and made the changes. Was that you or was that someone under your supervision?

A Someone under my supervision.

Q Who? Do you know?

AAMA; do you know?

A Condensation resistance factor.

Q What else?

A Air infiltration, thermal transmission.

Q Anything else?

A Not for the window frame. Some for glazing.

Q Can you tell me which of the specification provisions that are set forth in section 08520 other than the water resistance test pressure that we talked about, that are consistent with the designation of HC40?

A The air infiltration is greater than the minimum requirements by AAMA.

Q So it is different? The air infiltration requirement is higher than the HC40 designated in the contract?

A As specified, the air infiltration is higher than designated by AAMA's minimum standards.

Q Okay.

A The CRF does not have anything to do with this particular AAMA section.

Q What particular AAMA section?

A With 101. I believe it is the