IN THE UNITED STATES COURT OF FEDERAL CLAIMS

M. MAROPAKIS CARPENTRY, INC., :
PLAINTIFF :
:
VS : NO. 03-2825C
:
THE UNITED STATES, : (JUDGE BASKIR)
DEFENDANT :

DEPOSITION OF: LONNIE R. MOYER

TAKEN BY: PLAINTIFF

BEFORE: KAREN BLOUCH, RMR
NOTARY PUBLIC

DATE: APRIL 13, 2005, 9:00 A.M.

PLACE: RHOADS & SINON
ONE SOUTH MARKET SQUARE
HARRISBURG, PENNSYLVANIA

APPEARANCES:

RHOADS & SINON
BY: DAVID W. FRANCIS, ESQUIRE

FOR - PLAINTIFF

U.S. DEPARTMENT OF JUSTICE
BY: JAMES D. COLT, ESQUIRE
AND
DEPARTMENT OF THE NAVY
BY: ALAN CARAMELLA, ESQUIRE

FOR - DEFENDANT

EXHIBIT
tabbies
F

information down. People can sometimes speak at a rate of speed, and it makes it difficult for the court reporter to get everything said. So I would ask you to keep her in mind while you are answering questions. Okay?

A Yes.

Q Next thing, it's important that only one of us talk at the same time. And the reason for that is it's difficult for a court reporter to get two people talking at the same time.

So even if you know what the question I'm asking is, I would ask you to wait until I finish asking it before your answer. And I will attempt not to interrupt you during an answer to a question. Fair enough?

A Yes.

Q Mr. Moyer, by who are you presently employed?

A Naval Support Activity.

Q What's your duty position there?

A Civil engineer.

Q How long have you worked at that facility, in that capacity?

A Fifteen years plus.

Q Are you a Registered Professional

Engineer?

A Yes, I am.

Q In Pennsylvania?

A Yes.

Q When did you get your P.E. license, do you recall? Approximately.

A I believe it was '79.

Q And what is your license in? Let me ask you this. What is your specialty? Do you have a degree?

A Civil.

Q Civil engineering?

A Civil engineering.

Q Where did you go to school?

A Penn State.

Q Let me ask you specifically some questions about this project. We're here today to talk about the work that was done by M. Maropakis on the Building 110. Are you familiar with that project?

A Yes.

Q How is it you're familiar with the project?

A I worked on the design package. We contract out the designs with a consulting firm. And

I was the representative for the Navy to prepare the design package.

Q Let me just ask you some questions about what the chain of command was while you were in that position during the design phase. Who did you report to?

A My boss's name is Terry Kline.

Q Was he your boss during the design phase of this project?

A Yes.

Q Did you have any subordinates?

A No.

Q So, for example, Mr. Rosenberry was not in your chain of command?

A No.

Q Nevertheless, did you work with Mr. Rosenberry during this project?

A Somewhat, yes.

Q You indicated that you were involved with the project during the design phase. Were you involved in the project during the bid document preparation phase?

A Yes.

Q Let me ask this. It might be confusing to you. Because I may think of that as a

different time period than you.

What's involved in the work that you did during the design phase?

A Preparation of the plans and specs.

Q There were submissions of the design that are made by the engineer, correct?

A Yes.

Q Or the professional. In this case, it was Gale, correct?

A Yes.

Q G-A-L-E?

A Gale Associates.

Q You worked with them as the design professional who worked upon the plans, drawings, specifications, correct?

A Yes.

Q Do you recall how many submissions they provided to the Department of the Navy during the design phase?

A I don't remember precisely.

Q Those submissions concerned or were at certain levels of completion of the design, correct?

A Yes.

Q For example, there might have been a 60 percent submission, correct?

A Yes.

Q Now a hundred percent submission at some point?

A Yes.

Q Then a final submission at some point?

A Yes.

Q Did you review all of those?

A Yes.

Q After the final, the final submission by Gale to the Department of the Navy, what was the next step?

A The bid package goes to our contracting department, what we call the ROICC office.

Q Is the hundred percent submission that is provided by Gale the bid package, or does somebody from the Navy attach additional documents to that before it's sent to the ROICC office?

