IN THE UNITED STATES COURT OF FEDERAL CLAIMS

M. MAROPAKIS CARPENTRY, INC., :
PLAINTIFF :
:
VS : NO. 03-2825C
:
THE UNITED STATES, : (JUDGE BASKIR)
DEFENDANT :

DEPOSITION OF: ROBERT ROSENBERRY

TAKEN BY: PLAINTIFF

BEFORE: SHERRY BRYANT, RMR, CRR
NOTARY PUBLIC

DATE: APRIL 12, 2005, 9:22 A.M.

PLACE: RHOADS & SINON
ONE SOUTH MARKET SQUARE
HARRISBURG, PENNSYLVANIA

APPEARANCES:

RHOADS & SINON
BY: DAVID W. FRANCIS, ESQUIRE

FOR - PLAINTIFF

U.S. DEPARTMENT OF JUSTICE
BY: JAMES D. COLT, ESQUIRE

FOR - DEFENDANT

ALSO PRESENT:

SUSAN ROSENBERRY

tabbies EXHIBIT H

finish my question before you answer it so that the deposition transcript is clear about what the question was or what the answer was.

And the final thing is that it's important that you understand what I'm asking you. So if at any time during the deposition you don't understand a question, please ask me to clarify it and I'll try my best to do so, okay?

A Okay.

Q The final thing I guess I should say is it's important to vocalize your answers, because it's very difficult for her to get nods of the head, et cetera, okay?

A Yes.

Q Mr. Rosenberry, is there anything that would impact your ability to testify today?

A No.

Q No medications or anything like that that would affect it?

A No.

Q Okay, good. Who were you employed by before you retired?

A The official name of it is Resident Officer in Charge of Construction at the Navy. I don't know the exact title.

Q But you were employed by the Department of the Navy at the --

A Yes.
Q Again, let me finish. You were employed by the Department of Navy over at the Mechanicsburg Depot; correct?
A That is correct.
Q And what were your duties while you were employed there?
A In construction management.
Q And what did that involve, what types of duties did you have in construction management?
A Basically, there was a set of specifications. I just basically seen that the contractor complied with the specifications of the contract.
Q Okay. Let me ask you, did you have any responsibility for inspection of the work that was performed by the contractors?
A It all depended on which type of contract it was.
Q Well, let's talk about the work that Maropakis did. You're familiar with the work that they did on the Building 110?
A I know there was a roof project.
Q And were you involved in that project in any way?
A Yes.
Q And what was your involvement in that project?

A Basically, there was a -- the contractor had a quality control person, and basically I seen or overseen the contract as far as complying with the contract specifications.
Q When you say that they had a quality control person, I'm not sure what you mean by that. Can you clarify exactly what it is you mean by that.
A Well, if I remember correctly, quality control, his duties was to see that the contractor himself complied with the contract specifications.
Q So you had dealings with the quality control people that were employed by Maropakis; is that what you're saying?
A Vaguely.
Q What do you mean by vaguely?
A Well, some of the times there was -- Maropakis failed to have a quality control person on the job.
Q When -- well, let's just talk in general before we talk about that period of time. In general, did you have dealings with anyone else from Maropakis?
A I had dealings with the foreman or -- I guess the foreman or whatever they called him.
Q And that's somebody who was actually physically on the project site?
A Yes.
Q Do you remember his name?

A That's very hard. I really don't remember how many times.

Q Did you have any responsibility for inspecting the work that Maropakis performed?

A No. That's what the job of the quality control person was from Maropakis.

Q So you did not inspect Maropakis's work?

A I overseen it.

Q When you say overseen it, do you mean you observed it, you observed their work, you didn't inspect it to make sure that it complied with the contract documents, is that what you mean?

MR. COLT: Objection. He asked and answered that he had made sure they were complying with contract specs. That's asked and answered.

MR. FRANCIS: I'm asking for clarification as to what he means by oversaw.

BY MR. FRANCIS:

Q What do you mean by oversaw?

A Well, basically, to see if they complied with the contract specs.

Q I guess what I don't understand is what did you physically do. Did you physically observe the work to determine whether it complied with the contract specifications?

A Yes.
Q How frequently?
A I was on the job site probably every day.
Q And how long a day would you spend on this project observing the work?
A Probably not more than 15 or 20 minutes.
Q And did you fill out any sort of diary or logs relating to the inspection or the observation?
A I do not remember.
Q Again, it's important that we only talk one at a time. Let me ask you what the chain of command was, if you will, for your duty position. Did you have anybody that reported to you that was employed by the Navy?
A No.
Q And who did you report to?
A Basically, my supervisor was I believe Dave Waltman.
Q On this project, Dave Waltman?
A Well, Dave Waltman was the supervisor of everybody as far as the construction management part of it at that time.
Q And do you know what his job description was?
A No, I don't.
Q Do you know what office he worked in?
A He worked in our office.

on the record.

