**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| M. MAROPAKIS CARPENTRY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03-2825C |
| v. | ) | (Judge Baskir) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS, CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Acting Director

DONALD E. KINNER
Assistant Director

OF COUNSEL:

ALAN R. CARAMELLA
Senior Trial Attorney
NAVFAC Litigation Office
Washington, D.C. 20374-5051

DAWN S. CONRAD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 616-2279
Fax: (202) 305-7643

electronically filed
February 6, 2007

Attorneys for Defendant

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Nature Of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. Course Of Proceedings Below . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I. Liquidated Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II. Monitor Windows . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III. Discovery Of Lead Paint . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV. Adhesive Materials Requirement . . . . . . . . . . . . . . . . . . . . . 9

V. The Contract's Sequence Of Performance Requirement . . . 10

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I. Defendant's Motion To Dismiss . . . . . . . . . . . . . . . . . . . . . 14

A. Legal Standards Pursuant To RCFC 12(b)(1) . . . . . . . 14

B. Maropakis Has Failed To Satisfy The Jurisdictional Requirements Of The CDA Because Its Government-Caused Delay Claim Was Never Presented As A Certified Claim To The Contracting Officer . . . . . . . . . . . . . . . . 15

II. Cross-Motion For Summary Judgment . . . . . . . . . . . . . . . . . 21

A. Summary Judgment Standard Of Review . . . . . . . . . . . 21

B. The Navy Properly Assessed Liquidated Damages Against Maropakis . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

C. The Contract Specifications For The Monitor Windows Were Not Defective And The Navy Had The Right To Insist Upon Compliance With The Specifications . . . . . 25

D. The Navy Did Not Implicitly Waive The Contractual Requirement For The Use Of Non-Asphalt Materials . . 34

E. The Government Was Entitled To Insist Upon Compliance With The Sequence Of Performance Provided In The Contract . . . . . . . . . . . . . . . . . . . . . . . . 38

F. Maropakis Has Not Established That It Is Entitled To Additional Time For Lead Paint Removal, Above And Beyond The 14 Days Granted In Modification P0001 To The Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

# TABLE OF AUTHORITIES

Page

## Federal Cases

Ace Constructors, Inc. v. United States,
70 Fed. Cl. 253 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Alder Terrace, Inc. v. United States,
161 F.3d 1372 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Am. Elec. Contracting Corp. v. United States,
217 Ct. Cl. 338, 579 F.2d 602 (1978) . . . . . . . . . . . . . . . . . . . . . . . . 31

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

* Blake Constr. Co. v. United States,
28 Fed. Cl. 672 (1993) . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 30, 31

Cascade Pac. Int'l v. United States,
773 F.2d 287 (Fed. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

* Cegers v. United States,
7 Cl. Ct. 615 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

Conner Bros. Constr. Co. v. United States,
65 Fed. Cl. 657 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Contract Cleaning Maint., Inc. v. United States,
811 F.2d 586 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Davies Precision Mach., Inc. v. United States,
35 Fed. Cl. 651 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 39

Doe v. United States,
48 Fed. Cl. 495 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

* Elgin Builders, Inc. v. United States,
10 Cl. Ct. 40 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

England v. The Swanson Group,
353 F.3d 1375 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Fred A. Arnold, Inc. v. United States,
18 Cl. Ct. 1 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Fru-Con Constr. Corp. v. United States,
42 Fed. Cl. 94 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Gart v. Logitech, Inc.,
254 F.3d 1334 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

George Sollitt Constr. Co. v. United States,
64 Fed. Cl. 229 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Hawkins & Power Aviation, Inc. v. United States,
46 Fed. Cl. 238 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Hercules, Inc. v. United States,
24 F.3d 188 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Jennie-O Foods, Inc. v. United States,
217 Ct. Cl. 314, 580 F.2d 400 (1978) . . . . . . . . . . . . . . . . . . . . . . . 23

Kinetic Builder's Inc. v. Peters,
226 F.3d 1307 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Lane Bryant, Inc. v. United States,
35 F.3d 1570 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Massey v. Del Labs., Inc.,
118 F.3d 1568 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Maxwell Dynamometer Co. v. United States,
181 Ct. Cl. 607, 386 F.2d 855 (1967) . . . . . . . . . . . . . . . . . . . . . . . 40

McNabb v. United States,
54 Fed. Cl. 759 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

McNutt v. Gen. Motors Acceptance Corp.,
298 U.S. 178 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Mega Constr. Co. v. United States,
25 Cl. Ct. 735 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Mega Constr., Inc. v. United States,
29 Fed. Cl. 396 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Mingus Constructors, Inc. v. United States,
812 F.2d 1387 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . 17, 21

Morganti Natn'l, Inc. v. United States,
49 Fed. Cl. 110 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Moyer v. United States,
190 F.3d 1314 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Priebe & Sons, Inc. v. United States,
332 U.S. 407 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

R.P. Wallace v. United States,
63 Fed. Cl. 402 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34, 42

* Ralph Larson & Son, Inc. v. United States,
17 Cl. Ct. 39 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 29, 31

Reynolds v. Army & Air Force Exch. Serv.,
846 F.2d 746 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Rixon Elecs., Inc. v. United States,
210 Ct. Cl. 309, 536 F.2d 1345 (1976) . . . . . . . . . . . . . . . . . . . . . 31

S. Comfort Builders, Inc. v. United States,
67 Fed. Cl. 124 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Sauer, Inc. v. Danzig,
224 F.3d 1340 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Scheuer v. Rhodes,
416 U.S. 232 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Skip Kirchdorfer, Inc. v. United States,
229 Ct. Cl. 560 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

SMS Data Products Group, Inc. v. United States,
19 Cl. Ct. 612 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Sun Eagle Corp. v. United States,
23 Cl. Ct. 465 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

Tecom, Inc. v. United States,
732 F.2d 935 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Spearin,
248 U.S. 132 (1918) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Westerhold v. United States,
28 Fed. Cl. 172 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

WRB Corp. v. United States,
183 Ct. Cl. 409 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## Federal Statutes

41 U.S.C. § 609 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

41 U.S.C. § 602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

41 U.S.C. § 605 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

## Federal Acquisition Regulations

FAR 52.211-12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

FAR 52.236-21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 36

FAR 52.246-12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

Additional Authorities

A&A Insulation Contractors, Inc., VABCA No. 2766,
92-2 BCA ¶ 24,829, 1992 WL 25219 (Feb. 6, 1992) . . . . . . . . . . . 36

ACS Constr. Co., ASBCA No. 33832,
87-3 BCA ¶ 20,138, 1987 WL 41214 (Aug. 3, 1987) . . . . . . . . . . . 32

Community Sci. Tech. Corp., ASBCA No. 20244,
77-1 BCA ¶ 12,352, 1977 WL 185683 (Jan. 27, 1977) . . . . . . . . . . 37

Elter S.A., ASBCA No. 52327,
01-1 BCA ¶ 31,421, 2001 WL 520825 (May 3, 2001) . . . . . . . . . . 37

Shahin Elihu, ASBCA No. 47436,
96-1 BCA ¶ 28,254, 1996 WL 159060 (Apr. 2, 1996) . . . . . . . . . . 37

* Pursuant to ¶ 9 of the Court's June 4, 2004, Special Procedures Order, an asterisk is used to identify principal authorities.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| M. MAROPAKIS CARPENTRY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03-2825C |
| v. | ) | (Judge Baskir) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS, CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

STATEMENT OF THE ISSUES

1. Whether plaintiff's Government-caused delay claim is properly before this Court because it was not the subject of a certified claim to the contracting officer or a contracting officer's final decision.

