# TABLE OF CONTENTS


| TAB | Document Description | Page |
|---|---|---|
| 43 | Blueprint for Existing Roof System and Replacement Roof System................ | 805 |
| 44 | E-Mail exchange between Lonnie Moyer and Lt. Luke Robertson dated August 13 and 14, 2001 Re: Roof Specs ...................................................... | 809 |
| 45 | Excerpts from Deposition of Terrance L. Kline, dated May 2, 2005............... | 810 |
| 46 | Excerpts from Deposition of Abdulqader Rangwalla, dated April 15, 2005, adding pages 7-8, 15-17, 45-47, 52, 56-57, 65-66, 69, 72-79....................... | 833 |
| 47 | Excerpts from Deposition of Gary W. Brown, P.E., dated May 6, 2005, adding pages 2-9, 12, 14-17, 19, 24-25, 29-30, 37-40, 42-43, 46-49, 51-66................ | 880 |

# 43




## BUILDING 110 – ROOF REMOVAL PLAN

SCALE 1/16" = 1'-0"

## REMOVAL NOTES

1. THE BUILDING WILL REMAIN OCCUPIED DURING CONSTRUCTION. THE CONTRACTOR SHALL SCHEDULE AND EXECUTE WORK TO AVOID INTERRUPTIONS TO BUILDING OPERATIONS (SEE SPECIFICATION SECTIONS 01110 AND 01500).
2. CONTRACTOR SET-UP LOCATIONS SHALL BE AS DIRECTED BY THE CONTRACTING OFFICER.
3. ANY DISCREPANCIES ON THE DRAWINGS NOTED BY THE CONTRACTOR SHALL BE BROUGHT TO THE CONTRACTING OFFICER'S ATTENTION PRIOR TO BID SUBMISSION.
4. ROOFING AND FLASHINGS SHALL BE 100% WEATHERTIGHT ON A DAILY BASIS. REMOVE ONLY AS MUCH ROOFING AS CAN BE REPLACED ON THE SAME WORK DAY.
5. REMOVALS SHALL BE PERFORMED IN ACCORDANCE WITH THE ROOF REMOVAL PLAN, THE DETAIL DRAWINGS, AND THE CONTRACT SPECIFICATIONS.
6. REMOVE AND DISPOSE OF EXISTING GRAVEL SURFACED BUILT-UP MEMBRANES, BITUMINOUS FLASHINGS, CEMENTITIOUS CRICKETS AND BITUMINOUS BASE SHEETS DOWN TO WOOD DECK SUBSTRATES THROUGHOUT THE ROOF AREAS.
7. REMOVE AND DISPOSE OF EXISTING ASBESTOS CONTAINING BITUMINOUS FLASHINGS ON THE ROOF AREAS AND EXISTING CEMENTITIOUS ASBESTOS (TRANSITE) PANELS AND FELT UNDERLAYMENT FROM EXTERIOR MONITOR WALLS IN ACCORDANCE WITH SECTION 13281 AND FEDERAL, STATE, AND LOCAL REQUIREMENTS.
8. REMOVE AND DISPOSE OF EXISTING SHEET METAL FLASHINGS, EDGE METAL, COUNTERFLASHINGS, SCUPPERS, CONDUCTOR HEADS, AND DOWNSPOUT ASSEMBLIES, UNLESS INDICATED ON THE DETAIL DRAWINGS TO REMAIN.
9. REMOVE, STORE, AND PROTECT EXISTING LIGHTNING PROTECTION SYSTEM AS SPECIFIED FOR REINSTALLATION AFTER ROOF REPLACEMENT.
10. REMOVE AND DISPOSE OF EXISTING WOOD BLOCKING UNLESS INDICATED ON THE DETAIL DRAWINGS TO REMAIN.
11. REMOVE AND DISPOSE OF EXISTING ROOF DRAINS AND ASSOCIATED DOWNSPOUTS DOWN TO DRY WELL INLETS AT CONCRETE SLAB LEVEL.
12. DISCONNECT, REMOVE, STORE, AND PROTECT EXISTING ROOFTOP EQUIPMENT AND ASSOCIATED MECHANICAL / ELECTRICAL PENETRATIONS AND CONDUIT TO PROPERLY INSTALL REPLACEMENT ROOF SYSTEMS AND PROVIDE MINIMUM SPECIFIED FLASHING HEIGHTS.
13. THE CONTRACTOR SHALL REPORT DETERIORATED, WET OR OTHERWISE UNSUITABLE WOOD DECK SUBSTRATES UNCOVERED BY THE WORK TO THE CONTRACTING OFFICE PRIOR TO INSTALLING THE NEW ROOF SYSTEM COMPONENTS.
14. THE EXISTING STREET LIGHT STANCHIONS AND BUILDING ACCESS LADDER ARE COATED WITH LEAD BASED PAINT. HAND TOOL CLEAN THE STREET LIGHT STANCHIONS IN ACCORDANCE WITH OSHA REGULATIONS. SPOT PRIME AND PAINT LIGHT STANCHIONS. BUILDING ACCESS LADDER AND JUNIOR SAFETY CAGE SHALL BE DISPOSED OF IN ACCORDANCE W STATE AND LOCAL REGULATIONS.
15. THE CONTRACTOR SHALL BE RESPONSIBLE FOR ELECTRICAL / MECHANICAL DISCONNECTIONS & RECONNECTIONS AND FOR THE LENGTHENING AND SHORTENING CONDUIT, AND ASSOCIATED MECHANICAL / ELECTRICAL WORKS REQUIRED TO RESTORE NORMAL OPERATION OF ROOFTOP EQUIPMENT AS INDICATED TO COMPLY WITH FEDERAL, STATE, & LOCAL CODES AND REGULATIONS WHILE PERFORMING ELECTRICAL / MECHANICAL WORK.
16. REMOVE AND DISPOSE OF EXIST STEEL FRAMED WINDOW ASSEMBLIES ON NORTH AND SOUTH ELEVATIONS OF MONITORS.
17. REMOVE AND DISPOSE OF EXIST TERRA COTTA COPING SECTIONS AND MORTAR BEDS FROM TOPS FIRE WALLS IN PREPARATION FOR INSTALLING NEW ROOF SYS AND COPING.
18. REMOVE EXISTING LAMP FIXTURE FROM STREET LAMP STANCHIONS AND ASSOCIATED ELECTRICAL COMPONENTS AS SPECIFIED IN PREPARATION FOR INSTALLATION OF REPLACEMENT FIXTURES WHERE INDICATED.

GRAPHIC SCALE

0 8' 16' 32' 48'

NOTE: CHECK GRAPHIC SCALES BEFORE USING. IF SHEET SIZE IS LESS THAN 24" x 36", IT IS A REDUCED PRINT. SCALE REDUCED ACCORDINGLY.

PLAN NORTH

## LEGEND

- ROOF EDGE
- RIDGE LINE
- EXPANSION JOINT
- FIRE WALL
- CRICKET (TO BE REMOVED)
- ROOF DRAIN
- HOT PIPE (HP)
- HOT STACK (HS)
- VENT PIPE (VP)
- VENT, GRAVITY VENT (V, GV)
- FAN (F)
- SCUPPER/DOWNSPOUT ASSEMBLY (TO BE REMOVED)
- FIRE HOSE CONNECTION
- STREET LAMP ON STANCHION
- CAGED LADDER
- LIGHTNING PROTECTION CONDUCTOR (LP)
- LIGHTNING PROTECTION TERMINAL
- LIGHTNING PROTECTION GROUND DOWNLEAD
- POURABLE SEALER POCKET (TO BE REMOVED)
- ABANDONED POURABLE SEALER POCKET (TO BE REMOVED) (ABAN)
- ABANDONED PIPE PENETRATION (TO BE REMOVED) (ABAN)
- APPROXIMATE ROOF ELEVATION (ELV = #')
- SLOPE INDICATOR

## EXISTING ROOF SYSTEM (CROSS SECTION)

NOT TO SCALE




NOTES:

1. ITEMS ARE TO BE REMOVED UNLESS SPECIFICALLY INDICATED TO REMAIN.
2. REMOVE EXISTING CEMENTITIOUS GYPSUM CRICKETS WHERE INDICATED BETWEEN DRAINAGE POINTS ON MAIN ROOF AREA AND MONITOR ROOF AREAS.
3. BITUMINOUS BASE FLASHINGS AND STRIPPING THROUGHOUT THE ROOF AREAS CONTAIN ASBESTOS (ACBM). THE CONTRACTOR SHALL ASSUME THAT ACBM EXTEND [illegible] ROOF EDGES, CURBS, AND WALLS.

## INTERIOR OPERATIONS PLAN




LEGEND

- BAY INDICATOR
- ROOFTOP MONITOR
- FIRE WALL
- INTERIOR OFFICE / STRUCTURE
- OCCUPANT WORK SPACE
- STRUCTURAL AUGMENTATION AREA

## KEY PLAN



PWD DWG NO PWD-6418

REPLACE ROOF – BUILDING 110

ROOF REMOVAL PLAN – SOUTH




BUILDING 110 – ROOF REMOVAL PLAN
SCALE: 1/16" = 1'-0"

## LEGEND

- ROOF EDGE
- RIDGE LINE
- EXPANSION JOINT
- FIRE WALL
- CRICKET (TO BE REMOVED)
- ROOF DRAIN
- HOT PIPE
- HOT STACK
- VENT PIPE
- VENT
- FAN
- SCUPPER/DOWNSPOUT ASSEMBLY (TO BE REMOVED)
- FIRE HOSE CONNECTION
- STREET LAMP ON STANCHION.
- CAGED LADDER
- LIGHTNING PROTECTION CONDUCTOR
- LIGHTNING PROTECTION TERMINAL
- LIGHTNING PROTECTION GROUND/DOWNLEAD
- POURABLE SEALER POCKET (TO BE REMOVED)
- ABANDONED POURABLE SEALER POCKET (TO BE REMOVED)
- ABANDONED PIPE PENETRATION (TO BE REMOVED)
- APPROXIMATE ROOF ELEVATION
- SLOPE INDICATOR

## KEY PLAN



## EXISTING ROOF SYSTEM (CROSS SECTION)

NOT TO SCALE




NOTES:
1. ITEMS ARE TO BE REMOVED UNLESS SPECIFICALLY INDICATED TO REMAIN.
2. REMOVE EXISTING CEMENTITIOUS GYPSUM CRICKETS WHERE INDICATED BETWEEN DRAINAGE POINTS ON MAIN ROOF AREA AND MONITOR ROOF AREAS.
3. BITUMINOUS BASE FLASHINGS AND STRIPPING THROUGHOUT THE ROOF AREAS CONTAIN ASBESTOS (ACRM). THE CONTRACTOR SHALL ASSUME THAT ACRM EXTEND 18" FROM ROOF EDGES, CURBS, AND WALLS.

## INTERIOR OPERATIONS PLAN




LEGEND
- BAY INDICATOR
- ROOFTOP MONITOR
- FIRE WALL
- INTERIOR OFFICE/ STRUCTURE
- OCCUPANT WORK SPACE
- STRUCTURAL AUGMENTATION AREA

## REMOVAL NOTES

1. THE BUILDING WILL REMAIN OCCUPIED DURING CONSTRUCTION. THE CONTRACTOR SHALL SCHEDULE AND EXECUTE WORK TO AVOID INTERRUPTIONS TO BUILDING OPERATIONS (SEE SPECIFICATION SECTIONS 01110 AND 01500).
2. CONTRACTOR SET-UP LOCATIONS SHALL BE AS DIRECTED BY THE CONTRACTING OFFICER.
3. ANY DISCREPANCIES ON THE DRAWINGS NOTED BY THE CONTRACTOR SHALL BE BROUGHT TO THE CONTRACTING OFFICER'S ATTENTION PRIOR TO BID SUBMISSION.
4. ROOFING AND FLASHINGS SHALL BE 100% WEATHERTIGHT ON A DAILY BASIS. REMOVE ONLY AS MUCH ROOFING AS CAN BE REPLACED ON THE SAME WORK DAY.
5. REMOVALS SHALL BE PERFORMED IN ACCORDANCE WITH THE ROOF REMOVAL PLAN, THE DETAIL DRAWINGS, AND THE CONTRACT SPECIFICATIONS.
6. REMOVE AND DISPOSE OF EXISTING GRAVEL SURFACED BUILT-UP MEMBRANES, BITUMINOUS FLASHINGS, CEMENTITIOUS CRICKETS AND BITUMINOUS BASE SHEETS DOWN TO WOOD DECK SUBSTRATES THROUGHOUT THE ROOF AREAS.
7. REMOVE AND DISPOSE OF EXISTING ASBESTOS CONTAINING BITUMINOUS FLASHINGS ON THE ROOF AREAS AND EXISTING CEMENTITIOUS ASBESTOS (TRANSITE) PANELS AND FELT UNDERLAYMENT FROM EXTERIOR MONITOR WALLS IN ACCORDANCE WITH SECTION 13281 AND FEDERAL, STATE, AND LOCAL REQUIREMENTS.
8. REMOVE AND DISPOSE OF EXISTING SHEET METAL FLASHINGS, EDGE METAL COUNTERFLASHINGS, SCUPPERS, CONDUCTOR HEADS, AND DOWNSPOUT ASSEMBLIES, UNLESS INDICATED ON THE DETAIL DRAWINGS TO REMAIN.
9. REMOVE, STORE, AND PROTECT EXISTING LIGHTNING PROTECTION SYSTEM AS SPECIFIED FOR REINSTALLATION AFTER ROOF REPLACEMENT.
10. REMOVE AND DISPOSE OF EXISTING WOOD BLOCKING UNLESS INDICATED IN THE DETAIL DRAWINGS TO REMAIN.
11. REMOVE AND DISPOSE OF EXISTING ROOF DRAINS AND ASSOCIATED DOWNSPOUTS DOWN TO DRY WELL INLETS AT CONCRETE SLAB LEVEL.
12. DISCONNECT, REMOVE, STORE, AND PROTECT EXISTING ROOFTOP EQUIPMENT AND ASSOCIATED MECHANICAL / ELECTRICAL PENETRATIONS AND CONDUIT TO PROPERLY INSTALL REPLACEMENT ROOF SYSTEMS AND PROVIDE MINIMUM SPECIFIED FLASHING HEIGHTS.
13. THE CONTRACTOR SHALL REPORT DETERIORATED, WET OR OTHERWISE UNSUITABLE WOOD DECK SUBSTRATES UNCOVERED BY THE WORK TO THE CONTRACTING OFFICE PRIOR TO INSTALLING THE NEW ROOF SYSTEM COMPONENTS.
14. THE EXISTING STREET LIGHT STANCHIONS AND BUILDING ACCESS LADDER ARE COATED WITH LEAD BASED PAINT. HAND TOOL CLEAN THE STREET LIGHT STANCHIONS IN ACCORDANCE WITH OSHA REGULATIONS. SPOT PRIME AND PAINT LIGHT STANCHIONS. BUILDING ACCESS LADDER AND ALUMINUM SAFETY CAGE SHALL BE DISPOSED OF IN ACCORDANCE WITH STATE AND LOCAL REGULATIONS.
15. THE CONTRACTOR SHALL BE RESPONSIBLE FOR ELECTRICAL / MECHANICAL DISCONNECTIONS AND RECONNECTIONS AND FOR THE LENGTHENING AND SHORTENING OF CONDUIT, AND ASSOCIATED MECHANICAL / ELECTRICAL WORK AS REQUIRED TO RESTORE NORMAL OPERATION OF ROOFTOP EQUIPMENT AS INDICATED TO COMPLY WITH FEDERAL, STATE, AND LOCAL CODES AND REGULATIONS WHILE PERFORMING ELECTRICAL / MECHANICAL WORK.
16. REMOVE AND DISPOSE OF EXISTING STEEL FRAMED WINDOW ASSEMBLIES ON NORTH AND SOUTH ELEVATIONS OF MONITORS.
17. REMOVE AND DISPOSE OF EXISTING TERRA COTTA COPING SECTIONS AND MORTAR BEDS FROM TOPS OF FIRE WALLS IN PREPARATION FOR INSTALLING NEW ROOF SYSTEM AND COPING.
18. REMOVE EXISTING LAMP FIXTURE FROM STREET LAMP STANCHIONS AND ASSOCIATED ELECTRICAL COMPONENTS AS SPECIFIED IN PREPARATION FOR INSTALLATION OF REPLACEMENT FIXTURES WHERE INDICATED.

