**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| M. MAROPAKIS CARPENTRY, INC., Plaintiff, | ) | |
| v. | ) | No. 03-2825C (Judge Baskir) |
| THE UNITED STATES, Defendant. | ) | |

**CONSOLIDATED STATEMENT OF UNCONTROVERTED FACTS**

Pursuant to paragraphs 11 and 12 of this Court's Special Procedures Order dated June 4, 2004, and Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), the parties respectfully submit this Consolidated Statement of Uncontroverted Facts material to the motions for summary judgment presently before the Court.

The statements are organized according to the attached table of contents. Pursuant to the Special Procedures Order, the originating parties for each statement and objection are identified as follows: "[P]" for Plaintiff and "[D]" for Defendant. Plaintiff and Defendant have jointly submitted a total of 48 factual assertions. Plaintiff has submitted a total of 79 additional factual assertions. Defendant has submitted a total of 18 additional factual assertions.

Each party has opted to cite to the appendices filed by the parties as

"DA__" for defendant's appendix and "PA__" for plaintiff's supplemental appendix. Additionally, "Am. Compl. __" references the amended complaint filed by plaintiff on September 15, 2005, and "Compl.__" references the original complaint filed by plaintiff on December 17, 2003.

TABLE OF CONTENTS

A. Background Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

B. Maropakis' Claim Alleging That The Window Specifications Were Defective. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

C. Maropakis' Claim For Delay Due To The Discovery Of Lead Paint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

D. Maropakis' Claim For Breach Of Contract Based Upon The Navy's Implied Acceptance Of Asphalt For The Roof Adhesive . . . . . . . . . . 39

E. Maropakis' Claim Of Roofing Work Delay. . . . . . . . . . . . . . . . . . . . . 42

A. Background Information

**1. [P&D] On or about April 6, 1999, plaintiff, M. Maropakis Carpentry ("Maropakis") and the United States Navy ("Navy") entered into contract number N62472-92-C-4116 ("the contract") for the replacement of the roof and other specified construction work on Building 110, at the Naval Inventory Control Point, in Mechanicsburg, Pennsylvania. DA 16-17.**

**2. [P&D] Prior to the contract award, the Navy received a total of 26 bids in response to its solicitation for the contract. DA 454-58.**

**3. [P&D] In Maropakis' offer to the Navy for the contract, Maropakis acknowledged receipt of Amendments No. 1 and 2 to the solicitation. DA 16.**

**4. [P] The contract required Maropakis to provide all labor, material and equipment necessary to perform certain work ("the project") in accordance with the contract documents, including the following:**

**a. The removal and replacement of certain roofing from the building;**

**b. the removal and replacement of certain monitor**

windows from the building;

c. the removal, disposal and replacement of certain asbestos containing transite panels, and

d. other incidental work.

DA 25.

5. [P&D] The contract award price was $1,288,940. DA 16.

6. [P] The contract duration was 270 days. DA 14, 387.

7. [P&D] The contract commenced on April 6, 1999 and was originally scheduled for completion on or before January 16, 2000. DA 16.

8. [P&D] The contract incorporated FAR § 52.211-12, Liquidated Damages– Construction (Apr. 1984) - Alternate I (Apr. 1984). That provision states that if the contractor fails to complete the work within the time specified in the contract, or any extension, the contractor shall pay to the Government as liquidated damages, the sum of $650 for each day of delay. DA 67.

9. [P&D] The Navy hired the architectural and engineering firm of Gale Associates, Inc. ("Gale") to provide certain design services, including the preparation of specifications and drawings for

**the contract. DA 48, 622-23; PA 887-90.**

**10. [P&D] Three modifications were issued by the Navy after award of the contract. These modifications increased the contract price to $1,297,151, and extended the contract completion date to February 4, 2000. DA 361-62.**

**11. [P] Maropakis did not agree with the completion date identified by the Navy. DA 425-26.**

**12. [P&D] The Navy's possession and use of Building 110 was effective on May 17, 2001, 467 days past the contract completion date. DA 431, 800.**

**13. [D] Maropakis did not perform any work on the contract until after the original contract completion date had passed. DA 431.**

PLAINTIFF'S OBJECTION: Maropakis objects to this statement because it is factually incorrect. The evidence reflects that Maropakis performed a great deal of work prior to the original completion date, including attempting to find a window subcontractor who could provide the P-HC40 (Optional Performance Class) monitor windows specified in the contract documents, communicating with the Defendant regarding finding a manufacturer who could meet the specification requirements, obtaining

and providing window submittals to the Navy for review and approval, and requesting authority to perform roof removal and replacement work before final approval of the windows. DA 397-398, 400-401, 396-411.

DEFENDANT'S OBJECTION: Maropakis did not perform any work at the project site before the original contract completion date had passed. DA 390-92; 431. The contract required the replacement of the monitor windows before any roofing work could commence. DA 104, 431. The final window submittal was not approved until March 3, 2000. DA 446. Searching for a window manufacturer does not constitute "work" on the contract because Maropakis should have located a window manufacturer before it bid on the contract.

