# In the United States Court of Federal Claims

Case No. 03-2825C
(FILED: October 3, 2008)
**TO BE PUBLISHED**

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * *  \* | Jurisdictional prerequisites under |
| **M. MAROPAKIS CARPENTRY, INC.,**  \* | Contract Disputes Act, 41 U.S.C. |
| *Plaintiff,*  \* | § 605(a)-(c); Certified claim and |
| \* | contracting officer's final decision; |
| v.  \* | Government counterclaim; |
| \* | Liquidated damages for delayed |
| **THE UNITED STATES OF AMERICA,**  \* | contract performance; Defective |
| *Defendant.*  \* | specifications; Sequence of |
| \* | performance; Variance request; |
| * * * * * * * * * * * * * * * * * * * * * * * *  \* | Delay for discovery of lead based |
| | paint. |

**David W. Francis**, Harrisburg, PA, for Plaintiff.

**Dawn S. Conrad**, Department of Justice, Washington, D.C., for Defendant. With her on the briefs were: **Jeffrey S. Bucholtz**, Acting Assistant Attorney General; **Jeanne E. Davidson**, Director; and **Donald E. Kinner**, Assistant Director. **Joshua D. Harvey** and **Alan R. Caramella**, Department of the Navy, Of Counsel.

**John Bergen**, Law Clerk.

## OPINION

BASKIR, Judge.

The plaintiff, M. Maropakis Carpentry, Inc. (Maropakis), alleges breach of contract against the U.S. Department of the Navy. Citing various "delays, impacts and disruptions," plaintiff seeks damages resulting from the Navy's denial of Maropakis's request to extend the time for completion of a construction project pursuant the contract. *See* Complaint (Compl.). at ¶ 14; First Amended Complaint (Am. Compl.) at ¶ 10. The plaintiff moves for partial summary judgment, under the provisions of Rule 56(c) of the Rules for the U.S. Court of Federal Claims (RCFC), leaving the precise duration of the extension to which it claims it is entitled for determination at trial.

The defendant moves to dismiss plaintiff's complaint, pursuant to RCFC 12 (b)(1). The defendant also filed a cross-motion for summary judgment on the majority of Maropakis's claims, as well as on the government's counterclaim for liquidated damages assessed as a result of the contractor's delayed performance.

**For the reasons set forth below, we GRANT the defendant's motion to dismiss for lack of subject matter jurisdiction.  The pending summary judgment motions are largely rendered moot by virtue of our rulings on the motion to dismiss.  However, we consider below the government's entitlement to liquidated damages, and GRANT the defendant's motion for summary judgment only as it extends to the government's counterclaim.**

## BACKGROUND

## I.      Factual Background

These disputes arise in the context of a delayed government contract.  As the chronology below demonstrates, Maropakis did not commence performing the contract until well after the anticipated completion date.  The following background facts are gleaned from the pleadings, various exhibits contained in the appendices accompanying the briefs, and from the Consolidated Statement of Uncontroverted Facts (CSUF).  Based on the CSUF, a joint declaration filed after the primary briefing, the circumstances leading the parties to the steps of the courthouse are largely undisputed.  In the rare instance in which the parties offer contradictory versions of a legally significant fact or event, we address the matter more fully in the Discussion.

<u>The Solicitation and Award of the Contract</u>

The Navy issued Solicitation No. N62472-97-B-4116 for the procurement of construction and repair work on Building 110, a warehouse at the Naval Inventory Control Point in Mechanicsburg, Pennsylvania.  The project involved the demolition and removal of asbestos-containing materials, the removal and replacement of windows and roofing materials, and related work.  *See* Solicitation; Def. App. at 25; 102.  Maropakis was one of 26 contractors competing for the contract.

The solicitation contained a "NOTICE TO BIDDERS," typical of federal procurement, which provided that:

> All inquiries concerning the technical aspects of the attached specifications, or the drawings accompanying these specifications, must be requested <u>in writing</u> soon enough to allow a reply to reach all prospective bidders before the submission of their bids.  Oral explanations or instructions given before the award of a contract <u>will not be binding</u>.

Def. App. 47 (emphasis in original).

The buildings in and around the project site were to be occupied throughout the contract period.  Accordingly, the Navy imposed a number of limitations on access and scheduling to minimize interference with the ongoing operations of the buildings.  *See* Contract Section 01110, ¶¶ 1.4 (b); 1.7.5 and 1.7.5.1.  The solicitation called for performance in three distinct stages, as follows:

| TASK | DESCRIPTION |
|------|-------------|
| I | Removal of existing cementitious asbestos siding and metal framed windows on monitors [roof-level windows] and the installation of new EIFS wall systems and window assemblies. |
| II | Removal of existing built-up roof systems and the installation of new EPDM roof systems and associated work ... The roofing work shall begin over Fire bay A (South Bay) and proceed consecutively to Fire Bay D (North Bay). |
| III | Completion of remaining work final cleanup of the premises, final inspection, and project closeout. |

Contract § 01110, ¶ 1.5 (a) (Work Sequence); Def. App. 104.  Thus, the window project was to be completed prior to the roofing system.  This sequence requirement was reiterated in several places in the contract.  See Contract § 01110 at ¶ 1.7.5.1 ("special scheduling for occupied buildings"); Contract  § 01110, ¶ 1.4 (g) ("Schedule work so as to avoid trafficking over completed work and newly installed roof systems."); *see also* Def. App. at 804 ("sequence of operation").  The Navy insisted on this requirement in order to avoid the risk of damaging the new roof – the monitor windows on Building 110 are above the roof, and the only access to these windows is across the roof.  Def. App. 726, 804.

Prior to performing the contract work, Maropakis was to submit and have approved its plans and materials for each phase of performance.  The Navy's specifications were prepared by the architectural and engineering firm of Gale Associates, Inc. (Gale).  CSUF ¶ 9.  Designer Gary Brown was the individual at Gale responsible for preparing the project specifications.  He was also responsible for reviewing and approving drawings and submittals for all work to be performed on Building 110.  CSUF 26-28.

On February 4, 1999, prospective contractors conducted a routine site visit.  Two weeks later, on February 18, the Navy amended the solicitation.  Among the changes, the project's duration was increased from 210 to 270 calendar days.  Amendment 1, ¶ (a); Def. App. 14.  The amendment contained substantive revisions, as well: It

specifically prohibited the formerly approved use of hot asphalt as a roof insulation adhesive.  Amendment 1 ¶ (n); Def. App. 15.  Contractors were directed instead to use polyurethane foam for this purpose.  *Id.*

Maropakis acknowledged the amended requirements with its offer – a bid of $1,288,940.  CSUF ¶ 3; *see* Def. App. at 16.  On April 6, 1999, the Navy selected Maropakis's proposal.  Pursuant to the revised schedule, the project was to be completed on January 16, 2000.  However, several post-award modifications were issued by the Navy.  One of these items, which we discuss in far greater detail below, extended the contract period by 14 days.  Def. App. 357-58.  Yet another added 5 days to the contract.  Collectively, the modifications resulted in a revised completion date of February 4, 2000, and brought the total contract price up to $1,297,151.

As all prospective bidders were made aware, the contract incorporated the liquidated damages provision found in section 52.211-12 of the Federal Acquisition Regulations (FAR).  In accordance with that provision:

> [i]f the Contractor fails to complete the work within the time period specified in the contract, or any extension, the Contractor shall pay to the Government as liquidated damages, the sum of $650 for each day of delay.

Contract, ¶ 1.4 (a) at Def. App. 67; 48 C.F.R. § 52.211-12 (Liquidated Damages – Construction).  This rate was determined by the contracting officer, James Nihoff, based on the Government's estimated cost for the project and in accordance with the FAR.  Nihoff Affidavit, Def. App. 451-52.  The plaintiff expressed no objection to the liquidated damages provision, and submitted an unqualified bid.  *Id.*  Consequently, any unexcused delay beyond the revised February 4 completion date – absent a formal extension – would make the contractor liable for this agreed-upon sum of damages.

<u>Early Delays in Performance</u>

Under the terms of the contract, it was the plaintiff's responsibility to provide all labor and materials for the work to be performed, and to have them on hand prior to commencing with any work on a given stage or performance task.  Contract Section 01110, ¶ 1.4 (a); Def. App. 103.  During the early stages of the contract, as it prepared to begin the first phase of performance – removal and replacement of the monitor windows – Maropakis encountered difficulties in finding a suitable window manufacturer.  Plaintiff first entered into a subcontract with Exterior Technologies, Inc. (Extech).  However, when Gale received plaintiff's first submittal for Extech's monitor windows on July 26, 1999, they were deemed unsatisfactory; the submittal was disapproved on August 13.

Upon receiving this news, Maropakis informed the Navy that it was unable to locate a window manufacturer which "conform[s] to all the items in the contract specifications." Letter of Emmanuel Katerinis, Project Engineer; Def. App. 400. Without elaborating on the peculiar problems encountered with the specifications, the plaintiff's engineer requested that the government provide contact information for three window manufacturers that met the Navy's specifications. *Id.* On August 23, 1999, the Navy provided the names of "four (4) window manufacturers that manufacture window assemblies such as those specified for the above reference contract." Def. App. at 401.

In the midst of the start-up delays for Task I, the window project, Maropakis proceeded with the approval process for its proposed roofing work. As early as June 25, 1999, the company sent in its roofing submittal. On July 19, the Navy's consultant disapproved the submittal, believing the accompanying manufacturer's information was outdated. Finally, on August 6, the plaintiff furnished Gale with its final submittal for the roof assembly.

Maropakis's roof submittal indicated that the contractor intended to use Type III asphalt for the roof, as opposed to the polyurethane-based product that the Navy specifications called for. The submittal did not alert the recipient to the fact that it conflicted with the express prohibitions of the amended solicitation. Nor did the submittal, or any follow-up correspondence, request that the contracting officer relieve Maropakis of the polyurethane requirement imposed by Amendment 2. (The FAR sets out procedures for obtaining approval of deviations from contract requirements such as these. *See* 48 C.F.R. § 52.236-21 (e)-(f)).

On August 9, Gale approved the roof assembly submittal as presented. Plaintiff was notified of the approval on August 23. Despite the obstacles in getting the windows approved, Maropakis evidently assumed that its roof system submittal, at least, was on track.

Requests to Modify Construction Sequence

By early September, the Navy's contracting personnel began to express concerns regarding Maropakis's ability to meet the target completion date. On September 9, 1999, the Navy issued Maropakis a 10-day cure notice, warning the contractor that "the Government considers [Maropakis's] failure to perform any on site work, provide approved window submittals or provide a Construction Schedule conditions that are endangering performance of the contract." Def. App. 402. The plaintiff responded on September 14, in correspondence addressed to Lieutenant Larsen, Assistant Officer in Charge (OIC) at the Naval Inventory Control Point, again citing "great difficulty in obtaining the specified windows," and indicating that it is following up on the window manufacturer leads provided by the Navy. *Id.* The September 14 response also referenced and renewed earlier unsuccessful requests

made to the Navy's project manager, Robert Rosenberry, to adjust the sequence of the roof work in order to mitigate the delay in obtaining windows.