A Additional documents are attached.

Q By who?

A The ROICC office.

Q So you were not responsible for attaching additional documents?

A No.

Q Do you review the bid package, if you

will, after it is, I guess, finalized by the ROICC office?

A No.

Q Actually, just for the purpose of the court reporter, can you spell ROICC?

A R-O-I-C-C.

Q What does that stand for?

A Resident Officer in Charge of Construction.

Q After the bid packages are finalized by the ROICC office, what happens next, do you know?

A They advertise it.

Q And contractors request copies of the bidding documents for purposes of preparation of a bid?

A Yes.

Q Are you at all involved in the advertisement or sending those out?

A No.

Q Presumably there are modifications made during the period between when the proposals are advertised and the bid date. Is that correct?

A Yes.

Q Do you know if there were any such amendments during that period for this contract?

A Yes.
Q Are you involved at all in the review of bid packages that are provided by the contractors?
A No.
Q And you didn't review them in this case.
A No.
Q Maropakis was selected as the low responsive and responsible bidder. Did you have anything to do with the selection of Maropakis?
A No.
Q Ultimately Maropakis received an award and then a notice to proceed. Were you involved in the preparation or issuance of those?
A No.
Q Did you have any involvement with this contract during the construction phase, which I will identify as the period after the award to Maropakis?
A Yes.
Q What was that involvement?
A When questions came up during construction, they would often address those to me.
Q And these would be questions from whom?

A From the contractor.
Q How would they get to you?
A The contractor uses something called a request for information.
Q An RFI?
A An RFI, yes. They write out their question to the ROICC office. The ROICC office may send it to me.
Q Depending on what the subject matter of the RFI was?
A Yes.
Q Do you know who at the ROICC office would have forwarded those to you?
A I would presume it was Bob Rosenberry generally.
Q Do you recall reviewing any RFIs in this project?
A Yes.
Q During the construction phase?
A Yes.
Q Do you know how many?
A No.
Q Upon receipt of an RFI from Rosenberry or someone else in the ROICC office, what would you do?

A Check out the question, try to come up with answers.

Q And did you do that yourself, or did you forward it on to Gale?

A Generally we forwarded it on to Gale.

Q Were there any instances on this project when you did not refer an RFI to Gale but attempted to answer it yourself? Do you recall?

A I don't recall.

Q Do you recall the subject matters of any of the RFIs?

A One dealt with windows.

Q Do you remember what the -- strike that. Do you recall what the specific -- strike that again. Do you recall what the specific topic of the window RFI was?

A Windows meeting the specifications.

Q Do you recall what the question that Maropakis posed was?

A In general, it was they had trouble finding windows that met the specifications.

Q And they asked you to identify manufacturers who could meet the specs.

A Yes.

Q Any other RFIs with respect to the

windows?
A I think that was it.
Q What other RFIs do you recall on this project?
A I don't remember others.
Q The RFI that you recall with respect to the windows, is that one of the ones that you forwarded on to Gale?
A Yes.
Q Did you have any conversations with Gale about that RFI?
A Gale responded in a letter to answer.
Q So you didn't have any discussions with them about that RFI?
A I don't know. I may have talked to them on the phone.
Q You don't recall what the conversation was?
A No, I don't.
Q Do you recall who you would have spoken to at Gale?
A No.
Q Did you have any dealings with Thomas Grasso, G-R-A-S-S-O?
A Yes, he was a person that worked on

the project.

Q For Gale.

A For Gale.

Q Do you recall whether you had any discussions with him regarding the windows?

A No, I don't.

Q Let's talk about other things that you would have done during the construction phase. Did you review schedules that were submitted by the contractor?

A No.

Q Did you review submittals that were provided by the contractor?

A Possibly.

Q Under what circumstances would you have done that?

A There's a submittal register which lists all the submittals that are to be sent in. Those are divided up among who they go to. Some could have come directly to our office.

Q Do you recall whether any submittals came directly to your office?

A No, I don't recall.

Q Do you recall reviewing submittals with respect to the windows?

A No.

Q Do you recall reviewing any responses that were provided by Gale with respect to the submittals that were provided by Maropakis?