(Pause.)

BY MR. FRANCIS:

Q Let me ask you this: Did you review any documents in preparation for your deposition today?

A Just basically one document.

Q May I ask what document that was?

A It looked to me like it was -- somebody had written, it had to do with a time extension.

(Letter dated April 11, 2005 marked as Plaintiff Exhibit Number 1.)

BY MR. FRANCIS:

Q You know, I sort of jumped ahead on an issue. Just real quick, you're not a registered professional engineer; correct?

A That is correct.

Q And do you have any degrees in engineering?

A No, I do not.

Q Did you attend college?

A No, I did not.

Q And how long did you work for the Department of the Navy?

A Twenty-two and a half years.

Q In the same sort of capacity, in construction?

A Twenty years.

Q So you had no involvement in determining whether the submittals provided by Maropakis complied with the requirements of the specifications or not?

A That is correct.

Q And you did not compare the information contained in the specifications with the submittals that were provided by Maropakis with respect to the monitor windows?

A I did not review the submittals for compliance. That was the A&E's responsibility.

Q Just so it's clear for the court reporter, what do you mean by A&E?

A Architect and engineering I guess design.

Q You're referring to Gale Associates; correct?

A I believe that's the name.

Q How about were you involved at all in the review of the specifications that contained the requirements with respect to the monitor windows?

A Would you clarify?

Q Sure. Did you review the contract specifications for the monitor windows on this project?

A Yes.

Q When did you do that?

A We monitor the specifications of the contract, of all contracts during the contract.

MR. FRANCIS: Can I have that answer read back,

please.

(Answer read.)

BY MR. FRANCIS:

Q I guess I'm not clear what you mean by monitor.

A We read the specifications.

Q And when you say "we," you mean you?

A I read the specifications.

Q Who else is included in that we?

A If the contract is assigned to me, I am involved in reading the specifications.

Q And what is your purpose in reviewing the contract specifications?

A Well, you can't monitor a contract if you do not know what the contract requires.

Q So is it fair to say that you reviewed the contract specifications for the monitor windows in order to determine what the contract required with respect to the supply and construction of the monitor windows?

A Will you read --

Q Sure. Let me ask it this way, see if I can make it plainer, and maybe I already asked you this. I'll break it down.

You reviewed the contract specifications for the monitor windows on this project so you could understand what the scope of work was; correct?

A That is correct.

Q And also to ensure that Maropakis's submittals complied with those specifications?

A No.

Q That was submitted to the A&E for that purpose?

A That is correct.

Q Did you review the specifications for the purpose of determining whether the actual construction of the monitor windows complied with the contract?

A Would you explain what you mean by construction?

Q Yes. Well, let me break that down. Maropakis would submit submittals containing information about windows that Maropakis intended to supply and install on this project. Is that your understanding?

A I'm confused. I still don't know what...

Q Do you know what a submittal is?

A Yes.

Q What is it?

A It's a documentation basically saying what the contractor is going to provide in the contract.

Q So it's a document that says we, Maropakis, will provide these windows, meeting whatever criteria or information is --

A That is correct.

ready to talk about it.

A Okay.

Q Have you ever seen this document before?

A Yes.

Q And when did you see it?

A It's part of the contract specifications, I believe.

Q So you would have reviewed it during the contract performance by Maropakis?

A I probably would have.

Q Do you specifically recall whether you did?

A I do not.

Q Let's talk about the first page of this and the list of documents which are incorporated into the specification, and let's talk about them one at a time. The first document that's listed is AA 45, which is the (1980) Aluminum Finishes Publication by the Aluminum Association, Incorporated, do you see that?

A Yes.

Q Did you review that document as part of this contract?

A I do not remember.

Q Have you ever reviewed that document?

A I do not remember.

Q The next document is the ANSI/AAMA 101, which

is the (1993) Aluminum and Poly (Vinyl Chloride) (PVC) Prime Windows and Glass Doors. Do you see that?

A Yes.

Q Did you review that document as part of your review of the specifications for this contract?

A I do not remember.

Q Have you ever looked at that document?

A I do not remember.

Q Do you know what that document contains?

A I do not.

Q Let's go to the next document. The AAMA 1503.1 (1988) Thermal Transmittance and Condensation Resistance of Windows, Doors and Glazed Wall Sections, do you see that?

A Yes.

Q Did you review that document during this contract?

A I do not remember.

Q Did you ever review that document?

A I do not remember.

Q With respect to the AAMAs, do you know whether those documents were located in your office at the naval installation facility?