2. Whether the Government properly assessed liquidated damages against plaintiff.

3. Assuming the plaintiff's Government-caused delay claim is properly before this Court, whether the window specifications contained in the contract between the parties were defective and ambiguous.

4. Whether the Government implicitly consented to plaintiff's use of asphalt materials, when Maropakis did not request a variance from the contract's requirements pursuant to the contract's procedures.

5. Whether the Government properly insisted upon the contract's requirement to install the monitor windows before the roof removal and replacement.

6. Whether plaintiff has established, by a preponderance of the evidence, that it was entitled to additional time for lead paint removal, above and beyond the time extension granted in modification P0001 to the contract.

## STATEMENT OF THE CASE

### I. Nature Of The Case

This dispute stems from contract number N62472-97-C-4116 (the "contract"), dated April 6, 1999, in which plaintiff, M. Maropakis Carpentry, Inc. ("Maropakis"), agreed to replace the roof and perform related work on Building 110, at the Naval Inventory Control Point ("NICP"), in Mechanicsburg, Pennsylvania, in exchange for payment in the amount of $1,288,940 from the United States Navy ("Navy"). A 16-17.[1] The contract commenced on April 6, 1999 and was to be completed on or before January 16, 2000. A 16. Three modifications were issued on the contract,

[1] "A__" refers to the appendix, which will be filed contemporaneously with the parties' Consolidated Statement of Uncontroverted Facts, at the completion of briefing in this matter.

increasing the contract price to $1,297,151, and extending the contract completion date to February 4, 2000. A 357-62. The Navy's possession and use of Building 110, was effective on May 17, 2001, 467 days past the contract completion date. A 363, 429, 431.

On September 15, 2005, Maropakis filed an amended complaint in this Court claiming that it was delayed in its completion of the contract because the contract's specifications for the monitor windows required a window that did not exist. Am. Compl. ¶¶ 11-31.[2] Maropakis also alleged that it was delayed due to the discovery of lead paint on the existing windows, which were required to be removed by the contract. It alleged that it was delayed from March 7, 2000 to June 21, 2000 because of this discovery. Am. Compl. ¶¶ 32-36. Maropakis further alleged that the Navy approved of its plans to use asphalt materials, even though the contract required use of non-asphalt materials, and the Navy's subsequent rejection of the asphalt materials was a breach of contract. Id. ¶¶ 37-44. Maropakis also contended that the Navy "unreasonably and arbitrarily" refused to permit Maropakis to perform roof removal and replacement work before the removal and replacement of the monitor windows. Id. ¶¶ 45-47.

---

[2] "Am. Compl. __" refers to plaintiff's amended complaint, filed with the Court on September 15, 2005.

Maropakis contended that it was also delayed by the Navy's improper administration and review of submittals. Id. ¶¶ 48-49. Finally, Maropakis alleged that the Navy did not incur additional costs justifying the imposition of liquidated damages and contended that the assessment of liquidated damages was, therefore, improper. Id. ¶¶ 50-52. Maropakis seeks $244,036 in compensatory damages, other damages, amount unspecified, interest, attorney fees, and costs. Am. Compl. at pg. 9.

On December 14, 2006, Maropakis filed a motion for partial summary judgment asking this Court to find the Government liable for delay caused by defective window specifications and to find that Maropakis is entitled to an additional time extension due to the discovery of lead paint. Pl. Mot. at 1-2.[3] Maropakis proposes to establish the duration of these delays at trial. Id. at 1.

## II. Course Of Proceedings Below

On August 20, 2001, Maropakis submitted a letter to the contracting officer requesting a time extension of 447 calendar days. A 371-74. On August 28, 2001, the contracting officer responded by letter denying Maropakis' request, and noting that Maropakis could request a decision of

[3] "Pl. Mot.__" refers to plaintiff's motion for partial summary judgment, filed on December 14, 2006.

the contracting officer pursuant to the Disputes Clause of the contract. A 369-70. On July 18, 2002, the contracting officer issued a demand letter to Maropakis, requesting payment in the amount of $59,514, for liquidated damages above and beyond the contract balance retained by the Navy in the amount of $244,036. A 367-68. On December 20, 2002, the contracting officer issued a final decision demanding payment from Maropakis, in the amount of $59,514, for liquidated damages. A 365-66. Maropakis appealed that final decision to this Court on December 17, 2003. See Compl. at pg. 1.[4]

## STATEMENT OF FACTS

For our statement of facts, we rely primarily upon the consolidated statement of uncontroverted facts that will be jointly filed by the parties at the conclusion of briefing. However, a brief summary of the facts follows.

### I. Liquidated Damages

The contract commenced on April 6, 1999 and was to be completed on or before January 16, 2000. A 16. Three modifications were issued on the contract, extending the contract completion date to February 4, 2000. A 357-62. The Navy's possession and use of Building 110, was effective

[4] "Compl.__" refers to the original complaint in this matter, filed on December 17, 2003.

on May 17, 2001, 467 days past the contract completion date. A 363, 429, 431.

The contract incorporated FAR 52.211-12, Liquidated Damages–Construction (Apr. 1984) – Alternate I (Apr. 1984). A 67. That provision states that if the contractor fails to complete the work within the time specified in the contract, or any extension, the contractor shall pay to the Government as liquidated damages, the sum of $650 for each day of delay. Id.

Maropakis did not perform any work on the contract until after the original contract completion date had passed. A 431. The Navy assessed liquidated damages against Maropakis in the amount of $303,550 ($650 per day for 467 days). A 363-66. At the completion of the contract, the Navy retained a contract balance of $244,036 because of the assessment of liquidated damages. A 367-68. On December 20, 2002, the contracting officer issued a final decision to Maropakis demanding payment in the amount of $59,514, which was the amount of liquidated damages due and owing after the retained contract balance was subtracted from the total amount of liquidated damages. A 365-66.

II. Monitor Windows

The contract required Maropakis to provide all labor, material and

equipment necessary to replace the roof and related work on Building 110 in accordance with the contract plans and specifications. A 19. The contract specifications were prepared by the architectural and engineering firm of Gale Associates, Inc. ("Gale"), with offices located in Baltimore, Maryland. A 48.