GRAPHIC SCALE
0 8' 16' 32' 48'

NOTE: CHECK GRAPHIC SCALES BEFORE USING. IF SHEET SIZE IS LESS THAN 24" x 36", IT IS A REDUCED PRINT. SCALE REDUCED ACCORDINGLY.

NAVAL FACILITIES ENGINEERING COMMAND

REPLACE ROOF – BUILDING 110
ROOF REMOVAL PLAN – NORTH

SCALE: 1/16" = 1'-0"




## BUILDING 110 – ROOF AREA PLAN

SCALE: 1/16" = 1'-0"

## LEGEND

- ROOF EDGE
- GUTTER/DOWNSPOUT/SPLASHBLOCK
- RIDGE LINE
- EXPANSION JOINT/AREA DIVIDER
- FIRE WALL
- CRICKET
- ROOF DRAIN WITH 8' SQUARE SUMP
- AUGMENTING ROOF DRAIN
- HOT PIPE
- HOT STACK
- VENT PIPE
- VENT, GRAVITY VENT
- FAN
- FIRE HOSE CONNECTION
- STREET LAMP ON STANCHION
- CAGED LADDER
- LIGHTNING PROTECTION CONDUCTOR
- NEW LIGHTNING PROTECTION CONDUCTOR
- LIGHTNING PROTECTION TERMINAL
- LIGHTNING PROTECTION GROUND/DOWNLEAD
- APPROXIMATE ROOF ELEVATION
- SLOPE INDICATOR
- WALKWAY PROTECTION PAD
- DETAIL INDICATOR

## KEY PLA



## REPLACEMENT ROOF SYSTEM (CROSS SECT

NOT TO SCALE




NOTES:

1. ITEMS ARE TO BE NEW UNLESS SPECIFICALLY INDICATED AS EXISTING.
2. PROVIDE WOOD FIBERBOARD CRICKETS, SUMPS, AND TAPERED EDGE AS INDICA

## INTERIOR OPERATIONS PLAN




LEGEND

- BAY INDICATOR
- ROOFTOP MONITOR
- FIRE WALL
- INTERIOR OFFICE/ STRUCTURE
- OCCUPANT WORK SPACE
- STRUCTURAL AUGMENTATION A

## REPLACEMENT NOTES

EMAIN OCCUPIED DURING CONSTRUCTION. THE SCHEDULE AND EXECUTE WORK TO AVOID ILDING OPERATIONS (SEE SPECIFICATION 01500).

, EACH INDIVIDUAL DETAIL ON THE ROOF AREA FLAGGED. INSTALLATION DETAILS HAVE BEEN . COMPONENTS AT RANDOM LOCATIONS. ON THE DETAIL DRAWINGS SHALL BE NEW INDICATED AS EXISTING.

D SHALL BE CONSTRUCTED IN A MANNER TAIL DRAWINGS.

ARITY, ALL SECUREMENT FASTENERS ARE NOT IL DRAWINGS. SECUREMENT FASTENERS ARE ENT TO SUBSTRATE CONNECTIONS. REFER TO FASTENER TYPES AND SPACING TO BE USED. ON SHALL BE IN ACCORDANCE WITH FEDERAL, EGULATIONS APPLICABLE TO THE PROJECT.

K DECK WHERE REMOVED AS SPECIFIED IN HE CONTRACT SPECIFICATIONS.

EATED WOOD BLOCKING AS INDICATED FOR OF ROOFING AND FLASHING.

MENT ROOF SYSTEMS SHALL CONSIST OF EPDM DM FLASHINGS AND STRIPPING, WOOD ON AND ISOCYANURATE INSULATION, AND RLAYMENT.

10. SURFACES TO RECEIVE EPDM MEMBRANE AND FLASHINGS SHALL BE FREE OF BITUMEN CONTAMINATION.
11. PROVIDE WOOD FIBERBOARD INSULATION CRICKETS ATOP WOOD FIBERBOARD INSULATION WHERE INDICATED AND UPSLOPE OF EQUIPMENT CURBS.
12. INSTALL SHEET METAL FLASHINGS INCLUDING EDGE METAL, COUNTERFLASHINGS, COPING, EXPANSION JOINT COVERS, AND SHEET METAL GUTTER ASSEMBLIES AND DOWNSPOUTS, AS INDICATED.
13. REINSTALL EXISTING ROOFTOP EQUIPMENT AND PROVIDE PROPER FLASHING HEIGHTS AS INDICATED.
14. REINSTALL EXISTING LIGHTNING PROTECTION (LP) SYSTEM AND PROVIDE NEW LP CONDUCTOR TO DRAINS. TEST SYSTEM AS SPECIFIED.
15. THE CONTRACTOR SHALL BE RESPONSIBLE FOR ELECTRICAL / MECHANICAL DISCONNECTIONS AND RECONNECTIONS AND FOR THE LENGTHENING AND SHORTENING OF CONDUIT, CONDUCTOR, DUCT WORK, AND ASSOCIATED MECHANICAL / ELECTRICAL WORK AS INDICATED TO RESTORE NORMAL OPERATION OF ROOFTOP EQUIPMENT. COMPLY WITH FEDERAL, STATE, AND LOCAL CODES AND REGULATIONS WHILE PERFORMING ELECTRICAL / MECHANICAL WORK.
16. INSTALL EIFS WALL SYSTEMS ON MONITOR WALLS AS INDICATED AND SPECIFIED.
17. INSTALL REPLACEMENT WINDOWS ON MONITORS AS INDICATED AND SPECIFIED.
18. INSTALL COBRAHEAD REPLACEMENT LIGHT FIXTURES AND ASSOCIATED WIRING WHERE INDICATED.
19. IMPORTANT NOTICE: SEE SPECIFICATION SECTION 07536 PARAGRAPHES 1.3.3 AND 1.3.3.1

GRAPHIC SCALE

0 8' 16' 32' 48'

NOTE: CHECK GRAPHIC SCALES BEFORE USING. IF SHEET SIZE IS LESS THAN 24" x 36", IT IS A REDUCED PRINT. SCALE REDUCED ACCORDINGLY.

GARY WALTER BROWN

SEAL

PWD DWG NO. PWD-6420

DEPARTMENT OF THE NAVY NAVAL INVENTORY C

REPLACE ROOF – ROOF AREA PL

SCALE 1/16" = 1'-0"

SIZE D

5/4/98

12/1/98

000000807




## BUILDING 110 – ROOF AREA PLAN

SCALE: 1/16" = 1'-0"

## LEGEND

- ROOF EDGE
- GUTTER/DOWNSPOUT/SPLASHBLOCK
- RIDGE LINE
- EXPANSION JOINT/AREA DIVIDER
- FIRE WALL
- CRICKET
- ROOF DRAIN WITH 8' SQUARE SUMP
- AUGMENTING ROOF DRAIN
- HOT PIPE
- HOT STACK
- VENT PIPE
- VENT
- FAN
- FIRE HOSE CONNECTION
- STREET LAMP ON STANCHION
- CAGED LADDER
- LIGHTNING PROTECTION CONDUCTOR
- NEW LIGHTNING PROTECTION CONDUCTOR
- LIGHTNING PROTECTION TERMINAL
- LIGHTNING PROTECTION GROUND/DOWNLEAD
- APPROXIMATE ROOF ELEVATION
- SLOPE INDICATOR
- WALKWAY PROTECTION PAD
- DETAIL INDICATOR

## KEY PLAN



PLAN NORTH

## REPLACEMENT ROOF SYSTEM (CROSS SECTION)

NOT TO SCALE




NOTES:

1. ITEMS ARE TO BE NEW UNLESS SPECIFICALLY INDICATED AS EXISTING.
2. PROVIDE WOOD FIBERBOARD CRICKETS, SUMPS, AND TAPERED EDGE AS INDICATED.

## INTERIOR OPERATIONS PLAN




LEGEND

- BAY INDICATOR
- ROOFTOP MONITOR
- FIRE WALL
- INTERIOR OFFICE/ STRUCTURE
- OCCUPANT WORK SPACE
- STRUCTURAL AUGMENTATION AREA

## REPLACEMENT NOTES

1. THE BUILDING WILL REMAIN OCCUPIED DURING CONSTRUCTION. THE CONTRACTOR SHALL SCHEDULE AND EXECUTE WORK TO AVOID INTERRUPTIONS TO BUILDING OPERATIONS (SEE SPECIFICATION SECTIONS 01110 AND 01500).
2. FOR SAKE OF CLARITY, EACH INDIVIDUAL DETAIL ON THE ROOF AREA PLAN HAS NOT BEEN FLAGGED. INSTALLATION DETAILS HAVE BEEN FLAGGED FOR TYPICAL COMPONENTS AT RANDOM LOCATIONS.
3. COMPONENTS SHOWN ON THE DETAIL DRAWINGS SHALL BE NEW UNLESS SPECIFICALLY INDICATED AS EXISTING.
4. DETAILS NOT DEPICTED SHALL BE CONSTRUCTED IN A MANNER CONSISTENT WITH DETAIL DRAWINGS.
5. FOR THE SAKE OF CLARITY, ALL SECUREMENT FASTENERS ARE NOT SHOWN ON THE DETAIL DRAWINGS. SECUREMENT FASTENERS ARE SHOWN FOR COMPONENT TO SUBSTRATE CONNECTIONS. REFER TO SPECIFICATIONS FOR FASTENER TYPES AND SPACING TO BE USED.
6. ITEM OF CONSTRUCTION SHALL BE IN ACCORDANCE WITH FEDERAL, STATE, AND LOCAL REGULATIONS APPLICABLE TO THE PROJECT.
7. REPLACE WOOD PLANK DECK WHERE REMOVED AS SPECIFIED IN SECTION 06100 OF THE CONTRACT SPECIFICATIONS.
8. INSTALL PRESSURE TREATED WOOD BLOCKING AS INDICATED FOR PROPER TERMINATION OF ROOFING AND FLASHING.
9. IN GENERAL, REPLACEMENT ROOF SYSTEMS SHALL CONSIST OF EPDM MEMBRANES, WITH EPDM FLASHINGS AND STRIPPING, WOOD FIBERBOARD INSULATION AND ISOCYANURATE INSULATION, AND GYPSUM BOARD UNDERLAYMENT.
10. SURFACES TO RECEIVE EPDM MEMBRANE AND FLASHINGS SHALL BE FREE OF BITUMEN CONTAMINATION.
11. PROVIDE WOOD FIBERBOARD INSULATION CRICKETS ATOP WOOD FIBERBOARD INSULATION WHERE INDICATED AND UPSLOPE OF EQUIPMENT CURBS.
12. INSTALL SHEET METAL FLASHINGS INCLUDING EDGE METAL, COUNTERFLASHINGS, COPING, EXPANSION JOINT COVERS, AND SHEET METAL GUTTER ASSEMBLIES AND DOWNSPOUTS, AS INDICATED.
13. REINSTALL EXISTING ROOFTOP EQUIPMENT AND PROVIDE PROPER FLASHING HEIGHTS AS INDICATED.
14. REINSTALL EXISTING LIGHTNING PROTECTION (LP) SYSTEM AND PROVIDE NEW LP CONDUCTOR TO DRAINS. TEST SYSTEM AS SPECIFIED.
15. THE CONTRACTOR SHALL BE RESPONSIBLE FOR ELECTRICAL / MECHANICAL DISCONNECTIONS AND RECONNECTIONS AND FOR THE LENGTHENING AND SHORTENING OF CONDUIT, CONDUCTOR, DUCT WORK, AND ASSOCIATED MECHANICAL / ELECTRICAL WORK AS INDICATED TO RESTORE NORMAL OPERATION OF ROOFTOP EQUIPMENT. COMPLY WITH FEDERAL, STATE, AND LOCAL CODES AND REGULATIONS WHILE PERFORMING ELECTRICAL / MECHANICAL WORK.
16. INSTALL EIFS WALL SYSTEMS ON MONITOR WALLS AS INDICATED AND SPECIFIED.
17. INSTALL REPLACEMENT WINDOWS ON MONITORS AS INDICATED AND SPECIFIED.
18. INSTALL CUBRANCAD REPLACEMENT LIGHT FIXTURES AND ASSOCIATED WIRING WHERE INDICATED.
19. IMPORTANT NOTICE: SEE SPECIFICATION SECTION 07536 PARAGRAPHS 1.3.3 AND 1.3.3.1

GRAPHIC SCALE

0 8' 16' 32' 48'

NOTE: CHECK GRAPHIC SCALES BEFORE USING. IF SHEET SIZE IS LESS THAN 24" x 36", IT IS A REDUCED PRINT. SCALE REDUCED ACCORDINGLY.

NAVAL DISTRICT WASHINGTON

REPLACE ROOF – BUILDING 110
ROOF AREA PLAN – NORTH

SCALE 1/16" = 1'-0"

# 44

From: Lonnie R Moyer on 08/14/2001 09:46
To: "Robertson, Luke LT. (EFANE)" <RobertsonWL@efane.navfac.navy.mil>
cc: Terrance L Kline/MECH/NICP/NAVSUP
Subject: Re: 110 Roof Specs

Lt. Robertson,

The specs. for the windows were tight in one area, as I recall. The moisture penetration requirement was tight. However, several manufacturers met the requirement and these manufacturers names were given to the contractor.

To my knowledge, the wall panels were a common product and the specs were not restrictive.

R/ L. Moyer

"Robertson, Luke LT. (EFANE)" <RobertsonWL@efane.navfac.navy.mil>



**"Robertson, Luke LT. (EFANE)" <RobertsonWL@efane.navfac.navy.mil>**
08/13/01 03:43 PM

To: "'Lonnie Moyer (E-mail)'" <Lonnie Moyer@icpmech.navy.mil>
cc:
Subject: 110 Roof Specs

Lonnie,

The contractor on the 100 roof project has put in for a time extension for various reasons, two of which I would like your comments on before we send out a response:

1) Were the window specs too restrictive?

2) Were the specs for the snap on wall panels and coping caps too restrictive? (Technically and color selection)

Thanks for your help.

VR,
LT Luke Robertson
ROICC Mechanicsburg, PA
Engineering Field Activity Northeast
(717) 605-2402 (DSN 430-2402)
FAX 605-2529
mailto:RobertsonWL@efdnorth.navfac.navy.mil



PLAINTIFF'S EXHIBIT 13

45

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| M. MAROPAKIS CARPENTRY, INC., PLAINTIFF | : | |
| VS | : | NO. 03-2825C |
| THE UNITED STATES, DEFENDANT | : | (JUDGE BASKIR) |

DEPOSITION OF: TERRANCE L. KLINE

TAKEN BY: PLAINTIFF

BEFORE: TERESA K. BEAR, REPORTER NOTARY PUBLIC

DATE: MAY 2, 2005, 1:05 P.M.

PLACE: RHOADS & SINON, ONE SOUTH MARKET SQUARE, HARRISBURG, PENNSYLVANIA

APPEARANCES:

RHOADS & SINON
BY: DAVID W. FRANCIS, ESQUIRE

FOR - PLAINTIFF

U.S. DEPARTMENT OF JUSTICE
BY: JAMES D. COLT, ESQUIRE

FOR - DEFENDANT

difficult for others to know exactly what was asked and answered. So even though you know where I'm going, I'd ask you to let me finish asking the question, okay?

A I understand.

Q Thanks. And I will try not to interrupt you when you're answering, fair enough?

A Fair enough.

MR. FRANCIS: Mr. Colt, do you want to have the same stipulations that we had at the previous depositions with respect to objections?

MR. COLT: Yes.

BY MR. FRANCIS:

Q Mr. Kline, by whom are you presently employed?

A By the government.

Q By the Department of the Navy?

A Department of the Navy.

Q And what is your position with the Department of the Navy?

A I'm the director of engineering.

Q Director of engineering Navy wide or do you mean at the installation?

A For Mechanicsburg Naval Support Activity.

Q And does that have an acronym?

A NSA.

Q And how long have you been the director of engineering at the NSA?
A About 13 years.
Q What kind of engineer are you?
A I'm a civil engineer.
Q Are you a PE?
A Registered professional engineer.
Q In Pennsylvania and where else?
A Pennsylvania and Maryland.
Q As a director of engineering, what are your duties?
A I have a number of engineers that work for me. We develop plans and specifications for construction at Mechanicsburg and sometimes at other Navy bases.
Q When you say develop plans and specs, I'm not sure I understand what that means. Do you actually prepare them?
A We prepare them, plus we have architect engineering firms that work for us that prepares the plans and specifications.
Q Do you have any involvement in the selection of design professionals for the design of projects?
A I do.
Q And what's that role?