**14. [P&D] The Navy assessed liquidated damages against Maropakis in the amount of $303,550 ($650 per day for 467 days). DA 800-01.**

**15. [P&D] Because liquidated damages were assessed against Maropakis, the Navy retained a contract balance of $244,036. DA 800.**

**16. [P] On or about August 20, 2001, Maropakis submitted a request for a 447 consecutive day time extension. DA 371-374.**

**17. [P&D] On August 28, 2001, the Navy sent a letter to**

**Maropakis, advising that Maropakis had failed to provide sufficient information to support its request for the 447-day time extension. This correspondence specifically stated that Maropakis could provide additional information in support of its claim. The correspondence specifically stated that it was not a final decision. DA 369-370.**

**18. [P] On July 18, 2002, the Defendant issued correspondence to Maropakis ~~responding to its August 20, 2001 letter requesting a 447 day time extension~~. This letter noted that Maropakis had not yet supplied the additional information in support of ~~this claim~~. This letter also requested Maropakis pay the $59,514.00 in liquidated damages within 30 days. DA 367-368.**

DEFENDANT'S OBJECTION: We object to the characterization of the July 18, 2002 letter as "responding to [Maropakis'] August 20, 2001 letter," and to the characterization of Maropakis' August 20, 2001 letter as a "claim." The July 18, 2002 letter from the Navy noted that the Navy had responded to Maropakis' August 20, 2001 letter on August 28, 2001, and that Maropakis had not responded with additional information or requested a contracting officer's final decision as of July 18, 2002. The letter requested payment from Maropakis in the amount of $59,514 for liquidated

damages. DA 367-68. Maropakis' August 20, 2001 letter was not a "claim" within the meaning of the Contract Disputes Act ("CDA") as it did not request a sum certain, a contracting officer's final decision, and did not contain a certification.

PLAINTIFF'S RESPONSE: The Defendant's July 18, 2002 letter stated that Maropakis had not responded to the Defendant's request for additional information regarding the 447 day time extension request. DA 367.

**19. [P] On or about July 22, 2002, Maropakis forwarded correspondence to the Defendant addressing its request for a time extension and the remission of liquidated damages. This letter specifically stated, "We . . . disagree with the time extension given for the three modifications. . ." and "we will dispute for the liquidated damages amount of $303,550 and will indicate that M. Maropakis was not responsible for the delays." DA 802.**

**20. [P] On October 31, 2002, Maropakis presented additional information to the Defendant at the Engineering Field Activity, Northeast, ~~in support of its request for a 447 time extension and the remission of liquidated damages~~. DA 365-366; Compl. ¶ 78.**

DEFENDANT'S OBJECTION: The end of this statement is not supported by the documents cited.

PLAINTIFF'S RESPONSE: DA 365-366 is the final decision denying Maropakis claim for a time extension and asking for a remission of liquidated damages. DA365-366. This letter specifically references the defendant's letter of June 28, 2002, which addressed Maropakis request for a time extension. DA 800-801. It also specifically references Maropakis July 22, 2002 letter which also addressed Maropakis request for a time extension. DA 802. This is the only reasonable interpretation of these letters.

**21. [P] Following the October 31, 2002 presentation, the Defendant determined that no new information ~~supporting Maropakis request for a time extension and remission of liquidated damages~~ was provided, and it issued a final decision dated December 20, 2002. DA 365-66.**

DEFENDANT'S OBJECTION: A part of this statement is not supported by the document cited, which only states that "there has been no new information presented to change [the Navy's] position." DA 365. The Navy issued a final decision based upon its June 28, 2002 demand

letter because Maropakis had not paid the liquidated damages requested in that letter. The contracting officer's final decision reiterated the Navy's demand for payment from Maropakis in the amount of $59,514 for liquidated damages.

PLAINTIFF'S RESPONSE: Maropakis incorporates its response to the Defendant's objection to the preceding paragraph as if fully set forth here at length.

**22. [P&D] In the contracting officer's final decision, the Navy requested payment from Maropakis in the amount of $59,514 (the difference between the remaining contract balance of $244,035 and $303,550, the total amount of liquidated damages due and owing the Government). DA 365-66.**

**23. [P] On or about December 16, 2003, Maropakis filed a claim against the Navy in the Federal Court of Claims seeking remission of liquidated damages, an extension of time to complete the project work, additional compensation due to errors in the contract documents regarding the selection of windows, additional compensation due to Defendant's delays in resolving the discovery of lead paint on the existing windows, and delays attributable to the**

**Defendant's consultant's approval of asphalt materials for the roofing work. See Am. Compl. at pgs. 2-9.**

B. Maropakis' Claim Alleging That The Window Specifications Were Defective

**24. [D] The contract required the removal and disposal of monitor windows and the installation of new monitor windows. DA 25.**

**25. [P&D] The contract included specification section 08520, entitled Aluminum Windows. DA 285-92.**

**26. [P] Gary Brown, P.E., of Gale Associates was the designer of record for the project. He reviewed all of the work that was performed to get the design and signed the drawings. PA 889-890.**

**27. [P] Mr. Brown was involved in the preparation of the specifications for the project. He identified the appropriate window for reinstallations and design with that particular window system. PA 897-898.**

**28. [P] Mr. Brown had final say on the drawings prepared by Gale. PA 892.**

**29. [P] Gale used the Navy's Specs Intact in its preparation of the specifications for this project. PA 898-899.**

**30. [P] Gale obtained the Specs Intact from the Navy. PA 899.**

**31. [P] Gale made modifications to Section 08520 during the design phase of the project. PA 899.**

**32. [P] The specifications prepared by Gale contained design criteria for the windows supplied on this project. PA 899-900.**

**33. [P] These specifications included performance criteria for the windows such as, inter alia, the water resistance test pressure the windows were required to meet. PA 900.**

**34. [P] Specification 08520 paragraph 1.1 entitled "References" specifically identifies the American National Standards Institute ("ANSI")/American Architectural Manufacturers Association's ("AAMA") publication ANSI/AAMA 101 (1993) Aluminum and Poly (Vinyl Chloride) (PVC) Prime Windows and Glass Doors ("AAMA 101" or "ANSI/AAMA 101") as part of the contract documents. DA 285.**