Not surprisingly, the defendant did not react favorably to the fact that its cure notice was met not with an assurance that Maropakis will satisfy its performance obligations, but rather with an already rejected counter-approach to proceed immediately on a later stage of the contract.  On September 16, the Navy addressed the repeated requests to shift project phases.  *See* Letter of Lieutenant Larsen; Def. App. 404.  Lieutenant Larsen echoed the response of the procurement officials who had already been lobbied on this subject.  In pertinent part, he wrote:

> 1.  In response to your letter ... [t]he contract performance period is 270 days, which includes time to submit, get approval and order windows. Below are the specification sections that require the windows to be installed first.

> 2.  Specification section 01110, para. 1.4, Special Scheduling Requirements states that the monitor windows are required to be at the job site prior to commencement of work.  Section 01110, para. 1.5, Construction Sequence, Task I, requires the installation of the new windows prior to installation of the roof system, Task II.

> 3.  The contract was written in this manner to meet the building occupant request.  The customer needs have not changed and therefore, the window installation must be performed prior to the removal of the existing roof.  Your request to start roof work is regrettably denied.

*Id.*

Then, on September 20, the plaintiff issued a second, more direct response to the Navy's September 9 cure notice, in which it reiterated that it "has not been able to commence physical work for reasons that there has not been any window manufacturer that meets the contract specifications."  Letter of Sal Cali, Project Engineer; Def. App. 405.  Although we have seen no independent verification of the fact, and the CSUF is conspicuously silent on the issue, Maropakis claims in the letter that the previously provided list of approved window manufacturers could not meet the specifications.  *Id.* The plaintiff's letter fails to offer any specific justification for contract delay or to make a formal request for a contract extension.  Although the letter references enclosed "window test reports," it does not tie the information to a specific procurement infraction or lodge a formal objection to the specifications.  Nevertheless, in this correspondence Maropakis for the first time suggests that the window requirements should be reconsidered by the Navy:

> As it can be seen from our previous correspondence and attached window technical data [not included or referenced in the parties briefs or exhibits],

there are not any window manufacturers that meet the specifications.  It
may be necessary for the Navy to review and modify the window
requirements.  Otherwise, please provide my office with a list of window
manufacturers that do meet the specifications.

*Id.*  Maropakis concluded this correspondence by making yet again a request to
commence the roof work immediately, noting that the parties might take advantage of
the favorable weather and avoid further delay based on what plaintiff predicted to be a
twelve-week manufacturing period once a window supplier had been identified.  *Id.*

Locating a Window Manufacturer

Plaintiff's suggestion concerning modification of window specifications was
soon overtaken by events.  Upon receipt of Maropakis's September 20, 1999,
correspondence, the government on October 22, 1999, provided the plaintiff with the
names of three additional window manufacturers that had not been included on the first
list furnished Maropakis.  These suppliers had been contacted by the Navy on plaintiff's
behalf, and each reportedly confirmed their ability to meet the Navy's specific window
requirements.  Def. App. 408-09.  Soon thereafter the plaintiff received word from one
of those suppliers, J. Sussmen, Inc., that it carried a window that did indeed meet the
specifications.

This latest Navy communication with Maropakis ultimately did more than merely
pass on referrals.  At this late juncture in the 270-day contract period, the Navy also
made it a point to state its position that Maropakis had failed in its September 20, 1999,
correspondence to adequately address the items in the cure notice.  Def. App. 408.
Moreover, the Navy again explained that it would not permit a modification of the
construction sequence.  *Id.*  And, finally, the Navy repeated the warnings of its earlier
cure notice.  Specifically, it threatened to terminate the contract for default and
demanded that Maropakis provide a commitment to procure the specified windows and
submit a new schedule for completion of work.  *Id.* at 409.

On October 29, 1999, one day in advance of the deadline contained in the
government's second cure notice, Maropakis answered with a revised construction
schedule, and indicated that:  "On Monday morning, November 1, 1999, Maropakis will
be on site with an approved window installer from J. Sussman, Inc., to review the
existing conditions."  Def. App. 410.

Satisfaction of Window Specifications

Plaintiff's efforts to prepare for Task I are poorly documented.  A
contemporaneous record of the specific obstacles encountered in the search for
monitor windows was never developed.  The plaintiff's pleadings and briefs indicate that
the window specifications included higher than usual testing standards for certain
qualities.  Indeed, the solicitation itself provide that the "[w]indows shall conform to

specified [industry] standards and the following, *whichever are more stringent*."
Solicitation ¶ 2.1.4 ("specific performance requirements") (emphasis added); Def. App.
288.

Among the most contentious of the specifications are the standards for water
resistance. Naval personnel directly involved in this procurement acknowledged the
unusually high standard. On November 2, 1999, after the search for a window
manufacturer finally came to a close, internal email correspondence from project
engineer/design manager Lonnie Moyer acknowledged that a 20 psf water resistance
requirement was in error, and that in fact, "[t]his requirement should have been 10 psf
or perhaps even lower." Def. App. 396. Based on this same email, however, it is clear
that Mr. Rosenberry was made aware of the higher testing criterion and recognized that
it would be unfair to the other bidders to apply a lesser standard to the successful
offeror. *Id.*

Work Begins

On January 4, 2000 – less than two weeks from the contract completion deadline
– the Navy received Maropakis's re-submittal for the monitor windows. *See* Contract
Log (entry 19); *see also* CSUF ¶ 74. The drawings for the monitor windows were not
received by Gale Associates until February 29, 2000; the approving official, Gary
Brown, did not sign off on the drawings until March 3, 2000. Def. App. 446; CSUF ¶ 77.

One day prior to the actual approval on March 2, 1999, J. Sussman notified
Maropakis through its subcontractor, Yon Con United, Corp., that the windows had
been fabricated and were ready to be picked up. It is at this point, according to
Maropakis's project engineer, Mr. Abdulqader Rangwalla, that the company was "ready
to mobilize and prepared to commence" with the actual work on the building. *See*
CSUF ¶ 107. Although the timing of the purported mobilization is disputed, we can at
least infer that the plaintiff was prepared to commence with the physical construction
work even if it could not officially commence performance prior to delivery of the
windows. *See* Contract Section 01110, ¶ 1.4 (a); Def. App. 103.

Delays Due to the Presence of Lead Paint

It is also at this juncture, when Maropakis allegedly had made the final
preparations necessary to begin the removal of the existing monitor windows, that a
new obstacle to performance surfaced. The precise date is subject to dispute. We are
informed by Mr. Rangwalla's deposition testimony that on or about March 7, 2000, he
recalls telling the window subcontractor to hold off on delivering the windows to the
construction site because of the possible presence of lead-based paint (LBP) on the
existing windows. Rangwalla Deposition (depo.) at Def. App. 843; *see also* CSUF
¶ 107 (disputed). Because LBP is a regulated hazardous substance, the Navy was
required to ensure certain precautions were observed in the removal and disposal of
the windows.

Pursuant to the contract, upon encountering possible hazardous substances Maropakis was required to "stop that portion of work and notify the contracting officer immediately."  *See* Contract ¶ 3.1.2 ("Unforeseen Hazardous Material"); Def. App. 180. The government would then investigate and determine whether to issue a modification. *Id.*  It is not clear precisely when Mr. Rangwalla informed the Navy of his suspicions concerning LBP.  We have only a series of conflicting accounts from which to piece together a proper time line:  (1) Maropakis began independent examinations of the window covering on March 22, *see* CSUF ¶¶ 109-11; and (2) Mr. Rosenberry's phone log indicates that Maropakis first asked the Navy about LBP on April 6, *see* CSUF ¶ 112.  The actual date that the test results were known to all is likewise subject to dispute.  What is important for purposes of this chronology is that at some point between April 6, 2000 and April 26, 2000, the presence of lead on the monitor windows was confirmed.  CSUF ¶¶ 111-15.  Subsequently, on May 5, the Navy directed Maropakis not to begin demolition activities until further notice.  CSUF ¶ 116.

On May 31, prior to receiving any further word on the LBP problem, the plaintiff's windows were delivered to the job site.  Def. App. at 418.  By letter dated June 7, 2000, Maropakis pressed the Navy for direction on how to proceed, emphasizing that its materials had been delivered to the site and that the company was prepared to commence work immediately.  Mr. Rosenberry called Maropakis on June 12 to express the government's position that the plaintiff was not authorized to begin work, irrespective of the LBP stoppage.  He advised Maropakis that:  (1) it must have approved submittals prior to beginning work on the roof (adhesive submittals had not yet been approved); (2) its materials are required to be at job site prior to starting work; and (3) All Quality Control personnel have not been approved.

Meanwhile, the parties proceeded with negotiations on an appropriate modification for the extra time and expense associated with removing the windows with the added requirement to abate LBP.  Ultimately, the parties settled on a modification that increased the contract price by $6,154 and added 14 days of work to the project; the Government accepted the responsibility to dispose of the hazardous materials. Def. App. 416-17.  On June 22, the Navy authorized Maropakis to resume work pending the formal modification, which was subsequently issued on June 30.

Although there is no indication that more than 14 days was required to do the added work, Mr. Rangwalla refused to sign the modification document as drafted. Maropakis was unwilling to agree to a 14-day extension, given the duration of the delays it had thus far experienced, both as a result of the LBP discovery and the plaintiff's inability to find suitable windows.  CSUF ¶¶ 120-21.  Consequently, the Navy issued a unilateral modification while acknowledging the plaintiff's disclaimers:

> The contractor during negotiations agreed to the sum of $6,154.00 and
> 14 calendar days time extension for removal of windows as lead
> contaminated.  However, the contractor signed a faxed copy of the
> Change Order agreeing to the sum of $6,154.00, dis-agreeing (sic) to the

14 day time extension.  The contractor wrote in a 360 day time extension in lieu of the 14 day time extension.  The 14-calendar day time extension is considered more than reasonable to accomplish this work.  The contractor stated that there were other reasons that he was entitled to this time extension, which had nothing to do with this modification.

Def. App. 419 (Rosenberry memo to file); *see also* Def. App. 420-21 (contract modification with handwritten exceptions).

On June 30, 2000, plaintiff formally objected to the modification and requested that the contract completion date be extended 365 days from January 16, 2000 to January 16, 2001.  Def. App. 422.  In a second letter to the contracting officer dated July 10, 2000, plaintiff again objected to the extension and this time requested an extension of 122 calendar days.  This represented the total time lost on the contract due to the discovery and abatement of lead paint:  108 days from the original start date of March 7, 2000 to June 22, 2000 – the date that the Navy cleared them to resume work -- and 14 days for removal.  Def. App. 425-26.

Prohibited Asphalt Discovered

In the midst of the controversial LBP modifications, Mr. Rosenberry noticed, apparently for the first time on June 26, 2000, that Maropakis had assembled asphalt for the roof work it intended to embark on after the window installation phase.  According to his log, Mr. Rosenberry informed the plaintiff on June 28, 2000, that the asphalt materials on-site could not be used.  Def. App. 394.