A I saw the letter they sent back regarding --

Q A letter that they -- strike. I'm sorry. Continue, please. I cut you off.

A Yes. I saw the letter that they sent back regarding the windows.

Q I'm going to show you what was marked yesterday at Plaintiff's Exhibit Number 4. Is that the letter you were just referring to?

A No, this isn't the one I had in mind.

Q What letter, what do you recall about the letter that you did see?

A The letter listed three manufacturers that they said met the specs.

Q Had you ever seen that letter, the one I have handed you, the plaintiff's exhibit from yesterday, have you ever seen that before?

A I think I have.

Q Do you recall when you saw it?

A Just looking over the file in the last couple months.

design of this project?

A Yes.

Q What exactly did you review?

A Our review is to assure that the design project that we get meets what we need for the -- for the tenant.

Q So did that involve looking at the specifications for the project?

A Somewhat. Generally it's specifically for accommodating the tenants so they can keep in operation during the project.

Q When you say somewhat, I'm not sure if I understand what that means.

A We don't review the specs in detail.

Q Does anyone from the Department of the Navy do that?

A No.

Q Do you know whether the specifications for this project, the technical specifications, were they created by Gale, or were they used by Gale from previous Navy projects, do you know?

A They're pulled from the Specs Intact system and then edited.

Q Pulled from the, say that again?

A Specs Intact.

Q Specs Intact?

A Specs Intact.

Q Who maintains that system?

A The Navy.

Q What exact -- is that a computer system?

A Yes.

Q Do you know where that -- is that a server? Do you know if those documents are maintained at a server?

A I suppose it's a server, yes.

Q Do you know where that server is located?

A No.

Q The Specs Intact, are those specifications just for projects done at this facility, or Navy wide?

A Navy wide.

Q Do you know whether, in fact, that system is located at the Naval installation that we're referring to, the one where you work?

A No, I think they're somewhere else.

Q So this would be a specification that would be utilized by designers at other Naval installations?

Q Yes.
A Yes.
Q How many?
A I don't know. We had one with the tenant.
Q Who exactly is the tenant?
A DLA, Defense Logistics Agency. They occupy the building.
Q Do you know what the -- is utilization by the DLA, is that classified? What they use the facility for?
A Classified?
Q Is it secret?
A No.
Q What's it used for?
A They fill orders. They have supplies stored in the buildings, and then they fill orders and they're shipped out.
Q It serves as a warehouse.
A Yes.
Q Was it serving as a warehouse during construction of this project?
A Part of that time.
Q What part was it not operating as a warehouse?

A Sometime during the project, DLA cut back on their operation.

Q Do you recall when that occurred?

A No, I don't.

Q What happened when they cut back on their operation?

A They stopped using a large portion of that building.

Q Did anyone else utilize the portion of the building that DLA had vacated?

A No. Not that I know of.

Q Was there any materials or equipment maintained underneath the windows in the areas where DLA vacated it? Do you know?

A The conveyers are still there. Or they were still there. I don't know what else might have been there.

Q Do you have an understanding of why the Navy provides detailed plans, drawings and specifications to prospective contractors on a project?

A So they can bid on the project.

Q Do you know whether the Navy intends for the specifications to be reasonably complete so that contractors can provide and perform the work in

accordance therewith?

A Yes.

Q Do you know whether, in fact, the plans, drawings and specifications for this project were reasonably complete so that the contractors could perform work in accordance therewith?

A Yes, I believe they were.

Q Are you aware of any discrepancies with respect to the ratings of the windows, for example?

A A question came up about the windows that was what they were searching for, manufacturers that could meet all of the criteria for the window spec.

Q Did that question also involve whether there was errors in the specification for the windows?

A Errors?

Q Or omissions.

A No, I don't think so.

Q How about incorrect information?

A I don't think it was incorrect information.

Q What was it then?

A The windows, part of the spec was a

little tighter than it needed to be.
Q What part?
A There was a requirement for water resistance.
Q And when you say tighter, what do you mean?
A It was a little more strict than it needed to be for our building.
Q When you say more strict, I'm not sure that that's really clear on the record what you mean. What exactly do you mean by more strict?
A Well, the requirement was tighter than it needed to be. It was --
Q For purposes of the tenant's use?
A Yes.
Q Anything else?
A No, not that I recall.
MR. FRANCIS: This was marked yesterday as exhibit, Plaintiff's Exhibit Number 2. Counsel should have a copy of that.
BY MR. FRANCIS:
Q Have you ever seen that document before?
A It looks like part of the spec.
Q Spec for what?