A I do not remember.

Q Do you know whether anyone from the Department of the Navy reviewed those documents in order to determine

Maropakis?

A I do not know.

Q Do you know whether anyone from Gale Associates reviewed those documents during the performance of the work by Maropakis?

A I do not know.

Q How about during the design phase, do you know?

A I was not involved in the design phase.

Q Let's go down to paragraph 1.3.1. It's entitled "SD-02, Manufacturer's Catalog Data." Do you see that, at the bottom of --

A Yes, yes.

Q And below that it says "A. Windows G AE," do you see that?

A Yes.

Q What does the G mean, do you know?

A I presume it means government.

Q And what does the AE mean?

A Architect engineering firm.

Q Does that mean that the government and the AE are going to review the submittal for that, do you know?

A I do not know.

Q Let's go to paragraph 2.1, which is on page 3 of the specifications. And the first sentence: "Prime windows shall conform to ANSI/AAMA 101 and the requirements

specified herein." Do you know what the ANSI/AAMA 101 requirements were?

A I do not.

MR. FRANCIS: I'm going to take a two-minute break. I'll be right back.

(Pause.)

BY MR. FRANCIS:

Q The reference to the condensation resistance factor of 53, do you know what a condensation resistance factor is?

A I do not.

Q Do you know what class of window requires a condensation resistance factor of 53?

A I do not.

Q Let's go to paragraph -- I'm sorry, to page 2.1.5, water resistance test. Do you see that paragraph?

A Yes.

Q Did you review that paragraph during the performance of the work by Maropakis?

A I did not.

Q Do you know where the -- let me restate that. There is a third sentence of this paragraph that says: "When a static pressure of 20 pounds per square foot has been stabilized, five gallons of water per square foot of window shall be applied to the exterior face of the window for a

period of 15 minutes." Did I read that correctly?

A I believe so.

Q Do you know what class of window is tested at 20 pounds per square foot?

A I do not.

Q Do you know what a class of window is?

A I do not. Again, it's the A&E's responsibility when we submitted the submittals to him.

Q This project included both projected windows and fixed windows; correct?

A I don't remember.

Q Well, let's go down to paragraph 2.1.8, projected windows, do you see that?

A Yes.

Q It says type P-HC 40. Do you know what that is?

A I do not.

Q Do you know whether there are any documents that set forth the criteria for the designation of a window as P-HC 40?

A I do not.

Q Do you know what (optional performance class) means?

A I do not.

Q Do you know whether P-HC 40 is also an optional

performance class?

A I do not.

Q With respect to the fixed windows, do you know whether, in fact, the -- what an F-HC 40 window is?

A I do not.

Q Do you know whether there are any documents that identify that?

A I do not know.

Q Do you know whether that's consistent with the designation as optional performance class?

A I do not know.

Q Do you know whether any of the documents that were incorporated that we spoke about earlier, the AA 45, the AAMA 101 or the AAMA 1503.1, reference the designations of F-HC 40 or P-HC 40?

A I do not know.

Q And do you know whether they reference optional performance class?

A I do not know.

Q Do you know whether under those specifications those are consistent terms?

A I do not know.

Q And do you know whether the contract, the rest of the specification, is consistent with those designations?

A I do not know.

Q Did you have any communications with Terry Kline with respect to whether the requirement for the water resistance test that was included in the contract documents should have been 10 instead of 20 pounds per square feet?

A I don't remember.

Q And do you recall any such conversations with anyone else?

A No, I do not.

(E-mail communications between Mr. Moyer and Lieutenant Kline marked as Plaintiff Exhibit Number 3.)

BY MR. FRANCIS:

Q This document contains e-mail communications between Mr. Moyer and Lieutenant Kline; is that correct? Do you know whether Mr. Kline, is he a lieutenant or is he a civilian?

A He's a civilian.

Q So between Moyer and Kline. Have you ever seen either of these e-mails before?

A No.

Q This has a reference in the e-mail dated 11/02/99 at 9:08 a.m. "Bob Rosenberry has advised me that we should not revise this requirement at this time," and that relates to going from 20 psf to 10 psf, correct, is that what that says?

A That's what it says here in this document.

Q Do you recall whether you had any such communication with Mr. Moyer?

A I do not remember of any.

Q And just so we're clear, let me state this: Do you recall -- and if I've asked this I apologize. Do you recall any communications that you had with anyone regarding whether the specifications were improper or erroneous because they contained a requirement --

MR. COLT: Objection. I would note that this doesn't say that they are improper or erroneous. It says --

MR. FRANCIS: I can ask that question.

MR. COLT: It misstates the letter.