The contract required the removal and disposal of monitor windows and the installation of new monitor windows. A 25. Specification section 08250 to the contract provided the technical requirements for the monitor windows. A 285-93. The specifications required the contractor to provide windows that conform to the "ANSI/ AAMA 101" (American Architectural Manufacturers Association) publication "and the requirements specified herein." A 287 (emphasis added). The specifications listed in paragraph 2.1.4 indicate the air infiltration test for the windows, and state that "air infiltration shall not exceed .10 cfm/ft when tested [at] a pressure of 6.24 psf." A 288. The specifications listed in paragraph 2.1.5 indicate the water resistance test for the windows and require a water resistance test pressure of 20.00 pounds per square foot ("psf"). Id. The specifications specifically state that standards, performance, and testing for the windows will comply with ANSI/ AAMA 101 "except as otherwise indicated." A 287.

The specifications for the windows were not amended or changed

between the initial solicitation date and the completion of the contract. See A 1-15, 357-64. The contract required the contractor to submit work plans, i.e. submittals, for all work required by the contract for approval by the Government. A 117-21. The contractor was not permitted to begin work until a submittal for that work had been approved. A 119, 121.

It was Maropakis' responsibility to find suppliers for the materials required by the contract. A 547. On July 26, 1999, the first window submittal was received by the Navy for the monitor windows. A 433-39. On August 19, 1999, the first window submittal was returned to Maropakis as disapproved. A 397-99. Over the next several months, there were multiple communications between Maropakis and the Navy as Maropakis tried to find windows that met the contract's specifications. A 400-11. Eventually, Maropakis found a manufacturer, J. Sussman, Inc., that manufactured windows that met the contract's specifications and chose that manufacturer to supply the windows. A 407, 411-12, 440-45. On March 3, 2000, the window submittals were approved in their entirety. A 446. The new monitor windows eventually installed in Building 110 satisfied the specifications in the contract. A 407, 443-45.

III. Discovery Of Lead Paint

On April 12, 2000, Maropakis notified the Navy of the discovery of

lead paint on the monitor windows that were being replaced. A 392. On May 5, 2000, the Navy directed Maropakis not to begin the removal of existing windows due to the presence of lead paint until further direction. A 413. The Navy issued modification P0001 to the contract on June 28, 2000. A 357-58. It directed the contractor to remove the windows as hazardous waste. On June 22, 2000, Maropakis proceeded with the work prior to receiving the notification, with the permission of the Navy. A 426. The contract modification was a unilateral modification and provided a contract increase of $6,154 and a time extension of 14 calendar days. A 419-21. Maropakis objected to the time extension, requesting a time extension of 365 days. A 420-22.

IV. Adhesive Materials Requirement

After the initial solicitation was issued but before the proposal deadline, the Navy decided that the contractor would not be permitted to use hot asphalt as an adhesive for roof insulation or wood fiberboard and would be required to use polyurethane foam as an adhesive as specified in section 07220, paragraph 2.3.3. A 15. This requirement was set forth in Amendment 2 to the solicitation. A 13-15. Maropakis, with its bid submission, acknowledged the receipt of this amendment. A 16. Maropakis understood that the use of asphalt was not permitted pursuant

to the terms of the contract and that no modification was ever issued permitting the use of asphalt. A 564-68.

Where a variation is sought from the contract requirements, the contract requires Government approval pursuant to the contract clause entitled "FAR 52.236-21, Specification and Drawings for Construction." A 118. Pursuant to this section, when proposing a contract variation, Maropakis must submit a written request to the contracting officer, with documentation of the nature and features of the variation, and why the variation is desirable and beneficial to the Government. A 118-19.

On August 6, 1999, Maropakis submitted a submittal for the roof assembly, which indicated that it would use Type III asphalt. This submittal did not note that it was a deviation from the contract requirements, nor was a written request submitted to the contracting officer. See A 447-49. The submittal was approved by Gale on August 9, 1999. A 450.

On June 28, 2000, the Navy noticed that Maropakis had asphalt at the project site and directed Maropakis to comply with the contract, which prohibited the use of asphalt. A 394.

V. The Contract's Sequence Of Performance Requirement

Contract specification section 01110, paragraphs 1.4 and 1.5 sets forth the construction sequence for the project and requires the removal of

the existing monitor windows and installation of new monitor windows before the roofing work is begun. A 103-04. Because the monitor windows are located above the roof, the work on the windows had to be completed before the roof work or there was a risk of puncturing or damaging the new roof. A 726-27.

On September 14, 1999, Maropakis requested permission to start the roofing work prior to the new window installation. A 403. Its letter requesting permission stated that "[t]he work will start with the asbestos abatement, new roofing, window removals, EIFS, and then followed by the new window installation." Id. On September 16, 1999, the Navy denied Maropakis' request because it did not comply with the contract specifications. A 404. On September 20, 1999, Maropakis renewed its request to "commence the roof work immediately to take advantage of the favorable weather and avert delays. While the roof replacement work is in progress, the Navy can review the window specifications and an acceptable submission can be made." A 405. On October 22, 1999, the Navy again denied Maropakis' request to replace the roof before the windows were installed and directed Maropakis to refer to the contract's requirements. A 408-09.

## SUMMARY OF THE ARGUMENT

This Court does not possess jurisdiction to entertain Maropakis' Government-caused delay claim because that claim was never presented as a certified claim to the contracting officer, seeking a sum certain, or requesting a final decision. Although the contracting officer issued a final decision assessing liquidated damages against Maropakis, Maropakis' claim of Government-caused delay must still be presented to the contracting officer for a final decision.

The Government is entitled to summary judgment upon Maropakis' appeal of the liquidated damages assessment because the contracting officer applied the liquidated damages provision set forth in the contract, and the evidence shows that the contract was completed 467 days past the contract completion deadline. It is well-settled that the Government is not required to demonstrate that the liquidated damages are equal to its actual damages.

Assuming this Court does find that it possesses jurisdiction to entertain Maropakis' Government-caused delay claim, the Government is entitled to judgment as a matter of law upon Maropakis' claim that the window specifications were defective. Although Maropakis had difficulty finding a manufacturer for the windows, locating a supplier was Maropakis'

responsibility. Maropakis was eventually able to install windows that satisfied the contract's specifications. The fact that the specifications were more stringent than the normal trade standard does not make them defective.

Additionally, the Government is entitled to summary judgment upon Maropakis claim that the Government implicitly waived the non-asphalt materials requirement of the contract. Because Maropakis failed to seek a variance from the terms of the contract pursuant to contract requirements, the approval of a submittal proposing the use of asphalt materials does not constitute a waiver of the contract requirements. Moreover, Government inspection without objecting to the presence of asphalt materials does not constitute a waiver of the contract's requirement to use non-asphalt materials only.

The Government is also entitled to summary judgment upon Maropakis claim that the Government unreasonably failed to change the contract's sequence of performance. It is well established that the Government is entitled to strict compliance with the contract's requirements and can insist upon them even if the contractor does not think it prudent or desirable.