Q What was your purpose in reviewing the plans prior to going to the ROICC office?

A I look at the plans to determine that they are consistent with normal Navy policy. I review them to make sure that they have all the sign-offs of all the various reviewing groups within Mechanicsburg and I page through the plans and specs.

Q Now, is this something you personally do or do you delegate that to somebody else?

A I personally do that.

Q And when you say you page through, you page through both the plans and the specifications for the project?

A Basically that's correct.

Q Do you conduct any detailed review of any of the specifications?

A No.

Q Now, it's my understanding that the contract documents in this case incorporated various other standards and publications as part thereof, such as the ASDMs and the AAMAs. Did you review any of those documents prior -- or during the design phase?

A No, I did not.

Q And between the design phase and the project going out to bid?

A Did not.

Q Does the Navy maintain a master specification system that design professionals can access?

A Yes.

Q And what's that called?

A Specs Intact.

Q And what exactly is Specs Intact?

A Specs Intact is a guide specification for various types of work on contracts.

Q And does the Department of Navy prepare Specs Intact or does another governmental or agency do that?

A I don't know.

Q I think you indicated earlier in your deposition that occasionally your office is actually involved in the design of a project, correct?

A Correct.

Q Let me ask you this before I go into that in greater detail. Did your office design any of this project?

A No.

Q In those instances when your office designs projects for the Navy, does it utilize the Specs Intact specifications?

A Yes.

Q Do you know whether there's any other government agencies that use Specs Intact?

A Do not know.

Q Is the Specs Intact information maintained on a database accessible by the Internet?

A Yes.

Q Do you need a security clearance to get hold of that or get into that database?

A Do not know that.

Q In the project that your office has actually been involved in the design of, have you ever reviewed the Specs Intact for purposes of preparing the design?

A I have not personally done that.

Q Has anyone under your supervision?

A My engineers would do that.

Q Including Mr. Moyer?

A Including Mr. Moyer.

Q Has your office prepared designs for replacement of windows on the warehouses that are located at the Naval installation?

A In answer to that question, we have specified windows in connection with designs that we have completed, not necessarily a replacement project.

Q When you say not necessarily a replacement

window project, let me ask you, has the Navy -- for lack of a better term I'll call it the Navy Depot. Has the Navy prepared plans and specifications for the removal and replacement of windows on its facility, to your knowledge, do you know?

A The Navy has prepared projects for both but not necessarily together.

Q When you say both, for removal -- one plan says plan for removal and another plan spec is for replacement, is that what you mean?

A For instance, in explaining that --

Q Sure.

A -- we may have an old warehouse that was all windows when built in the forties. We may on occasion have taken those windows out and put solid walls in and then we would put an energy efficient window in its place.

Q I understand. The contract for the new window that you put in its place, were you involved in those -- preparation of those specifications?

A I was not personally involved.

Q Did you have any discussions during the design phase with any of the other individuals employed by your office regarding the design of the project?

A The only person I would have had any discussions with would have been Mr. Moyer.

Q Do you recall what the subject of those discussions were?

A I -- during design I can't remember of any discussions except every Thursday I have a staff meeting and he would have given me the status of where the project was.

Q Are there minutes kept of those meetings?

A No.

Q Do you keep notes of those minutes?

A He gave me -- they give me a status sheet every Thursday which I keep for a period of maybe a month or two, maybe three, depending on how much we have going at a given time and then because of volumes of work they're discarded.

The purpose of those is to determine the status of my ongoing projects and the only information they normally give me on those sheets are status type things.

Q Like percentage of completion?

A Yeah, yeah, yeah, because then I have to -- I have to relate that to other -- to the tenant paying for it.

Q I understand. Let's talk about the period between the completion of the design and the transmittal of the documents to the ROICC office. How long is that

period or how long was that period for this project, do you recall?

A I don't remember.

Q How long is it typically?

A Well, there's really no typical because it depends on money. Sometimes an agency will have money for design, which we design a project, and we have had them sitting on the shelf for two, three, four years before the agency got money to put them over in the ROICC office.

Q And do you recall -- you don't recall how long -- I already asked you that.

A No, I do not.

Q Who else would have reviewed the plans and specifications prior to being forwarded to the ROICC office?

A We all -- we have fire look at them, we have safety look at them, we have environmental look at them and we always have the tenant look at them.

Q And do you recall who from the tenant agency looked at these?

A I do not, no.

Q Who actually transmits the contract documents to the ROICC office, do you know?

A I do.

Q And do you include any sorts of transmittal

with the documents when you send it to them?

A The only thing that goes over to the ROICC office would be the project itself and we have to have a money document for them to put it out on the street and we have a front sheet that people just sign off that they have looked at it.

Q When you say the project itself, you mean the design documents, the plans and specs?

A Yeah, the plans and specs, yeah.

Q What involvement, if any, did you have during the construction phase of this project?

A The only involvement I had would be Lonnie coming to me with any construction problems there may have been.

Q Do you recall any problems that he came to you with on this project?

A The only problem I really remember is there was a discrepancy between the contractor and the government as far as the availability of the windows.

Q Who came to you about that discrepancy?

A That would be Lonnie.

Q Anyone else?

A No.

Q And when he came to you, did he come to you orally or did he send you an e-mail or both?

A He originally had come to me orally and then after research he came to me with an e-mail.

Q What did he report to you?

A He had reported to me originally that the contractor said he could not get a window to meet the specification. And I told Lonnie with that being the case that he should look into the matter to see if he could find any manufacturers that could meet the specification.

Q And do you know whether Mr. Moyer did that?

A He did that and by e-mail he had told me who the manufacturers were. He found I think a total of four and I think three of which had responded back to him.

Q And that they could all -- and that they could all supply those?

A They could meet what we -- what was specified.

Q Do you remember who those were?

A No, I do not.

Q Did you speak with anyone from Gale Associates about the -- this issue with respect to the windows?

A To my knowledge I did not.

Q Or share any e-mails?
A To my knowledge I did not.
Q To your recollection?
A To my recollection.
Q Did you have any conversations or other communications regarding deficiencies in the specifications with respect to the design of the windows?
A No.
Q Do you have any understanding sitting here today as to whether the specifications were defective in any material respect?
A I have a question.
Q Sure.
A What's your definition --
Q Of defective?
A Yes.
Q Well, for example, are you aware that there were certain documents that were incorporated by reference into the contract as set forth in the specifications?
A No.
Q You're not aware of that?
A (Witness shook his head negatively.)
Q Are you aware of any communications between any personnel employed by the Department of the Navy and Maropakis, the contractor, regarding the adequacy of the

specifications?

A No.

Q Have you ever reviewed the AAMA 101-93?

A I have not.

Q Do you know if anyone from the Department of the Navy did?

A What is that document?

Q It's the voluntary specifications for aluminum and poly (vinyl chloride)(PVC) prime windows and glass doors.

A I have no personal knowledge that the government has -- had reviewed that.

Q Do you know whether it was part of the contract?

A I do not know.

Q Do you know whether the contract documents required the contractor to perform his work in accordance with that specification?

A I do not know that.

Q Do you know whether any of the provisions of the contract documents violated the provisions of that specification?

A I do not know that.

Q I'm going to show you what was previously marked at a prior deposition as Plaintiff's Exhibit

know whether Graham Architectural Products could actually meet the specifications for this project?

A I just know what's in the e-mail.

Q You've never reviewed any submittal information from Graham?

A No.

Q And how about J. Sussman, do you know whether they could meet the specifications for this project?

A I do not know.

Q How about Forte, Inc.?

A I do not know.

Q Let's go onto the sentence that begins with the word the requirement in the spec, do you see that? It's the next -- skip a sentence. Do you want me to point it out to you?

A It starts with what?

Q The words, quote, the requirement in the spec is.

A Oh, yeah, okay. I follow you.

Q There is a requirement -- and I'll read it. The requirement in the spec is for a water resistance test of 20 PSF with no leaks.

A Um-hum.

Q The requirement should have been 10 PSF or

perhaps even lower, close quote. Did you have a conversation with Mr. Moyer about the PSF that was required for these windows?

A I can't remember having a conversation with Mr. Moyer concerning what the requirements were.

Q Do you have any idea --

A Specifically.

Q Do you have any idea why Mr. Moyer said that?

A I do not.

Q Do you know where he obtained that information?

A I do not.

Q Do you know whether it's in fact true that the requirement should have been 10 PSF or lower?

A I do not.

Q Do you know whether that information was shared with the contractor?

A I do not.

Q Do you know whether that information was discussed with the design professional?

A I do not.

Q Let's go onto the next sentence. Quote, Bob Rosenberry has advised me that we should not revise this requirement at this time, close quote. Did you have

any conversation with Mr. Rosenberry regarding the revisions to the contract documents?

A I did not.

Q Do you know whether Mr. --

A To my -- let me qualify that. To my knowledge I did not.

Q To the best of your recollection?

A To the best of my recollection I did not.

Q Do you know whether anyone else had conversations with Mr. Rosenberry about whether the contract documents should be revised with respect to the PSF testing for the windows?

A Do not.

Q Let me ask you this: Did you have any -- strike that. Are you aware of any other communications within the Department of the Navy regarding revisions to the contract documents because of the windows, other than what's been marked as Exhibit 3?

A No, I'm not.

Q The next sentence says the consequences may be as follows: (1) The contractor used this item as an excuse for his time delay. A change now would justify his delays and may cost us for delays.

Do you recall any discussions that you had with Mr. Moyer about that?

A No, I do not.

Q Do you know whether the contractor had utilized that item regarding the PSF rating for the windows as an excuse for why he believed he was delayed?

A I do not know.

Q Why was it important that the delays may cost you money? And by you, I mean the Department of the Navy. Do you know?

A I do not know, no.

Q With respect to the financing, does the Department of the Navy -- strike that. The money for this project comes from the tenant agency, is that correct?

A That's correct.

Q Do they have a budget with respect to the projects that they do?

A Their budget would normally be what the government estimate would be.

Q For what, for one project?

A For each project is independent of another.

Q And with respect to the project, just so I'm clear, a project would be, for example, Building 110, not a number of projects that are broken down then by the Navy, correct? Do you know?

A That's partially true. Sometimes they may

the Army.

Q I understand. Let's go onto the next sentence. (2) LD's would be cancelled. What are LD's?

A Liquidated damages.

Q What happens to liquidated damages that are collected from a contract on a project, do you know?

A Don't know.

Q Who would know?

A I would say that Mr. Nihoff probably would know.

Q The third and final sentence -- let me strike that. The final sentence of the paragraph says (3) Other bidders may file a complaint since they would have bid on the original spec. Do you see that?

A Um-hum.

Q What would be -- do you remember a conversation with Mr. Moyer about that?

A In this particular project I do not.

Q Any other projects?

A Yes.

Q What projects?

A A general rule is that all the bidders bid on the same package. You reduce your requirements and you could have a protest.

Q A bid protest?

A A bid protest. If you reduce the requirements that the requirements could have been met, you could have a bid protest.

Q After a contract has been awarded and construction's commenced?

A Yes.

Q You've seen that?

A In contracting courses I'm told that. I can't say I've ever seen it.

Q Let's go to the e-mail then at the top which is from you to Mr. Moyer.

A Um-hum.

Q You say, quote, since you have found three or more manufacturers that can meet the specification, to reduce the number form -- I believe you meant from -- the 20 PSI would serve no purpose, close quote. Why did you say that?

A I, as a rule, am reluctant to change any specifications once they're bid and awarded. And the rule is if you can find three manufacturers that can meet a particular part of the spec, then the contractor must provide what was in the specification.

Q Let me show you what was marked as Plaintiff's Exhibit Number 6 which is a copy of a review on a submittal that was provided by Gale Associates with

respect to the windows. Have you ever seen that document before?

A No, I have not.

Q Let's go down to the double asterisk where it says, quote, product submitted is well suited for this application. Gale recommends the Navy consider accepting this product under the following conditions, colon, and it lists some conditions. Were you aware that Gale had recommended that?

A No, I was not.

Q I'm going to show you what has been marked as Exhibit 13. Were you aware -- have you ever seen these documents before?

A I was copied on this.

Q They're e-mails. The first one, the bottom one, is dated August 13, 2001 and then the top one is dated August 14, 2001, correct?

A Um-hum, correct.

Q The bottom one is from Lieutenant Robertson to Mr. Moyer, correct?

A That's correct.

Q And he asks two questions, the first of which was were the window specs to a respect restricted. Do you see that?

A Yes, I do.

Q Did you have any conversations with Lieutenant Robertson about the specifications being too restrictive?
A To my recollection I had not -- did not.
Q Do you ever utilize the term too restrictive in connection with specifications?
A This is the first I've heard of too restrictive.
Q How about too tight, have you ever heard of that phrase used?
A No.
Q Are there ever any circumstances that you're aware of in which the specifications are in fact too restrictive or too tight that they must be modified?
A At this point I cannot remember one.
Q In response Mr. Moyer writes, quote, the specs for the windows were tight in one area, as I recall. The moisture penetration requirement was tight. Do you know what Mr. Moyer meant by that?
A No, I do not.
MR. FRANCIS: Let's take a five-minute break.
(Break taken.)
BY MR. FRANCIS:
Q Were you involved at all in reviewing

the building.

Q When you say high area, what do you mean?

A There's probably about four per building and they may be 12, 14 feet above the normal roof level.

Q And they have windows on them?

A They have windows on them.

Q Are those projected windows, do you know?

A Projected?

Q On this project, do you know, what kind of windows they were?

A Well, they were just warehouse windows. They -- no, I'm sorry, they were warehouse windows that had the ability to be opened.

Q Do you know whether there was a roof on top of that monitor?

A There was.

Q Do you know whether Maropakis was authorized to remove and replace that roof before they replaced the windows?

A I don't know. I do not know that.

Q Was there any construction or engineering reason why they would be prohibited from removing the roof over the monitors prior to removal of the monitors -- windows I should say?

A I don't know.

Q You can't think of any sitting here today?
A Of why they would not be able to do that?
MR. COLT: Objection, asked and answered.
BY MR. FRANCIS:
Q Go ahead.
MR. COLT: He said he didn't know.
A No, I don't know.
BY MR. FRANCIS:
Q Were you at all involved in assessing Maropakis's request to remove and replace that portion of the roofing prior to securing approval of the windows?
A To my recollection, no, I was not.
Q Do you have an understanding as to whether asphalt materials were authorized for utilization as an adhesive on the roof?
A Do not know that detail.
Q Were you at all involved in the review of the schedule for the project?
A Was not.
Q Anyone from your office?
A I do not know.
Q Do you have any knowledge with respect to the discovery of lead paint on the monitor windows?
A I do not.
Q Were you at all involved in any of the

# 46

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

M. MAROPAKIS CARPENTRY, INC., PLAINTIFF :
:
VS : NO. 03-2825C
:
THE UNITED STATES, DEFENDANT : (JUDGE BASKIR)
:

DEPOSITION OF: ABDULQADER RANGWALLA

TAKEN BY: DEFENDANT

BEFORE: TERESA K. BEAR, REPORTER
NOTARY PUBLIC

DATE: APRIL 15, 2005, 9:10 A.M.

PLACE: RHOADS & SINON
ONE SOUTH MARKET SQUARE
HARRISBURG, PENNSYLVANIA

APPEARANCES:

RHOADS & SINON
BY: DAVID W. FRANCIS, ESQUIRE

FOR - PLAINTIFF

U.S. DEPARTMENT OF JUSTICE
BY: JAMES D. COLT, ESQUIRE

FOR - DEFENDANT

more factors.

Q Okay, but did those -- do you claim that those factors caused a delay on the project?

A Yes.

Q Are there any other factors that you claim caused delay?

A Yes.

Q What are they?

A Lead paint abatement.

Q Okay, so the encountering of lead paint. I believe we mentioned that.

A And then submission of the roofing system.

Q I'm sorry, could you --

A Submission of the roofing system.

Q What do you mean?

A That we submitted in the beginning the roofing system and somehow consultant rejected the system, in the sense that they realized that they -- they are not aware of the documents, it's outdated, and they rejected it at that time and turned back to us and then they found out -- they did research and found out that these documents are correct.

Q And which consultant was this?

A Gale Associates.

Q When did this occur?