**35. [P&D] Specification 08520 paragraph 1.1 notes that the ANSI/AAMA 101 is a part of this specification "to the extent referenced." DA 285.**

**36. [P] Contract Specification 08520 paragraph 1.2 required**

**that windows supplied by Maropakis contain a written certification warranting that the window complies with the AAMA 101. It provides,**

> **1.2 CERTIFICATION**
> **Each prime window unit shall bear the AAMA Label warranting that the product complies with the ANSI/AAMA 101. Certified test reports attesting that the prime window units meet the requirements of the ANSI/AAMA 101, including test size, will be acceptable in lieu of product labeling.**

**DA 285 (emphasis added).**

**37. [P] Specification section 08520 paragraph 1.3.4.1 required the contractor to provide test reports certifying that the windows have been tested and conform to the requirements specified in the ANSI/AAMA 101, as follows:**

> **1.3.4.1 Report Requirements**
>
> **Submit test reports for each type of window attesting that identical windows have been tested and meet the requirements specified herein for conformance to ANSI/AAMA 101 including test size, and minimum condensation resistance factor (CRF).**

**DA 286 (emphasis added).**

**38. [P] Specification section 08520 paragraph 1.3.5 SD-14, Samples, subparagraph a, required submission of windows with**

**AAMA labeling, as follows:**

> **1.3.5 SD-14, Samples**
> **a. Windows G**
>
> **Submit one full-size window of each type proposed for use, complete with AAMA label . . .**

**DA 286.**

**39. [P&D] Specification section 08520, paragraph 2.1 set forth numerous requirements Maropakis was contractually required to provide, as follows:**

> **2.1 Windows**
>
> **<u>Prime windows shall conform to ANSI/AAMA 101 and the requirements specified herein</u>. Provide windows of types, grades, performance classes, combination and sizes indicated or specified. . . .**
>
> **2.1.1 Standards**
>
> **<u>Except as otherwise indicated</u>, <u>requirements for aluminum windows, terminology and standards of performance, and fabrication workmanship are those specified and recommended in the ANSI/AAMA 101</u> and applicable general recommendations published by the AAMA and ANSI.**
>
> **2.1.2. Performance and Testing.**
>
> **<u>Except as otherwise indicated</u>, comply with air infiltration tests, water resistance tests, and**

> **applicable load tests specified in ANSI/AAMA 101 for type and classification of window unites required in each case.**
>
> *** * ***
>
> **2.1.4 Specific Performance Requirements**
>
> **Windows shall conform to specified ANSI/AAMA standards and the following, <u>whichever are the more stringent</u>.**
>
> *** * ***
>
> **b. Air Infiltration Test (Operable Units): With the vent in a closed and locked position, the window shall be subjected to an air infiltration test in accordance with ASTM E 283. <u>Air infiltration shall not exceed .10 cfm/ft when tested a [sic] pressure of 6.24 psf</u>.**
>
> **2.1.5 Water Resistance Test**
>
> **The glazed unit shall be mounted in its vertical position continuously supported around perimeter. The window unit shall be subject to a water resistance test in accordance with ASTM E 331 and ASTM E 547. <u>When a static pressure of 20.00 pounds per square foot has been stabilized, five gallons of water per square foot of window area shall be applied to the exterior face of the unit for a period of 15 minutes</u>. No water shall pass the interior face of the window frame and there shall be no leakage as defined in the test method.**

**DA 287-88 (emphasis added).**

**40. [P] Specification section 08520, paragraph 2.1.8, Projected**

**Windows, also specifically identified the windows to be provided, as follows:**

> **2.1.8 Projected Windows**
>
> **Type P-HC 40 (Optional Performance Class).** **Provide projected windows with concealed four bar friction hinges only.**

**DA 288 (emphasis added).**

**41. [D] The specifications for the windows were not amended or changed between the initial solicitation date and the completion of the contract. DA 1-15; 285-93; 357-64.**

**42. [P] The AAMA 101 is a National Standard that establishes minimum requirements for windows. The preface of the AAMA provides in part as follows:**

> **PREFACE**
>
> **This American National Standard establishes minimum requirements for aluminum and poly (vinyl chloride) (pvc) prime windows and glass doors. It consists of three sections and an Appendix.**
>
> *** * ***
>
> **SECTION 2 contains specific requirements for product performance. There are three mandatory primary performance requirements. They are: 1) Structural adequacy to withstand**

**wind loads, 2) Resistance to water leakage, and 3) Resistance to air infiltration. Levels of performance are set forth for each window and door type covered by the standard.**

**SECTION 3 contains optional higher performance classes which make it possible for the specifier to require higher uniform load structural test pressures and higher water resistance test pressures than those contained in Section 2. Use of products in the higher performance classes is desirable where severe weather condition or wind loadings are encountered.**

**The APPENDIX, although not part of this ANSI/AAMA standard, contains much information on materials, construction, installation, wind loads, water resistance, air infiltration, condensation and heat transmission that will be helpful to the specifier in the selection and specification of windows and doors.**

**DA 376 (emphasis added).**

**43. [P] ~~The AAMA standards do not recognize the existence of a P-HC 40 (Optional Performance Class) window~~. DA 383.**

DEFENDANT'S OBJECTION: This statement is not supported by the appendix page cited. Although a P-HC 40 designation is not listed in the chart on DA 383, Section 2.1, DA 377, sets forth the AAMA 101 testing requirements for P-HC 40 windows, and in paragraph 3.1, DA 381, the

AAMA 101 states that after meeting the performance requirements listed in section 2.1, a window can be tested for conformance to an optional performance class.