The roofing submittal, which signaled the plaintiff's intention to use asphalt as the means of attaching the roofing insulation, had been received and approved by Gale Associates almost a year earlier.  *See* Gale Associates Approval Document at Def. App. 449-50 (transmittal letter contains a stamp of approval, signed by Mr. Rosenberry on August 19, 1999).  However, neither the submittal nor its approval acknowledged that the use of asphalt was inconsistent with the contract specifications.  *Id.*  The asphalt was subsequently delivered to the site and apparently was not addressed again until Mr. Rosenberry's discovery.

When confronted by Mr. Rosenberry on June 28, 2000, the plaintiff invoked the earlier submittal approval.  According to the log notes, Mr. Rosenberry countered that Maropakis's quality control certification indicated that the submittal met the contract specifications, including Amendment 2, which specifically prohibited the use of asphalt.  Def. App. 394.  Ultimately, the plaintiff acceded to the government's insistence and arranged for the delivery of the proper roofing materials, turning its attention back to the ongoing window project.

Maropakis had not pursued a formal modification of the adhesive specifications when the requirements were initially imposed via Amendment 2.  Nor did it do so at this

point when confronted by Mr. Rosenberry.  In fact, Maropakis did not raise the asphalt issue again until several months after the completion of the entire project, in an all-encompassing retroactive request for an extension of the contract.  Def. App. 371-74.

Contract Performance and Delay

Following the two June 2000 events – the Navy's enforcement of the adhesive materials provision and the unilateral modification for removal of LBP – the plaintiff was moved to seek additional time in which to complete the contract.  As we previously indicated, the plaintiff sent the contracting officer two conflicting extension requests in response to the Navy's 14-day modification for lead abatement.  The second of these, the July 10 request, contained the subject heading "Extension of Time for Change Order P00001."  Def. App. 425-26.  In that document the contractor contended that it was unable to begin work from March 7 through June 22 because the Navy would not permit any demolition of windows during the investigation of the LBP issue and had previously declined the plaintiff's requests to commence work on other phases of the project.  *Id.*  Maropakis did not mention any other grounds for extension at this time.  The contracting officer did not respond to this request, although the same request had effectively been denied when the unilateral modification had been issued ten days earlier.

Several months passed, during which demolition and construction activities were performed by the plaintiff.  Then, on November 30, 2000, the contracting OIC sent a letter stating the following:

This contract provides for all work to be complete by 16 January 2000.  The work, to date, has not been completed and three hundred nineteen (319) calendar days have elapsed since the contract completion date.

The contract further provides that liquidated damages at the rate of $650.00 per calendar day shall be assessed for each calendar day of delay which the Contractor cannot substantiate as being beyond the control and without the fault or negligence of the Contractor, his subcontractors (at any tier) and within the purview of FAR Clause 52.249-10 [providing for termination for default] of the contract.

Def. App. 427.  The letter then advised the plaintiff to submit "at the earliest practical time" its application for time extension accompanied by substantiating data (the letter described the specific level of corroboration required).  *Id.*  The plaintiff was also directed to "identify the specific days, the number of days lost by reason of such delays and that such delays impacted the critical path."  *Id.*  In closing, the contracting officer promised that the formal application would be given prompt consideration upon receipt.  *Id.* at 428.

There is a gap in correspondence between the parties following the November cure notice.  However, during this period the defendant again pressed the plaintiff to perfect a formal extension application, as evidenced by the following entries in Mr. Rosenberry's log:

[Entry 44.]   **Feb. 01.**  Phoned Maropakis, asking when they plan to return to complete job.  Contractor gave no direct answer.  Ask him again about documentation for time extension.  Contractor said he is working on it.

[Entry 45.]   **4/10/01**  Phoned Maropakis, Abdule requesting additional information to justify their request for time extension.  Requested additional info, phone dates, memo on their effort to obtain a window supplier.  I was told by Abdule that there was no records of phone dates, memos or info.  Also tried to set a date to have a meeting with contractor to discuss his request for time extension.

Def. App. 394-95.

On May 17, 2001, the project was completed and passed inspection.  Def. App. 429-30.  The Navy assumed full "use and possession" under the contract.  Personnel had continued their occupancy of the building for the better part of the contract period – 467 days beyond the contract completion date.  Nihoff Affidavit, Def. App. 451–52.  With the completion of the project, the plaintiff finally turned its attention toward a formal application for extension.

<u>August 20, 2001 Application for Extension</u>

By letter dated August 20, 2001, "Re: Final Extension of Contract Time," Mr. Rangwalla detailed a 19-point chronology addressing each of the delays Maropakis encountered during the contract period and beyond.  Def. App. 371–74.  He included a section captioned "Time Detailed Information," capturing time lost during distinct periods of performance.  *Id*.

According to the letter, the plaintiff purportedly suffered the following delays: (1) **187 days** from April 22-October 25, 1999, addressing the difficulty in locating a window supplier (the plaintiff made no claim of defective or ambiguous specifications); (2) **32 days** from January 10-February 10, 2000, in time lost from the start date of fabrication of windows due to the need to re-submit plans; (3) **107 days** from March 7-June 21, 2000, due to the discovery and abatement of LBP on the existing monitor windows; (4) **20 days** from June 22-July 11, 2000, as a result of halting preparations for the roofing system installation when the Navy insisted on the use of adhesive instead of

asphalt; and (5) **101 days** for time lost searching for a metal fabricator during the July 7-October 20, 2000 period.  According to the letter, the "total extension of time required is up to April 7, 2001 [elsewhere in the letter, April 17, 2001] 447 consecutive calendar days."  *Id.* at 374.  Mr. Rangwalla provided no substantiating documents with the request.

Initial Response to Maropakis's Extension Request

Despite the fact that the plaintiff's request had not been addressed to him, the contracting officer promptly replied to the August 20 letter.  On August 28, 2001, the contracting officer "determined that [plaintiff] ha[s] not presented sufficient justification to warrant the time extension you have requested."  Def. App. 369.  With respect to the first two periods, totaling 219 days, the contracting officer wrote:

> You have stated that your delays associated with obtaining the specified windows started on April 22, 1999.  You did not notify the government of your difficulty in locating a supplier until 19 August 1999.  You have documented contacts with several window suppliers, but you have not shown for all of the suppliers you contacted, why they could not meet the specification; nor have you demonstrated why you had difficulty finding a supplier that met the specification.

*Id.*

Similarly, the contracting officer rejected the 107-day time extension for the removal of the LBP-contaminated windows based on his understanding that the materials had not been delivered to the project site prior to commencing work under the contract.  *Id.*

Then turning his attention to the 20-day extension associated with the Navy's refusal to approve the use of asphalt on the roofing system, the contracting officer noted:

> Amendment 2 to the contract, issued during solicitation and acknowledged by your company prior to contract award requires the use of adhesive.  In accordance with FAR clause 52.246-12 Inspection of Construction, the presence or absence of a government inspector doesn't relieve the contractor of any contractual requirement.  No variation to the contract was ever requested by your company, in accordance with specification section 01330 paragraph 1.3.3 and the associated delays are attributed to the contractor.

*Id.* at 369-70.

Finally, the contracting officer addressed a 101-day delay associated with difficulties in locating a sheet metal manufacturer.  The rationale for this extension paralleled plaintiff's explanations respecting suppliers of windows, and was dealt with similarly by the contracting officer.  In treating the sheet metal delays, however, the contracting officer noted an independent defect in the requested extension:  the delay periods for the adhesive and those for the sheet metal overlap.  *Id.* at 370.  Moreover, the alleged delay in rectifying the adhesive materials issue occurred during Maropakis's work on the window removal/ installation project.  *Id.*  Therefore, it could not have impacted the plaintiff's schedule until Phase I (window installation) of the contract was completed and Phase II (roof replacement) was set to commence.

The letter closed with a standard explanation of the contractor's rights.  Specifically, Maropakis was informed, "[i]f you disagree with this determination, you may request a decision of the Contracting Officer pursuant to the provisions of the Disputes Clause of your contract."  *Id.*  The letter further concluded:

> You may submit information and you may request the previous correspondence concerning this matter be forwarded to the Contracting Officer for further review and determination.
>
> This letter is *not a Final Decision* of the Contracting Officer.

*Id.* (emphasis added).

Demand for Liquidated Damages

The plaintiff never replied to the contracting officer's August 28, 2001 letter, either by supplying additional information or requesting a final decision on its extension requests.  *See* Nihoff letter dated Aug. 28, 2001 at Def. App. 370.  There was nothing signifying to the Navy that the plaintiff intended to follow up on these items.

The next correspondence in the record is dated June 28, 2002, a full 10 months after the denial of plaintiff's requests.  Def. App. 800.  But it is the Navy, not Maropakis, which breaks the long period of silence.  (The papers contain an identical version of this letter dated July 18, 2002, and it is this later version that is cited in the CSUF.  See CSUF ¶ 18; Def. App. 367–68).  After first noting that Maropakis had "not responded with additional information or requested a Contracting Officers (sic) final decision" for the 447-day extension request, the defendant assessed liquidated damages against the contractor in accordance with the $650 per day rate set forth in the contract.  Def. App. 367.  Based on the Navy's earlier determination that the Maropakis finished the project 467 days after the contractual completion date, plaintiff was found liable for $303,550 in liquidated damages.  *Id.*  This figure was applied against the contract balance of $244,035, resulting in a net liability of $59,514.  *Id.*  The plaintiff was allowed 30 days to

remit payment or request deferment, after which period the contracting officer would issue a final decision pursuant to the contract's disputes clause.  *Id.*  at 367-68.

July 22, 2002 Response to the Demand for Liquidated Damages

The plaintiff responded to the demand for liquidated damages on July 22, 2002. Maropakis reiterated its earlier request for an extension, mentioning only the 107-day extension for the removal of lead contaminated windows. Def. App. 802.  For the first time since the Contracting Officer's August 28, 2001 letter, the plaintiff responded to the Navy's rationale for rejecting the LBP delays.  According to the plaintiff, the 107-day extension caused by the LBP work stoppage is "correct and justifiable."  *Id.*  Maropakis acknowledged the contractual requirement that materials be on-site prior to the beginning of the window work, and conceded that the plaintiff's windows had not been delivered until May 31, as the Contracting Officer found.  *Id.*  According to the plaintiff, however, the windows were ready for delivery prior to that date – the contractor does not state since when – but Mr. Rosenberry from your office verbally directed us not to deliver and start installation of windows until we resolve the problem related to [LBP]." *Id.*

Therefore, plaintiff asserted, "we *will* dispute ... the liquidated damages amount of $303,550.00 and *will* indicate that M. Maropakis was not responsible for the delays. *Id.*  (emphasis added).  The July 22 response made no mention of the remainder of the previously asserted and rejected extensions, nor did it contest the propriety of enforcing liquidated damages, in general.  There was no follow-up correspondence between the parties after this exchange, nor did the plaintiff follow through on what appeared to be a promise to file a separate formal claim.