A For 110 roof.
Q Is it the specification that governs the windows?
A Yes, it is.
Q Would this have been a document that came from the Specs Intech system?
A Yes, I believe so.
Q Do you know whether Gale accessed that system directly, or whether the Department of the Navy did?
A Gale did.
Q Directly.
A Yes.
Q Did you review this document at all during the design phase?
A Very little.
Q Did you review this document at all during the construction phase?
A When the question came up, yes.
Q And what exactly did you review in this specification when that question came up?
A There was a question about the water penetration requirement for the windows.
Q Where is that located?
A Paragraph 2.1.5.

Q What about that paragraph did you review?
A I didn't review that paragraph. During the design phase, when the question came up, the question was about the 20 pounds per square foot requirement for water resistance test.
Q Is that the spec that was tighter than it needed to be?
A Yes.
Q Do you know why it was tighter than it needed to be?
A No, I don't.
Q Let's talk in general about -- first of all, let me ask you this. Do you know what the Navy's position in this case is with respect to these specifications and Maropakis's duty to meet them?
A The Navy's position?
Q Yeah, in this litigation, for example, do you know?
A Just that we were going to hold to this spec and not revise it.
Q That the Navy was going to hold Maropakis to the specification?
A Yes.

Q Let's talk about some of the requirements in the specification. First of all, on the first page of the specification, which is Section 08520, Page 1, Part 1, it references documents that are incorporated into the contract. Do you see that?

A Yes.

Q Have you ever reviewed any of the documents that are listed there?

A No.

Q So it's fair to say, for example, that you don't know what the contents of the AAMA 101 1993 is?

A No, I don't get into that much detail.

Q Do you know whether anyone else from the Department of the Navy reviewed that specification?

A Well, someone prepared it for the Navy.

Q Someone at the Naval facility?

A At our facility? No.

Q Do you know who at the Navy may have prepared it?

A No.

Q Under 1.3.1, there's a number of items

listed, windows, hardware, etcetera. After each one of those, it appears that there's a G, and then an AE. What does the G mean, do you know?

A G means that that submittal goes to the government for review. AE means that it goes to the architectural firm for review on behalf of the government.

Q When it goes to the government for review, would that have been you?

A Possibly.

Q Do you know whether it was you with respect to the windows?

A No. Generally these come into the ROICC office and then go right to the A and E.

Q Let's go to Page 4 and Paragraph 2.1.8. Do you see that?

A Um-hmm.

Q That says Type P, as in papa, dash HC, as in hotel, Charlie, space 40, space parens, optional performance glass, closed parens, period. Do you see that?

A Yes.

Q Do you know what the P stands for?

A No.

Q Do you know what the HC stands for?

A No.

Q Do you know what the 40 stands for?

A No.

Q Do you know what the optional performance glass is?

A No.

Q Do you know whether there is such a window in the AAMA?

A No.

Q Was that a representation in the Navy's contract that the contractor was required to provide an HC -- strike that -- P-HC 40, parens, optional performance glass window?

A Say that again? Was that?

Q Was that a representation that the contractor was required to provide that?

A Yes, I guess so.

Q Was it a representation that that window exists?

A I would assume it exists.

Q That's not the question. Was it a representation by the Navy that that window exists?

MR. COLT: I'm sorry, I don't know if Mr. Moyer can testify what the Navy was representing. He can testify what he knew, but I don't think he can

speak for the Navy.
BY MR. FRANCIS:
Q Do you have an understanding as to whether this contract document and this paragraph we're talking about was a representation to Maropakis that that window existed and can be provided?
A I'm not sure how to answer that.
Q You don't know?
A I assume it represents a window that's -- that exists.
Q Would you agree with me that if that window did not, in fact, exist, that that would be an error or omission under this contract?
MR. COLT: Objection. I don't know if Mr. Moyer can testify about the legal significance of a contract provision. He can testify about the engineering aspects of this case, but I don't know if he can testify about the implications for contract interpretation.
MR. FRANCIS: Well, I'm not asking him about whether it was attachable. I'm asking him --
BY MR. FRANCIS:
Q Do you have an understanding what an error is? It's a mistake, right?