MR. FRANCIS: Counsel, that's not -- no, I didn't say that. I didn't say that at all. I'm asking about his conversations.

MR. COLT: Okay.

MR. FRANCIS: Just for the record, it does say: "The requirement in the spec is for a water resistance test of 20 psf with no leaks. This requirement should have been 10 psf." So even if you were right --

MR. COLT: "Or perhaps even lower."

MR. FRANCIS: Or perhaps, yes, even lower.

BY MR. FRANCIS:

Q Did you have any communications with anyone, Mr. Rosenberry, during the performance of the work by

Q Do you know whether, in fact, the Navy's position in this litigation is that the submittals of the windows by Maropakis delayed project completion?
A Would you rephrase that?
Q Sure. Do you know whether the Navy's position in this case is that the submittal of the windows was on the critical path?
A I would assume so.
Q Was that your understanding during the contract?
A It was one of the items.
Q That was on the critical path?
A It was an important item.
Q Do you know whether Maropakis alleged during the performance of work on this project that it could not find a window manufacturer that could meet the requirements of the contract?
A Yes.
Q Do you know why Maropakis said that?
A I don't remember or I don't know.
Q Did the Navy have a responsibility to carefully evaluate whether Maropakis's contention that it could not supply a window manufacturer that complied with the requirements of the contract was valid?
MR. COLT: Objection. Mr. Rosenberry can't

building.

Q Do you know who made that decision on behalf of the government?

A I presume from what the paragraph says, I guess the information came from Lieutenant Larson and Waltman.

Q That reference to Nibort, is that Nihoff or is that a different individual?

A I don't know. I don't remember. I don't know why that's there. I don't recognize that at all.

Q There's a reference in this paragraph to Building 402. Do you see that?

A Yes.

Q Who was the contractor on that project?

A Evidently it must have been Maropakis. One of the other project managers must have had that contract.

Q You believe that this indicates that Maropakis did it?

A I would say that's probably what it indicates, yes.

Q Do you know what kind of windows were supplied to that project?

A No, I do not.

Q Let's go to entry 23 dated April 6, 2000. It indicates that Abdul from Maropakis phoned and asked if the windows on the monitors contained lead paint or had lead

paint; correct?
A Yes.
Q To the best of your recollection, is that the first communication that you had with Abdul regarding lead paint in the monitor windows?
A I would say yes.
Q Let's go to the entry number 28, which is May 3rd, 2000, do you see that?
A Yes.
Q It indicates that you spoke with -- that I guess you spoke with Abdul and that the Navy would be responding with a letter regarding lead paint and that the government position would probably be that removing the windows, that the Navy would remove the windows and that no special requirements would be required. Is that an accurate paraphrasing?
A I would say yes.
Q Did that, in fact, turn out to be what the government's position was?
A I don't remember.
Q Let's go to item 29, which is dated May 4th of 2000. This is, again, a conversation between you and Mr. Rangwalla, Abdul; correct?
A Item 29?
Q Yes.

A Yes.

Q This reflects that you told Mr. Rangwalla, that you told Abdul to hold off on the removal of the monitor windows until he received a letter regarding the proper method of doing that?

A Yes, that's what it indicates.

Q Did the Navy ever change its position as to when Maropakis could begin removal of the windows with the lead paint on them? You don't understand my question?

A No, I don't.

Q Never mind. Strike it. Let's talk about the utilization of asphalt versus adhesive. Were you involved in that issue?

A I probably was.

Q Do you recall a conversation between you and anyone from Maropakis regarding whether the submission of the asphalt had been approved by Gale Associates?

A I don't remember a conversation, any particular conversation going to that.

Q Let's go to item number 38. Why don't you review item number 38.

A Okay.

Q Does that refresh your recollection as to any conversations that you may have had regarding utilization of asphalt versus adhesive?

amendment 2. I do remember that little bit of it. But who had approval, I don't remember.

(Contractor drawings & information submittal dated 8/6/99 marked as Plaintiff Exhibit Number 8.)

BY MR. FRANCIS:

Q Mr. Rosenberry, I've handed you what's been marked as Exhibit Number 8, Plaintiff's Exhibit Number 8 for identification. Why don't you take a moment to look at that.

A Okay.

Q Have you ever seen this document before?

A All I remember, that there was a document from Firestone, but whether this was the particular one or not, I don't remember.

Q Let's talk about the document that's Bates stamped 593, which is the Gale approval of a submittal, and the approval appears to have been on August 9th of 1999. Do you see that?

A Yes.

Q This is approved as noted; correct?

A That's what Gale -- yes.

Q And one of the notes that's indicated below that's handwritten says, bullet point: "Contract requires type III asphalt." Do you see that?

A Yes.

Q Do you know whether that's the asphalt that was