Finally, should the Court determine that it does possess jurisdiction

to entertain Maropakis' delay claim, the Government opposes Maropakis' motion for partial summary judgment seeking an additional time extension for the discovery of lead paint. Maropakis has not shown that it is entitled to an additional time extension above and beyond the 14-days already granted by the Navy. It has not demonstrated that the discovery of lead paint affected the activities on the critical path, and it has the burden to prove so by a preponderance of the evidence. Accordingly, Maropakis is not entitled to judgment as a matter of law upon that issue.

## ARGUMENT

### I. Defendant's Motion To Dismiss

#### A. Legal Standards Pursuant To RCFC 12(b)(1)

The plaintiff bears the burden of establishing jurisdiction. See McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998). When deciding a motion to dismiss based upon lack of subject matter jurisdiction, this Court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). When considering a motion to dismiss for lack of subject matter jurisdiction, the Court may examine relevant evidence in order to resolve

any factual disputes. See Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988).

### B. Maropakis Has Failed To Satisfy The Jurisdictional Requirements Of The CDA Because Its Government-Caused Delay Claim Was Never Presented As A Certified Claim To The Contracting Officer

On December 20, 2002, the contracting officer issued a final decision assessing $303,550 in liquidated damages against Maropakis, and demanding payment in the amount of $59,514. A 365-66. Maropakis appealed that decision to this Court on December 17, 2003. Compl. ¶¶ 80,81. However, in Maropakis' amended complaint, Maropakis contends that the Government is responsible for the delay that occurred on the project. Am. Compl. ¶¶ 54, 56. Maropakis states that its claim "involves Maropakis' request for a compensable time extension and extra costs as a result of errors and omissions in the contract documents as well as actions taken by the Navy and its consultants during the period of contract performance." Id. at ¶ 10. It claims that the Navy is responsible for delay caused by allegedly defective window specifications, discovery of lead paint, requiring the use of non-asphalt materials, insisting on the sequence of performance contained in the contract, and improper review of

submittals.[5] Am. Compl. at pgs. 2-8. It seeks damages in excess of $244,036. However, the above claim for Government-caused delay was never presented to the contracting officer as a certified claim, requesting a final decision, as is required by the CDA, 41 U.S.C. § 605.

The CDA, 41 U.S.C. §§ 401-413, allows those in privity of contract with the United States, see 41 U.S.C. § 602, to bring suit in this Court within 12 months of a contracting officer's final decision upon a claim, if certain jurisdictional prerequisites are met, 41 U.S.C. § 609(a). Subsection 605(a) mandates that "[a]ll claims by a contractor against the Government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." Claims of more than $100,000 further must be certified by the contractor. 41 U.S.C. § 605(c)(1). Failure to submit a claim in accordance with these provisions deprives the Court of jurisdiction to consider that claim. Tecom, Inc. v. United States, 732 F.2d 935, 937 (Fed. Cir. 1984); McNabb v. United States, 54 Fed. Cl. 759, 774 (2002).

To satisfy the jurisdictional "claim" requirement, the United States

---

[5] Maropakis also challenges the Navy's assessment of liquidated damages. Am. Compl. ¶¶ 50-52, 55. We do not dispute that this Court possesses jurisdiction to entertain Maropakis' appeal of the assessment of liquidated damages.

Court of Appeals for the Federal Circuit has held that the claim must provide "a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." Contract Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987) (emphasis added); Hawkins & Power Aviation, Inc. v. United States, 46 Fed. Cl. 238, 243 (2000). Moreover, a claim must request a final decision from the contracting officer. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1395 (Fed. Cir. 1987). In order to determine whether a letter to the contracting officer qualifies as a claim, this Court's predecessor applied a four-part analysis:

> [W]hether the letter clearly and unequivocally 1) asserted specific rights; 2) requested specific relief of a sum certain; 3) requested a final decision; and 4) whether the letter, in conjunction with the totality of the circumstances, was sent in the context of an ongoing dispute between the parties as to which they had previously abandoned negotiations.

Sun Eagle Corp. v. United States, 23 Cl. Ct. 465, 471 (1991). "A contractor must make a written, non-routine demand to a contracting officer, request a final decision, and seek the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising from or relating to the contract." Ace Constructors, Inc. v. United States, 70 Fed. Cl. 253, 266 (2006) (citing England v. The Swanson

Group, 353 F.3d 1375, 1380 (Fed. Cir. 2004)) (additional citations omitted). Additionally, for claims of more than $100,000, the contractor must certify the claim in the manner specified in the CDA. See 41 U.S.C. § 605(c).

Maropakis' August 20, 2001 letter to the contracting officer did not constitute a claim to the contracting officer, requesting a final decision, nor was it certified, pursuant to 41 U.S.C. § 605(c). See A 371-74. From its complaint and amended complaint before this Court, it is clear that Maropakis considers its August 20, 2001 letter to the contracting officer to constitute a claim under 41 U.S.C. § 605(a). See Am. Compl. at pg. 9; Compl. ¶ 73. However, the August 20, 2001 letter does not request a sum certain, does not request a final decision, and it is not certified pursuant to 41 U.S.C. § 605(c)(1). It requests "an extension of contract time" for a total of 447 days and lists the reasons therefor. A 371. Furthermore, there is no indication that negotiations between the parties had been abandoned. In the contracting officer's response to Maropakis August 20, 2001 letter, the contracting officer determined that Maropakis had "not presented sufficient justification to warrant the time extension [Maropakis had] requested." A 369. Additionally, the contracting officer's letter states that it is "not a Final Decision of the Contracting Officer," and states that if Maropakis disagrees with this determination, it may "request a decision of

the Contracting Officer pursuant to the provisions of the Disputes Clause of [the] contract." A 370. The contracting officer also noted that Maropakis could submit additional information if it requested a final decision of the contracting officer. Id. However, Maropakis never did so.

Eventually, the contracting officer assessed liquidated damages against Maropakis in a final decision issued on December 20, 2002. A 365-66. However, that decision alone cannot serve as a proper jurisdictional basis for Maropakis to bring its Government-caused delay claim before this Court. "Where . . . the contractor seeks to contest the assessment of liquidated damages by claiming entitlement to time extensions or other relief, the court is presented with a claim by the contractor against the government and that must first be presented to the [contracting officer]." Elgin Builders, Inc. v. United States, 10 Cl. Ct. 40, 44 (1986). Where a contractor is seeking an adjustment of contract terms or monetary relief because it defends against the assessment of liquidated damages upon the basis that the Government caused the delay, that constitutes a claim by the contractor. See Sun Eagle Corp., 23 Cl. Ct. at 482. Where a contractor is challenging a Government claim to liquidated damages and making its own claim to recover amounts withheld for liquidated damages, the latter must be certified. See id. at 477. Maropakis

may contest the assessment of liquidated damages based upon the contracting officer's final decision; however, because Maropakis raises issues of relief to which it might be entitled, such as entitlement to time extensions and damages for Government-caused delay, such claims must first be presented to the contracting officer for his decision, and this Court should not consider such claims until that has been accomplished. See Elgin Builders, 10 Cl. Ct. at 44.