A I believe in 1999.
Q What months?
A I don't recall.
Q Did anything else cause delay?
A Let me see.
MR. FRANCIS: Can I ask you a question, Mr. Colt? Can you refresh his recollection with respect to the other issues that were raised in his letters and/or the document?
MR. COLT: I'm sorry, I listed the factors that were named in the complaint. I need to know if there were any others. I can't refresh his recollection as to something I don't know about.
A That's it.
BY MR. COLT:
Q Are there any other issues?
A No.
Q Thank you. So, again, continuing with the overview, the project originally was supposed to have been completed on January 16th, 2000?
A That's true.
Q It was then extended to -- the deadline was extended to January 30th of 2000, an extension of 14 days?
A Yes.
Q There were then five more days added on for

Q But would you describe it as professional on both sides?

A Professional in the sense that Mr. Rosenberry used to come to the site a few hours and that's it.

Q But was it contentious? Was it a contentious --

A Yeah, it's professional.

Q Now let's talk about some specifics. The windows, Maropakis claimed that there was delay related to finding windows that could meet the specifications.

A Yes.

Q What problems were there in meeting the specifications for the windows?

A The only problem we had that -- after awarding the contract, we started looking for a window supplier that could meet the requirements of the specs.

Q After contract award?

A Yes. As soon as we got the award, we started looking for a supplier to find a proper window manufacturer who could meet the required contract documents. We had a very hard time for several months to find a proper contractor who could meet, you know, the requirements of the required specifications.

Q What was the problem?

A Mainly the problem was the testing results, the requirement of the testing that --

Q What about the windows would fail to meet the testing requirement?

A The water resistant test.

Q Now, you're referring to the requirement that it -- the window be able to withstand 20 pounds per square foot?

A Ounce per square foot. That's true.

Q Ounce per square foot?

A Right.

Q Was there anything else?

A Air infiltration test.

Q Anything else?

A That's it.

Q So you started looking for a manufacturer after the contract award, is that correct?

A Yes.

Q When did you tell the Navy about your problems finding a manufacturer?

A I don't recall the date, but several times we mentioned in writing to the Navy that we are having a hard time to find a proper window supplier who could meet, you know, the required specifications.

Q But you don't remember the date?

A I exactly don't remember the date, but several times, several occasions we did mention in writing. Of course, in the year 1999. I don't know the date, but the year 1999.

Q This was all in the year 1999?

A Right.

Q Who did you tell at the Navy?

A Mr. Rosenberry.

Q Anybody else?

A I don't recall the name of each and every individual person, but I did inform others also, the people who were in charge of these projects.

Q Who were those people?

A The contracting officers.

Q Do you remember their names?

A I don't exactly remember. There are so many names.

Q Have you worked on other projects either with the Navy or other sorts of government contracting?

A No.

MR. FRANCIS: Hold on. Can you restate that?

MR. COLT: I'm sorry, has Maropakis -- I keep forgetting that Mr. Abdul is not testifying personally, he's testifying for Maropakis.

BY MR. COLT:

Q Has Maropakis handled other government contracts?

A I don't know.

MR. FRANCIS: No, no, no. Do you mean has Maropakis performed as a general contractor on other government projects ever?

BY MR. COLT:

Q Has Maropakis performed other -- been a prime contractor on other contracts involving the Navy?

A I don't know.

Q Was it Maropakis' responsibility to find suppliers for the project?

A Yes.

Q But the Navy helped you to find a window manufacturer, did it not?

A The Navy didn't help, we requested for the help.

Q And did the Navy provide names?

A Yes.

Q Which manufacturer eventually provided the windows?

A J. Sussman.

Q Now, one thing to clear up here, J. Sussman created the windows that met the requirements. What was

(Letter dated 3/9/00 produced and marked as Defendant's Exhibit No. 3.)

MR. FRANCIS: What's your question, Counsel?

BY MR. COLT:

Q What date did you tell the window manufacturer not to bring the windows on site?

MR. FRANCIS: Hold on a second. Window manufacturer or window subcontractor?

BY MR. COLT:

Q The window subcontractor, YonCon. When did you tell YonCon not to bring the windows on site?

A On May 9th -- on March 9, I'm sorry. March 9, 2000. It's per the document you have given to me to verify.

MR. COLT: Off the record.

(Discussion held off the record.)

BY MR. COLT:

Q Why did you tell them not to bring the windows on site?

A Because we suspected -- we found that lead -- I mean window contains lead paint.

Q When you say the window, the old windows, the windows that were --

A The existing windows.

MR. FRANCIS: Can I ask that the parties -- that, Mr. Colt, you not step on his answer by talking while he's answering.

MR. COLT: I apologize. If I need a clarification, I'll wait until you're done. I'm sorry, please continue.

MR. FRANCIS: I think he answered it.

BY MR. COLT:

Q Just so I understand, encountering the lead caused you to tell them not to bring the windows on site?

A That's true.

Q When did you inform the Navy that there might be a problem with lead?

A Again, I don't recollect, but do you have a document to indicate or to show me so I can look at the document and tell you?

Q Mr. Rangwalla, I'm going to refer you to what shall be marked as Defendant's Exhibit 4. Specifically it was provided to Maropakis. It's a letter from Maropakis on Maropakis letterhead dated March 30th, 2001, signed by you, Abdul Rangwalla, and specifically it was provided to Maropakis at Bates Numbers 4492 through 4495.

(Letter dated 3/30/01 produced and marked as Defendant's Exhibit No. 4.)

BY MR. COLT:

Q About the presence of lead.

MR. FRANCIS: About the specific comments that are in Paragraph 11?

BY MR. COLT:

Q Did you tell the Navy prior to that?

MR. FRANCIS: Object to the form of the question and direct him not to answer. You have to be more specific about what you're asking him. If you're asking him did you tell the Navy on or about April 26 that the window had been previously tested, which means they knew about it beforehand, and was considered hazardous waste under RCRA standards, then the answer is obviously yes. Is that what you're asking him?

BY MR. COLT:

Q Had you informed -- had Maropakis informed the Navy earlier than that about the possibility that there was lead on the site, lead on the windowpanes?

A Yes.

Q Do you remember when?

A I don't recollect, but if you have a document, could you show it to me? On March 7th, Paragraph 8 on this page number 4492.

Q Could you read that, please.

A M. Maropakis was prepared to mobilize and

commence the removal of asbestos containing transit panels all around the monitors on March 7, 2000. The window installation was scheduled to immediately follow. Since lead paint was suspected on the windows, M. Maropakis requested lead sampling results from the Navy.

Q When was this request made, do you recall?

A Mr. Rosenberry.

Q And when was it made, do you recall?

A I don't recall the date.

Q Please continue reading.

A M. Maropakis requested lead sampling results from the Navy. Lead sampling results were not readily available and the Navy was checking whether samples were taken from the window paint. During the interim, M. Maropakis instructed our abatement contractor to take necessary samples.

Q So when did Maropakis inform the Navy, as far as you recall or as far as you're aware?

A It would be found on March 7 when we were ready to mobilize and prepared to commence the transit panels containing asbestos. At that time we realize and at that time we inform the Navy that there's a problem with the lead. On the same day we asked whether they have any previous results for this lead -- lead sampling results.

again? Mr. Rangwalla, do you need to see Defendant's Exhibit 4 again?

MR. FRANCIS: Take a look at it. See if it says the date that you confirmed that. That's an ambiguous -- that's an ambiguous question.

MR. COLT: I'm sorry, could -- I'm sorry, may the record reflect that Mr. Francis is standing over Mr. Rangwalla while -- and flipping the pages while Mr. Rangwalla is trying to read.

MR. FRANCIS: Well, that's fine. I'm pointing him out to, you know, a portion of the exhibit that you gave him to look at where it says, quote, paint samples were taken by our subcontractor CES on March 22, 2000.

So to the extent that I, you know, refreshed Mr. Rangwalla's understanding by pointing to a specific provision of the letter that you provided him as an exhibit, guilty.

BY MR. COLT:

Q Does that refresh your recollection about when you informed the Navy?

MR. FRANCIS: Of what?

BY MR. COLT:

Q That you had found lead paint.

MR. FRANCIS: Found. Jim, can you explain

Q That letter in front of you, which has been marked Defendant's Exhibit 4, says that you informed the Navy of the test results on April 26th, I believe. Could you read the date that it says?

MR. FRANCIS: Read the whole sentence, Abdul.

A Yeah, the Paragraph 11 on page 4493, it says, positive results were obtained on April 25th, 2000 indicating that the paint on the window frame is considered hazardous by RCRA standards for lead and must be disposed as a hazardous waste. The Navy was advised about this matter on April 26, 2000.

BY MR. COLT:

Q Had Maropakis informed the Navy of these results prior to April 26, 2000?

MR. FRANCIS: Of the testing results?

BY MR. COLT:

Q Of the testing results.

A Would you please repeat the question?

Q Prior to April 26th, 2000 had the Navy informed -- had Maropakis informed the Navy that it had confirmed that there was lead paint that was a hazardous material prior to that date?

MR. FRANCIS: Under RCRA?

A You can always -- I cannot confirm anything

the test results into the record, Mr. Colt, so it's plain what the results were, or do you want to put a copy of the letter from CES which explains the results into the record?

MR. COLT: If Mr. Rangwalla recalls, that's adequate enough.

MR. FRANCIS: The specific parts per --

MR. COLT: I don't believe we need that information at this stage right now.

MR. FRANCIS: Then what exactly are you asking for?

BY MR. COLT:

Q Did the lab results indicate the presence of lead paint that had to be dealt with as a hazardous material?

A We have a copy of the testing laboratory and from the contractor. If you want, I can read it. And if you want to keep that as document for the records, I can do that. I don't recall anything right now, but I can read the letter. We have a copy of that letter. I can read it and I can provide that as a document.

Q Did Maropakis conclude it was going to have to dispose of the old windowpanes as hazardous material?

A Knowing the results from the subcontractor where the lab confirmed that the window components and

frames consist of lead, then, yes, you had to remove that hazardous waste.

Q So Maropakis concluded it would have to remove the -- dispose of the windowpanes as hazardous waste?

A If it is hazardous material, of course you have to remove hazardous waste.

MR. FRANCIS: Under RCRA.

BY MR. COLT:

Q When did it conclude -- inform the Navy of this conclusion?

MR. FRANCIS: Hold up.

A Again, that's a very ambiguous question. If you have any documents, please show it to me so I can recollect the date.

MR. FRANCIS: Hold on.

MR. COLT: Counsel, if you feel that I'm in any way misleading the witness or creating an ambiguity that isn't there, you'll have a chance to ask your questions after I am done.

MR. FRANCIS: I also have the opportunity to pose objections as to the form of the question during the deposition, as we stipulated, and I am right now considering based upon my review of the mountains of documents that we have whether or not your question is

vague, ambiguous or misleading.

In particular, what my concern is is this, if it's tested positive for lead paint at a certain level, which I believe to be parts per million, then the RCRA, which is a federal statute, the Resource Conservation and Recovery Act, has specific requirements with respect to how that has to be disposed of.

So it's not so much a question of the conclusions that Maropakis reached, it's a question of what the test results were and what the federal statute requires, unless you're suggesting that Maropakis was free to ignore federal statutes regarding disposal of hazardous materials.

MR. COLT: All I'm trying to ascertain is the conclusions that Maropakis drew. I am not trying to prove any point with regard to the accuracy of those determinations at this point. I'm just asking what conclusions Maropakis drew based -- I would presume they based it on some sort of testing or information they received.

MR. FRANCIS: Which was documents that were provided to you in discovery and you have those documents, right?

MR. COLT: I am trying to ascertain what Maropakis knew.

MR. FRANCIS: Do you understand what he's asking you? He's asking you what date did you tell them about the RCRA?

A Right. Do you have any documents?

BY MR. COLT:

Q I have Defendant's Exhibit 4. And do you know when you got those results?

A Do you have a document? Can you show it to me, please, so I can look at it and tell you.

Q I'll offer you Defendant's Exhibit 4 if you wish to see it.

MR. FRANCIS: Can I ask you why, Mr. Colt, you're not simply putting in a copy of the April 26, 2000 letter from Abdul to Rosenberry that attached copies of the results indicating the presence of lead --

MR. COLT: Because --

MR. FRANCIS: -- which is something that we provided for you in discovery which is pretty plain as far as the date is concerned.

MR. COLT: Because that is not the strategy I've chosen to pursue to get information on this deposition.

MR. FRANCIS: So you'd rather get misleading information rather than getting information that is reliable based upon the documents, is that

correct?

MR. COLT: If anything I've said is misleading, you'll have an opportunity to question Maropakis' representative afterwards.

MR. FRANCIS: That's true. However, I also have the ability to object to the form of the question if I think that you're intentionally attempting to mislead or confuse a witness.

We both know that there are documents with specific dates that have specific information and that -- you know, asking somebody to remember things without refreshing their recollection, without putting the documents in front of them can create an ambiguous record with respect to the dates and sequence of events.

And to the extent that you're attempting to do that, and it appears to me that that's what you are attempting to do, that must be your strategy, I'm going to object to the form of those questions.

And to the extent that I think that you're intentionally attempting to create a misleading record, I'll direct him not to answer. And if you have a problem with that, we can get the judge on the phone, but it seems to me that we're wasting a tremendous amount of time trying to confirm or address information that's in the documents.

BY MR. COLT:

Q Did the Navy eventually tell Maropakis to dispose of the old windowpanes as hazardous waste?

A Do you have any document regarding this to show it to me?

Q How did Maropakis dispose of the windows, the old windows?

A There was an order from the Navy. The Navy must have written to us.

Q How did Maropakis dispose of the windows? You're Maropakis' 30(b)(6) deponent. How did Maropakis dispose of the old windowpanes? Did it dispose of them as hazardous waste?

MR. FRANCIS: Again, just for purposes of the record, there is an amendment to the contract that's executed by Mr. Nihoff which specifically directs Maropakis on how to remove the lead contaminated material and it's -- you know, it's a document that I'm looking at right now and -- I'll certainly make a copy of it for you if you want to see it. It was produced to you in the course of discovery and you should have it since it's your document.

BY MR. COLT:

Q Mr. Rangwalla, you recall this amendment increased the pay by the Navy to Maropakis by over $6,000,

is that true?

A That is true.

Q And the Navy gave Maropakis 14 more days on the contract which Maropakis said it regarded as inadequate, is that true?

A That's true.

Q I'm going to refer you to pages 393 -- Bates Numbers 393 through 406 of the government's document production and that will be marked as Defendant's Exhibit 5.

(Packet of documents produced and marked as Defendant's Exhibit No. 5.)

MR. COLT: Please note that Mr. Francis took the documents and is looking at them.

MR. FRANCIS: Please let the record reflect that unlike the depositions where I gave Mr. Colt copies of the exhibits to look at, he does not have copies for me and so that therefore as part of my job I'm looking at the documents to make sure that there's nothing objectionable before the witness looks at them. And once again, I'd request that copies of these documents be provided to me following the deposition so I can keep accurate records.

MR. COLT: That shall be done. Off the record.

(Discussion held off the record.)

Q In fact, there's a page in there where you signed and you made a notation. Could you read that notation, please.

A Accepting the amount $6,154 but not the extended time from January 16 to January 30, 2000.

Q How much did you claim originally should have been given in additional time because of the lead issue?

A Again, I don't recollect, but you must have a document -- my document indicating how many days we requested. Would you please show it to me, that document.

Q May I see that, please, Defendant's Exhibit 5.

A (Handing.)

Q On page Bates Number 393 of Defendant's Exhibit 5, a memo to the contract file states that Maropakis demanded a 360 day time extension rather than a 14 day, is that correct?

A I have to see the document to make sure.

Q Well, here, and please also look at the next page Bates numbered 394. I believe you made a notation at the bottom. Was that you, Mr. Rangwalla, or was that somebody else from Maropakis?

A No, this is from Abdul Rangwalla.

Q And what do you say the time extension should be -- what does Maropakis say the time extension --

A With exception of extended time. Time should be extended from January 16, 2000 to January 16, 2001.

Q So that's a year time extension, is that correct?

A At that time, yes.

Q So originally Maropakis claimed that it should have gotten an extra year because of the lead issue, is that correct?

MR. FRANCIS: Just because of the lead?

A Just because of the lead.

BY MR. COLT:

Q Is that correct?

MR. FRANCIS: Is that what you're asking?

BY MR. COLT:

Q Is it correct that Maropakis originally claimed an extension of a year because of the lead?

MR. FRANCIS: Just so we're clear, as opposed to the other issues, just lead?

BY MR. COLT:

Q Just lead. Is that correct, Mr. Rangwalla?

MR. FRANCIS: Just so we're clear, the documents you gave him explain the number of days that

he's requesting because of lead at Bates stamp 406. So, I mean, again, I'd object to the form of the question because it's going to be misleading on the record. If you want to ask him about the calculations on page 406, you certainly can do that.