PLAINTIFF'S RESPONSE: The defendant's objection misstates how windows are classified under the AAMA 101. The designation P-HC40 identifies specific information about the window, including its positive design pressure. In this case, the positive design pressure is 40 psf (this is the "40" in P-HC40). Under Section 2.1, the water test pressure for a HC window is 0.15 its positive design pressure, which is 6.0 psf (40 psf x 0.15 = 6.0 psf). DA 377. The contract documents issued by the Defendant identified a water resistance test pressure of 20 psf, which is inconsistent with the designation P-HC40.

Optional Performance Class windows provide performance beyond the requirements of a specified window. This is set forth in the preface of the AAMA 101 as follows:

> Section 3 contains optional higher performance classes which make it possible for the specifier to require higher uniform structural test pressures and higher water resistance test pressures than those identified in Section 2.

DA 376.

Moreover, the language relied upon by the Defendant in Section 3 of the AAMA 101 specifically recognizes that specifications requiring more stringent requirements (which specifically relate to the designation of the window) require the designation of Optional Performance Class, as follows: ". . . a product is permitted to be tested . . . for conformance with an Options Performance Class as listed on the table below." DA 383. The more stringent water resistance test pressure and the fact that the "table below" does not include the designation P-HC40 is conclusive evidence that the AAMA does not recognize the existence of that window.

**44. [P] The preface to the AAMA 101 explains what the term "HC" means as follows:**

> **This standard defines requirements for four grades of windows and glass doors. The grades are Residential (R), Commercial (C), Heavy Commercial (HC) and Architectural (AW).**

**DA 376 (emphasis added).**

**45. [P] AAMA 101 Section 2 Specific Requirements, Section 2.1 Primary Performance Requirements sets forth the primary performance requirements applicable to particular types of windows. This section specifically provides that the "Performance Class" is the "Design Pressure." DA 377.**

**46. [P] Accordingly, the "40" in P-HC 40 is the design pressure for the window. DA 377.**

**47. [P] AAMA 101 Section 2.1 also provides that the Water Test Pressure for a specified window is 0.15 times the design pressure. DA 377.**

**48. [P] Accordingly, the water test pressure for a P-HC 40 window is 6 lbf/ft$^2$ (i.e. 40 x. 0.15 = 6). DA 377.**

**49. [P] This is confirmed by the table that appears in AAMA 101 Section 2.1. DA 377.**

**50. [P] AAMA 101 Section 3 describes the requirements for windows designated as part of the "Optional Performance Classes." DA 383-84.**

**51. [P] The AAMA appendix ~~mandates that the maximum water resistance test pressure permitted is 12 psf~~. Page 35 of the AAMA 101 provides,**

> **[W]ater resistance is generally determined at a pressure less than the Design Pressure. The required Water Resistance Test is commonly conducted at a pressure equal to 15% of the Design Pressure for R, C and HC products (20% for AW products) <u>but never</u> less than 2.86 psf (132 Pa) <u>nor more than 12 psf (575 Pa).</u>**

**DA 385 (emphasis added).**

DEFENDANT'S OBJECTION: This statement is argumentative to the extent that plaintiff is implying that optional performance class windows can never be tested at a water resistance test pressure of more than 12 pounds per square foot ("psf"). The quote above only describes how the water resistance test for optional performance class windows is "commonly conducted." Clearly, it is possible for optional performance class windows to be tested at a greater water resistance test pressure than 12 psf because Maropakis provided windows for this project that had been tested at a water resistance test pressure of 21 psf. DA 444.

PLAINTIFF'S RESPONSE: The Defendant's Objection mischaracterizes the language contained in the AAMA 101. It specifically states, "The Water Resistance Test is commonly conducted at a pressure equal to 15% of the Design Pressure for R, C and HC products . . . but never less than 2.86 psf (132 Pa) nor more than 12 psf." DA 385 (emphasis supplied).

Moreover, the mere fact that Maropakis supplied windows that the Defendant accepted does not mean that the windows were P-HC40 (Optional Performance Class) windows. Maropakis supplied custom made windows meeting criteria beyond the maximums identified in the AAMA.

DA 288, 377-378, 383, 385-386, 396-398, 400, 407.

**52. [P] The table appearing in the errata attached to the end of the AAMA 101 notes that the maximum design test pressure is 12 psf, as follows:**

| | | |
|---|---|---|
| **Design Pressure** | **=** | **Performance Class** |
| **Structural Test Pressure** | **=** | **1.5 Design Pressure** |
| **Water Resistance Test Pressure** | **=** | |
| **R, C, & HC** | **=** | **.15 x Positive Design Pressure*** |
| **AW** | **=** | **.20 x Positive Design Pressure*** |
| | | ***(Maximum 12 psf)** |

**DA 386 (emphasis supplied).**

**53. [P] Abdul Rangwalla ("Mr. Rangwalla") was the project engineer at the project site for Maropakis. DA 374, 413.**

**54. [D] It was Maropakis' responsibility to find suppliers for the materials required by the contract. DA 547.**

PLAINTIFF'S OBJECTION: Plaintiff objects to this proposed fact on the basis that it was the Defendant's responsibility to ensure that the contract documents it let out for bid identified windows that can actually be provided. There are no P-HC40 (optional performance class windows)

and there are no HC 40 windows that can met the requirements of the specification. Maropakis actually submitted windows beyond the maximum requirements of the AAMA 101. These were designated HC140 for water resistance testing and HC100 for uniform structural load testing. DA 383, 385-386, 443-444 .

DEFENDANT'S RESPONSE: Plaintiff's objection is argumentative. The statement above is supported by the record. Maropakis did provide windows that met the contract's specifications. The Government was entitled to insist on compliance with its specifications even when those specifications were more stringent than industry standards.