The Navy did not issue a written response to the plaintiff's stated intention that it "will" dispute responsibility for delays and dispute the quantum of liquidated damages. According to the pleadings, however, the parties met on October 31, 2002, at which time "Maropakis presented additional information to the Navy demonstrating delay as a result of the atypical window specifications and other documentation supporting its claim for an extension of time."  Compl. ¶ 78.  During the briefing of the pending motions neither party elaborated on this meeting or on the alleged exchange of information.  Nor is there any documentation, contemporaneous or otherwise, to elucidate the matters discussed.  However, the meeting was specifically cited by the Contracting Officer when taking final action on what the government contends was simply the liquidated damages piece of this case.

Final Decision of the Contracting Officer

On December 20, 2002, the Navy issued Final Decision #03-002F, which provides, in pertinent part:

Reference is made to our Demand letter to you dated June 28, 2002.

-15-

After reviewing your letter dated July 22, 2002 and the information presented at the 31 October 2002 meeting at Engineering Field Activity, Northeast, the Contracting Officer has determined that there has been no new information presented to change our position.  Therefore, we reiterate our demand that you are liable to the navy for the difference between the remaining contract balance of $244,035.00 and $303,550.00, the total amount of liquidated damages due and owing the Government.

\*          \*          \*

This is the Final Decision of the Contracting officer.  This decision may be appealed to the Armed Services Board of Contract Appeals, which is the authorized representative of the Secretary of the Navy for hearing and determining contract disputes.

Def. App. 365-66.

The plaintiff's and the defendant's characterizations of this letter differ.  CSUF ¶¶ 20-21.  Whereas the government limits the final decision to the Navy's demand for liquidated damages, the plaintiff contends that the final decision applies to each of its previous "claims" for extension of the contract period.  *Id.*  As we shall discuss shortly, the case turns on this issue.

## II.    Procedural History

Approximately one year elapsed without any further claim activity at either the contracting officer level or at the Board of Contract Appeals.  On December 17, 2003, Maropakis filed a Complaint in this Court.

Maropakis avers that it is entitled to compensatory damages in the amount of $244,036 for the contract balance, "rescission (sic) of liquidated damages," and interest and attorneys' fees.  *See* Am. Compl. (Request for Relief).  In support of its request, the pleading alleges several categories of "delays, impacts, and disruptions," including: impacts due to non-traditional window specifications, Compl., ¶¶ 15-39; impacts resulting from the unanticipated presence of lead paint, Compl., ¶¶ 40-61; delay relating to roof materials, Compl., ¶¶ 62-69; and delay due to unusually severe weather conditions, Compl., ¶¶ 70-72.

Subsequently, on September 15, 2005, after discovery had concluded, the plaintiff filed its First Amended Complaint.  Maropakis refined its  "window claim," and now alleged a series of defects in the Navy's specifications, a contention which had not been formally raised before.  *See* First Amended Complaint, ¶¶ 11-31.  It repeated the original assertions with respect to the lead paint delays, *id.* at  ¶¶ 32-36, and the Navy's untimely rejection of Maropakis's roofing materials, *id.* at  ¶¶ 37-44.  Finally, it added

several items that had been omitted from the original pleading, namely:  the Navy's refusal to permit Maropakis to begin roof removal and replacement work, *id.* at ¶¶ 45-47, delays associated with "improper review of submittals," *id.* at ¶¶ 48-49, and remission of liquidated damages, *id.* at ¶¶ 50-52.  With respect to this last item, the plaintiff for the first time in this dispute challenged liquidated damages, not just as to the amount or the period of delay attributable to its own conduct, but also because "the Navy did not incur additional costs justifying the imposition of liquidated damages."  *Id.* at ¶ 51.

These allegations were met with the government's answer and a four-paragraph counterclaim, in the amount of $59,514, representing the unpaid balance of the assessed liquidated damages.  Maropakis's answer to the defendant's counterclaim denies its own culpability in failing to timely perform its contractual obligations, and raises a series of affirmative defenses to the demand for liquidated damages.

Plaintiff moved for partial summary judgment, limited to its claims regarding the allegedly defective monitor window specifications and its entitlement to an additional extension for the unanticipated abatement of lead paint on the windows.  With regard to the latter, however, "Maropakis requests that the duration of these delays be established at trial."  Plaintiff's Brief (Pl. Br.) 1.  This, of course, marks a retreat from plaintiff's earlier insistence that it is entitled to a 122-day extension for the period March 7 through June 21, 2000.  *See* Compl. ¶ 61;  First Am. Compl. ¶ 34; *compare* Rangwalla letter, dated Aug. 20, 2001 (requests LBP extension of 107 days, taking into account 14-day extension approved by unilateral modification).

The government moved to dismiss for lack of subject matter jurisdiction the portions of Maropakis's complaint relating to its claim for government-caused delay.  Defendant's Brief (Def. Br.) 20.  According to the defendant, Maropakis never submitted a certified claim requesting a final decision from the contracting officer and, therefore, failed to meet the jurisdictional prerequisites of the Contract Disputes Act, 41 U.S.C. § 609(a).  The government also seeks summary judgment as to liquidated damages demanded by the contracting officer.  It further moves for summary judgment on the majority of the contentions within the plaintiff's amended complaint.  In particular, the government seeks judgment as a matter of law on the plaintiff's assertions: (1) that the Navy's window specifications were defective; (2) that the Government's implicitly waived the non-asphalt materials requirement when it approved plaintiff's submittal; and (3) that the Government unreasonably failed to change the contract's sequence of performance.  Interestingly, however, the defendant does not demand summary judgment on the claims relating to LBP.

On June 11, 2008, this Court heard oral arguments on the above motions.  During the argument, plaintiff's counsel presented new arguments that had not been fully developed during the briefing.  Furthermore, in responding to questions posed from

the bench, counsel indicated that he could produce authority directly related to the Court's jurisdictional inquiry. Accordingly, we permitted the parties to file supplemental papers, with the briefing to be completed by July 21, 2008.

## DISCUSSION

### I.    The Government's Motion to Dismiss

<u>Subject Matter Jurisdiction</u>

The Tucker Act, 28 U.S.C. § 1491 (a)(2), provides that "[t]he Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under ... the Contract Disputes Act of 1978, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act." *Id.*

Accordingly, plaintiff's claims are governed by the Contract Disputes Act (CDA), 41 U.S.C. §§ 601, *et. seq.* Pursuant to that authority, contractors are required first to pursue claims with the contracting officer, the official charged with administering that particular government contract on behalf of the agency. 41 U.S.C. §§ 605(a), 609(a). This requirement, along with procedural requirements applicable to the claim, are considered "jurisdictional prerequisites" to filing an action in the Court of Federal Claims. *Sharman Co., Inc. v. United States*, 2 F.3d 1564, 1568-69 n.6 (Fed. Cir. 1993), overruled on other grounds by *Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995); *North Star Alaskan Housing Corp. v. United States*, 76 Fed. Cl. 158, 183-84 (2007). *But see Davies Precision Machining, Inc. v. United States*, 35 Fed. Cl. 651, 655-56 (1996) (treating failure to satisfy CDA requirements as failure to state a claim on which relief can be granted).

It is the plaintiff's burden to establish jurisdiction by a preponderance of the evidence. *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing *McNutt v. General Motors Acceptance Corp.*, 298 U.S.178, 189 (1936)); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). When, as in this case, the government challenges jurisdiction pursuant to RCFC 12 (b)(1), we construe the allegations of the Complaint favorably to the pleader. *Scheurer v. Rhodes*, 416 U.S. 232, 236 (1974). However, it is also incumbent upon the Court to decide any disputed facts that are relevant to the issue of jurisdiction. *Reynolds*, 846 F.2d at 747.

<u>Threshold Requirements for Valid CDA Claim</u>

Pursuant to the CDA, "[a]ll claims by a contractor against the Government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a). Furthermore, claims over $100,000 must be

certified by the contractor.  *Id.* at  § 605 (c)(1).  Although the statute does not define the term, the FAR defines a "claim" in the following manner:

> Claim means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract.  However, a written demand or written assertion by the contractor seeking the payment of money exceeding $100,000 is not a claim under the Contract Disputes Act of 1978 until certified as required by the Act.  A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim.  The submission may be converted to a claim, by written notice to the contracting officer as provided in 33.206(a), if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

48 C.F.R. § 2.101.

The Court of Appeals has held that no particular form or wording is necessary; however, a claim under the CDA requires "a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim."  *Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987); *Hawkins & Power Aviation, Inc. v. United States*, 46 Fed. Cl. 238, 243 (2000).

A claim for CDA purposes is more than a routine demand or invitation to negotiate with the contracting officer.  The contractor must seek a final decision on the matter in question and assert a legal right to that which is requested.  *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1395 (Fed. Cir. 1987).  This Court's predecessor, the United States Claims Court, has looked to the following factors in determining whether a contractor's written demand qualifies as a claim under the CDA:

> [w]hether the letter clearly and unequivocally (1) asserted specific rights; (2) requested specific relief of a sum certain; (3) requested a final decision; and (4) whether the letter, in conjunction with the totality of the circumstances, was sent in the context of an ongoing dispute between the parties as to which they had previously abandoned negotiations.

*Sun Eagle Corp. v. United States*, 23 Cl. Ct. 465, 471 (1991).  A careful review of these factors in the context of Maropakis's claims leads us to conclude that CDA jurisdiction over those claims is lacking.

Plaintiffs "Claims" at a Glance

The government's motion to dismiss goes to the entirety of plaintiff's First Amended Complaint, except for plaintiff's request for remission of liquidated damages, which the defendant concedes is properly before the Court.

The subjects listed below represent categories of objections or reasons for delay. Each was relied upon by Maropakis to a greater or lesser degree in attempting to extend the period for completing the project.  As is indicated in the recitation of background facts, the plaintiff raised other grounds for extensions, such as severe weather delays and difficulties in obtaining sheet metal.  Those objections have apparently been abandoned by Maropakis, however, and do not warrant further consideration.

      *(i.)*    *Window Specifications*

As we have seen, Maropakis's early letters to Naval personnel overseeing the work explained the late start on contract performance by vaguely describing problems in finding a window manufacturer that "conform[s] to all the items in the contract specifications."  Letter of Emmanuel Katerinis, Project Engineer, dated Aug. 19, 1999, at Def. App. 400; *see also* Letter of Sal Cali, Project Engineer, dated Sept. 14, 1999, at Def. App. 403 ("M. Maropakis has incurred great difficulty in obtaining the specified windows.") There was no formal request for an extension or equitable adjustment of the contract period contemporaneous with the delays experienced by Maropakis.  Indeed, this early correspondence was not even addressed to the contracting officer.