A Yes.
Q Would you agree with me that specifying a window in a contract that doesn't exist is a mistake?
MR. COLT: Objection. I don't think Mr. Moyer is able to testify to this.
MR. FRANCIS: Are you telling him not to answer?
A I don't prepare the master specs.
BY MR. FRANCIS:
Q That's not the question.
A Somebody else does.
Q Okay. That's not the question. Do you have an understanding, Mr. Moyer, as a Registered Professional Engineer in the Commonwealth of Pennsylvania, as to whether a specification in a public contract which identifies a window that does not exist is an error? Yes or no?
A Would that legally be an error? I don't know.
Q As an engineer. Would it be an error?
A I suppose it would.
Q Did anyone from Gale tell you, or anyone else from the Department of the Navy, that they had identified a window that does not exist in

the contract documents?
A No.
Q Did you ever become aware during the course of the contract performance by Maropakis or thereafter whether that window, in fact, exists?
A No.
Q Is it still your understanding today, in fact, that that window does exist?
MR. COLT: I'm sorry, one thing I would point out. I think this misstates. There are many types of windows listed. There are projected windows, fixed windows --
MR. FRANCIS: I'm talking specifically about --
MR. COLT: It doesn't say all these are required.
MR. FRANCIS: It says fixed windows. Listen, counsel, you are testifying for the witness?
MR. COLT: I am sorry, I can't allow you to misstate what Mr. Moyer has said. There are many types of windows listed. Not all may have been required.
BY MR. FRANCIS:
Q Mr. Moyer, do you have an understanding as to whether fixed windows were

not sure that that's required. Do you know of any other types of projected windows that were identified in the contract documents?
A No.
Q Do you know whether, in fact, that window exists, the P-HC 40, parens optional performance glass, do you know whether that window, in fact, exists either?
A I assume it exists.
Q Do you agree with me that it would be an error in the contract documents for the Navy specification to identify a window that doesn't exist?
A It may be considered an error.
Q Let's talk about the water resistance test that's specified in Paragraph 2.1.5. The 20 pounds per square foot. Do you see that?
A Yes.
Q Do you know whether P-HC 40 windows are designated under the AAMA as being tested at 20 pounds per square foot?
A No, I don't.
Q For water resistance?
A I'm sorry. No, I don't.
Q Do you know whether the AAMA

authorizes testing of windows at 20 pounds per square foot?

A No.

Q Do you know what the relationship is between -- strike that. Do you know what positive design pressure is?

A No.

Q Do you know what water resistance test pressure is?

A Vaguely.

Q What's your vague understanding of that?

A The water is somehow placed on that window and that pressure, and it's not supposed to leak.

Q Do you know if there is a relationship in the AAMAs regarding the positive design pressure of a window and the water resistance pressure?

A No, I don't.

Q Do you know what the water resistance test pressure specified for a P-HC 40 window is?

A No.

Q Do you know whether the AAMA specify a water resistance test pressure for P-HC 40 windows?

A No.

Tighter than it needed to be.

BY MR. FRANCIS:

Q With counsel's clarification, do you recall any conversations?

A No, I don't.

Q Read the next sentence.

A These manufacturers were Graham Architectural Products, J. Sussman, Incorporated, and Forte, Incorporated.

Q Those are the entities that you contacted, correct?

A Yes.

Q Did they provide information to you?

A Yes.

Q Do you know whether they provided information on their P-HC 40, parens, optional performance glass windows?

A No.

Q You don't know?

A No.

Q Read the next sentence.

A Another manufacturer, Peterson Window Corporation, has said that they can meet the spec, but I have not received their information yet.

Q Did you ever receive their

A I'm sure it included the windows, yes.

Q Do you know how they prepared that?

A No.

Q Read the next sentence in the e-mail.

A The requirement in the spec is for water resistance test of 20 pounds per square foot with no leaks.

Q Read the next sentence.