Allowing Maropakis to bring its claim for Government-caused delay in the first instance in this Court and thereby bypass the contracting officer would undermine the "claim" requirement in the CDA, which is designed to encourage parties to settle and resolve disputes prior to litigation. See SMS Data Products Group, Inc. v. United States, 19 Cl. Ct. 612, 616 (1990) ("The [CDA] provides the Government notice of claims and an opportunity to settle or otherwise dispose of disputes without litigation."). Accordingly, this Court should dismiss the portions of Maropakis' complaint relating to its claim for Government-caused delay, as Maropakis never submitted a certified claim, requesting a final decision, to the contracting officer.

## II. Cross-Motion For Summary Judgment

### A. Summary Judgment Standard Of Review

Summary judgment may be granted where there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Mingus Constructors, 812 F.2d at 1390-91; Ralph Larson & Son, Inc. v. United States, 17 Cl. Ct. 39, 42 (1989). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. Doe v. United States, 48 Fed. Cl. 495, 499 (2000) (citing Anderson, 477 U.S. at 247-48; Lane Bryant, Inc. v. United States, 35 F.3d 1570 (Fed. Cir. 1994)). Summary judgment will not be granted "if the dispute about a material fact is ‘genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Id. (quoting Anderson, 477 U.S. at 248).

When reaching a summary judgment determination, the judge’s function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Blake Constr. Co. v. United States, 28 Fed. Cl. 672, 683 (1993) (citing Anderson, 477 U.S. at 249) (additional citation omitted). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must

be granted. Id. at 684 (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Id.

With cross-motions for summary judgment, each party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts. Conner Bros. Constr. Co. v. United States, 65 Fed. Cl. 657, 666 (2005) (citing Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997)). The Court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. Id. (citing Gart v. Logitech, Inc., 254 F.3d 1334, 1338-39 (Fed. Cir. 2001)).

Questions of contract interpretation are issues of law and may be disposed of by summary judgment. Ralph Larsen, 17 Ct. Cl. at 46 (citations omitted).

B. The Navy Properly Assessed Liquidated Damages Against Maropakis

Maropakis seeks the return of the liquidated damages withheld by the Navy. Am. Compl. ¶ 52. Maropakis challenges the assessment of

liquidated damages upon the grounds that "the Navy did not incur additional costs justifying the imposition of liquidated damages." Id. ¶ 51. In other words, Maropakis asserts that the Government may not assess liquidated damages unless it has incurred actual damages.

Liquidated damages are "generally accepted as a legitimate technique to allocate the consequences of a breach before it occurs." Jennie-O Foods, Inc. v. United States, 217 Ct. Cl. 314, 580 F.2d 400, 412 (1978). When liquidated damages "are fair and reasonable attempts to fix just compensation for anticipated loss cause by breach of contract, they are enforced." Id. (quoting Priebe & Sons, Inc. v. United States, 332 U.S. 407, 411-12 (1947)). "[T]he fact that the damages suffered are shown to be less than the damages contracted for is not fatal. These provisions are to be judged as of the time of making the contract." Id. It is well-settled that "liquidated damages can be imposed even though, in fact, the damages sustained are less than those to which the parties stipulated." Cegers v. United States, 7 Cl. Ct. 615, 620 (1985) (citing Priebe & Sons, 332 U.S. at 412). In fact, liquidated damages awards have been upheld in cases in which no actual damages were sustained. Id. (citing Skip Kirchdorfer, Inc. v. United States, 229 Ct. Cl. 560, 567 (1981)).

The proposition that actual damages are necessary

> before liquidated damages become recoverable is incorrect as a matter of law. All that the Government need show is that the damages claimed were reasonably anticipated when the contract was formed.

Fred A. Arnold, Inc. v. United States, 18 Cl. Ct. 1, 14 (1989).

In this case, there is no dispute that the contract contained a liquidated damages provision, which stated that if Maropakis failed to complete the work within the time specified in the contract, or any extension, Maropakis shall pay to the Government as liquidated damages, the sum of $650 for each day of delay. A 67. Maropakis entered into the contract aware of that provision. See A 16. The Navy's use and possession of Building 110, was effective May 17, 2001, 467 days past the contract completion date of February 4, 2000. A 363, 429, 431. The Navy applied the liquidated damages provision of the contract, $650 per day, to the total number of days past the contract due date, 467, to assess liquidated damages in the amount of $303,550. A 363.

Maropakis' argument that the Navy is not entitled to liquidated damages because it has not shown actual damages is incorrect as a matter of law. The Government does not have to demonstrate actual damages to properly assess liquidated damages. See Mega Constr., Inc. v. United States, 29 Fed. Cl. 396, 503 (1993). Accordingly, there is no

triable issue of fact on Maropakis's unsupported assertion that the liquidated damages amount had no basis in reality. See Cegers, 7 Cl. Ct. at 620.

C. The Contract Specifications For The Monitor Windows Were Not Defective And The Navy Had The Right To Insist Upon Compliance With The Specifications

Once the Government demonstrates that the assessment of liquidated damages was proper because the contract's performance was not completed by the contract's completion date, the burden shifts to the contractor to show that any delays were excusable and that it should be relieved of all or part of the liquidated damages assessment. See George Sollitt Constr. Co. v. United States, 64 Fed. Cl. 229, 243 (2005). Maropakis raises several issues of Government-caused delay in its amended complaint, but it relies for the most part upon its contention that the contract's specifications for the monitor windows were defective. Am. Compl. at pgs. 2-5. Additionally, in its motion for partial summary judgment, Maropakis contends that it is entitled to a time extension as a matter of law because the Navy provided specifications for a window "that does not exist" and the window specifications identified "inconsistent criteria." Pl. Mot. at 1-2.

The contract required the removal and disposal of monitor window

assemblies and associated operators and the installation of monitor window assemblies with operators. A 25. Specification section 08520 set forth the specifications for the windows. A 285-93. That specification section referenced several publications that "form a part of this specification to the extent referenced." A 285. Included among those publications is the ANSI/AAMA 101 for "(1993) Aluminum and Poly (Vinyl Chloride) (PVC) Prime Windows and Glass Doors." Id. The specifications at issue in this case are set forth below:

> 2.1 Windows
> Prime windows shall conform ANSI/ AAMA 101 and the requirements specified herein. . . . .
>
> 2.1.1 Standards
> Except as otherwise indicated, requirements for aluminum windows, terminology and standards of performance, and fabrication workmanship are those specified and recommended in ANSI/AAMA 101 and applicable general recommendations published by AAMA and ANSI.
>
> 2.1.2 Performance and Testing
> Except as otherwise indicated, comply with air infiltration tests, water resistance tests, and applicable load tests specified in ANSI/ AAMA 101 for type and classification of window units required in each case. . . .
>
> 2.1.4 Specific Performance Requirements
> Windows shall conform to specified ANSI/AAMA standards and the following, whichever are the more stringent.

a. Air Infiltration Test (Fixed Units): The window shall be subjected to an air infiltration test in accordance with ASTM E 283. Air infiltration shall not exceed .06 cfm/ft$^2$ when tested at a pressure of 6.24 psf.

b. Air Infiltration Test (Operable Units): With the vent in a closed and locked position, the window shall be subjected to an air infiltration test in accordance with ASTM E 283. Air infiltration shall not exceed .10 cfm/ft when tested at a pressure of 6.24 psf.