MR. COLT: Fair enough.

BY MR. COLT:

Q Mr. Rangwalla, how did Maropakis calculate the delay it claims it should have gotten?

MR. FRANCIS: For the lead paint?

BY MR. COLT:

Q For the lead paint on this modification P00001. If Maropakis had had its way, how many days of -- additional days would it have gotten?

A (Pause.)

Q Sir, how many days? You made several notations and I believe those should refresh your recollection. How many days for this modification did Maropakis claim?

A There's a letter written by -- and signed by Abdul Rangwalla dated July 10, 2000 to Mr. James Nihoff and that letter clearly explains step by step and made the conclusion at that time that the total number of days for the lead removal item is altogether 122 calendar days.

Q For the lead issue?

A Right, correct.

Q So any other -- the mention of the year extension involved other issues as well?

A That's true.

Q So for the lead you were at that time only claiming 122 days?

A 122.

Q That's correct?

A Yes.

Q So Maropakis eventually disposed of the old windowpanes as hazardous waste, is that correct?

A It's not correct in the sense that Maropakis did not dispose. We just removed, you know, the framing of the windows and an associate part of the windows is a -- contained lead.

Q And then those were disposed of as hazardous waste?

A The hazardous waste disposal was done by the government.

Q Now, Maropakis at one point wanted to proceed with the roof work before the windows had been done, wasn't that correct?

A Correct.

Q And could you describe the layout of this building? In other words, on a traditionally shaped

building the windows are on the wall and the roof is above the wall, isn't that correct, in most buildings that people think of?

MR. FRANCIS: I'm sorry, could you say that again? I'm sorry.

BY MR. COLT:

Q Was this a -- let me rephrase that. I'm sorry, that's a bit awkward. In this building isn't it true that the windows where the work was going to be done were above the part of the roof where -- that was also going to be worked upon -- worked on, isn't that correct?

MR. FRANCIS: You're talking about all of the roof?

BY MR. COLT:

Q Parts of the roof that were going to be worked on under the contract, the windows were above that, correct? In other words, somebody doing work on the windows would get there by being on top of the roof, isn't that correct?

A There are two roofs, one is a main roof and one is a monitors.

Q The roof of the monitors -- the monitors, just to clarify, being a small part of the building with a wall and it's own mini roof and windows on the side that's above the main roof, is that correct?

A An extension of the building.

MR. FRANCIS: Just object to your characterization as a mini roof. The square footage of the roofs can be calculated from the contract documents which I see that both of us have. I'm looking at yours right now.

BY MR. COLT:

Q I'm just trying to ascertain, Mr. Rangwalla, the layout of the building. So the windows that were being worked on were above a part of the roof that was being worked on, is that correct?

A Windows were supposed to be installed on the monitors.

Q And the monitors were -- a person would access the monitors by going over the main roof, is that correct -- by going on the main roof, isn't that correct?

A To reach to the monitors you have to go to the main roof, yes.

Q And there was a sequence of construction, wasn't there, on this project in the specs, is that true?

A Yes.

Q So there was a construction sequence that was --

A Yes.

MR. FRANCIS: Objection to the form of the

question. It's been asked and answered.

BY MR. COLT:

Q I'm going to refer you to a portion of the specs, Section 01110, in the document production provided by Plaintiff. It is Bates Numbers M0212 through M0219. I'm going to refer you, Mr. Rangwalla, to paragraph -- this will be marked as --

MR. FRANCIS: It is marked.

MR. COLT: It is marked already?

MR. FRANCIS: This is Number 1, Defense Exhibit 1.

MR. COLT: I believe, Counsel, that it's -- there was Plaintiff's Exhibit 2, but that's a different section. That's section --

MR. FRANCIS: Defendant's Exhibit 1, your exhibit.

MR. COLT: I stand corrected. It's already been marked Defendant's Exhibit 1.

BY MR. COLT:

Q You're familiar with the specs, are you not --

A Yes.

Q -- in the contract? And I'd refer you to Paragraph 1.5 of that.

A 1.5.

Q Take your time to read it, if you need, Paragraph 1.5. Let me know when you're done.
A I finished reading Paragraph 1.5 indicated in the specification Section 01110, page 3.
Q What is the title of that section?
A Construction sequence.
Q And doesn't it require that the window work be completed before the roof work?
A It does.
Q And you understood this requirement, didn't you?
A Yes.
Q In fact, I'm going to refer you to Defendant's Exhibit 6.
(Letter dated 8/20/01 produced and marked as Defendant's Exhibit No. 6.)
BY MR. COLT:
Q This is a letter from Maropakis which you wrote, at least it has your name, and it's dated August 20th, 2001. Have you seen this before? It's in the Plaintiff's document production. It's Bates Number M0001 through M0004. Do you recall writing this letter or do you recognize it?
MR. FRANCIS: Objection, asked and answered. You can answer it again.

BY MR. COLT:

Q It has your signature, doesn't it?

A Yes. And I wrote this letter, yes.

Q And, in fact, in Paragraph 2, could you read that, please?

A The contract requires that the window work must be performed prior to the roofing work.

Q Thank you very much. So this was a contract requirement and Maropakis acknowledged that this was a contract requirement of the specs, is that true?

A Yes.

Q Did Maropakis feel that the Navy had an obligation to allow it to proceed with roof work when the windows were incomplete?

A This is a request, not that Navy should allow it or not.

Q But you made the request?

A We made the request to avoid further delays.

Q And the Navy --

A Rejected it.

Q -- insisted that you hold to the contract sequence?

A True, that's true.

Q Mr. Rangwalla -- and we're just about done.

Mr. Rangwalla, prior to the contract award, the Navy issued preaward amendment number 0002, isn't that correct?

A Can I look at it, please?

MR. COLT: This will be marked Defendant's Exhibit 7.

(Five-page document produced and marked as Defendant's Exhibit No. 7.)

A Yeah, I saw this.

BY MR. COLT:

Q And page 1 of Defendant's Exhibit 7 is an acknowledgement by Maropakis that it received this modification, isn't that true? It's got Stylianos Maropakis on it?

A Yes.

Q And who is Stylianos Maropakis?

A President of the company.

Q So Maropakis was aware of this amendment, was it not?

A I believe so.

Q Now, if I may refer you to page 5 of Defendant's Exhibit 7, can you just read Paragraph N of the changes made.

A Delete the use of hot asphalt as an adhesive for roof insulation or wood fiberboard. Use polyurethane foam as an adhesive as specified in Section

07220, Paragraph 2.3.3.

Q So did you understand this modification which Maropakis signed to mean that asphalt was not to be used, that polyurethane foam was to be used as a roof adhesive?

A Yes.

Q Was there ever any modification where the Navy said it's okay to use asphalt?

MR. FRANCIS: When you say modification, you mean an executed modification in accordance with the contract?

BY MR. COLT:

Q Was there a formal executed modification in which the Navy told Maropakis that it was okay to use asphalt?

A No.

Q Was there a point where Maropakis tried to use asphalt after that on the roof?

MR. FRANCIS: When you say tried to use it, could you be more specific about what you mean? Did they make a submittal, is that what you're asking?

BY MR. COLT:

Q Did Maropakis claim that it should have been allowed to use asphalt on the roof?

MR. FRANCIS: Object to the form of the

question. At what point in time?

BY MR. COLT:

Q After this amendment.

MR. FRANCIS: At any point after this amendment?

BY MR. COLT:

Q After this amendment did Maropakis believe that the Navy had approved the use of asphalt on the project, that it was okay to use asphalt on the project?

MR. FRANCIS: By Navy you mean the Navy or its consultant?

MR. COLT: I mean the Navy.

MR. FRANCIS: Just so we're clear, are you saying that the consultant didn't have the ability to bind the Navy?

BY MR. COLT:

Q I'm asking if Maropakis was given permission to use asphalt after this amendment by whomever it felt had the authority to do that.

MR. FRANCIS: Just so we're clear, are you asking whether or not the professional approved the utilization of asphalt on the roof?

BY MR. COLT:

Q Did Maropakis feel that it was given permission to use asphalt on the project after this

amendment?

A Again, would you please clarify this question in the sense that the Navy or professional people, the people who were working for the Navy?

Q By anybody. Did Maropakis feel it was given permission by anybody to use asphalt? Did Maropakis feel that it had permission to use asphalt?

A Yes.

Q Why did it feel it had permission to use asphalt after this amendment?

A We submitted the roofing system indicating that we are going to use asphalt on the system and we submitted this document to the consultant.

Q The consultant being whom?

A Gale Associates.

Q It was submitted directly to Gale Associates?

A It was submitted through Mr. Rosenberry.

Q So you gave it to Mr. Rosenberry --

A (Witness nods head affirmatively.)

Q Just to clarify, Maropakis submitted something to Mr. Rosenberry?

A As I recollect, all of our submissions used to go through Mr. Rosenberry.

Q Did Mr. Rosenberry tell you that you could

use asphalt or tell anybody at Maropakis that they could use asphalt?

MR. FRANCIS: Can we clarify what you mean by that? Do you mean did he orally tell them, did he provide a copy of the approval? What do you --

BY MR. COLT:

Q Through any means.

MR. FRANCIS: So in other words, did Maropakis -- did Rosenberry forward the approval to Maropakis?

BY MR. COLT:

Q Did Mr. Rosenberry inform Maropakis through any means that it was -- that the contract was amended again to allow asphalt on the roof?

A The answer is no.

Q Did Maropakis feel that there was a sort of implicit permission on his part by anything he did?

A Would you --

Q An implicit permission to use asphalt.

A Special permission, is that what you're talking about?

Q Did Maropakis feel that Mr. Rosenberry or the Navy had given implicit permission to use asphalt?

MR. FRANCIS: Do you understand what that means, implicit?

A No, what is implicit permission?

BY MR. COLT:

Q Did you feel you had -- did Maropakis feel it had permission to use asphalt on the roof?

A From whom?

Q From anybody with the authority to give it.

MR. FRANCIS: I mean --

A Professional people, Navy, government?

BY MR. COLT:

Q Did Maropakis develop the impression that it had the ability to use asphalt on the roof despite this modification that we've acknowledged that Maropakis saw? After that point did Maropakis develop -- come to believe that it had permission to use asphalt on the roof?

MR. FRANCIS: Just to clarify, are you asking him whether he received the approved submittal from somebody --

MR. COLT: No, I'm asking --

MR. FRANCIS: -- in addition to that?

MR. COLT: -- if Maropakis received any -- received permission from the Navy.

MR. FRANCIS: Other than the submittal?

A Other than submittals.

BY MR. COLT:

Q So you believe that the submittal

constituted -- that you submitted to Mr. Rosenberry and you've said Mr. Rosenberry never gave you permission to use asphalt, but you feel that you still had permission to use asphalt?

MR. FRANCIS: I'm going to object to that question because I think you mischaracterized what he said.

BY MR. COLT:

Q If I've mischaracterized what you said, please explain.

MR. FRANCIS: Explain what?

A The procedure is to submit the submission to Mr. Rosenberry and Mr. Rosenberry, through him, submitted them to the consultant.

BY MR. COLT:

Q And did Mr. Rosenberry tell you it was okay to use asphalt?

MR. FRANCIS: Can you be more specific about what you mean by tell?

BY MR. COLT:

Q Through any means.

MR. FRANCIS: Well, first of all, is Mr. Rosenberry responsible for reviewing submittals of materials for approval? I mean, I think that's a predicate question.

BY MR. COLT:

Q You testified that this came through Mr. Rosenberry.

MR. FRANCIS: Correct.

BY MR. COLT:

Q Did you, Mr. Rangwalla?

A We submitted -- the procedure was to submit all the submittals to Mr. Rosenberry and then Mr. Rosenberry would submit that to the consultant.

Q And did Mr. Rosenberry -- so this all came through Mr. Rosenberry?

A No, it -- what I'm saying is the procedure is to submit any submissions through Mr. Rosenberry. So we submitted this to Mr. Rosenberry and his job at that time was to submit all the submittals, including this, to the consultant for his approval or disapproval.

Q And did Mr. Rosenberry ever tell you that asphalt could be used on the roof?

MR. FRANCIS: Again, object to the form of the question. When you say tell, it's not plain what you're asking. I mean, there's a procedure in the contract for review and approval of submittals. Maropakis submitted asphalt to Rosenberry and Rosenberry sent it to Gale. Gale approved it and wrote on there the asphalt is required. That was sent to Rosenberry and Rosenberry

returned it to Maropakis.

A Right.

MR. FRANCIS: Are you asking for something in addition to that?

BY MR. COLT:

Q So was the submittal, was that what you felt gave you permission to use asphalt on the contract?

A Yes.

Q On the roof?

A Yes.

Q Was there anything else?

A No.

Q So just the submittal, you believed that that gave you permission to use asphalt on the project?

A That's true.

Q I'm going to show you what has previously been marked as Plaintiff's Exhibit 7. It is a diary of events from Mr. Rosenberry on the project. I'm going to refer you specifically to the page of Plaintiff's Exhibit 7 marked with Bates Number 4512. Could you please read Paragraph 38. Here's the rest of the document. Take your time and read it and let me know when you've red it.

A I read this paragraph dated 6/29/2000.

Q Could you read it into the record, please.

A It's written by Mr. Rosenberry. Phoned

Abdul and told him that we were returning his invoice because the contract required --

Q I'm sorry, I may have told you to read the wrong paragraph. I'm sorry, I believe I said Paragraph 38. It has a date -- I'm sorry, could you read it aloud into the record, I'm sorry.

A Paragraph 38 dated 6/28/2000. On June 26, 2000 I noticed that contractor had asphalt at the job site to fasten the fiberboard. Amendment 2 requires adhesive. Told contractor to comply with Amendment 2. Contractor told me that he had an approved submittal. Told contractor his quality control certified that the submittal met the contract specifications. However, it neglected to comply with Amendment 2. Told contractor the expansion joints in EIF system is in noncompliance with the specifications.

Q Thank you very much. Do you remember that conversation?

A No.

Q Are you the Abdul referred to in that? Was there another Abdul on the Maropakis --

MR. FRANCIS: In that paragraph?

A In that paragraph Abdul -- it doesn't say.

BY MR. COLT:

Q So you don't remember -- you weren't a

A Yes, I found out that -- starting date of the project, what was the weather, the snow, rain, that's what I submitted dates.

Q So it was just off the computer?

A That's true.

Q Could you please look at these dates of delay that are listed. Could you read off for the record all the dates --

MR. FRANCIS: Objection, no.

BY MR. COLT:

Q -- April 19 --

MR. FRANCIS: It's a written document. It speaks for itself. He doesn't have to read the dates into the record.

BY MR. COLT:

Q Well, let me just --

MR. FRANCIS: I'm going to direct him not to do that.

BY MR. COLT:

Q Well, let me just confirm that. Maropakis claims that the project was delayed from April 22nd, 1999 through October 25th, 1999 and January 10th, 2000 through February 10th, 2000 by the problems with finding a window manufacturer, is that correct? That's identified in prior discovery. I can refresh your recollection if you'd like.

A Please.

Q I'm going to refer you to Maropakis' answers to our first set of interrogatories, Number 2, the paragraph right after answer it lists the dates. Please tell me if those were the dates -- the first interrogatory requested -- I'm sorry, second interrogatory, that's Interrogatory Number 2, please list the specific dates that you claim the project was justifiably delayed due to the asserted delay in finding an appropriate window manufacturer as described in Paragraphs 15 through 39 of your complaint and give the names of any persons with knowledge of this delay.

Now, there are some dates listed on the answer, on Maropakis' answer, and my records indicate that those dates are October -- I'm sorry, April 22nd, 1999 through October 25th, 1999 and January 10th, 2000 through February 10th, 2000. You're looking at Maropakis' written answers. Is that accurate? It's Interrogatory Number 2, sir. I'll read the dates again.

MR. FRANCIS: No, give him an opportunity to read the document, Counsel. He's looking at it.

A Yes.

BY MR. COLT:

Q Now, if I could refer you again to Maropakis' answers to the -- the supplemental answers to

Interrogatory Number 5, which is the list of dates that you have in front of you.

A Okay.

Q All of the dates in 1999 -- could you please look at that list of dates. All of the dates in 1999 that you assert were caused by bad weather -- the project you claim was delayed by bad weather, all of those fall between April 22nd, 1999 and October 25th, 1999, is that not accurate -- is that accurate?

A Yeah, that's true.

Q So they all fall during a period when Maropakis alleges work was not progressing anyway because of the problems with the window manufacturer?