**55. [P] After being awarded the contract, Maropakis began looking for a window manufacturer that could meet the requirements of the specifications. PA 836.**

**56. [P] ~~Maropakis was unable to find a window manufacturer who could supply windows that complied with the provisions of the contract documents~~. DA 400, 405, PA 836-37.**

DEFENDANT'S OBJECTION: This statement is not supported by the record. Although Maropakis had difficulty finding a window manufacturer that could meet the contract specifications, Maropakis did eventually find a

window manufacture, J. Sussman, Inc., who could meet the contract specifications. DA 407, 440-45. Maropakis eventually provided windows that met the contract specifications. DA 392, 440-46.

PLAINTIFF'S RESPONSE: DA 400 is an August 19, 1999 letter from Maropakis to the Defendant stating, "Maropakis has been unable to locate a window manufacturer that does conform to all items of the contract specifications." DA 400. DA 405 is a September 20, 1999 letter form Maropakis to the Defendant stating, "A window manufacturer could not be found that meets the specifications." DA 405. Maropakis ultimately supplied windows identified as HC140 for water resistance test pressure and HC100 for Uniform Structural Load testing, which is not what was specified. DA 444.

**57. [D] The contract required Maropakis to submit submittals for work required by the contract for approval by the Government. "Work" was defined by the contract as all on- and off-site construction required by the contract documents, including labor necessary to produce the construction and materials, products, equipment, and systems incorporated or to be incorporated in such construction. The contractor was not permitted to begin work until a**

**submittal for that work had been approved, unless work is required as a basis for the submittal. DA 117-21.**

PLAINTIFF'S OBJECTION: Plaintiff objects on the basis that the identified section does not support the Defendant's contentions. First, it is incorrect to classify all submittals as "work plans." As explained at DA 117, submittals include shop drawings, product data, samples and administrative submittals. DA 117.

Second, the evidence shows that Maropakis performed a great deal of work attempting to find a manufacturer who could satisfy the requirements of the contract documents, as well as attempting to perform some of the roofing work before finalization of the window submissions. DA 400-401, 403, 405-406, 407-411, 440-445.

DEFENDANT'S RESPONSE: The statement above is supported by the contract pages cited. DA 117-21. Maropakis' attempt to perform work that was not in compliance with the contract specifications does not constitute "work" under the contract.

**58. [P&D] On July 26, 1999, the first window submittal was received by the Navy for the monitor windows. DA 433-39.**

**59. [P&D] On August 19, 1999, the first window submittal was**

**returned to Maropakis as disapproved. DA 399.**

**60. [P&D] On August 19, 1999, Maropakis submitted a letter to the Navy stating that they had been unable to locate a window manufacturer that could provide a window that conforms to the contract specifications. Maropakis requested that the Navy provide a list of three window manufacturers that could provide windows in conformance with the contract's specifications. DA 400.**

**61. [P&D] On August 23, 1999, the Navy provided Maropakis with a list of four window manufacturers "that manufacture window assemblies such as those specified for" the contract. DA 401.**

**62. [P] Maropakis contacted each of these manufacturers and determined that they could not meet the requirements of the contract specifications. DA 371-74.**

**63. [P&D] On September 9, 1999, the Navy issued a cure notice to Maropakis for, among other things, failing to provide approved window submittals. DA 402.**

**64. [P&D] On September 20, 1999, Maropakis notified the Navy that it was still having difficult finding a window manufacturer to meet the specifications. DA 405-06.**

**65. [P&D] On October 22, 1999, the Navy provided Maropakis with a list of three additional window manufacturers that the Navy believed could meet "the Navy's specification." DA 408-09.**

**66. [P] Lonnie R. Moyer ("Mr. Moyer") is a civil engineer employed by the Navy. DA 693.**

**67. [P] Mr. Moyer worked with Gale in the preparation of the plans and specifications. DA 696.**

**68. [P] Mr. Moyer sent an e-mail correspondence dated November 2, 1999 stating in part as follows:**

> **Terry,**
> **As you know, I gave a list of three window manufacturers who can meet the spec. for water resistance, to the ROICC office. These manufacturers were: Graham Architectural Products, J. Sussman, Inc., and Forte, Inc. Another manufacturer, Peterson Window Corp. has said that they can meet the spec., but I have not received their information yet. <u>The requirement in the spec is for a water resistance test of 20 psf with no leaks. This requirement should have been 10 psf or perhaps even lower</u>. <u>Bob Rosenberry has advised me that we should not revise this requirement at this time. The consequences may be as follows: (1) The contractor used this item as an excuse of his time delay. A change now would justify his delays and may cost us for delays. (2) LD's would be canceled. (3) Other bidders may file a</u>**

**complaint since they would have bid on the original spec.**

**DA 396.**

**69. [P&D] On November 8, 1999 Maropakis provided the Navy with a submittal for the Monitor Windows to be installed on the project. DA 440- 445.**

**70. [P&D] The November 8, 1999 submittal reflected that the monitor windows would be provided by J. Sussman, Inc. as a subcontractor to Maropakis. DA 443-444.**

**71. [P&D] The November 8, 1999 submittal identified the windows, manufactured by J. Sussman, Inc., as HC140 for purposes of the Water Resistance Test (140 psf x .15 = 21 psf). DA 444.**

**72. [P&D] The November 8, 1999 submittal identified the windows as HC100 for purposes of the Uniform Structural Load test. DA 444.**

**73. [D] The November 8, 1999 submittal identified the windows as having an overall product performance of P-HC 100. DA 443.**