We recognize the contractor need not invoke certain magic words or explicitly request a final decision.  *James M. Ellett Const. Co. v. United States*, 93 F.3d 1537, 1543 (Fed. Cir. 1996); *Contract Cleaning*, 811 F.2d at 592.  However, there are three characteristics which define a nonroutine submission as a "claim" under the CDA.  The submission must be: "(1) a written demand or assertion, (2) seeking as a matter of right, (3) the payment of money in a sum certain."  *Ellett*, 93 F.3d at 1542-43.  A mere settlement proposal is insufficient.  *Id.* at 1544.  A claim signifies an impasse in negotiations, whereupon the contractor resorts to the final step of submitting its demand to the contracting officer for a final decision.  *See McDonnell Douglas Corp., v. United States*, 37 Fed. Cl. 285, 291 (1997) (quoting *Ellett*, 93 F.3d at 1543-44), *rev'd on other grounds* in *McDonnell Douglas Corp. v. United States*, 182 F.3d 1319 (Fed. Cir. 1999); *see also Medina Constr., Ltd. v. United States*, 43 Fed. Cl. 537, 548-49 (1999) (discussing impasse requirement for termination settlement proposal).

The plaintiff's correspondence to personnel other than the contracting officer, in which the plaintiff suggested "[i]t *may* be necessary for the Navy to review and modify the window requirements," hardly qualifies as such a demand or assertion. *See* Letter of Sal Cali, Project Engineer, to Lieutenant Commander M.A. Weaver, dated Sept. 20, 1999; Def. App at 405 (emphasis added).  Maropakis's initial correspondence concerning the procurement of windows made no demand for additional money or adjustment of the contract period.  At most, the contractor attempted to work with its employer in order to mitigate the delay both in pursuing referrals for manufacturers and in seeking permission to do work out of sequence.

For instance, the plaintiff furnished the Navy with periodic assurances and a revised schedule of performance.  The Navy approved the revised progress schedule, at the same time notifying Maropakis that any forbearance on its part should not be construed as waiving contractual remedies.  Even with the threat of default termination and multiple cure notices during late 1999, Maropakis did not request an equitable adjustment of the contract period or seek to modify the window specifications.

The first time the plaintiff invoked the window procurement delays as grounds for an extension was August 20, 2001, two years after the Navy assisted Maropakis in finding a window subcontractor.  In response to the Navy's liquidated damages notice, the plaintiff contended that the contract should be extended for various reasons and time periods -- among those, a 187-day delay during the period from April 22 to October 25, 1999, during which Maropakis labored to find a satisfactory window manufacturer.  Application for Extension (Aug. 20, 2001), Def. App. at 371-74.  The letter to the contracting officer cited no legal basis for an extension and provided only the barest of details in summarizing the contractor's delays.

In contrast, the claim before us today raises a myriad of detailed objections to the solicitation.  For instance, in its First Amended Complaint, Maropakis avers that "the specifications required a window which does not exist," pointing to purportedly inconsistent descriptions of the product sought and the industry standards cited.  First Am. Compl. at ¶¶ 11-18.  Furthermore, the plaintiff contends, the specifications violated applicable industry standards for water resistance test pressure and air infiltration pressure.  First Am. Compl. at ¶¶ 19-25 and ¶¶ 26-31, respectively.  *But see* Contract ¶¶ 2.1, 2.1.1, 2.1.2 and 2.1.4; Def. App. 287-88 (contract specifications requiring AAMA and ANSI standards "and the requirements specified herein;" "except as otherwise indicated;" "and the following, whichever are the more stringent").

Certainly, as respects these allegations, the contracting officer cannot be said to have been given "adequate notice of the basis and amount of [plaintiff's] claim." *Contract Cleaning*, 811 F.2d at 592.  These items have never been presented to the contracting officer.  Consequently, we have no jurisdiction to decide the allegations concerning defective or ambiguous contract specifications.  *See Spirit Leveling Contractors v. United States*, 19 Cl. Ct. 84, 90-91 (1989) (finding claim submitted to contracting officer stated different legal theory than that alleged in complaint).

Although the issue was never addressed by the contracting officer, the government correctly argues that the Navy was entitled – or, as we believe, obligated -- to insist upon plaintiff's compliance with the contract specifications.  *See Cascade Pac. Int'l v. United States*, 773 F.2d 287, 291 (Fed. Cir. 1985) (and cases cited therein).  Furthermore, the Navy may require Maropakis to comply with performance requirements in excess of the standards normally accepted in the trade.  *Blake Constr. Co. v. United States*, 28 Fed. Cl. 672, 688-89 (1993) (citing *Ralph Larson & Son, Inc. v. United States*, 17 Cl. Ct. 39, 46 (1989)), *aff'd*, 29 F.3d 645 (Fed. Cir. 1994).

Even had Maropakis's allegations been presented to the contracting officer for a final decision, consideration of the issue runs contrary to the accepted principle that objections to contract specifications, or clarification of patent ambiguities in a solicitation, must be sought prior to the closing date for bids. *Cf. Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313-14 (Fed. Cir. 2007) (applying doctrine of patent ambiguity in bid protest context, Court notes that the doctrine "was established to prevent contractors from taking advantage of the government, protect other bidders by assuring that all bidders bid on the same specifications, and materially aid the administration of government contracts by requiring that ambiguities be raised before the contract is bid, thus avoiding costly litigation after the fact.") (citations omitted); *Erinys Iraq Ltd. v. United States*, 78 Fed. Cl. 518, 533 n.7 (2007) (Finding challenges to solicitation untimely). There has been no showing by the plaintiff that the defects it complains of were latent defects which could only be determined once performance had been attempted. Nor has the plaintiff demonstrated that it was impossible to satisfy the specifications.

Indeed, it would be hard-pressed to make such a showing given the fact that a manufacturer eventually provided windows that met the government's specifications. *See Davies,* 35 Fed. Cl. at 670-71 (contractor who eventually performs work in accordance with the specifications faces "an extraordinarily heavy burden to establish that the specifications were defective"); *Kit-San-Azusa v. United States*, 32 Fed. Cl. 647, 657 (1995) (absent evidence of defective design, "unforeseen difficulties" is not a basis for additional compensation; contractor "has no right to complain if the structure it ultimately constructed was essentially the same as the one it contracted to construct") (citations omitted). In any event, these questions are appropriate for a summary judgment proceeding, which we find precluded.

(ii.)    *Sequence of Performance*

As we explained earlier, the construction schedule required Maropakis to replace the monitor windows prior to proceeding with the second phase of performance -- installing the new roofing system. See Contract specification section 01110, ¶¶ 1.4 and 1.5; Def. App. 104; *see also* Def. App. at 804. In his deposition, design manager Lonnie Moyer explained that the location of the monitor windows, above the roof, necessitated the order of the project. Def. App. 726. The Navy's aim was to avoid having contractors tread upon a newly installed rooftop while replacing the monitor windows. *Id*.

On several occasions in September 1999, Maropakis asked Navy officials to permit the contractor to begin work on the roof pending the procurement of monitor windows and approval of the window replacement phase of the project. The plaintiff's requests were denied, and the reasons for the denials explained. *See, e.g.*, Letter of Lieutenant S.K. Larson, dated Sept. 16, 1999, Def. App. at 404 ("The contract was written in this manner to meet the building occupant request. The customer needs

have not changed and therefore window installation must be performed prior to removal of the existing roof."); *see also* Letter of Lieutenant Commander M.A. Weaver, dated Oct. 22, 1999, Def. App. at 408-09.  As a general matter, a procuring agency is entitled to insist on strict compliance with its solicitation's requirements.  *Mega Constr. Co. v. United States*, 25 Cl. Ct. 735, 744 (1992); *see Blake Constr. Co., Inc. v. United States*, 987 F.2d 743, 747 (Fed. Cir. 1993) ("Contracting parties may freely choose to have work performed in a specified manner ... even if [it] was not the usual mode.").

As we view the record, this issue never matured into a demand for specific relief or an independent request for additional time.  The request to perform work out of sequence is more aptly described as an attempt by the plaintiff to mitigate its own delay in procuring the materials required for the first phase of performance.  *See* Response to Cure Notice, dated Sept. 20, 1999, Def. App. at 405 ("Please be advised that the window manufacturing time is approximately twelve weeks.  If it is necessary to wait for the window installation prior to the roofing work, the project will incur further delays.").

For reasons which remain unexplained, Maropakis failed to raise with the contracting officer some of the finer points it now raises in its claims before this Court.  See Compl. ¶¶ 45-47.  Notably, however, plaintiff's motion does not seek summary judgment on an independent "claim" relating to the Navy's adherence to the contractual sequence of performance.  The issue is mentioned merely as a factor which exacerbated the delay caused by the allegedly conflicting monitor window specifications.  Plaintiff's opening brief made no attempt to demonstrate that the contractor was entitled to have the sequence requirement waived by the Navy.  Only in opposition to the defendant's cross-motion did the plaintiff address this issue, calling the agency's refusal to allow the deviation in work arbitrary and capricious.  Plaintiff's Opposition (Pl. Opp.) at 6.  Here for the first time the plaintiff argues:

There were two roofs on this project – the principal roof ("the lower roof") and the roof above the monitor windows ("the high roof").  The monitor windows were located below the high roof.  Maropakis sought to begin roof work on the high roof.

\*        \*        \*

In this instance, there was no threat that the workmen would be walking on or otherwise damaging the high roof while working on the monitor windows.  The United States has not provided any non-arbitrary basis for its refusal to allow Maropakis to replace the roof in that area.

*Id.* at 6-7; *see also* CSUF ¶¶ 133-35.

There may be something to this proposition.  The contract does provide for completion of the monitor windows "before roofing installation is done on the *main roof deck*," so as to avoid construction on newly installed roofing.  Solicitation, ¶ 1.3(e)

(emphasis added); *but see*, Solicitation, ¶ 1.5 (establishing roof work as Task II, to be performed after removal and installation of window assemblies).  If the contract does not prohibit work on the high roof, but only work on the principal roof, as plaintiff suggests, then we are at a loss to explain why Maropakis bothered to ask for permission to proceed as it now proposes.

We do not express an opinion on the merits of this argument.  It is an argument better made to the contracting officer at a time when it could have had an impact on the plaintiff's performance obligations.  However, we do note that there is no evidence that Maropakis ever limited its request to only one portion of the roof.  Maropakis promises only that it will "take all necessary precautions to protect the roof after its installation." Def. App. 403.  Under the circumstances, this is hardly a clear and unequivocal assertion of specific rights.  *Sun Eagle*, 23 Cl. Ct. at 471.

Finally, in the document which the plaintiff describes as its formal claim to the contracting officer – the August 20, 2001 request for delay delineating several independent extension periods – the sequence issue is scarcely mentioned.  *See* Def. App. 371 ("(6) Since there had been difficulty with the window approvals, [plaintiff] had requested to perform the roofing work prior to the window work.  (7) The Navy denied our request to start roof work prior to window work.").  Never was the Navy's denial tied in with the 447-day extension or associated with specific relief or sum certain.  *Sun Eagle*, 23 Cl. Ct. at 471.  Accordingly, the contracting officer did not address the matter at all in his August 28, 2001, response to Maropakis's blanket extension request.  *See* Def. App. 369-70.  The plaintiff failed to preserve this claim, quantify its impact, or demand a final decision from the contracting officer.