A This requirement should have been 10 pounds per square foot or perhaps even lower.

Q Stop. When did you conclude -- strike that. How did you conclude that the specifications should have been 10 pounds per square foot or lower?

A I don't know.

Q Did you conclude it, or did Gale conclude it?

A I would assume Gale concluded that.

Q And they communicated that to you.

A I would assume so, yes.

Q In written form or orally? Or by phone?

A I don't recall.

Q Do you recall why they told you that?

A Because we were searching for manufacturers that met the specification.

what you're saying? I'm just trying to understand what you are saying.

MR. COLT: Objection. The Navy did not change the specifications from what Maropakis agreed to. That would misstate the facts.

MR. FRANCIS: That's not the question.

BY MR. FRANCIS:

Q The question is, if they had done that. Do you know whether Maropakis was ever informed by the Department of the Navy or by Gale that the pressure should not have been 20, it should have been 10 or lower?

MR. COLT: Objection. I believe that misstates the evidence. It doesn't say it should have been. It said it might have been. Could have been. It was a little tighter than necessary.

BY MR. FRANCIS:

Q Can you read the sentence that says "this requirement should have been" into the record again, please?

A This requirement should have been 10 pounds per square foot or perhaps even lower.

Q Can you tell me whether Maropakis was ever told that the requirement should have been 10 pounds per square foot or lower?

A I don't know.
Q You don't know if Gale was ever told that?
A No.
Q Do you know whether the Navy ever put Gale on notice with respect to errors and omissions in the contract documents?
A No, I don't know.
Q Do you know whether Gale is still doing work for the Department of the Navy?
A Yes, they are.
Q On the Naval facility here in Mechanicsburg?
A Yes.
Q Do any of those involve windows?
A No.
Q Had the Navy performed any other projects involving the use of projected windows?
A Not on roof jobs, but in other renovations.
Q Do you know whether the windows that had been approved on those other projects were held to the same criteria of 20 pounds per square foot?
A I don't know.
Q Did you have any prior dealings with

A It may be.
Q Did you have any conversations with Mr. Scarberry regarding whether Maropakis should continue with the work on the project with respect to the removal of the windows in light of the fact that there was lead paint?
A I don't recall the outcome.
Q Do you know whether Maropakis was, in fact, told not to proceed with the removal of the windows because of the lead paint?
A I don't know.
Q Do you know whether the Navy issued a modification to Maropakis regarding the removal of the lead paint?
A I believe they did.
Q Were you involved in the preparation or review of that in any way, shape or form?
A I think I worked up some quantity for the volume of the windows.
Q What was done with that quantity markup that you prepared? Was it a mark-up or a take-off?
A Just a brief calculation. So many cubic feet or something.
Q What was the purpose of preparing

BY MR. COLT:

Q Is this a part of the specifications?

A Yes.

Q Does it require that the roof work be done after the window work is completed?

A Yes.

Q To your knowledge what was the reasoning behind the requirement of that sequence? Why did the window work have to be completed first?

A The windows are above the roof. So you want to do as much work as you can before you put down the rubber roof, otherwise you risk puncturing the new roof membrane you just put down.

Q So just to be clear, in this building, it's not a typical building where you think of where the roofs -- the windows are below the roof. In this case, the monitors, those windows were above this part of the roof.

A Yes.

Q So, for example, in order to do work on the roof -- I mean, work on the windows, you would have to be walking on the roof, bringing materials across the roof --

A Yes.

Q -- potentially dropping things on the

roof?

A Yes.

Q Turning you to the prior page -- and we can make this whole section part of one defendant's exhibit.

MR. FRANCIS: That's fine.

MR. COLT: The specs.

BY MR. COLT:

Q Section 0110, Page 2, Paragraph 1.4, special scheduling requirements, Subparagraph A, and then sub, Subparagraph 1 through 3. In the plaintiff's document production, this is Bates Number M0213. Mr. Moyer, is this also part of the specs?

A Yes.

Q Does it require that materials for the windows, the new windows, be on site and available prior to work beginning removing the old window panes?

A Yes.

Q What was the reason for that requirement?

A So that when the old windows are taken out, you don't have that big opening for an extended period of time. They have to be closed up right