2.1.5 Water Resistance Test
. . . When a static pressure of 20.00 pounds per square foot has been stabilized, five gallons of water per square foot of window area shall be applied to the exterior face of the unit for a period of 15 minutes. No water shall pass the interior face of the window frame and there shall be no leakage as defined in the test method. . . . .

2.1.8 Projected Windows
Type P-HC 40 (Optional Performance Class). Provide projected windows with concealed four bar friction hinges only.

2.1.9 Fixed Windows
Type F-HC40 (Optional Performance Class).

A 287-88 (emphasis added). As noted by the underlined sections above, the contract required the windows to comply with the performance and testing requirements of the ANSI/AAMA 101, unless other requirements were indicated.

Maropakis had difficulty finding a window manufacturer to fabricate windows that conformed to the specifications. A 400. It communicated with the Navy regarding its difficulties. A 400, 403. On October 22, 1999, the Navy provided Maropakis with a list of three manufacturers that had represented that they could meet the contract specifications. A 408. Maropakis eventually chose J. Sussman, Inc. to manufacture the windows. A 411. The windows manufactured by J. Sussman, Inc. conformed with the specifications, A 407, and were eventually installed by Maropakis. A 412, 418.

Maropakis now argues that the window specifications were defective and ambiguous, and required testing and performance specifications above and beyond what is required by the ANSI/AAMA 101. Pl. Mot. at 5-8. Maropakis alleges that the specifications were conflicting because the water resistance test pressure and air infiltration test pressure requirements were above what is required for a P-HC40 (optional performance class) window. Pl. Mot. at 7-8. Maropakis states that "after being awarded the contract, Maropakis began looking for a window manufacturer that could meet the requirements of the specifications." Id. at 8. It further states that it "supplied custom built windows that satisfied the most stringent of the conflicting requirements of the specifications." Id.

at 8-9. However, it also contends that the specifications were "impossible to follow" because they "were materially defective." Id. at 20.

Maropakis has failed to demonstrate that the window specifications were defective, and has merely shown that the Navy required specifications above and beyond the normal trade practice, which it has the right to do. Maropakis' argument "fails to recognize . . . that the government may require performance both in excess of, or below, the standard normally accepted in a trade." Ralph Larsen, 17 Cl. Ct. at 46. The contract's specifications unambiguously indicated that the contractor was to follow the requirements of ANSI/AMAA 101 and the specifications contained in the contract "whichever are the more stringent." A 288.

It is well established in Government contract law that whenever the Government uses specifications in a contract, there is an accompanying implied warranty that the specifications are free from errors. S. Comfort Builders, Inc. v. United States, 67 Fed. Cl. 124, 133 (2005) (citations omitted). Under the Spearin doctrine, when the Government provides a contractor with defective specifications, the Government "is deemed to have breached the implied warranty that satisfactory contract performance will result from adherence to the specifications, and the contractor is entitled to recover costs proximately flowing from the breach." Id. (citing

United States v. Spearin, 248 U.S. 132, 136 (1918)).

> Spearin stands for the proposition that when the government includes detailed specifications in a contract, it impliedly warrants that (i) if the contractor follows those specifications, the resultant product will not be defective or unsafe, and (ii) if the resultant product proves defective or unsafe, the contractor will not be liable for the consequences.

Hercules, Inc. v. United States, 24 F.3d 188, 197 (Fed. Cir. 1994), aff'd, 516 U.S. 417 (1996) (citing Spearin, 248 U.S. at 136-37).

However, where a contractor eventually performs work in accordance with the specifications, the contractor has "an extraordinarily heavy burden to establish that the specifications are defective." Davies Precision Mach., Inc. v. United States, 35 Fed. Cl. 651, 670-71 (1996). In this case, Maropakis was eventually able to provide windows that met the specifications. See A 440-45. The specifications did not result in a defective or unsafe product. The windows manufactured by J. Sussman, Inc. were accepted by the Navy. A 429, 446. In actuality, Maropakis' argument seems to be that because the Navy's specifications required performance and testing capabilities above and beyond what was required by the trade standard, they are defective. However, the Government has the right to insist upon compliance with contract specifications. Blake Constr., 28 Fed. Cl. at 688. "'[T]he Government is entitled to obtain

precisely what is contracts for as long as it does not mislead the contractor.'" Id. (quoting Am. Elec. Contracting Corp. v. United States, 217 Ct. Cl. 338, 350, 579 F.2d 602, 608 (1978)). The Government "may require material specifications more or less stringent than the standards normally accepted in a trade or industry at the time." Id. at 688-89 (citing Ralph Larsen, 17 Cl. Ct. at 46). "The government could, if it wanted "'engage a contractor to make snowmen in August.'" Id. at 689 (quoting Rixon Elecs., Inc. v. United States, 210 Ct. Cl. 309, 320, 536 F.2d 1345, 1351 (1976)). The Government, just as any other party, "is entitled to receive that for which it contracted and has the right to accept only goods that conform to the specifications." Cascade Pac. Int'l v. United States, 773 F.2d 287, 291 (Fed. Cir. 1985) (citing Am. Elec. Contracting, 579 F.2d at 608)). Accordingly, the Navy was entitled to insist that the contract's specifications for the windows be met, even though they were above and beyond the normal trade practice.

Maropakis admits that it did not begin looking for a window manufacturer until after award of the contract. Pl. Mot. at 8. It now seeks to hold the Government responsible for the delay and increased costs of obtaining a custom-made product. However, courts and boards of contract appeals have generally denied this type of claim. They have held that the

contractor should have determined, prior to submitting a bid, the availability of products called for in the specifications. See ACS Constr. Co., ASBCA No. 33832, 87-3 BCA ¶ 20,138, 1987 WL 41214 (Aug. 3, 1987), aff'd, 848 F.2d 1245 (Fed. Cir. 1988) (citing WRB Corp. v. United States, 183 Ct. Cl. 409, 511-12 (1968)); see also Westerhold v. United States, 28 Fed. Cl. 172, 176 (1993) (noting that the obligation to locate a supplier falls upon the contractor). Therefore, Maropakis should have determined, prior to submitting its bid, whether it could find a window manufacturer who could satisfy the contract's window specifications.