A That's true.

Q I would refer you -- if I may see the -- you keep the list of dates. I would refer you to your answer to Interrogatory Number 3. For the record, Interrogatory Number 3 requested the specific dates of delay that Maropakis was claiming due to the lead paint issue.

And if you would look at your response to Interrogatory Number 3, you're claiming that the project was delayed from March 7th, 2000 through July 21st of 2000, is that not accurate?

A March 7, 2000 through and including June

21st.

Q June 21st, yes. So that's accurate?

A Yes.

Q So the project wasn't proceeding because of the lead paint issue?

A Right.

Q Now, referring you to the list of dates, is it not true that the dates on that list, the supplemental answer to Interrogatory Number 5, the dates March 11th of 2000 through May 24th of 2000 fall during a period when Maropakis is claiming the project was not proceeding because of the lead paint problem?

A Yes.

Q In addition, going back to the window manufacturer issue, you claim, also referring you to response to Interrogatory Number 2, that the project was held up from January 10th, 2000 through February 10th, 2000 by the window manufacturer problem and that the periods of weather -- asserted weather delay, on that list that you see in front of you, from January 10th, 2000 through February 4th of 2000 fall during that period of second delay that you assert was caused by the problem finding a window manufacturer, is that not true?

A True.

Q Isn't it your understanding as a contractor

when you're planning out how to do a project and how long it's going to take you that you need to anticipate a certain degree of adverse weather, is that not true?

A Yeah, that's true.

Q So the mere fact that it's less than ideal on any given day does not mean that you automatically deserve an extension, isn't that correct? You would only claim extensions for weather that was unusually inclement, isn't that true?

A That's true.

Q I'm just about done. Not to skip around, but one issue on the window manufacturer. It was your responsibility as a contractor to find the suppliers, was it not, for this project?

A That's not true.

Q Okay, whose responsibility was it?

A The contractor -- we did try, like we said before, to find a manufacturer, but when you fail to find the right manufacturer, then the Navy has a responsibility also to tell us or direct us who are the manufacturers.

Q To give assistance?

A Yes, to help us.

Q And the Navy did give you --

MR. FRANCIS: Objection, the question has been asked and answered.

BY MR. COLT:

Q The Navy did give you a list of manufacturers and one of them did turn out to be capable of manufacturing the windows, did they not? It was after you claim the project had been delayed, but eventually they did, isn't that true?

A Yeah, eventually, you know, we found a contractor that manufactured the windows, yes.

MR. FRANCIS: Just so it's plain on the record, Maropakis is not conceding for purposes of this litigation that the specifications that were included in the contract documents could in fact be satisfied by any contractor given the provisions of the codes that were incorporated therein and the designations provided on the windows.

BY MR. COLT:

Q Other than providing its best assistance, do you feel it was the -- in finding a window supplier, did you feel that the Navy had a responsibility to find suppliers for you?

MR. FRANCIS: Are we assuming that the specifications were adequate? Does that question assume that, or are you saying that regardless of the accuracy and the legitimacy of the specifications it was still Maropakis' responsibility to find somebody?

MR. COLT: I'm actually asking Mr. Rangwalla if it was Maropakis' responsibility or the Navy's to find suppliers for the project.

MR. FRANCIS: Object to the form of the question and I'm going to direct him not to answer because it is Maropakis' position in this case that the specifications that were provided in the contract documents contain designations for windows that don't exist and that therefore you could not provide -- Maropakis could not provide a supplier that met that.

MR. COLT: So you're instructing him not to answer?

MR. FRANCIS: Because your question is confusing and it assumes facts not in evidence. It seems to me that before you can ask him whether it was his duty to provide a manufacturer that met the requirements of the specifications, you have to demonstrate that the specification was capable of being met by somebody. And the mere fact that the Navy accepted Sussman doesn't mean that the specifications weren't defective. It doesn't mean that the Navy didn't violate its obligations under the Sparin doctrine and so I think your question is confusing and misleading.

If you're asking regardless of the -- you know, regardless of the nature of the specifications and

whether in fact there were erroneous and identified windows that don't exist and contain requirements that are beyond those specified in the documents that were incorporated into the contract --

MR. COLT: I'm asking --

MR. FRANCIS: -- then he can answer that.

MR. COLT: -- in general, even apart -- even not just confined to the windows, suppliers in general.

MR. FRANCIS: In general, even if the specification identifies windows that don't exist, is that your question? Direct him not to answer.

MR. COLT: I don't have any other questions at this time. Thank you.

MR. FRANCIS: I have no questions either.

(The deposition was concluded at 11:46 a.m.)

# 47

V I R G I N I A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------X

M. MAROPAKIS CARPENTRY, INC., :

Plaintiff, :

VERSUS, : 03-2825C

THE UNITED STATES OF AMERICA, :

Defendant. :

-----------------------------X

Fairfax, Virginia

Friday, May 6, 2005

Deposition of

**GARY W. BROWN, P.E.,**

a witness, called for examination by counsel for the plaintiff, pursuant to notice and agreement, in the offices of Gale and Associates, Inc., 11781 Lee Jackson Highway, Fairfax, Virginia 22033, beginning at approximately 1:05 o'clock p.m., before LeShawne M. Thompson, a Verbatim Court Reporter and a Notary Public in and for the Commonwealth of Virginia at large, when there were present on behalf of the respective parties:

LT05-068

APPEARANCES:

On behalf of the plaintiff, MAROPAKIS:

DAVID W. FRANCIS, ESQUIRE
Rhoads and Sinon, LLP
One South Market Square
Twelfth Floor
P.O. Box 1146
Harrisburg, PA 17108-1146

On behalf of the UNITED STATES OF AMERICA:

JAMES D. COLT, ESQUIRE
United States Department of Justice
1100 L. Street, Northwest
Room 12118
Washington, D.C. 20530

On behalf of GALE and ASSOCIATES and GARY W. BROWN, P.E.

WARREN D. HUTCHISON, ESQUIRE
Donovan Hatem, LLP
World Trade Center East
Two Seaport Lane
Boston, Massachusetts 02210

C O N T E N T S :

| WITNESS | EXAMINATION BY MR. FRANCIS | EXAMINATION BY MR. COLT |
|---|---|---|
| GARY W. BROWN, P.E. | 5, 61, 63 | 54, 62, 64 |

E X H I B I T S


| | PAGE |
|---|---|
| G. Brown Deposition Exhibit No. 1 --copy of American National Standard | 24 |
| G. Brown Deposition Exhibit No. 2 --September 24, 1999 letter cc to G. Brown from Thomas Grasso | 34 |
| G. Brown Deposition Exhibit No. 3 --handwritten notes | 35 |

P R O C E E D I N G S :

(The witness was duly sworn by notary public.)

MR. FRANCIS: Okay. My name is David Francis and I am the attorney that represents M. Maropakis Carpentry, Inc., in the case at issue.

In the room with us at this time is the deponent Gary W. Brown, P.E. from Gale Associates, Inc.; Warren D. Hutchison from Donovan and Hatem, he represents Mr. Gale and/or Mr. Brown; James Colt from the Department of Justice; and myself.

The oath has already been administered, and I just have a couple of preliminary things to talk about. First, we have previously agreed on stipulations with respect to the objections, which for your information is basically that all objections except as to the form of the question are preserved until the time of trial. Is that acceptable to you Mr. Hutchison?

MR. HUTCHISON: Certainly.

MR. FRANCIS: James is that acceptable to you?

MR .COLT: Well, actually I am just mainly observing. Yes, that is acceptable.

MR. FRANCIS: Okay. Okay.

Whereupon,

**GARY W. BROWN, P.E.,**

a witness, was called for examination by counsel for the plaintiff, and having been first duly sworn by the Notary Public, was examined and testified as follows:

**EXAMINATION BY COUNSEL ON BEHALF OF THE PLAINTIFF**

BY MR. FRANCIS:

Q First of all, Mr. Brown, have you ever been deposed before?

A Yes, I have.

Q How many times?

A I think three.

Q Several. Okay.

So you are fairly familiar with the way depositions work?

A Yes.

Q A couple of things. First, the purpose of the deposition is for me to ask questions and for you to provide answers and for the court reporter to get it all down. So, with that in mind, just a couple of basic rules. The first is, make sure that you understand what I am asking you, because if you do not understand my question and the answer could be confusing and it won't

be helpful to anybody. So if you do not understand what I am asking please let me know. Okay?

A Okay.

Q The second thing. It is important that you vocalize your answers. It is very difficult for the court reporters to get uh-huhs and nods of the head. Okay?

A Yes.

Q Okay. The third thing. It is important that only one of us speak at a time. Frequently, in normal conversation people anticipate what the question will be and so forth and that is natural, however, it does not lead to a very good record. Okay?

A Yes.

Q Okay.

Who are you presently employed by?

A Gale Associates Incorporated.

Q And what is your present duty position with Gale?

A I am an associate. I run this Virginia office.

Q And when you say you run the office, what exactly does that mean?

A I have several inspectors and project engineers that do work for me for this office, or for Gale, and I represent Gale in running -- basically managing the office.

Q Let me ask you this. When you say this office, Gale has offices in a number of locations; correct?

A That is correct.

Q And just so I am clear, the duties that you have with respect to running this office, is that a proper term, running it?

A I believe so.

Q Okay. Does that involve design services or construction administration services?

A Design services.

Q So you have individuals who prepare designs under your direction or supervision?

A That is correct.

Q How about construction administration services; are you responsible in any way for construction administration services?

A We perform construction monitoring services and we work on some design/build type aspects of

construction.
Q When you say we, you mean Gale Associates?
A That is correct.
Q I am asking primarily about you though as an employee of Gale. Do you actually provide construction administration type services?
A Yes.
Q And what exactly is it that you do?
A I assist in developing details. I assist in providing full designs for building envelope systems, that is roofs, walls, window, lower grade foundation.
Q Let me ask you -- maybe I should clarify what I am saying. On a project such as the one at issue here, building 110 at what was the NAVICP, there was a design phase involved in that project; are you familiar with that?
A Yes.
Q A period during which the design was prepared?
A Correct.
Q After that, the design at some point was let out for bid by contractors; correct?
A Yes.

Q And then it was constructed by a contractor?

A Yes.

Q So, when I refer to design phase, I am talking about the design of the project. If I talk about the construction administration phase I am talking about services that would be provided during the construction of the project; is that your understanding?

A We provide a design for that particular project and other projects.

Q I am not asking about that. I am asking about what you do, whether you provide any construction administration services during a construction of a project, such as reviewing RFIs, answering contractors questions, reviewing submittals, things like that.

A I got a little confused.

Q Okay.

A You jumped from design into construction administration. What -- you want to talk about design first?

Q No, I want to talk about construction administration. I understand you do design. I want to talk about construction administration. Okay?

A Yes.
Q Okay. And do you understand what I mean by construction administration, which would be the services that a professional might perform during the construction of a project?
A Yes.
Q And what is your understanding of what those would be?
A Review submittals, review shop drawings, inspect the work that is being installed.
Q Good. That is my understanding too.
And do you perform any of those services as an employee of Gale at this time?
A Yes, I do.
Q And which ones do you perform?
A All of the above.
Q How long have you been employed by Gale?
A I believe it has been about five years. I had a two or three year stint several years ago that I left for a couple of years and now I have been back here for about three years, two and a half to three years.
Q Are you familiar with the building 110 project that is in dispute in this case?

A Yes, I am.

Q And how is it you are familiar with that?

A I was the designer of record. I signed the drawings. I reviewed all the work that was performed to get to the design.

Q And at that time, the time that you were the designer of record for this project, did you work out of this Fairfax office or did you work out of the Baltimore office?

A The Baltimore office.

Q And let's just talk about at that time. At that time when you were the, quote, unquote, designer of record, did you provide any construction administrative services?

A In general you mean?

Q Yes.

A Yes.

Q Like what?

A Inspection, submittal review, same types of services.

MR. HUTCHISON: I think we have to clarify, because he asked in general. So are you talking about this project?

MR. FRANCIS: No, just in general.
MR. HUTCHISON: Okay.
MR. FRANCIS: We are going to get more into specifics in a moment.
BY MR. FRANCIS:
Q At that time, at the time that you were the designer of record -- well, actually, let me step back.
Did that title change at all between the design phase and construction phase of this project; your title?
A I do not recall. I do not think so.
Q At that time, at the time that you were the designer of record, who did you report to?
A Ed Madden.
Q And how do you spell his name?
A M-a-d-d-e-n.
Q And is he a architect?
A No, he is not.
Q Is he a professional engineer?
A No, he is not.
Q Does he have a degree in engineering?
A I do not know.

Q Don't know.
What does Mr. Ed Madden do?
A He runs the office in Baltimore. He is the overall -- he is the vice president of the firm.
Q Okay. He didn't review your design work, did he?
A No, sir.
Q Was there anyone from Gale who at that time that you were the designer of record for this project, is there anyone that reviewed your design work at that time?
A I do not recall. I mean I had the final say. I am a professional engineer and I have the final say on drawings. It may or may not have been reviewed by another P.E. out of the Baltimore office.
Q Okay.
Now, did you have subordinates who were assisting you with the design during this project?
A Yes.
Q Who were they?
A Tom Grasso was the primary person.
Q Actually, let me step back for a question. Are you a P.E., a registered professional --

A Yes, sir.

Q And where are you a P.E. at?

A Maryland, Virginia, Pennsylvania, D.C., South Carolina, Florida.

Q Okay. And I assume you are a civil engineer in terms of the degree you have from college?

A I have a Bachelor of Science in Civil Engineering; that is correct.

Q Is Mr. Grasso a P.E.?

A No, sir.

Q Is he still employed by Gale?

A Yes, he is.

Q Do you know where he works out of, which office?

A Waymouth, Mass. office.

Q Which one?

A The Waymouth, Massachusetts office.

Q Which office did he work out of during the design and construction of the project; do you know?

A Baltimore.

Q Does he ever spend any time there out in the Baltimore office?

A Not anymore. He was in Baltimore and he

has moved back to his family in Massachusetts?

Q How about you, do you ever spend any time at the Baltimore office?

A Once every two or three weeks.

Q Other than Mr. Grasso, anyone else working for you and doing the design work? Or working for you during the design phase, I guess is what I should say.

A We had several consultants working on the project and we also had other people -- other engineers out of the other Waymouth office and at least one other guy out of the Baltimore office. The Baltimore fellow is Steve Bohlen.

Q Could you spell the last name?

A B-o-h-l-e-n. He had a limited role. Elizabeth Lewis, a structural engineer who worked out of the Boston office. She worked on the project.

Q Is it L-e-w-i-s?

A Yes, it is.

Q Anyone else?

A There was probably a field person doing test cuts, but I do not recall.

Q What was the scope of work that Mr. Grasso had with respect to the design phase?

A He would have been -- he would have gotten all the information from the client, that is roof plans, existing conditions. He would have done the field work necessary to provide a design that is measuring the system. He would have developed the preliminary specifications and drawings.

Q Go ahead.

A I am sorry.

I believe he would have written the report, he would have written the original report for my final review.

Q Which report is that?

A We do a design development report for all projects.

Q I guess I should have asked you this, does Mr. Grasso have a degree in engineering, do you know?

A I believe not, but I am not sure.

Q Does he have a college degree?

A I do not know that either.

Q What was your scope of work with respect to the design of this project, other than sealing and signing it?

A I did some of the field work and so I

actually visited the site and saw some of the requirements that were for the site. I met with the client and discussed what they wanted to see in the project, and then I administered the engineers and the sub-consultants.

Q Did you actually do any of the design work yourself?

A I probably did. I generally do at least some, whether it is a couple of details here and there or whether it is developing some specifications sections.

Q Would you have reviewed all of the design drawings for the project?

A Yes.

Q How about the specifications?

A Yes.

Q It is my understanding that the specifications for this project came from the Department of Navy as a I think it is called master spec, are you familiar with that?

A I do not think this is master spec. I think this is another form that they have for master spec. It may be master spec but they have their own Navy form. Specs intact.

Q Specs -- yes, you are right. That is what it is called. Yes. I stand corrected.
Prior to this project, have you ever worked with the specs intact before?
A Yes.
Q How many times?
A I would have to say several, but I cannot remember exact specific location.
Q Were all of those for the Department of the Navy or were they for other agencies as well or other owners as well?
A It would only be Navy type work.
Q Do you know whether other agencies use specs intact?
A I do not know that.
Q The scope of work for this project included among other things the removal and replacement of monitor windows; is that your understanding?
A Yes.
Q What was your involvement in the design and/or specifications for that work?
A Identify the appropriate window for reinstallations and design with that particular window

system.