**74. [P&D] A window re-submittal was received by the Navy on January 4, 2000. DA 392.**

**75. [D] J. Sussman, Inc., manufactured windows that met the contract's specifications, and it was chosen by Maropakis to supply the windows. DA 407, 410, 440-45.**

**76. [P] J. Sussman, Inc., manufactured windows that the Navy accepted. DA 407-08; 412,**

**77. [P&D] Gale received Maropakis' window shop drawings on February 29, 2000. The drawings were reviewed and approved on March 3, 2000. DA 446.**

**78. [P] Gary W. Brown, P.E. ("Mr. Brown") was the Gale employee who was the designer of record. Mr. Brown reviewed all of the design work and signed the plans. DA 622-23.**

**79. [P] Gale prepared the specifications for the project based upon standard Navy specifications entitled, "Specs Intact." PA 896-99.**

**80. [P] Prior to this project, Mr. Brown had worked with Specs Intact on other Navy design projects. DA 625.**

**81. [P] Typically, the Navy provides Specs Intact to designers, and the designers then make modifications to the Specs Intact for specific contracts. DA 626; PA 897-99.**

**82. [P] Specs Intact contains design criteria for windows, including water resistance test pressure. DA 626-27; PA 899-90.**

**83. [P] Gale made changes to the Specs Intact to conform with the Gale specifications. PA 919-20.**

**84. [P] Mr. Brown did not know whether the criteria set forth in Gale's window specification was authorized under the AAMA documents. PA 901.**

**85. [P] Mr. Brown agreed that 12 psf is the highest water resistance test pressure authorized under the AAMA. DA 630; PA 905.**

**86. [D] Mr. Brown stated that the AAMA provides minimum standards for window criteria. PA 901.**

**87. [D] Mr. Brown stated that the contract specifications had some criteria that were equal to the AAMA standards, some criteria that were greater than the AAMA standards, and "no criteria that was less than the AAMA standard." PA 901.**

**88. [P] Mr. Brown testified that he could "not recall" what the HC in P-HC40 stood for. PA 907.**

**89. [P] Mr. Brown testified that "there is not necessarily a correlation between" design pressure and water resistance test pressure. PA 907.**

**90. [P&D] Mr. Brown testified that the "P-HC40 (optional performance class)" in the contract specifications represented the performance class of the windows. PA 906.**

**91. [P] Mr. Brown testified that he does not know where the 20 psf requirement for the water resistance test pressure in the contract specifications came from. DA 640-41; PA 923-24.**

**92. [D] Mr. Brown testified that at the time specifications were written for this contract, a water resistance test pressure of 20 psf was a "Gale standard for windows." PA 918.**

**93. [P] Mr. Brown was not aware of any claims made by Maropakis that it could not find windows that satisfied the requirements of the specifications. DA 635; PA 912.**

**94. [P] Mr. Brown did not contact any manufacturers to find out if they could meet the requirements of the specifications, and did not know whether anyone else from Gale did. DA 635-36; PA 912-13.**

**95. [P&D] Lonnie Moyer, P.E., was the Navy's civil engineer during the design phase. He reviewed all of the design submissions provided by Gale for the project work. DA 694-697.**

**96. [P] Mr. Moyer could not state why the water resistance test pressure included in the contract was set at 20 psf. DA 712.**

**97. [P] Mr. Moyer was not familiar with the provisions of the AAMA 101. DA 713.**

**98. [P] Mr. Moyer did not know what the "P," "HC" or "40" in P-HC 40 stands for. DA 714-15.**

**99. [P] Mr. Moyer did not know what the term "Optional Performance Class" means. DA 715.**

**100. [P] Mr. Moyer did not know whether there is a P-HC 40 (optional performance class) window under the provisions of the AAMA. DA 715.**

**101. [P] Mr. Moyer did not know whether the AAMA permits the testing of windows for water resistance test pressure at or above 20 psf. DA 719-20.**

**102. [P] Mr. Moyer did not know if there was a relationship in the AAMA between the positive design pressure (i.e. the "40" in "P-HC 40") and the water resistance test pressure. DA 720.**

**103. [P] Mr. Moyer did not know what the water resistance test pressure for a P-HC 40 window is or whether the AAMA specifies such a test pressure. DA 720.**

**104. [P] Mr. Moyer testified that he assumed the inclusion of the "P-HC40 (optional performance class)" window in the specifications meant the window existed. DA 715-16.**

**105. [P] Mr. Moyer stated, "it may be considered an error" for a Navy Specification to identify a window that does not exist. DA 719.**

**106. [P&D] The windows arrived at the project site on May 31, 2000. DA 418.**

C. <u>Maropakis' Claim For Delay Due To The Discovery Of Lead Paint</u>

**107. [P] ~~On March 7, 2000, Mr. Rangwalla informed the Navy of his belief that lead paint had been encountered on the existing monitor windows~~. DA 371, 550-51; PA 842-43.**

<u>DEFENDANT'S OBJECTION</u>: This statement is not supported by the record. Mr. Rangwalla's testimony is unclear that it was actually March 7,

2000, when Maropakis informed the Navy about the discovery of lead paint. Mr. Rangwalla, during his deposition, had difficulty remembering the date that Maropakis informed the Navy of the discovery of lead paint. DA 550-51. In addition, other evidence in the record is contradictory to Mr. Rangwalla's testimony. For example, Maropakis' letter, dated August 20, 2001, requesting a time extension, states that on March 17, 2000, its subcontractor, CES, informed Maropakis that existing windows should be checked for the suspected lead paint, and samples were not taken until March 22, 2000. DA 373.