(iii.)   *Asphalt Roofing Materials*

As with the previous two items, there is a dearth of contemporaneous evidence supporting the plaintiff's claims respecting its attempted use of asphalt on the roof project.  Once again the plaintiff sought to perform contrary to the express terms of the solicitation without any legal justification or timely objection to the Navy's requirements. And, once again, Maropakis failed to cast its requests to the contracting officer in a manner that contends that the government was responsible for delay.

The only correspondence concerning the contract's adhesive materials requirement is found in Maropakis's August 20, 2001, extension request.  In that request, plaintiff recounts the following chronology:

Firestone roofing system with the manufacturers literature was submitted for approval on June 25, 1999.  On July 19, 1999, the literature was disapproved by the Consultant assuming that it is outdated. On August 18, 1999, the Navy/Consultant accepted the same literature. Maropakis received the approval notice on August 23, 1999.

M. Maropakis submitted manufacture's assembly letter on August 6, 1999, indicating the attachment method of fiberboard to the roof system using Type III asphalt.  On August 9, 1999, the Navy/Consultant accepted this method.  Therefore, M. Maropakis ordered and delivered Type III asphalt to the site.  Mr. Rosenberry, Project Manager, from your office noticed the delivery of asphalt, gave the location for storage and never objected to the delivery and its usage.  Mr. Rosenberry never informed M. Maropakis that asphalt could not be used.

The Navy insisted (sic) the use of adhesive instead of asphalt.  Therefore, M. Maropakis had no choice but to stop preparation for the installation of roofing system.  We ordered and received adhesive on July 11, 2000 and started the installation of roofing system on July 12, 2000.  Therefore, time lost from June 22, 2000 to July 11, 2000 – total of 20 consecutive calendar days.

Def. App. at 374.

The Navy's response noted that "Amendment 2 to the contract, issued during solicitation and acknowledged by your company prior to contract award requires the use of adhesive."  Def. App. at 369-70.  It further observed that "[n]o variation to the contract was ever requested by your company, in accordance with specification section 01330 paragraph 1.3.3."  *Id.*  With respect to the suggestion that Maropakis was misled, despite the clear import of Amendment 2, the Navy cited FAR § 52.246-12, pertaining to inspections for construction contracts.  According to that clause, the presence of a government inspector, and his implicit approval of construction activities, does not relieve a contractor of its contractual requirements.

Finally, in addressing the actual period of delay associated with the delivery of non-conforming materials, the Navy noted that any delay overlapped with other delay periods and with work on Phase I of the contract; thus, the asphalt mishap had "no demonstrated impact on [Maropakis's] schedule."  Def. App. 370.  Maropakis was invited to submit additional information in support of a formal claim.  *Id.*  The letter closed with the following proviso: "This letter is not a Final Decision of the Contracting Officer."  *Id.*

In describing the "claim" presented here, if indeed one has been presented, it is important to recognize what is *not* being asserted.  The solicitation was amended, prior to the deadline for receipt of proposals, to require that the successful offeror use polyurethane foam as adhesive for roof insulation; hot asphalt was not permitted.  There is no dispute that Maropakis understood and agreed to the Navy's prohibition against the use of asphalt materials.  *See* Rangwalla depo. at Def. App. 564-65.  Neither the extension request nor the pleadings contend otherwise.  *See* Am. Compl. at ¶ 38 ("The contract documents called for Maropakis to provide non-asphaltic adhesive materials for the new roof.").

Moreover, Maropakis did not request specific relief from the adhesive requirements, despite the suggestion in its complaint that "[a]sphalt is frequently used in the roofing industry as an adhesive for new roofing work."  Am. Compl. at ¶ 37.  This is not a case in which the plaintiff sought a variance in contract specifications that had subsequently been denied by the contracting officer.  *See* FAR § 52.236-21 (f) (describing procedure for submitting variations from contract requirements and issuing modifications thereon).  There is also no indication that the plaintiff contends it is legally entitled to use asphalt in lieu of the materials specified by the amended solicitation.

At most, Maropakis *requested* additional time for the period June 22 through July 11, 2000, the denial of which may or may not have impacted its overall time frame for completing the project (the window removal and lead abatement procedures had just begun on June 22, thus the roof work could not have commenced immediately in any event).  This request was premised not on an entitlement to additional time, but rather on the administrative oversight of both the contractor and the procuring agency.  Certainly, the plaintiff's letter to the contracting officer made no claim of contractual breach, as is alleged in the pleadings.  *See* Am. Compl. at ¶ 44 ("The Navy's untimely rejection of the asphalt materials was a material breach of the contract, and caused Maropakis to experience delays, impact and extra costs.").  We cannot consider a legal theory which has never been presented to the contracting officer for his final decision.  *See J. Cooper & Assoc., Inc. v. United States*, 47 Fed. Cl. 280, 285-86 (2000) (holding breach of contract claim was not properly presented to contracting officer, despite earlier claims based on termination/changes/stop work clauses).

Interestingly, plaintiff has not moved for summary judgment on this ground, nor does its opening brief expound upon plaintiff's theory of breach.  The above-quoted passage from the August 20, 2001, correspondence fails to cite any statutory, regulatory, or contractual authority in support of its 20-day extension request.  A valid CDA claim is more than a mere request.  Whether it is for monetary or nonmonetary relief, a claim seeks it as a matter of right.  *Davies*, 35 Fed. Cl. at 664 (citing *Reflectone*, 60 F.3d at 1576);  *North Star*, 76 Fed. Cl. at 185 (contractor required to "specifically assert entitlement to the [nonmonetary] relief sought") (quoting *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1265 (Fed. Cir. 1999)).  In the absence of a specific basis for relief in the plaintiff's letter to the contracting officer, we cannot conclude that a CDA claim was pursued below.

### (iv.)   Lead-Based Paint

In contrast to the other delay issues, the extension necessitated by the discovery of LBP was addressed more formally by the parties.  Both parties recognized that the unanticipated presence of LBP on the monitor windows caused a period of delay for which Maropakis should not be responsible.  Accordingly, they negotiated a formal change in the terms of the contract terms – Maropakis submitted a proposal for abatement work and additional expenses, and the Navy approved a modification which

resulted in 14 days of additional work and an increase of over $6,000 in the contract price.  Def. App. 416-17.

Although the 14-day extension was calculated based upon Maropakis's own proposal for the abatement project, the contractor ultimately refused to sign the modification.  Apparently Maropakis wanted to seize this opportunity to raise a number of its other delay matters which were completely unrelated to the abatement procedures.  Def. App. 419 (Rosenberry memo to file); *see also* Def. App. 420-21 (contract modification with handwritten exceptions).  Maropakis proposed a year extension to account for all of the delays it had encountered.  Objection to Modification, dated June 30, 2000 at Def. App. 422 (request to extend contract completion date 365 days from January 16, 2000 to January 16, 2001).

Maropakis later honed its LBP delay request.  Plaintiff's July 10, 2000, correspondence to the contracting officer requested an extension of 122 calendar days in dealing with the LBP issue -- as the plaintiff explained, the extension represented not just the 14 days of additional work, but also accounted for the period beginning on March 7, 2000, when it claims to have been prepared to begin the window removal, and ending June 22, when the company was cleared to begin window removal and replacement.  Def. App. 425-26.

One year later, the LBP delay issue reemerged – this time reflected as 107 days, apparently accounting for the 14-day extension allowed – as part of the omnibus 447-day extension request of August 20, 2001.  Def. App. 371-74.  It is this request which the plaintiff maintains as its formal claim for CDA purposes.

The contracting officer denied the extension on the basis that Maropakis "did not have the appropriate materials onsite to start work until June 2000."  Def. App. at 369.  Consequently, the period from March 7 through May 31, when delivery of the windows was made, was attributed to the plaintiff.  *Id.*  The math does not work out neatly here.  And there is some question as to when the windows *could have been delivered* were it not for the stop work directive.  Even the defendant acknowledges that were the LBP delay claim to survive the Rule 12 motion, the precise time lost as a result of this delay should be determined at trial, rather than on summary judgment.  However, even here the plaintiff has failed to perfect its claim.  Therefore, we decline to consider whether the additional 107-day extension is justified for the time plaintiff awaited the government's direction to proceed with the window removal project.

Our conclusions are buttressed by the fact that Maropakis never intended to pursue its complaints at the contracting officer level until confronted with the immediate threat of liability.  A closer look at the core documents -- the August 2001 extension request and the July 2002 response to the assessment of liquidated damages – is necessary to put the actions of the parties in context.

<u>August 20, 2001 Letter is not a CDA Claim</u>

The defendant argues that Maropakis's August 20 letter, which was the first all-encompassing request with periods of delay differentiated and spelled out, cannot be considered a claim under the CDA. According to the government, this letter did not demand a sum certain, did not request a final decision of the contracting officer, and was not certified under 41 U.S.C. § 605(c)(1). *See* Defendant's Reply (Def. Reply) at 5.

The letter has a number of attributes which belie its proposed status as a CDA demand. First, it was not addressed to the contracting officer. *But see Tri-Ad Constructors v. United States*, 21 Cl. Ct. 789, 791-92 (1990) (Contractor satisfied CDA § 605(a) despite the fact that its letter was addressed to OIC supervising contract work as opposed to the contracting officer, where letter expressly "commits the claim to the contracting officer for a final decision"). Nor, in the case of some of the requests, did it make a specific claim or establish an entitlement to relief. Moreover, the letter opens:

> We hereby request an extension of contract time on the above contract from January 16, 2000 to April 17, 2001, a total of 447 consecutive calendar days. This application for an extension of time is based on the following ...

Def. App. at 371. The plaintiff did not specifically request a final decision. *But see Transamerica Ins. Corp. v. United States*, 973 F.2d 1572, 1576 (Fed. Cir. 1992) ("[a]s long as what the contractor desires by its submissions is a final decision, that prong of the CDA claim test is met."), *overruled on other grounds* by *Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995). Nor did the contracting officer abandon the hope of resolving the dispute upon further substantiation of the delays. The government's August 28, 2001, response merely advised Maropakis that it had "not presented sufficient justification to warrant the time extension." Def. App. at 369. A letter inviting contractor comment is not a final decision upon which CDA jurisdiction can rest. *Sharman*, 2 F.3d at 1570; *see Greenhill Reforestation, Inc. v. United States*, 39 Fed. Cl. 683, 687 (1997) (finding contracting officer's letter was "no more than a tentative determination"). The lack of a final decision, alone, defeats jurisdiction, absent some evidence that the contractor treated the contracting officer's failure to render a final decision as a deemed denial. *See Ellett*, 93 F.3d at 1541-42 (jurisdiction under CDA requires *both* a valid claim *and* a final decision upon that claim) (emphasis added); *Case, Inc. v. United States*, 88 F.3d 1004, 1008-09 (Fed. Cir. 1996); *see also Paragon Energy Corp. v. United States*, 227 Ct. Cl. 176,177 (1981) (contracting officer's decision is "linchpin" for judicial review).