In its motion for partial summary judgment, Maropakis contends that the Navy learned of the defect in the window specifications and purposefully decided not to tell Maropakis. Pl. Mot. at 16. To support this statement, Maropakis relies upon an e-mail sent from Lonnie Moyer, a civil engineer for the Navy, to Terrence Kline, the director of engineering at the NICP in Mechanicsburg. Pl. Mot. at 11, Pl. Ex. G. The e-mail states that "[t]he requirement in the spec is for a water resistance test of 20 psf with no leaks. This requirement should have been 10 psf or perhaps lower." A 396. This statement is not an admission that the specification was defective, rather it points out that the water resistance test was more stringent than it needed to be. Also, Mr. Moyer notes that the specification

should not be revised because "other bidders may file a complaint since they would have bid on the original spec." A 396. This was a proper concern, as other bidders may have bid on the project after locating a window manufacturer who could satisfy the window specifications.[6] Moreover, Mr. Kline responded to the e-mail that it was not necessary to lower the water resistance test requirement because Mr. Moyer had located three manufacturers that could meet the specifications, and noted that the "contractor should choose from the manufacturers that can meet all aspects of the specification." A 396. These e-mail communications do not represent a decision to withhold a defective specification from the contractor, rather they evidence the Government's decision to only accept windows that conformed to the contract's specifications.

Maropakis relies upon this Court's decision in R.P. Wallace v. United States, 63 Fed. Cl. 402 (2004), to support its motion for summary judgment on the defective specification issue. However, a close reading of R.P. Wallace shows that it is factually distinguishable from this case. In R.P. Wallace, the parties agreed– and the court held– that the windows could not be manufactured as specified. The windows were impossible to

[6] The Navy received 26 bids in response to solicitation number N62472-97-B-4116. See A 17.

produce. 63 Fed. Cl. at 406-07. In contrast, in this case, the evidence establishes that Maropakis– after some difficulty– did provide windows that met all the contract requirements, including the water resistance test. A 407, 440-46. Accordingly, Maropakis' reliance on R.P. Wallace in misplaced.

Because the window specifications were not defective, and Maropakis was eventually able to provide windows that met the specifications' more stringent testing requirements, Maropakis has failed to establish a claim for Government-caused delay due to defective specifications. Therefore, the Government is entitled to judgment as a matter of law on that issue.

D. The Navy Did Not Implicitly Waive The Contractual Requirement For The Use Of Non-Asphalt Materials

In its amended complaint, Maropakis alleges that the Navy approved its use of asphalt materials for the new roof, even though the contract provided for the use of non-asphaltic materials. Am. Compl. ¶ 38, 40-41. It contends that the Navy's untimely rejection of the asphalt materials was a material breach of contract. Id. ¶ 44. However, the Government is entitled to judgment as a matter of law upon this claim because Maropakis did not follow contract procedures for requesting a variation to the

contract's requirements, nor did the Government implicitly waive the contract's requirement for use of non-asphalt materials.

After the initial solicitation for the contract was issued but before the proposal deadline, the Navy decided that the contractor would not be permitted to use hot asphalt as an adhesive for roof insulation or wood fiberboard and would be required to use polyurethane foam as an adhesive as specified in section 07220, paragraph 2.3.3. A 15. This requirement was set forth in Amendment 2 to the solicitation. A 13-15. Maropakis understood that the use of asphalt was not permitted pursuant to the terms of the contract and that no modification was ever issued permitting the use of asphalt. A 564-68. Nevertheless, on August 6, 1999, Maropakis submitted a submittal for the roof assembly that indicated it would use Type III asphalt. A 447-49. This submittal did not note that it was a deviation from the contract requirements, nor was a written request submitted to the contracting officer. See id. This submittal was approved by Gale, the architectural and engineering firm, on August 9, 1999. A 450. On June 28, 2000, the Navy noticed that Maropakis had asphalt at the project site and directed Maropakis to comply with Amendment No. 2 to the solicitation, which prohibited the use of asphalt. A 394.

Where a variation is sought from the contract requirements, the

contract requires Government approval pursuant to the contract clause entitled "FAR 52.236-21, Specification and Drawings for Construction." A 118. When proposing a contract variation, the contractor must submit a written request to the contracting officer, with documentation of the nature and features of the variation and why the variation is desirable and beneficial to the Government. A 118-19. "If the Contracting Officer approves any such variation, the Contracting Officer shall issue an appropriate contract modification, except that, if the variation is minor or does not involve a change in price or in time of performance, a modification need not be issued." FAR 52.236-21(f), 48 C.F.R. § 52.236-21(f).

> Approval by the Contracting Officer shall not relieve the Contractor from responsibility for any errors or omissions in such drawings, nor from responsibility for complying with the requirements of this contract, except with respect to variations described and approved in accordance with [FAR 52.236-21(f)].

FAR 52.236-21(d) (emphasis added).

Maropakis asserts that the Navy's approval of its submittal for asphalt adhesive constituted a waiver of a contract requirement. However, approval of submittals does not relieve the contractor of its contractual obligations. Fru-Con Constr. Corp. v. United States, 42 Fed. Cl. 94, 97 n.1 (1998) (citing A&A Insulation Contractors, Inc., VABCA No. 2766, 92-2

BCA ¶ 24,829, at 123,811, 1992 WL 25219 (Feb. 6, 1992)); see also Elter S.A., ASBCA No. 52327, 01-1 BCA ¶ 31,421, 2001 WL 520825 (May 3, 2001) ("Without notice of a deviation from the contract requirements, approval of a submittal does not relieve a contractor from complying with contract requirements."); Community Sci. Tech. Corp., ASBCA No. 20244, 77-1 BCA ¶ 12,352, at ¶ 59,766, 1977 WL 185683 (Jan. 27, 1977) (erroneous approval of shop drawings containing nonconforming work does not bind Government to accept such work where deviations were not brought to attention of the Government).

Maropakis also suggests that the Navy's failure to stop the work at the project site once Navy personnel observed asphalt at the contract site constituted a waiver of the contract requirements. See Am. Compl. ¶ 42, 43. However, Maropakis is again incorrect. See Shahin Elihu, ASBCA No. 47436, 96-1 BCA ¶ 28,254, 1996 WL 159060 (Apr. 2, 1996) ("The failure of the [Government] inspector to object to the non-complying shingles when they were being installed did not constitute an implied acceptance of the deviation."). Additionally, the contract between the parties incorporated FAR 52.246-12, entitled Inspection of Construction (Aug. 1996). A 99. Section (c) of that FAR provision states that Government inspections are for the sole benefit of the Government and do not "constitute or imply

acceptance." FAR 52.246-12(c), 48 C.F.R. § 52.246-12(c). Accordingly, the Government is entitled to judgment as a matter of law on Maropakis' claim that the Navy waived the requirement to use non-asphalt materials because Maropakis did not request a variation from the contract pursuant to contract requirements, nor did the presence of Navy personnel at the work site constitute "acceptance" of the use of asphalt materials.

E. The Government Was Entitled To Insist Upon Compliance With The Sequence Of Performance Provided In The Contract

Maropakis additionally contends that the Navy "unreasonably and arbitrarily" refused to allow Maropakis to begin roof removal and replacement work before the removal and replacement of the monitor windows. Am. Compl. ¶¶ 45-47. The Government is also entitled to judgment as a matter of law upon this claim because the Government can insist upon compliance with the contract's specifications.