Q How about with respect to the specifications and the identification of the criteria therein? Did you have responsibilities with respect to that?

A I do not understand the question.

Q Well, let me give -- let me use an exhibit.

Let me hand you what was previously marked as Plaintiff's Exhibit Number 2. This is a copy of the specification section 08520; have you ever seen this document before?

A Yes.

Q And when did you see it?

A I saw it as an unedited version, that would be in specs intact, and then I saw it during the process of writing the spec and then I have seen this specific specification as it was completed.

Q For this project?

A Yes, sir.

Q Were any changes made to this specification section during the design phase?

A Changes compared from at what point to

what point?

Q Well from - let me -- good question.

I assume you received the specs intact from somewhere?

A Yes, we do.

Q Where did you receive it from?

A I am not sure if the Navy just gives you a CD, but in some way or manner we got the unedited version of the spec.

Q Did you at some point -- strike that.

Did Gale at some point during the design phase of the project modify specification section 08520?

A Yes.

Q What did you modify about it?

A Probably quite a bit. I mean the original specification has a lot of choices that you can make and you delete the choices that you do not need and you include choices that you do need.

Q Did you add or subtract any design -- strike that.

Do you know whether this document contains design criteria for the windows?

A Yes, it does.

Q And what would you classify as design criteria, in general terms?

A Generally it would tell you the performance criteria of certain elements.

Q So for example, issues might be the water resistance test pressure, might a design -- performance criteria; correct?

A That is correct.

Q Let's go back to the front page of this specification. It refers to certain documents that are part of the specification under paragraph 1.1 references, and one of the ones that is listed there is the ANSI/AAMA 101; are you familiar with that document?

A Yes.

Q Have you ever read it?

A Yes.

Q The 1993 version?

A I read it frequently, so I am sure the 1993 would have been read.

Q And was it your understanding that the windows that were designated for this window complied with the requirement of the AAMA 101?

A They were at least as stringent as the

requirements of AAMA 101; yes.

Q I am not sure I understand that answer. At least as stringent. What do you mean by that?

A AAMA sets aside standards that they are looking to get as minimum standards.

Q And your specifications were -- you are saying were -- what were they in relation to the AAMA?

A There were some criteria that were equal to, some criteria that were greater than, and no criteria that was less than the AAMA standard.

Q Let's go to paragraph 1.2. Strike that. Let me go back to that question.

Do you know whether the criteria that were set forth in specification section 08520 were authorized under AAMA?

A I do not know that AAMA authorizes anything besides their minimum, so I do not have an answer to that?

Q Did you know at the time that this project was let for bid?

A I am sorry?

Q Did you know at the time that this project was let for bid by the contractors?

A Did I know that it was let for bid?

Q Did you know -- you are saying you do not know? Did you know at some point in time whether AAMA set limitations on design factors for windows?

A No, I do not know if there are any maximums.

Q Would you agree with me that that would be an important factor to consider when preparing specifications for construction of a project?

A Minimum standards are absolutely required and then anything greater than that is up to the designer's discretion.

Q Well, let's talk about the certification, paragraph 1.2. Each prime window unit shall bear the AAMA label warranting that the product complies with ANSI/AAMA 101. Do you see that?

A Yes, sir.

Q Do you know whether windows that exceed the minimum -- the maximum requirement set forth in AAMA can be certified in accordance with that provision?

MR. HUTCHISON: Objection.

BY MR. FRANCIS:

Q Do you know?

A You said maximum instead of minimum, I believe.

MR. FRANCIS: Can I have this marked as -- why don't we mark it as Gale 1.

(The document referred to below was marked Gale Deposition Exhibit Number 1 for identification.)

BY MR. FRANCIS:

Q I am going to hand you what has been marked as Gale Exhibit 1 for identification. It is a copy of the AAMA standard, 101-93 and as set forth in the contract documents. Have you ever seen this document before?

A I am sure I have.

Q Can we turn to page 20 -- I am sorry, page 35 of this document, the AAMA 101.

A Yes.

Q And look at the paragraph on the bottom right-hand corner, it says in recognition of this.

A Yes.

Q Go ahead and read it to yourself.

A Okay.

Q Does that paragraph provide that the water resistance test pressure is never tested more than 12

pounds per square foot?

MR. HUTCHISON: Objection. I would note it says required, the required pressure. It does not say that it can never exceed that.

BY MR. FRANCIS:

Q Can you read the sentence into the record, please, Mr. Brown?

A I am sorry. Can you repeat your question?

Q Can you just read that sentence into the record?

A In recognition of this, water resistance is generally determined at a pressure of less than the design pressure. The required water resistance test is commonly conducted at a pressure equal to 15 percent of the design pressure for R C and HC products, 20 percent for AW products, but never less than 2.8 psf, 132 pascals, no more than 12 psf, 575 pascals.

Q Is it your understanding that the sentence that you just read does not provide that you may not test windows with a water test pressure in excess of 12 psf under this AAMA 101?

MR. HUTCHISON: Objection.

THE WITNESS: There are certain -- it

allows for pressure equal to 15 percent of the design pressure. So if you have got excessive design pressures there are times when it will go greater than 15 -- I am sorry, 12 psf.

BY MR. FRANCIS:

Q Let me just see if I understand what you are saying. Are you saying that if you have a window that is designated with a higher design pressure, let's call it 133 ounce per square foot, that that would result in a water resistance test pressure in excess of 12?

A Can you repeat the question? I was reading that again.

Q Is it your testimony that if a window is designated as let's say a PHC 200, that that allows for testing of the water resistance test pressure at more than 12 pounds per square foot?

A No, after rereading that I see that 12 is the max.

Q So, do you believe that you can have an AAMA certified window that exceeds that provision that is tested at greater than 12?

MR. HUTCHISON: Objection.

THE WITNESS: The test gives you a result,

the result being 12 or less to 2.86, and then it would be approved by AAMA. Anything outside of those standards, whether it is less than 2.86 or greater than 12, does not fall within AAMA.

BY MR. FRANCES:

Q Question: Do you know whether the windows that were specified in the contract documents had to be certified as complying with AAMA?

A Yes, it looks like they would have to.

Q Why don't we go to page four of the specifications. Under paragraph 2.1.8, projected windows, there is a designation of PHC40, parens, optional performance class, close parens. Do you see that?

A Yes, I do.

Q Is that a reference to an actual window?

A Yes. Performance class, yes.

Q Well, do you believe that there is in fact under the AAMA PHC40, parens, optional performance class, close parens, window?

A Yes, I believe you can find those types of windows.

Q Well, I gave you -- that is not the

question. The question is under the AAMA.

First of all, do you know what the P stands for in that designation?

A Projected.

Q What does the HC stand for?

A High -- I do not recall.

Q Do you know what the 40 stands for?

A Forty pounds per square foot.

Q And what is it? Effective design pressure?

A Not necessarily. You can put any number designation you want there as a minimum. If you have got 20 pounds you can still ask for HC40 or 60 or other class, but it is as a minimum, yes.

Q A minimum for design pressure?

A Yes.

Q What is the difference between design pressure and water resistance pressure?

A There is really -- there is not necessarily a correlation between the two.

Q Under the AAMA?

A That is correct.

Q How about we go to page 8 of the AAMA.

See where it sets forth the primary performance requirements?

A Yes.

Q Does that identify projected windows?

A Yes.

Q Does it have a PHC40?

A Yes, it does.

Q And the 40, what is the 40 identified as?

A Forty psf.

Q What is that? It is the design pressure; correct?

A Yes.

Q So you agree with me that the designation after PHC40, the 40 is the design pressure for the window?

A Yes.

Q And do you agree with me that the design pressure is the performance class?

A Yes.

Q And if you look at the top where it says water test pressure for R, C and HC windows is 15 percent of the positive design pressure.

A Yes, I see that.

Q So what would be the positive design pressure for a PHC40 window?
A Fifteen percent of the 40.
Q What is that? Do you know?
A Six.
Q And is that indicated in this graph?
A Chart, yes.
Q Chart.
A Yes, it is.
Q Did the specifications for this project require six pounds per square foot water test pressure for the windows -- or water resistance test pressure?
A Greater than six, yes.
Q It required 20.
A So that was greater than six. That is correct.
Q Do you see the designations AW at the top right-hand corner? AW equals 20 percent positive design pressure.
A Yes.
Q Do you know what AW stands for?
A It is a different class window. I do not recall specially. The manufacturers state theirs as HC

or AW. I do not know necessarily the difference between the two.

Q Do you agree with me though that the specifications didn't identify providing AW windows?

A That is correct.

Q Does this chart identify any optional performance class windows?

A No.

Q Turn to page 30 of the AAMA 101?

A Yes, I have done that.

Q Does that identify the optional performance class windows?

A Yes, it does.

Q Is there a PHC40 window?

A No.

Q Is there an HC window 40?

A An HC? I am sorry.

Q HC.

A No, 45 is the minimum HC.

Q Well, let's talk about 45. What is the water resistance test pressure that is identified for a HC45 window?

A 6.75.

Q Are there any other windows that are identified in the optional performance class that exceed 12 psf?

A No.

Q Were you aware -- well, strike that.

Did you discuss the water resistance test pressure specification for this project with anyone from the Department of the Navy during the design phase?

A Not to my recollection.

Q How about internally with employees of Gale?

A Not to my recollection.

Q Did you become aware -- strike that.

Did you discuss the water resistance test pressure with anyone from the Department of the Navy during the construction phase of this project?

A Very likely.

Q Do you know who you would have discussed it with?

A The only person I would have talked to at NAVICP was Lonnie Moyer.

Q And I take it you don't recall any specific conversations?

A No, sir.
Q Did you ever have a conversation wherein you discussed the requirements of the AAMA with respect to water resistance test pressure? Do you know?
A I do not recall.
Q Did you have any conversations with any window manufacturers or suppliers during the design or construction phase with regard to the requirements of the AAMA 101?
A I did not, no.
Q Do you know if anyone from your office did?
A Perhaps Mr. Grasso did.
Q Do you have any information about what he discussed?
A No, sir.
Q Were you aware of any claims made by Maropakis during the construction phase of the project that they could not find a window manufacturer who could meet the specifications?
A I was not aware of that.
Q Do you know whether Gale contacted any window manufacturers in order to determine whether they

could meet the specifications?

A I did not do that, so I do not know.

MR. FRANCIS: Can I have this marked as Gale 2.

(The document referred to below was marked Gale Deposition Exhibit Number 2 for identification.)

MR. COLT: This is Gale 2?

COURT REPORTER: Yes.

BY MR. FRANCIS:

Q Mr. Brown, I have handed you what has been marked as Gale Exhibit Number 2, which is a document that was Bate stamped G as in golf, 001109. Would you take a moment to look at this document?

A Okay.

Q You are on the cc list for this document; correct?

A Yes.

Q Did you receive this document during the construction phase of this project?

A Yes. I imagine -- I mean, I have got that. So I would say it was routed to myself, yes.

Q There is a notation on the right-hand side next to TRACO, I will spell that, that is T-R-A-C-O,

where it says except water infiltration 20 psf, TRACO 12 psf; whose handwriting is that, do you know?

A I do not know.

Q Do you know whether the Department of the Navy asked Gale to research whether manufacturers can meet the specifications set forth in the contract documents?

A Only based on the wording of this letter. I was not -- no one asked me specifically.

MR. FRANCIS: Can I get this marked, please.

(The document referred to below was marked Gale Deposition Exhibit Number 3 for identification.)

MR. COLT: This is Gale Exhibit 3?

COURT REPORTER: Yes.

BY MR. FRANCIS:

Q Mr. Brown, I am handing you what has been marked as Gale Exhibit Number 3 for identification, it is a document that was Bate stamped G as in golf, 001154; do you know whose handwriting this is?

A It looks like Tom Grasso's, but I am not positive.

Q Under TRACO at the bottom, there is a

provision that is in quotes, and I will read it, it says: none projected, provide 20 pounds. AAMA states 10 pounds. AAMA provides 12 pounds, close quotes.

Did you ever have a conversation with Mr. Grasso about that statement?

A No. When the project went into construction phases I did not deal with any of the issues at all. Mr. Grasso took care of all the construction issues.

Q Just so I am clear. So after -- during the construction phase he no longer reported to you?

A There is no clear lines of reporting to me on a project. Basically the project designer would have the direct reporting. After it got into a different phase he reported to somebody else. I am not sure who that would have been.

Q You do not know who Mr. Grasso reported to with respect to this project during the construction phase?

A No, sir. It could have been Mr. Madden or it could have been someone else.

Q But it was not you?

A That is correct.

Q Are you aware of any other registered professional engineers from Gale being involved in this project during the construction phase other than yourself?
A No.
Q How did you prepare for your deposition today?
A I spent probably 30 minutes looking at drawings and specifications.
Q During the design phase, did you have any conversations with any of the window manufacturers regarding whether they could meet the specifications that were going to be incorporated into the contract documents?
A I do not recall any exact communications. Typically we research their manufacturer's data and make decisions on the design at that point.
Q Well, did Gale prepare a budget for the Navy of expected cost of the project? Do you know?
A We typically did for those type of projects. So I would have to say yes.
Q Do you know whether you exchanged any correspondence with Extech regarding the windows that

would be supplied to the project?

A During design phase?

Q Yes.

A Not to my knowledge.

Q Did you have any communications with the Department of the Navy following during the construction phase regarding the utilization of Extech windows?

A I recall conversations with Extech windows. I do not recall any specifics?

Q Do you recall any communications with the Department of the Navy about the Extech windows?

A I am sure since we were deciding whether the windows were adequate or not we would have had those discussions with the owner, yes.

Q Do you recall the substance of those conversations?

A No, sir.

Q Do you know whether Gale ever recommended to the Department of the Navy that they accept the Extech windows?

A It is my understanding that we recommended that they would accept those.

Q Were you at all involved in the review of

the QA submittals that were required by Maropakis in designation of someone as a QA, quality personnel?

A I never saw any of those documents.

Q Were you at all involved in reviewing the claim that had been submitted by Maropakis in this case?

A I had no idea there was even a claim.

Q So, I take it you would not know if Mr. Grasso reviewed it either; is that correct?

A I had no idea this was a claim until just a few weeks ago.

Q Okay. Can I ask you a question? Can you tell me do you know why the specifications included the provision that the contractor include or provide a window that met a water resistance test pressure of 20 pounds per square foot? I guess I got that right. Let me check the spec again on this.

A At the time the specification was written that was a Gale standard for windows, all windows?

Q Twenty?

A Yes, sir.

Q Is it still?

A I do not know.

Q When you say it was a Gale standard, do

you mean it was the only standard that Gale had with respect to windows?

A As a minimum requirement, yes. In the master specifications that our firm has has certain criteria that products have to meet and that was the minimum required.

Q What is the maximum required?

A Depending on conditions it can be anything. I am not sure I understand the question.

Q What is the maximum water resistance test pressure that you are aware of that Gale has ever specified for a window?

A Twenty.

Q So that is the maximum and the minimum? That is the most -- strike that. I understand.

You are saying that that was the minimum standard as well?

A That is correct.

Q And that is the most you ever specified?

A That is correct.

Q Just so I am clear. Is what you did was this, you took specs intact and modified it to confirm with the Gale specifications?

A Frequently we take master specifications and utilize our minimums.

Q Did you have any conversations with anyone at the Department of the Navy about changing the minimum water resistance test pressure to 20?

A No.

Q Do you recall any conversations with anyone at the Department of the Navy with respect to whether that was consistent with with the designation of HC40?

A No.

Q Did Gale do any other projects on this facility, on the Naval facility involving the utilization -- strike that -- involving the removal and replacement of windows?

A I do not know.

Q How about the installation of new windows?

A I do not know.

Q Do you know whether that modification would have been made during the design phase?

A Which modification?

Q Changing the water resistance test pressure to 20 psf?

A I do not think it was ever changed. I do not understand the question.

Q Maybe I misunderstood what you had said. I had thought you had indicated that frequently Gale would take the specs intact and modify those to comply with Gales master specifications; correct?

A Yes.

Q And the 20 pounds per square foot water resistance test pressure was one of those items that was changed to comply with Gale's requirements; is that right?

A Yes, that is correct.

Q Do you know when that happened?

A That must have been in the first submission of the specifications.

Q And would there be any documentation that reflects when that change actually occurred?

A Typically it occurs when the designer takes those specifications and does his editing. He compares it to the masters.

Q Do you know what the '98 specs were?

A I do not even know what you are asking.