PLAINTIFF'S RESPONSE: Mr. Rangwalla testified that he notified the Navy of his belief that the transit panels contained lead on March 7th when Maropakis was "ready to mobilize and prepared to commence" its work on the panels. PA 842-843. In addition, Maropakis August 20, 2001 correspondence to the Defendant specifically stated,

> 8) M. Maropakis was prepared to mobilize and commence the removal of asbestos containing transite panels all around the monitor windows on March 7, 2000. . . . Since lead paint was suspected on the windows, M. Maropakis requested lead sampling results from the Navy. Lead sampling results were not readily available and the Navy was checking whether samples were taken from the window paint. During the interim, M. Maropakis instructed our abatement contractor to take necessary samples.

9) Paint Samples were taken by our subcontractor, CES, Inc. on March 22, 2000.

**108. [P] On March 9, 2000, Mr. Rangwalla requested that the window installation subcontractor not deliver the specialty windows to the project site. DA 548-49; PA 840-41.**

**109. [P] Maropakis' remediation subcontractor obtained samples of the suspected lead paint on or about March 22, 2000. DA 371, 373, 946-947.**

**110. [P] On March 23, 2000, CES provided the samples to Westech for testing to determine the amount of lead paint. PA 946 - 947.**

**111. [P] On March 31, 2000, Westech performed a total lead analysis test and on April 6, 2000 Westech performed at TCLP Leachate Analysis : Inorganics test. PA 947.**

**112. [D] On April 6, 2000, Maropakis asked the Navy whether there was lead paint on the existing monitor windows. DA 392.**

PLAINTIFF'S OBJECTION: The document cited by Defendant was not provided to Maropakis until discovery in this matter. It conflicts directly with the testing information included in the documents obtained from

Maropakis subcontractor CES that they obtained the test results confirming the presence of lead on April 6, 2000.

DEFENDANT'S RESPONSE: The document cited above was provided to Maropakis during discovery. It reflects the Navy Project Manager's record of phone conversations and other communications with Maropakis during the course of the project. DA 390-95. It does not conflict with Maropakis' evidence because Maropakis' evidence only demonstrates that it was planning to "commence the removal of asbestos containing transite panels all around the monitors on March 7, 2000," not that it actually notified the Navy of the discovery of lead paint or its suspicion of the presence of lead paint on that date. DA 425. Also, testing documents only show the date of the tests, not the date that the test results were supplied to Maropakis. PA 946-47.

**113. [D] On April 12, 2000, the Navy informed Maropakis that the existing monitor windows did have lead paint. DA 392.**

PLAINTIFF'S OBJECTION: The Document cited by the Navy was not provided until discovery in this matter. It conflicts directly with evidence reflecting that Maropakis--not the Navy--tested the paint for the presence of lead. It also conflicts with testing information set forth in Maropakis' July

10, 2000, and August 21, 2001 letters to the Navy stating, "According to [our] telephone conversation with Mr. Robert Rosenberry on April 12, 2000, the Navy did not have any sample results for window paint." DA 372, 425.

DEFENDANT'S RESPONSE: The document cited above was provided to Maropakis during discovery. It reflects the Navy Project Manager's record of phone conversations and other communications with Maropakis during the course of the project. DA 390-95. Maropakis' evidence only demonstrates that lead sampling results were not readily available from the Navy, not that the Navy denied the presence of lead paint. DA 371-72.

**114. [P] Lab results reflecting the presence of lead were obtained by Maropakis on April 25, 2000. The lead had to be disposed of under Resource Conservation and Recovery Act ("RCRA") standards. DA 425.**

**115. [P] The Navy was notified of these test results on April 26, 2000. DA 425.**

**116. [P&D] On May 5, 2000, the Navy directed Maropakis not to begin the removal of the existing windows due to lead paint content clarification until further direction. DA 413.**

**117. [P&D] On June 22, 2000, Maropakis proceeded with the work prior to receiving the notification of the contract modification with the permission of the Navy. DA 426.**

**118. [P&D] The Navy issued modification P0001 to the contract on June 28, 2000. It directed the contractor to remove the windows as hazardous waste. DA 357-58.**

**119. [P&D] The contract modification was a unilateral modification and provided a contract increase of $6,154 and a time extension of 14 calendar days. DA 357-58.**

**120. [P] Maropakis claimed that the 14 days was not sufficient, and noted in the contract modification that it did not accept the 14-day time extension. DA 420-21.**

**121. [P&D] Maropakis objected to the time extension of 14 days, instead requesting a time extension of 365 days. DA 422.**

D. Maropakis' Claim For Breach Of Contract Based Upon The Navy's Implied Acceptance Of Asphalt For The Roof Adhesive

**122. [P&D] After the initial solicitation was issued but before the proposal deadline, the Navy decided that the contractor would not be permitted to use hot asphalt as an adhesive for roof insulation or wood fiberboard and would be required to use polyurethane foam as**

**an adhesive as specified in section 07220, paragraph 2.3.3. DA 387-89.**

**123. [P&D] This requirement was set forth in Amendment 2 to the solicitation. DA 13-15.**

**124. [P&D] Amendment No. 2 to the solicitation deleted the use of hot asphalt as an adhesive for roof insulation or wood fiberboard, and directed the contract to "[u]se polyurethane foam as an adhesive as specified in section 07220 paragraph 2.3.3." DA 15.**

**125. [P&D] Maropakis understood that the use of asphalt was not permitted pursuant to the terms of the contract and that no modification was ever issued permitting the use of asphalt. DA 564-68; PA 862-66.**

**126. [P&D] When a variation is sought from the contract requirements, the contract requires Government approval pursuant to the contract clause entitled "FAR 52.236-21, Specification and Drawings for Construction." DA 118.**