Under the totality of circumstances, we find that neither party treated the August 20 extension request – either the divisible delay periods or the entirety of the 447-day period – as a CDA claim. The advice that the contracting officer's letter did not

constitute a final decision, and the invitation to submit additional information supporting the request, illustrate that the plaintiff's letter did not have the force and effect of a contractor claim.  The long period of silence following the August 2001 exchange speaks volumes as to Maropakis's own disinterest in pursuing a formal claim within the meaning of the CDA.  It is obvious, based on the inaction of the parties, that no final decision had been sought at that time.  *See* 41 U.S.C. § 605(c)(2) (within 60 days of receiving certified claim, the contracting officer shall either issue a decision or "notify the contractor of the time within which a decision will be issued").

When it was clear from the plaintiff's silence that it did not intend to pursue the extension request – almost a year after the plaintiff's application for an extension had been denied -- the contracting officer finally initiated the matter of liquidated damages. He gave the plaintiff a thirty-day period prior to issuance of a final decision.  *See* Demand Letter, dated July 18, 2002, Def. App. at 367 ("To date you have not responded with additional information or requested a Contracting Officers (sic) final decision for these matters.").

Maropakis's July 22, 2002 Letter is not a CDA Claim

On July 22, 2002, the plaintiff responded to the July 18 demand letter.  It finally argued that Maropakis was not responsible for the delays and that it "will dispute" the liquidated damages.  Def. App. 802.  In the letter, the plaintiff raises only the previously denied 107-day time extension caused by the LBP work stoppage.  *Id.*  Yet the plaintiff still did not provide additional documentation or request a final decision on the previous 447-day extension request.  There was no mention in this letter of the delay in procuring windows, claims respecting defective specifications, objections to the sequence of performance, or delay associated with the delivery of asphalt roofing materials. Maropakis also did not raise the 101-day extension for delay in locating a sheet metal manufacturer.  This and the other items of alleged Government-caused delay, originally included in the 447-day request of August 20, 2001, were dropped from the plaintiff's grounds for extended performance time.  As the Government argues, "[t]hese inconsistencies demonstrate that the [plaintiff's correspondence] does not constitute a claim for a final decision for a sum certain pursuant to the requirements of the CDA." Def. Suppl. at 4.

We are compelled to agree with the government.  The status of the earlier delay requests, which had all been previously addressed a year earlier and never followed up on by Maropakis, is unclear in July 2002.  At best, a generous reading of the July 22, 2002, correspondence can be interpreted as Maropakis's request for a final decision on the government's liquidated damages assessment.

The plaintiff contends that its earlier extension requests were disposed of by the contracting officer's December 20, 2002, final decision on liquidated damages. Plaintiff's Response (Pl. Resp.) at 2.  However, the final decision letter mentions neither previous delay requests nor the plaintiff's August 2001 correspondence.  Def. App. at

365-66.  The final decision does mention "information presented at the 31 October 2002 meeting."  As we indicated earlier, we do not know the agenda for this meeting.

Mr. Rosenberry's log makes reference to a proposed meeting "to discuss [Maropakis's] request for an extension."  This log entry is dated April 10, 2001, long before the liquidated damages demand.  *See* Def. App. at 395.  In any event, to the extent this meeting in October 2002 was the plaintiff's attempt to submit additional evidence to bolster its extension requests, it only lends further support to the government's argument that the earlier requests had not matured into formal claims for final agency action.  *See e.g., Sun Eagle*, 23 Cl. Ct. at 472 ("[I]t would be inconsistent to find that plaintiff impliedly requested a final decision when it expressly requested a meeting to discuss the situation.").  Maropakis's August 2001 and July 2002 letters were not contractor claims.  Nor was the Navy's denial of any requested extension a final decision within the meaning of the CDA.  Consequently, with the exception of the liquidated damages issue, there is no jurisdiction over the plaintiff's claims.  *England v. The Swanson Group, Inc.*, 353 F.3d 1375, 1379 (2004) (holding the statutory provisions of CDA require that contractor's claim was presented to the contracting officer *and* that contracting officer rendered a final decision on the claim) (citations omitted).

Certification Requirement for "Set Off" Claims

Both the 2001 and 2002 letters fall short of a formal claim in yet another respect – the absence of a certification.  Pursuant to the CDA, contractor claims in excess of $100,000 must be certified, as follows:

> [T]he contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor.

41 U.S.C. § 605(c)(1); *see Tecom, Inc. v. United States*, 732 F.2d 935, 937 (Fed. Cir. 1984) (applying former $50,000 threshold).

To date, the plaintiff has not submitted a certified claim with respect to its assignment of responsibility for delay or to its entitlement to the contract balance.  In defense of its failure to certify its claim, the plaintiff argues that it did not with its August 2001 letter "request additional compensation for delay, extra work, additional work, differing site conditions, or any other basis."  Plaintiff's Supplemental Brief (Pl. Suppl.) at 1.  Maropakis did not directly request compensation; it simply requested that the contract completion date be adjusted by 447 days.

Plaintiff also contends the subsequent July 2002 correspondence justifying the delay in performance also did not trigger the CDA's certification requirement.  During

oral argument Maropakis implied that the extension requests were no longer contractor claims at that point but challenges to the Navy's liquidated damages claim.

Stymied by the contortionist nature of the plaintiff's arguments, the Court asked counsel for Maropakis to provide authority in support of the argument that the CDA's claim requirements do not apply when those claims arise in the context of a government claim for liquidated damages.  In its supplemental papers, the plaintiff cited two familiar cases.  Maropakis relied primarily on *Placeway Constr. v. United States*, 18 Cl. Ct. 159 (1989), *aff'd in part* 920 F.2d 903 (Fed. Cir. 1990).  According to the plaintiff, this case held that "the set off of a contract balance against the amount of liquidated damages is a government claim, and therefore certification is not required."  Pl. Suppl. at 3 (citing the trial court opinion, *Placeway*, 18 Cl. Ct. at 164).  For further support, the plaintiff points to *Roxco, Ltd. v. United States*, 77 Fed. Cl. 138 (2007), a case in which this Court purportedly applied this tenet.  *Id.*

We fail to see how the *Placeway* decision supports the plaintiff's arguments.  In that case, the Court of Appeals confirmed that a set off against the balance due for liquidated damages is a government claim.  *Placeway v. United States*, 920 F.2d 903, 906 (Fed. Cir. 1990).  The Court further held that the certification requirement does not apply to *government* claims, although such claims do require a final decision of the contracting officer.  *Id.* at 906-07.  The Federal Circuit held that the government's denial of the plaintiff's contract balance, "determine[d] both liability and damages" and, therefore, constituted a final decision on that governmental claim.  *Id.* at 907.  Finally, the Court found that the determination to withhold the balance as liquidated damages was a final decision notwithstanding the fact that the contracting officer reserved the authority to redetermine the amount of the setoff claimed based upon the receipt of additional information on the actual costs incurred by the government.  *Id.* In sum, *Placeway* dealt strictly with the CDA's requirements for the government's assessment of liquidated damages.  *See Kit-San-Azusa v. United States*, 86 F.3d 1175 (Fed. Cir. 1996) (unpub.) at *2 (interpreting *Placeway* decision).

This decision has no bearing on the CDA's requirements for *contractor* claims.  In fact, the Claims Court considered the very issue raised by the plaintiff in this case and interpreted the Federal Circuit's guidance in *Placeway*.  In *Sun Eagle Corp. v. United States*, 23 Cl. Ct. 465 (1991), the Court thoroughly addressed the CDA's requirements, in particular, the certification requirement, and concluded:

> *Placeway* held that a contractor's challenge to a government claim need not be certified.  This court holds that the plaintiff is challenging a government claim to liquidated damages and making its own contractor claim to recover amounts withheld for liquidated damages.  The latter must be certified.

*Id.* at 477.

According to its own theory, Maropakis had already pursued the claims underlying its appeal of the imposition of liquidated damages.  There was just no dollar figure associated with the claims until the Navy threatened to withhold the balance of the contract and seek additional payments.  This is the precise situation addressed in *Sun Eagle*, where the Court found that the contractor was "seeking an adjustment of contract terms or monetary relief because it defends against the assessment of liquidated damages on the basis that the Army caused the delay." *Id.* at 482.  Irrespective of its impetus, "[t]he claim is a claim by the contractor ... [and] must be certified, as required by 41 U.S.C. § 605(c)." *Id.*; *see also Elgin Builders, Inc. v. United States*, 10 Cl. Ct. 40, 44 (1986) ("Where ... contractor seeks to contest the assessment of liquidated damages by claiming entitlement to time extensions or other relief, the court is presented with a claim by the contractor against the government and that must first be presented to the [contracting officer].").

The plaintiff's reliance on *Roxco* is similarly misplaced.  That case involved issues of timeliness and waiver pertaining to certain contractor claims.  In the initial summary judgment proceedings in that matter, the Court applied the *Fulford* Doctrine and permitted the contractor to challenge a default termination -- even though it had not appealed, nor had it intended to appeal, the termination initially -- upon being assessed excess reprocurement costs by the government. *Roxco, Ltd. v. United States*, 60 Fed. Cl. 39, 46–47 (2004).  That doctrine has no application in the present matter.

A subsequent decision in that same matter is cited by the plaintiff for the proposition that "the imposition of liquidated damages was a government claim, and .. the Court has jurisdiction over a contractor challenge to a set off even though not certified."  Pl. Suppl. at 3-4.  However, Maropakis fails to place *Roxco* in its proper context.  A close review of that decision indicates that it has only limited application to the issue at hand.

In *Roxco*, the contractor had submitted a valid claim for equitable adjustment pursuant to the CDA, alleging defective documents, differing site conditions, and active interference by the government. *Roxco, Ltd. v. United States*, 77 Fed. Cl. 138, 140 (2007).  Therefore, the jurisdictional adequacy of the contractor's underlying claims was not at issue as it is in our case. *See id.* (The contracting officer "return[ed] Roxco's REA without action because Roxco failed to appeal the default termination within the time provided by the CDA.").  The challenged defect went only to the plaintiff's claim for the withheld contract balance – over $772,000 in liquidated damages that the government offset against the contract -- for which the contractor had not submitted a *separate* certified claim to the contracting officer. *Id.* at 144-45.  Applying the "rule in *Placeway*," the Court found that the plaintiff's request for the outstanding contract balance was an appeal of the government's liquidated damages claim, which resulted in a final decision adverse to the contractor.  The plaintiff's challenge to the government's claim thus met CDA prerequisites despite the absence of a separate timely submitted certified claim for the contract balance. *Id.* at 148-49.

The defendant has no objection, at least not one based on jurisdictional grounds, to Maropakis's appeal of the Navy's $303,550 assessment of liquidated damages. Therefore, we express no opinion on whether *Roxco* was a proper extension of the *Placeway* decision, and find no reason to consult the case further.  Accordingly, we reject the arguments presented by the plaintiff in its supplemental briefs.  We conclude that any CDA requirements that apply to the relief sought by Maropakis, still apply regardless of the fact that the same issues are subsequently raised in the context of a government counterclaim.