On September 14, 1999, Maropakis requested permission to start the roofing work prior to the new window installation. Its letter requesting permission stated that "[t]he work will start with the asbestos abatement, new roofing, window removals, EIFS, and then followed by the new window installation." A 403. On September 16, 1999, the Navy denied Maropakis' request because it did not comply with the contract specifications. A 404.

On September 20, 1999, Maropakis renewed its request to "commence the roof work immediately to take advantage of the favorable weather and avert delays. While the roof replacement work is in progress, the Navy can review the window specifications and an acceptable submission can be made." A 405. On October 22, 1999, the Navy again denied Maropakis' request to replace the roof before the windows were installed and reminded Maropakis to refer to specification section 01110, paragraphs 1.4 and 1.5 for the required construction sequence and special scheduling requirements. A 408-09.

Specification section 01110 of the contract, paragraphs 1.4 and 1.5 sets forth the construction sequence for the project and requires the removal of the existing monitor windows and installation of new monitor windows before roofing work is begun. A 103-04. Because the monitor windows are located above the roof, the work on the windows had to be completed before the roof work or there was a risk of puncturing of damaging the new roof. A 726-27.

As noted above, it is well established that the Government "is entitled to strict compliance with the contract requirements." E.g., Mega Constr. Co. v. United States, 25 Cl. Ct. 735, 744 (1992) (citing cases); accord Davies Precision Mach., 35 Fed. Cl. at 670. It is also well settled that it is

up to the Government to determine its contracting needs, and the Government is entitled to receive exactly what it contracts for, without regard to whether the contractor believes that it is prudent or desirable. E.g., Maxwell Dynamometer Co. v. United States, 181 Ct. Cl. 607, 628, 386 F.2d 855 (1967).

In this case, the Navy denied Maropakis' request to change the sequence of the performance, noting "[t]he contract was written in this manner to meet the building occupant request. The customer needs have not changed and therefore the window installation must be performed prior to the removal of the existing roof." A 404. The Navy determined its contracting needs, and contracted for them. Accordingly, the Navy was entitled to strict compliance with the contract requirements and did not act "unreasonably and arbitrarily" when it denied Maropakis' request to change the sequence of performance. Therefore, the Government is entitled to judgment as a matter of law upon this issue.

### F. Maropakis Has Not Established That It Is Entitled To Additional Time For Lead Paint Removal, Above And Beyond The 14 Days Granted In Modification P0001 To The Contract

Maropakis contends that the 14-day time extension issued by the Navy was insufficient, and further contends that the evidence supports Maropakis' request for a longer extension of time. Pl. Mot. at 20.

However, Maropakis has not demonstrated that it is entitled to an additional time extension as a matter of law, and this is not an appropriate issue for summary judgment because there are facts in dispute as to whether the discovery of lead paint impacted the activities on the critical path of the contract.

There is no dispute that lead paint was discovered on the project site, or that Maropakis was entitled to a time extension; however, the Navy maintains that the 14-day time extension granted in modification P0001 was sufficient. See A 419. On or before April 12, 2000, Maropakis notified the Navy of the discovery of lead paint on the monitor windows that were being replaced. A 392. On May 5, 2000, the Navy directed Maropakis not to begin the removal of existing windows due to the presence of lead paint until further direction. A 413. The Navy issued a modification to the contract, P0001, to remove the windows as hazardous waste. A 357-58. The modification was approved on June 28, 2000. A 426. Maropakis proceeded with work prior to receiving this notification on June 22, 2000, with the permission of the Navy. Id.

Basically, Maropakis is arguing that it is entitled to additional days of excusable delay because of the discovery of lead paint and the delay that discovery caused on the project. Maropakis contends that the discovery of

lead paint caused delay in the project "from [an] unforseeable cause beyond the control and without the fault or negligence of the Contractor." See Sauer, Inc. v. Danzig, 224 F.3d 1340, 1345 (Fed. Cir. 2000). However, to establish excusable delay, the contractor must prove that the excusable event proximately caused a delay to the overall completion of the contract, i.e., that the delay affected activities on the critical path. R.P. Wallace, 63 Fed. Cl. at 409 (citing Sauer, 224 F.3d at 1345); see also Kinetic Builder's Inc. v. Peters, 226 F.3d 1307, 1317 (Fed. Cir. 2000) ("In establishing the causal link, the contractor must show that the government's actions affected activities on the critical path of the contractor's performance of the contract.").

> When a contractor is seeking extension of contract time, for changes and excusable delay, which will relieve it from the consequences of having failed to complete the work within the time allowed for performance, it has the burden of establishing by a preponderance of the evidence not only the existence of an excusable cause of delay but also the extent to which completion of the contract work as a whole was delayed thereby.

Morganti Natn'l, Inc. v. United States, 49 Fed. Cl. 110, 132-33 (2001) (citations omitted) (emphasis added). Maropakis has not established by a preponderance of the evidence the extent to which the discovery of lead paint affected the overall completion of the contract– i.e. that the discovery

of lead paint affected activities on the critical path.

Furthermore, there is evidence that the discovery of lead paint was not the only issue that delayed performance at that time. When the Navy's project manager responded to Maropakis' June 7, 2000 request to commence work immediately, the project manager noted that the adhesive submittal had not yet been approved, that certain materials were not yet at the job site, and that not all quality control ("QC") personnel had been approved. A 415. The project manager also noted that these were contractual requirements, and that these requirements had to be met prior to the start of work. See id. Therefore, it is possible that it was not the discovery of lead paint, but contractor-caused delay that caused the delay of the activities on the critical path of the contract. There are facts in dispute as to whether the discovery of lead paint delayed the overall completion of the contract beyond the 14-day extension already granted by the Navy. Accordingly, the Court should deny Maropakis' motion for partial summary judgment upon the issue of whether it is entitled to an additional time extension due to the discovery of lead paint.

## CONCLUSION

For these reasons, we respectfully request that the Court dismiss Maropakis' Government-caused delay claim for lack of jurisdiction,

because the claim was never presented as a certified claim to the contracting officer, nor did Maropakis ever request a final decision or state a sum certain. We additionally request that the Court grant summary judgment in our favor upon the Navy's assessment of liquidated damages.

In the alternative, we respectfully request that the Court grant summary judgment in our favor upon the following Government-caused delay claims raised by Maropakis: defective specifications, the Navy's implied consent to modify the contract, and the Navy's refusal to modify the contract's sequence of performance. We additionally request that the Court deny Maropakis' motion for partial summary judgment for additional time due to the discovery of lead paint because Maropakis has failed to demonstrate that it is entitled to an additional time extension.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Acting Director

s/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

OF COUNSEL:

ALAN R. CARAMELLA
Senior Trial Attorney
NAVFAC Litigation Office
Washington, D.C. 20374-5051

s/ Dawn S. Conrad
DAWN S. CONRAD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 616-2279
Fax: (202) 305-7643

electronically filed
February 6, 2007

Attorneys for Defendant