Q Well, do you know whether in fact the

Department of the Navy forwarded to you a diskette that contained, or it was entitled, quote, '98 specs, close quote, for use on the project?

A I am sure that must have been master specs.

Q When the modifications were made to the specifications by Gale to reflect the greater water resistance test pressure, were those modifications identified to the Department of the Navy in any way?

A No, we do not trouble them or give them any indication that it has been changed.

Q Any of the provisions?

A No, sir.

Q So for example, the meetings that you have -- strike that.

During the process of the design you would have different types of submissions that you would provide, like 60 percent submission, a hundred percent submission, et cetera; correct?

A That is correct.

Q And those submissions would not identify the changes that you made to the specs intact?

A No, we give them the edited spec and then

they either review it or don't review it to their satisfaction.

Q Which means that you don't identify the changes that you have made?

A No, sir. Those are our changes and --

Q And so there is never discussion about the changes that are made unless the Navy catches them during the design phase?

MR. HUTCHISON: Objection.

BY MR. FRANCIS:

Q Is that what you are saying?

MR. HUTCHISON: Objection.

BY MR. FRANCIS:

Q Can you explain that to me?

A Gale does the design and we have recommendations and specifications that are sometimes greater than the minimums required by the Navy or other agencies, and no, we do not necessarily tell them specifically what those changes are.

Q Are you aware of any professional publications such as the AAMA or the ASDMs which provide -- strike that.

Did Gale rely upon any professional

publications such as the AAMA or the ASDMs when it identified the minimum water resistance test pressure of 20 pounds per square foot? Do you know?

A I do not know where the 20 came from originally.

Q How was it that you know it is the minimum specification required by Gale?

A Because our master specs that we rely on to get the data for specifications.

Q That is what they say, the 20?

A We check 20 versus what the minimum standard requirement is in the industry.

Q That is not my question. My question is how do you know that that is what the Gale minimum standard is?

A When I open up a specification, a master spec, and it says a criteria is a certain number, that is what we are starting from.

Q Who actually went through the specs intact and Gale's master spec and made the changes. Was that you or was that someone under your supervision?

A Someone under my supervision.

Q Who? Do you know?

A For this particular project?
Q Yes.
A Mr. Grasso.
Q Do you have an understanding as to whether windows that are supplied with a water resistance test pressure of 20 psf will be more expensive than those that are specified let's say at six psf?
A I do not know that.
Q Was cost a factor that the Navy was considering in the design and construction of this project; do you know?
A I do not recall if there was an estimated construction cost or not. There typically is.
Q Did you prepare any communications to Lonnie Moyer during the design phase of the project which addressed reductions in the cost of the project?
A Not as I recall.
Q Do you recall any discussions with respect to the reduction of the installation to one inch for the roofing of the project?
A I do not recall any discussions like that.
Q What were the costs that might be realized in doing that?

A I do not recall what the original specification was.

You are reducing to one inch from what?

Q Three.

A No, I do not recall any specific conversations. Although I do know that that would reduce the cost of the job.

Q I am going to show you -- I am not going to have it marked in the record because we have the Bate stamp number. Let me show you a letter that is Bate stamped as G as in golf, 00255, it is a letter to Mr. Moyer regarding the design development submission; do you recall writing that letter to Mr. Moyer?

MR. COLT: Is this an exhibit?

MR. FRANCIS: No, I am referring to it by its Bate stamp number. You have it because it is Bate stamped. I provided it to you.

MR. HUTCHISON: What is the date again on the letter?

MR. FRANCIS: You want everything don't you. It is January 29, 1998, to Lonnie Moyer, subject: 60 percent design development submission. It is Bate stamped at G00255 -- strike that. G00256. The G

indicating that it came from Gale Associates.

BY MR. FRANCIS:

Q First of all, Mr. Brown, I am going to show you the document on my computer screen, is that your signature?

A Yes

Q And do you know whether you wrote this letter to Mr. Moyer on or about January of 1998?

A I am sure if I signed it I wrote that letter.

Q Okay. This letter says, quote, we received a quote from a window manufacturer which includes 100,000K, 100K, rather, for the window operators, and 180K for the projected windows, parens, i.e., a total of 280K, close parens, versus a total of 80 K for fixed windows, i.e. a savings of approximately 200 K if we go with fixed windows. Do you recall that conversation with the manufacturer?

A It has been a long time. No, I do not recall. No.

Q And you do not know who that was?

A Which manufacturer?

Q Yes.

A No, I do not recall.

Q Your letter goes on to say, quote, we feel that all other items included in this design are bare minimum necessities, period, close quote. Is that true about the 20 psf water resistance test pressure as well?

A As I wrote the letter -- I would have to read the whole -- I would have to read it in context because I do not understand.

Q Go ahead read the whole thing. Take your time.

A Okay. Can you repeat the question please?

Q I don't know if I remember it.

Does that reflect your recollection as to communications that you had with Mr. Moyer regarding the cost for the project and in particular the cost of the windows?

A The major items in the project was the roof and that letter was referring mostly to the fact that the roof was at the bare minimum. A large portion of the job was related to the roofing project.

Q Let me ask you this. In addition to the water resistance test pressure, what other design criteria are utilized in designating a window under the

AAMA; do you know?
A Condensation resistance factor.
Q What else?
A Air infiltration, thermal transmission.
Q Anything else?
A Not for the window frame. Some for glazing.
Q Can you tell me which of the specification provisions that are set forth in section 08520 other than the water resistance test pressure that we talked about, that are consistent with the designation of HC40?
A The air infiltration is greater than the minimum requirements by AAMA.
Q So it is different? The air infiltration requirement is higher than the HC40 designated in the contract?
A As specified, the air infiltration is higher than designated by AAMA's minimum standards.
Q Okay.
A The CRF does not have anything to do with this particular AAMA section.
Q What particular AAMA section?
A With 101. I believe it is the

condensation resistance factor.

Q Do you know where the AAMA addresses condensation resistance factor?

A 1502. 1502.

Q What other criteria is utilized in designating windows, as HP and HC40 for example, other than water, air infiltration and CRF?

A The structural test which we are not defining, because that is defined by the HC40.

Q So, just so I am clear, and correct me if I am mistaken, you are saying you did not define the structural because that is defined by HC40 and that the water resistance test pressure and the water infiltration pressure exceed the HC40? Is that right?

A I do not know why we didn't put the structural test pressure in there?

(Discussion held off the record.)

(Brief recess.)

BY MR. FRANCIS:

Q Did you have something to add to that since you have been discussing with your counsel? Did you have something to clarify?

A No, I was just looking for where it said

the structural performance. I did not see it.

Q In what? In the AAMA?

A No, anywhere.

Q Did you find any specifications?

A I did not find it in here. It may be in here.

Q Don't worry about it.

Just a couple of more questions and I will be done.

Changing subjects briefly.

Were you aware of the sequence of construction that were set forth in the contract documents with respect to the when the windows had to be replaced and the roofing done?

A I know there were some discussions on sequencing for internal reasons because of the use of the warehouse and issues related to damaging,e roofing for that type of thing.

Q You mean during installation of windows?

A During installation of the project. I mean generally you don't want to traffic over a new roof for instance.

Q Were you involved in any communications or

discussions with the Navy regarding Maropakis' request to begin removing and replacing roofing prior to installation of the windows?

A I was not aware of any of those issues.

Q Were you all involved in the issue with respect to the lead paint remediation?

A I didn't even know that was an issue at all.

Q Did you review the submittal that was provided by Maropakis for the windows that were actually installed?

A Not to my recollection.

Q Do you know who would have?

A Probably Mr. Grasso, but I do not know.

Q Is he authorized to review and approve submittals?

A I do not know who authorizes one way or the other. I do not know the answer to that.

Q Do you know whether the windows provided by Maropakis through its supplier manufacturer were PHC40 windows?

A I have no idea.

Q Did you have any conversations with anyone

from the Department of the Navy regarding any position on liquidated damages on Maropakis?

A No.

MR. FRANCIS: That is all I have. Thank you.

MR. COLT: Before I go, do you have any questions?

MR. HUTCHISON: No.

**EXAMINATION BY COUNSEL ON BEHALF OF**

**THE DEPARTMENT OF JUSTICE**

BY MR. COLT:

Q Mr. Brown, I just have a few questions if I could.

Returning to this Gale Exhibit 1, the American National Standard, it says on the cover voluntary specifications, do you recall reviewing this document earlier?

A Yes, sir.

Q Could you please turn to the inside, the preface, the small paragraph at the upper left-hand corner. It says, does it not, that this American National Standard establishes minimum requirements for aluminum and poly prime windows and glass doors. It

consists of three sections and an appendix; is that true to your knowledge?

A That is what I understand, yes.

Q Now, in this as we reviewed, these were optional performance class windows; were they not?

A Yes.

Q Of the project.

And could you read -- could you refer -- I would like to refer you to page 30, section 3, optional, and what is the title of that?

A Optional performance classes.

Q Could you refer back to the page you were looking at before in the preface to the document? Could you read what it says about section three? Read it for the record.

A Section three contains optional higher performance classes which make it possible for the specifier to require higher uniform load structural test pressures and higher water resistance test pressures than those contained in section two. Use of products in the higher performance classes is desirable where severe weather conditions or wind loadings are encountered.

Q So, as an engineer, do you take that to

mean as you have said before that this establishes minimums?

MR. FRANCIS: I object to the form of the question.

BY MR. COLT:

Q What is your understanding about the -- do you believe that an optional --

MR. FRANCIS: Well, he can --

BY MR. COLT:

Q -- performance class windows can require greater strengths than were mentioned in section two?

MR. FRANCIS: Objection to the form of the question.

THE WITNESS: Any building codes, any documents provided that are standard are minimums that are required to be met for the products to perform.

BY MR. COLT:

Q I would like also to refer you -- this document has three sections and an appendix; is that true?

A Yes, sir.

Q I would like to refer you on the preface to what it says about the appendix; could you read that

please?

A The appendix, although not a part of this ANSI/AAMA standard, contains much information on materials, construction, installation, wind loads, water resistance, air infiltration, condensation and heat transmission that will be helpful to the specifier in the selection and specification of windows and doors.

Q And you referred to -- at the beginning of this you were asked about page something that says on page 35 with regard to some advice he gives on the water resistance; is that true?

A Yes.

Q Could you please tell me which part of this document at page 35 language about the water resistance S falls in in this document?

A I do not understand the question. Can you repeat it?

Q Well, that was on page 35 of the document; correct?

A Yes.

Q Could you flip forward please and tell me which heading this shows this language to be in? I believe it might help you if you refer to page 32, which

part of the document is this in?

A Oh, appendix B.

Q So, this is part of the appendix, is it not?

A To my knowledge, yes.

Q And this appendix, although it is not part of the ANSI/AAMA standards, is that correct?

A That is correct.

Q But it does give advisory information; is that correct?

A It helps you design your systems.

Q But that is advisory? It does not --

MR. FRANCIS: Objection.

BY MR. COLT:

Q As far as you know?

MR. FRANCIS: It calls for a legal conclusion. You can answer it if you want.

BY MR. COLT:

Q Is that advisory?

A I take these as commentary.

Q Help me understand the standards -- the specifications. I mean -- I am sorry. Strike that.

Help me understand the nature of

submittals. Specifications are given out to all the bidders; is that correct --

A Correct.

Q -- telling them what they will have to do?

A Yes.

Q And then when somebody is proposing to do work on the project they can submit things that they propose to do; is that correct?

A After the bid has been awarded?

Q Yes.

A Yes.

Q Can a submittal in your opinion violate -- can a submittal propose to violate the specifications?

MR. FRANCIS: Objection to the question. Do you understand what he means by violate?

BY MR COLT:

Q If the specifications -- would you like me to rephrase it?

A Yes, please.

Q If the specifications tell a contractor that it cannot use a material, for example --

A Yes.

Q -- and then they make a submittal to you,

Gale and Associates, seeking to use that material, can valid approval be given by you that would violate the specifications or alter the specifications?

MR. FRANCIS: Objection. You can answer it if you understand.

THE WITNESS: Let me answer what I -- how I typically respond to that type of question, and that is, our approval stamp, the Gale Associates approval stamp does not relieve a contractor for any responsibility of meeting the specifications. We will accept it as noted, we will ask for corrections, we will revise -- ask for a revision and resubmittal or reject those submittals. If it is in very bad condition we will reject. We can accept it. We often times accept it. But it does not relieve the contractor from meeting the specifications.

BY MR. FRANCIS:

Q In other words, does Gale Associates have the ability on its own to waive a requirement in the specifications?

A No.

MR. COLT: I think that is all for now. Thank you.

MR. FRANCIS: I have one question about the AAMA.

**REEXAMINATION BY COUNSEL ON BEHALF OF THE PLAINTIFF**

BY MR. FRANCIS:

Q Would you turn to page 30 of the AAMA, page 30, where it says optional performance classes, do you see that?

A At the top?

Q Yes. Section three. Do you see that?

A Yes.

Q And does that have a box that is right there that talks about design pressure, performance class, yada, yada, et cetera? See the box right there at the top right-hand corner?

A Yes, I do.

Q Does that say maximum psf 12 pounds per square foot?

A That does say 12 psf.

Q And is that part of the AAMA 101 or is it part of the appendix?

A It is part of section three which is AAMA 101.

Q It is part of the AAMA; correct?

A Yes.

MR. FRANCIS: That is all I have.

**REEXAMINATION BY COUNSEL ON BEHALF OF THE DEPARTMENT OF JUSTICE**

BY MR. COLT:

Q Referring to that same box, which under the specifications these were I believe HHC type of class of product, were they not?

A Yes, they were.

Q So they were not R or C or AW type?

A That is correct.

Q And the maximum 12 psf refers to the AW; does it not?

A I do not know that it makes any distinction.

Q Okay. But it is listed under the AW; is it not?

A It is just listed in the box. I do not know what it designates.

Q Well, as a general question, do you believe that it was possible for a contractor to make windows compliant with the specifications in this contract.

MR. FRANCIS: Objection.

BY MR. COLT:

Q As an engineer, do you believe that?

MR. FRANCIS: Well, objection. You can answer it, but --

THE WITNESS: I believe that a window manufacturer can far exceed the AAMA standards, in fact they need to in certain conditions.

**EXAMINATION BY COUNSEL ON BEHALF OF THE PLAINTIFF**

BY MR. FRANCIS:

Q One last question.

Would you turn to the errata, the last page of the AAMA. Do you see it where it says page 30 in section three optional performance class and it clarifies that the 12 psf applies to both the AW and the HC windows, the asterisk?

MR. COLT: Excuse me. I would ask that he read that, what it says about page 30.

BY MR. FRANCIS:

Q Could you read it to yourself?

A Yes.

Q Is there an asterisk next to the 15 percent positive design pressure?

A Yes.

Q And does the asterisk say maximum 12 psf?

A Yes.

Q Is there any question in your mind that that asterisk means that the maximum test pressure for an HC window is 12 psf

A It means the maximum tested pressure is 12 psf not the maximum required pressure, by specifications.

MR. COLT: Do you have any other questions?

MR. FRANCIS: No.

**REEXAMINATION BY COUNSEL ON BEHALF OF THE DEPARTMENT OF JUSTICE**

BY MR. COLT:

Q So, just so I understand this, under the standards, what are they, the ANSI, or these standard shown in this Gale Exhibit 1, those standards did not require -- would require a maximum of 12 pounds per square foot; is that correct?

MR. FRANCIS: Can you read that back, please?

(Whereupon, the last question was read back by the court reporter.)

BY MR. COLT:

Q So, your understanding is that these ANSI standards would require a maximum of 12 pounds per square foot, is that correct?

MR. FRANCIS: Objection.

THE WITNESS: I understand that the maximum test is 12 pounds per square foot.

BY MR. COLT:

Q For these ANSI standards?

A For these standards.

Now, whether the performance of the windows is 12 or less or greater is based on the window performance not on the standard. A minimum standard by the industry is just that. It is what a window has to meet to fall into that class of window. Anything above that is a different class of window. Anything below that is also a different class of window.

Q So, the windows could exceed the 12 pounds per square foot requirement in your opinion?

A Yes, they can. They probably -- many that fall in the HC40 class probably test higher than 12 psf.

MR. COLT: Thank you.

MR. FRANCIS: I am done.

One question. Does he want to read and sign the deposition?

MR. HUTCHISON: Yes.

(Witness excused.)

(Whereupon, at approximately 3:50 o'clock p.m., the signature of the witness having been not waived, the taking of the deposition was concluded.)