**127. [P&D] When proposing a contract variation, the contractor must submit a written request to the contracting officer, with**

**documentation of the nature and features of the variation and why the variation is desirable and beneficial to the Government. DA 118-19.**

**128. [D] On August 6, 1999, Maropakis submitted a submittal for the roof assembly that indicated that it would use Type III asphalt. This submittal did not note that it was a deviation from the contract requirements, nor was a written request submitted to the contracting officer. DA 447-49.**

**129. [P] Maropakis submitted Firestone roof assembly letter which indicated it would use Type III asphalt and ~~the consultant accepted this method of assembly~~. DA 371-74.**

DEFENDANT'S OBJECTION: We object to this statement to the extent that it implies that Gale can accept a variation to the contract without the contracting officer's knowledge, which is then binding upon the Government. Gale's approval of the roof assembly submittal, DA 450, does not bind the Government to a contract variation.

PLAINTIFF'S RESPONSE: Maropakis relied upon Gale's approval of the submittal for asphalt in its subsequent work.

**130. [D] This submittal was approved by Gale on August 9, 1999. DA 450.**

**131. [P] The asphalt was delivered to the site. DA 372.**

**132. [D] On June 26, 2000, the Navy noticed that Maropakis had asphalt at the project site and directed Maropakis to comply with Amendment No. 2 to the solicitation, which prohibited the use of asphalt. DA 394.**

E. Maropakis' Claim Of Roofing Work Delay

**133. [P] The contract documents identified two roof elevations on the project. PA 805-806, 857.**

**134. [P&D] The contract drawings identified the "Main Roof" at an elevation of 22' +/-, and also identified eight "monitor" roofs set above the monitor windows at an elevation of 30' +/-. PA 805-806.**

**135. [P] The contract identified the required sequence of construction as follows:**

> **(e) Sequence of operation. The Contractor shall complete installation of windows and exterior insulation finish system on the monitors before roofing installation is done on the main roof deck. This will avoid construction operations taking place on top of the newly installed EPDM roofing.**

**DA 67 (underlined emphasis supplied).**

**136. [P&D] On September 14, 1999, Maropakis requested permission to start the roofing work prior to the new window installation. Its letter requesting permission stated that "[t]he work will start with the asbestos abatement, new roofing, window removals, EIFS, and then followed by the new window installation." DA 403.**

**137. [P&D] Maropakis further stated that it would "take all necessary precautions to protect the roof after its installation." DA 403.**

**138. [P&D] On September 16, 1999, the Navy denied Maropakis' request because the Navy asserted that it did not comply with the contract specifications. DA 404.**

**139. [P&D] On September 20, 1999, Maropakis renewed its request to "commence the roof work immediately to take advantage of the favorable weather and avert delays. While the roof replacement work is in progress, the Navy can review the window specifications and an acceptable submission can be made." DA 405-06.**

**140. [D] In its written requests to the Navy to begin roof work before the new monitor windows were installed, Maropakis did not**

**state that it only intended to begin working on the roofs above the monitor windows. DA 403, 405-06.**

**141. [P&D] On October 22, 1999, the Navy again denied Maropakis' request to replace the roof before the windows were installed and reminded Maropakis to refer to specification section 01110, paragraphs 1.4. and 1.5 for the required construction sequence and special scheduling requirements. DA 408-09.**

**142. [P] Contract specification section 01110, paragraph 1.4 provides "Schedule work so as to avoid trafficking over completed work and newly installed roof systems. Trafficking over new roof systems will not be permitted." DA 104.**

**143. [P] Section 01110 paragraphs 1.4 and 1.5 do not address performing roof removal and replacement work on the monitor roofs or where the roofs will not be trafficked during other construction. DA 103-104.**

**144. [D] Contract specification section 01110 paragraphs 1.4 and 1.5 do not permit the contractor to commence any roof work until the new monitor windows are installed. DA 104.**

PLAINTIFF'S OBJECTION: The defendant mischaracterizes the language of section 01110 paragraphs 1.4 and 1.5. Paragraph 1.4(g) prohibits trafficking over newly installed roof systems; it does not preclude roof removal and replacement in areas that will not be trafficked, such as those above the monitors.

Paragraph 1.5 contains an overall work schedule that, when read in conjunction with other portions contract, require that the work be scheduled so as not to traffic over newly installed roof systems. DA 103-104.

DEFENDANT'S RESPONSE: The above statement is supported by the contract sections cited. The contract does not permit the contractor to begin any roof work until the new monitor windows are installed, and plaintiff cannot point to any contract section that permits any roof work before the new windows were installed.

**145. [D] Mr. Moyer testified that the work on the windows had to be completed before the roof work or there was a risk of puncturing or damaging the new roof because the monitor windows are located above the main roof. DA 726-27.**

Respectfully submitted,

s/David W. Francis
DAVID W. FRANCIS
Rhoads & Sinon LLP
One South Market Square
12th Floor (PO Box 1146)
Harrisburg, PA 17108-1146
Tel: (717) 237-6738
Fax: (717) 231-6600

Attorney for Plaintiff

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/Dawn S. Conrad
DAWN S. CONRAD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 616-2279
Fax: (202) 305-7643

OF COUNSEL:

JOSHUA D. HARVEY
Trial Attorney
Department of the Navy
Naval Facilities Engineering Command
720 Kennon Street, SE
Washington Navy Yard, D.C. 20374

Attorneys for Defendant

April 17, 2008

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 17th day of April, 2008, a copy of the foregoing "CONSOLIDATED STATEMENT OF UNCONTROVERTED FACTS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Dawn S. Conrad