## II.  Cross-Motions for Summary Judgment

Standards for Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  RCFC 56(c).  A material fact is one that affects the outcome of the motion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In taking up motions for summary judgment, we view the evidence in the light most favorable to the nonmoving party, and draw all reasonable factual inferences in favor of the nonmoving party.  *Id.* at 255.

In order to meet its initial burden on summary judgment, a party may demonstrate "an absence of evidence to support [its opponent's] case."  *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed. Cir. 1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Plaintiff's failure of proof concerning an element essential to its case on which it will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the Defendant to summary judgment.  *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Celotex Corp.*, 477 U.S. at 323).

Procedural Posture of Motions

The parties' Rule 56 submissions are not true cross-motions.  As we have indicated, Maropakis requested summary judgment on only two claims:  (1) the claim that it is entitled to an extension due to the Navy's allegedly defective window specifications; and (2) the claim for an additional extension – beyond the 14 days already approved -- due to the presence of LBP with the duration of the extension determined at trial.  The defendant, on the other hand, requests summary judgment on: (1) its assessment of liquidated damages against the contractor; (2) the defective specifications claim; (3) the claim for an extension based on plaintiff's assertion that the Navy implicitly waived the non-asphalt materials requirement of the contract; and (4) plaintiff's claim that the Navy unreasonably declined Maropakis's request to alter the sequence of performance.

By virtue of our ruling on the government's motion to dismiss, it is unnecessary to render a decision on the plaintiff's motion or decide the majority of defendant's summary judgment grounds.  Since Maropakis's claims have not been properly presented to the contracting officer for a final decision, we do not comment upon their merits at this time.

The government's counterclaim, on the other hand, does satisfy the jurisdictional requirements of the CDA.  The Navy's demand for liquidated damages under the contract – and the plaintiff's objection to that demand -- resulted in a final decision by the contracting officer, and is properly before us.  *See* Def. Reply at 4 ("We do not dispute that this Court possesses jurisdiction to entertain Maropakis's appeal of the Navy's assessment of liquidated damages.").

<u>Plaintiff's Liability for Liquidated Damages</u>

According to the contract's terms, the contractor may only avoid liability for delayed performance by pointing to an approved extension.  *See* Contract, ¶ 1.4 (a) (incorporating FAR § 52.211-12) (" [i]f the Contractor fails to complete the work within the time period specified in the contract, *or any extension*, the Contractor shall pay to the Government as liquidated damages, the sum of $650 for each day of delay.") (emphasis added).  As the record now stands, with no jurisdiction to consider plaintiff's delay claims, Maropakis is entitled to no such extension.

In its response to the government's summary judgment motion, Maropakis raises no material disputes of fact with regard to the imposition of liquidated damages.  Nor does the plaintiff rely on its earlier unsuccessful attempts to persuade the Navy to extend the contract.  Instead, Maropakis challenges the legitimacy of the government's demand for liquidated damages, arguing that the damages imposed in this case constitute an unenforceable penalty.

As the U.S. Supreme Court has held, liquidated damages clauses are enforceable as a matter of law and, in fact, "serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable, as is the case in many government contracts."  *Priebe & Sons, Inc. v. United States*, 332 U.S. 407, 411-12 (1947).  Therefore, these provisions are upheld, provided they represent "fair and reasonable attempts to fix compensation for anticipated loss caused by breach of contract."  *Id.; see Safeco Credit & Fraley Assoc., Inc. v. United States*, 44 Fed. Cl. 406, 412 (1999) ("When the amount of damages is difficult to predict, a liquidated damages clause will generally be upheld unless the court determines that the parties must have intended a penalty rather than liquidated damages.") (citations omitted).

It is the plaintiff's burden to establish its defense that a liquidated damages provision is an *unenforceable* penalty.  *See DJ Manufacturing Corp. v. United States*, 33 Fed. Cl. 357, 359-60 (1995) (emphasis added).  Maropakis has neither alleged nor

proven any facts which show that the Navy's liquidated damages constituted a penalty, as opposed to a "reasonable forecast of just compensation" for the harm caused by the breach. *See Mega Construction Co. v. United States*, 29 Fed. Cl. 396, 502 (1993) (setting forth factors for determining whether liquidated damages clause is proper); *DJ Manufacturing*, 33 Fed. Cl. at 360 (Plaintiff did not provide sufficient evidence to demonstrate that the contracted for rate was an unreasonable forecast of the amount necessary to provide just compensation). The plaintiff supports its penalty defense solely on the assertion that the defendant had not been harmed, a factual contention for which it offers no evidence. Pl. Opp. 3; *see* First Am. Compl. at ¶ 51 ("Upon information and belief, the Navy did not incur additional costs justifying the imposition of liquidated damages."). In support of its position, Maropakis cites two decisions in which agency Boards of Contract Appeals declined to impose liquidated damages, finding that those particular provisions had been intended as a penalty and that there had been no anticipated damages in the event of delay. *See id.* at 3-4 (citing *Ford Constr. Co.*, AGBCA 241, 72-1 BCA ¶ 9275 and *Engineered Electric*, 84-2 ENGBCA ¶ 17,216).

Courts have universally held that a liquidated damages clause is not rendered unenforceable merely because actual damages are not equal to the contractual liability incurred as a result of the breach. *See Priebe & Sons*, 332 U.S. at 412; *Fred A. Arnold, Inc. v. United States*, 18 Cl. Ct. 1, 14 (1989); *Cegers v. United States*, 7 Cl. Ct. 615, 620 (1985). Consequently, the plaintiff's maxim that there can be no liquidated damages unless actual damages are incurred is erroneous. On the contrary, these clauses "are to be judged as of the time of making the contract," not in the aftermath of the plaintiff's breach. *Jennie-O Foods, Inc. v. United States*, 217 Ct. Cl. 314, 334 (1978) (Government need only show "that the damages claimed were reasonably anticipated when the contract was formed") (quoting *Priebe & Sons*, 332 U.S. at 411-12); *see Fred A. Arnold*, 18 Cl. Ct. at 14). Liquidated damages have been enforced against a contractor even where no actual damages were sustained by the government. *See Skip Kirchdorfer, Inc. v. United States*, 229 Ct. Cl. 560, 567 (1981).

One of the factors compelling the parties to enter into an agreement with a liquidated damages clause is that the extent of harm to the nonbreaching party cannot be known at the time the parties enter into the contract. *See Mega Constr.*, 29 Fed. Cl. at 502-03 (liquidated damages enforced where harm "is incapable or nearly incapable of accurate estimation"). This is particularly true in the construction contract context, and directly relevant to cases of excessive delay in performance. Here, the construction project involved a warehouse used by the Defense Logistics Agency "to store supplies, which it shipped out in response to orders." Def. Reply at 10; Def. App. 707. At the time the parties entered into the contract, it would have been difficult to determine the amount of damages that would be caused by a contract breach, particularly for a project that included the replacement of the warehouse's windows and roof. *Id.*

Liquidated damages are the parties attempt to "reasonabl[y] forecast" just compensation for the breach in advance. *Mega Constr.*, 29 Fed. Cl. at 502. If the government incurs damages greater than those stipulated in the contract, it is nevertheless bound to the agreed-upon rate. *Id.* at 503. The plaintiff now suggests that the $650/ day rate is a penalty and is unreasonable in light of the damage anticipated. The plaintiff expressed none of these concerns it now raises when bidding on the contract, despite the fact that the solicitation clearly spelled out the contractor's liability in the event it failed to perform within the contract period. Maropakis also did not raise an objection to the propriety of the liquidated damages clause, or the rate itself, when responding to the Navy's demand letter.

The contracting officer explained his rationale for incorporating the liquidated damages clause in the solicitation. His affidavit indicates that he followed the Defense Federal Acquisition Regulations, the FAR and the Navy Contracting Manual, NAVFAC P-68, in setting the liquidated damages rate. Def. App. 451-52. There is nothing improper in using such regulatory guidelines and standardized rates to anticipate potential damages. *See Young Assoc. Inc. v. United States*, 200 Ct. Cl. 438, 445 (1973) (liquidated damage schedule need not be "tailor-made for each individual contract"); *Cegers*, 7 Cl. Ct. at 619, n.6. In fact, this Court has held that "[t]he government is entitled to the presumption that damages assessed in accordance with the NAVFAC P-68 are reasonable." *Safeco*, 44 Fed. Cl. at 412 (citing *P&D Contractors, Inc. v. United States*, 25 Cl. Ct. 237, 240 (1992)).

The entire penalty defense issue was given spare treatment – a mere nine lines of argument – in Maropakis's opposition to summary judgment. *See* Pl. Opp. at 3-4. The plaintiff elaborated slightly on its argument in its supplemental brief following oral argument. However, that portion of the plaintiff's brief exceeded the scope of the Court's request for additional submissions and is out of order. *See* Special Procedures Order ¶ 10 (concerning reply briefs).

Maropakis would have us presume that the damages provision was unenforceable based on its unsupported allegation that the Navy suffered no economic harm as a result of a contract that was delayed over a year. This, despite the fact that the plaintiff submitted an unqualified bid accepting these terms. *See Jennie-O Foods*, 217 Ct. Cl. at 337 (Provision should be enforced "[w]here parties have by their contract agreed upon a liquidated damages clause as a reasonable forecast of just compensation ...".); *Mega Constr.*, 29 Fed. Cl. at 502 (Courts "look with candor upon provisions that are deliberately entered into between parties") (citations omitted) (citation omitted).

The plaintiff has failed to establish a material issue as to whether the government's liquidated damages provision was an unenforceable penalty. Accordingly, it has not met its burden in opposing the defendant's summary judgment

motion.  Based on the absence of evidence to support the plaintiff's case, we conclude that the liquidated damages provision of the contract is valid and enforceable under the FAR, and was properly applied in this case.

## CONCLUSION

The plaintiff has failed to establish that jurisdiction to consider its claims is proper under the CDA.  Having found that the plaintiff did not submit a valid certified claim for a final decision to the contracting officer, we hereby **GRANT the defendant's motion to dismiss, pursuant to RCFC 12 (b)(1).**

We further find that the government is entitled to judgment as a matter of law on its claim for liquidated damages.  Plaintiff is liable for the retained balance of the contract and an additional $59,514 in liquidated damages.  We have not considered the merits of the remaining grounds for summary judgment, either those asserted by the plaintiff or by the defendant.  **In accordance with RCFC 56 (c), the defendant's motion for summary judgment is GRANTED-IN-PART and DENIED-IN-PART. Furthermore, the plaintiff's motion for summary judgment is DENIED as moot, the Court having not considered its merits.**

**Accordingly, the Clerk is directed to DISMISS the First Amended Complaint and enter judgment in favor of the Defendant in the amount of $59,514.**

**IT IS SO ORDERED.**

  s/ Lawrence M. Baskir  
LAWRENCE M. BASKIR
Judge
